FRANKLIN,    SOUTHWICK, CANNON and WARREN *vs.* REUBEN MERRILL.
*Janury,*
1830.

The sum actually appearing to be due from the record of a judgement, and not the amount for which the judgement was rendered, is the " *debt or matter in demand,*" within the meaning of the statute defining the powers of justices of the peace ; and

Where a judgement had been rendered for more than one hundred dollars, and a payment had been made, and endorsed, which reduced the sum due to less than one hundred dollars,—it was held, in an action of debt brought on such judgement, that the county court had not jurisdiction of the action.

Where it appears on the trial of an action from the plaintiff's own showing, that his debt is not of sufficient amount to give the court jurisdiction, the cause will be dismissed on motion.

This was an action of *debt* on a judgement rendered by a justice of the peace, on the confession of the defendant, for $563,50, and there was endorsed on the record by the plaintiff's attorney $533,86. The suit was brought originally to the county court after the endorsement had been made. No mention was made in the declaration of the endorsement, but the judgement was declared on as though no payment had been made thereon. On trial there was no dispute respecting the correctness of the endorsement, but the only question was, whether the court had original jurisdiction of the action. The defendant filed a written motion praying that the suit might be dismissed for want of jurisdiction, and on this ground the court dismissed it. The parties afterwards agreed on a statement of facts, on which the case was removed to this Court for a final decision.

After argument,

PRENTISS, Ch. J., delivered the opinion of the Court.—It appears from the case agreed upon by the parties, that the plaintiffs declared in debt on a judgement for the sum of $563,50, but the record produced by them on the trial shewed an acknowledgement of satisfaction for the sum of $533,86, leaving due on the judgement the sum of $87,69, including interest. The court below dismissed the action, on the ground that the plaintiff's demand was within the jurisdiction of a justice of the peace, and, consequently, not within the original jurisdiction of that court.

Every justice of the peace is authorized and empowered to hear, try, and determine all pleas and actions of a civil nature, other than certain actions particularly specified, where the *debt*, or other *matter in demand*, does not exceed the sum of one hundred dollars ; and in all such cases, the county court has appellate jurisdiction only.—( *Comp. Stat. p.* 139–91.) The question in the case before us, therefore, is, whether the original amount of

FRANKLIN,
January,
1830.

Southwick etal.
vs.
Merrill.

the judgement declared upon, or the sum appearing from the record to be due upon it was the *debt* or *matter in demand*, within the meaning of the statute; and we are all of opinion, that the balance, which thus appeared to be due from the plaintiffs' own showing, must be regarded as the debt or matter in demand. It is certain that the sum due on the judgement was the real debt, and all that could be recovered in any form. Though by the modern decisions, a less sum may be recovered than is demanded in the declaration, in an action of debt on judgement, as well as on simple contract, and it is not necessary to demand the precise sum due, as required by the old law, yet, as the plaintiffs might have declared for the balance of the judgement only, the right of jurisdiction in the court below did not depend on the manner in which the declaration was framed in this respect, but upon the sum which appeared from the record to be due. Where payment in part satisfaction of a judgement is set up by the defendant, and does not appear from the record, as the payment in such case may be a matter of dispute, and the plaintiff has a right to contest it, the jurisdiction of the court will not be affected although the plaintiff's demand may be reduced thereby to one hundred dollars or less.

*See 599 N.G.*

Where the want of jurisdiction appears from the face of the writ, the defendant may avail himself of the objection by plea; but where from the writ the court, *prima facie*, has jurisdiction, but it appears on trial, from the plaintiff's own showing, that his debt or demand is not of sufficient amount to give the court jurisdiction, the course is to dismiss the action on motion. Such has always been the practice; and if it did not prevail, it would be in the power of the plaintiff to give the court jurisdiction, in evasion of the statutes, in any case, by merely declaring for or demanding a sum exceeding one hundred dollars. In actions of tort, where the damages are uncertain, and rest in the discretion of the jury, the damages demanded must be the criterion of jurisdiction. In actions on penal bonds, as the penalty is the debt at law, and judgement is regularly to be entered up for that, the question of jurisdiction must be determined by the amount of the penalty, without regard to the damages which the plaintiff may be entitled to recover on the breaches assigned. And, indeed, in all cases where by the rules of pleading, the plaintiff, in the form of action he adopts, is bound to declare for the original amount of his claim, and cannot demand in debt or damages, according to the nature of

FRANKLIN, his action, less, it is immaterial, as it respects the question of ju-
January
1830.    risdiction, what is the sum actually due.

Southwick et al.                                    Judgement affirmed,
    vs.        *Royce* and *Hunt*, for plaintiffs.
Merrill.     *H. E. Hubbell*, for defendant.

---

FRANKLIN,                    JAMES FOSTER *vs.* JOHN STEARNS.
January,
1830.

> Where an action was brought before a justice of the peace on a small note due from
> the defendant to the plaintiff, also for money had and received, and for money paid,
> and the defendant not appearing, judgement was rendered against him by default;
> and the plaintiff, without introducing any evidence in support of the common counts,
> caused to be included in the damages, in addition to the note mentioned in the dec-
> laration, the amount of a note, not negotiable, executed by the defendant to a third
> person,—it was held that the judgement could not be set aside by *audita querela.*

This was an *audita querela* brought to vacate a judge-
ment rendered by a justice of the peace in favor of *John Stearns*
vs. *James Foster.*

The declaration stated, that *Stearns* commenced an action
against *Foster* before a justice of the peace, declaring on a note
executed by *Foster* to *Stearns* for $2,50, and payable on de-
mand, also for money paid, laid out and expended, and for mon-
ey had and received, concluding to the damage of the plaintiff
twenty dollars; that *Foster* did not appear at the return day of
the writ to answer to the action, but suffered a judgement to be
rendered against him by default; that the said justice of the peace
did not at the time of the default, nor at any other time, assess
and make up the damages in the case, but delivered the judge-
ment files to *Stearns'* attorney, who made out, and entered upon
the writ, the damages in the action; that no witnesses were call-
ed, nor any evidence offered, at the time of the default, nor at any
other time, in support of the counts for money had and received,
and for money paid, nor to prove to the said justice that *Stearns*
had paid, laid out, or expended any money for *Foster,* or that
*Foster* had received any money for *Stearns*, and that no attempt
was made to prove any debt, duty or liability against *Foster*, oth-
er than the note mentioned in the declaration; that *Stearns* had
fraudulently and deceitfully, and without the knowledge or consent
of *Foster*, procured to be included in the damages, in addition
to the small note aforesaid, a note, not negotiable, executed by
said *Foster* to a third person, for eight dollars, making in the
whole the sum of $11,19, as damages; that the justice did
not examine how said damages were made up, but issued

FRANKLIN,
January,
1830.

Foster
vs.
Stearns.

an execution therefor, on the application of *Stearns*, and that *Foster*, had been, by virtue thereof, committed to prison. The complaint concluded by praying that said judgement might be set aside, and that the complainant might be allowed a day in court to be heard in the premises.

The defendant demurred to the complaint, but the county court overruled the demurrer, and decided in favor of the plaintiff. The case was reserved for the opinion of this Court.

After argument,

PRENTISS, Ch. J., delivered the opinion of the Court.—The ground of the plaintiff's complaint is, that the judgement, rendered against him in the original action, included the amount of a note, executed by him to one Peleg Stearns, for the sum of eight dollars, payable in grain, which, he alleges, was neither due from him, nor recoverable in the action. The action, it appears, contained a count upon a small note, given by the plaintiff to the defendant, and also counts for money had and received, and money paid, laid out and expended ; and as the plaintiff had legal notice of the suit, it must be taken that he had time and opportunity to make defence against every claim which might properly be recoverable under either of the counts. When a party has had a legal opportunity of defence, or the injury of which he complains is to be attributed to his own neglect, he cannot be relieved by an *audita querela*—(*Staniford* vs. *Barry*, 1 *Aik. Rep.* 321.) Although the note given to Stearns would not, of itself, be any evidence under either count in the suit, yet if it was accompanied with proof that the defendant paid and took up the note at the request of the plaintiff, the amount of it might have been properly recoverable under the count for money paid and advanced. We must suppose that some proof was given, in connection with the note, or the amount of it would not have been included in the judgement ; but whether any, or what proof was given, cannot be a subject of inquiry in this action. If sufficient proof might have been given, or the defendant, under any supposable state of facts, might have been entitled to recover the amount of the note, under either of the counts in the suit, we must presume the judgement to be right.

The allegation, that no evidence was given to support the count for money had and received, or for money paid, laid out and expended, and that the defendant fraudulently procured the amount of the note to be included in the judgement, can have no effect,

<div style="margin-left:auto">

FRANLLIN,
January,
1830.

Foster
vs.
Stearns

</div>

inasmuch as the judgement must be taken to be the judicial act of the justice who rendered it, and no inquiry can be had, on this process, into the grounds or merits of it, or whether it was rendered upon sufficient or insufficient evidence. The substance of the complaint is not that the defendant might not have recovered in the action, on proper and sufficient evidence, all that was included in the judgement, but that he recovered without evidence, or on insufficient evidence, more than he was entitled to. In the case of *Dodge* vs. *Hubbell*, 1 *Vt.Rep.* 491, the complaint was, that the damages in the judgement sought to be relieved against, were assessed, in an action of trespass on default, without evidence, and were excessive ; and it was held to be no ground for an *audita querela*. The doctrine of that case is, that where a party, competent to defend his rights, has had an opportunity to do it, and the judgement against him, is rendered by a court of competent authority, this process does not lie to overhaul its merits, and correct an error in the assessment of damages, or any other alleged error or injustice in the judgement. The act of 1829, authorizing a petition to the county court, furnishes a remedy, by which relief may be obtained against the judgement of a justice rendered on default, in many cases of wrong and injustice, where by the rules of law an *audita querela* will not lie.

<div style="margin-left:auto">

Judgement of the county court reversed,
and judgement entered for the defendant.

</div>

*Read*, for plaintiff.
*Royce and Hunt*, for defendant.

<div style="margin-left:auto">

GRAND-ISLE,
January
1830.

</div>

EPHRAIM BEARDSLEY *vs.* ALEXANDER GORDON'S administrator.

When a cause has been removed into the Supreme Court and decided on a bill of exceptions, a petition for a new trial will not be sustained, if the grounds for the application are the same which were raised and decided on the exceptions.

This was a petition for a new trial complaining of error in this Court in affirming a judgement of the county court in the case of *Gordon's administrator* vs. *Beardsley*. The original cause had been tried in the county court at its September term, 1827, when a verdict was returned for the plaintiff. *Beardsley*, the (then) defendant, filed a bill of exceptions, which being allowed by the court, the cause was thereupon removed to this Court, and, at the January term, 1828, the judgement of the county court was affirmed.—(See 1 *Vt. Rep.* 151.) *Beardsley*, at a subsequent term, presented his petition for a new trial, alleging for causes the

same matters which had been urged and decided on the excep-
tions.   And now at this term the counsel for the petitionee filed a
motion praying that the petition be dismissed, on the ground that
the parties were concluded by the judgement which had been
rendered in said cause, and because the petition did not allege any
matter which had not been decided on said bill of exceptions.

GRAND-ISLE,
*January,*
1830.

Beardsley
*vs.*
Gordon's adm.

PRENTISS, Ch. J., delivered the opinion of the Court.—The
action, in which the petitioner prays for a new trial, was removed,
after verdict and judgement against him in the county court, into
this Court on exceptions, and the judgement of the county court
was here affirmed.   The causes assigned in the petition are the
same which were heard and decided by this Court on the excep-
tions.

The statute, on which this application is founded, authorizes the
court to grant new trials, on petition, after judgement, *according to
the usages of law.—( Comp. Stat. p.* 88, *s.* 1.)    It cannot be
contended, that it is according to the usages of law, to grant a
new trial on the same merits on which an application for a new
trial has already been made and refused, or where the same ques-
tions have been discussed and decided on exceptions.    No pre-
cedent can be found to justify a practice so anomalous, and so di-
rectly leading to delay, confusion, and uncertainty.   Though a
writ of error *coram nobis* will lie for error *in fact,* it is a salutary
and well settled rule, that it does not lie for error *in law.*   The
petition in the present case is in the nature of a writ of error, and
the object of it is, in effect, to re-examine and reverse a decision
made by this Court on matters of law presented by exceptions.
If we would not sustain a writ of error on a matter of law deci-
ded by this Court, we ought not, surely, to sustain this petition.
The reason why a writ of error *coram nobis* will not lie for error
in law, is, because the matter of law in the case has once been
solemnly determined by the court, and it is unfit that it should be
open to further discussion.   The same reason exists in all its force
against a petition for a new trial, where the very questions presen-
ted by it have already received the judgement of the Court,
in the same cause, on exceptions. If the party, in such case, is not pre-
cluded by the former judgement, it is not easy to see when there
would be an end of litigation. A decision on a motion or petition for a
new trial, must be a bar to a second application grounded on the
same matters ;  and when a cause has been removed into this
Court and decided on exceptions, if an application for a new trial

GRAND-ISLE,
January,
1830.

can be sustained, it must be on some new matter, not raised and decided on the exceptions.

Beardsley
vs.
Gordon's adm.

Petition dismissed.

*Smalley & Adams,* for petitioner.
*C. Adams,* for petitionee.

ADDISON,
January,
1830.

### SAMUEL FARRAND vs. GEORGE A. GAGE.

F delivered G certain promissory notes against a third person to be collected and applied on sundry executions against F which G, as constable, held in his hands. G received payment on the notes, but made no application of them on the executions. F afterwards sued G in an action on book account, and, among other items, properly chargeable on book, he claimed the amount of the notes so delivered to G, and G also claimed to be allowed the amount of the executions against F.—It was held that the notes were not proper items of book charge ; but, that, as G had brought the executions into the account, and insisted on them as a claim against F, he thereby made the notes, or the amount received by him upon them, a proper matter of adjustment in the settlement of the accounts.

This case came before the Court on a report of auditors in an action on *book account.* It appeared by the report that the plaintiff's account consisted of sundry items, and amongst them were charged two promissory notes against one Wines, which were delivered by the plaintiff to the defendant to be collected and applied in satisfaction of sundry executions against the plaintiff, which the defendant, as constable, held in his hands, and also of other charges which the defendant might have against the plaintiff. The notes were made payable at a future day in labour, at $18 per month. The defendant had received the amount of the two notes of Wines, and had paid to the execution creditors the amount due on the several executions. The defendant's account consisted, amongst other things, of the several executions before mentioned, which he claimed to have allowed him by the auditors. The defendant objected to the charges of the notes on the ground, that, from the understanding, and manner they were received by him, they could not be properly charged on book. But the objection was overruled by the auditors, and the notes were allowed. The amount due on the several executions was also allowed to the defendant, leaving a balance due to the plaintiff of sixty dollars.

The defendant filed objections to the acceptance of the report ; but the only one insisted on in argument was, that the notes were improperly allowed, they not being proper items of book charge, and that, at the time of the delivery of said notes to the defendant, no certain debt accrued for which the defendant was liable to the plaintiff. The county court accepted the report,

and rendered judgement thereon.   The defendant excepted to the decision, and the case was reserved for the opinion of this Court.

ADDISON,
January,
1830,

Farrand
ve.
Gage.

*The defendant's counsel* cited 1 *Sw. Dig*, 582, 583, and *Slasson* vs. *Davis et al.* 1 *Aik. Rep.* 74.

*The plaintiff's counsel* cited *Barlow* vs. *Butler*, 1 *Vt. Rep.* 146.

PRENTISS, Ch. J., delivered the opinion of the Court.—The exception, founded upon the allowance of the notes charged in the plaintiff's account, which is the only exception relied upon by the defendant, might have been available, if it had not appeared that the defendant, on his part, introduced and claimed charges, connected with the notes, in a way, which rendered it proper that the notes should be considered and allowed by the auditors. The plaintiff's account, it appears, consisted of the notes, and various other articles admitted to be properly chargeable on book ; and the defendant's account consisted, amongst other things, of several executions, which the defendant, as an officer, held, in favor of different creditors against the plaintiff, to collect.    The notes charged in the plaintiff's account were delivered by him to the defendant to be collected and applied in satisfaction of the executions presented and claimed by the defendant ; and the defendant had collected and received payment of the notes, but had not applied them on the executions.    The auditors allowed the defendant the amount of the executions, and the plaintiff the amount of the notes.    If the defendant had not brought the executions into the account, he might with propriety have objected to the notes ; but having brought in the executions and insisted upon them as a claim against the plaintiff on book, he thereby made the notes, or the amount received by him upon them, a proper matter of adjustment in the settlement of the acounts.    The executions, no more than the notes, were proper items of book charge ; but if the defendant claimed, and the plaintiff consented, to have the executions adjusted with the other accounts, whatever the defendant had received in payment of, or to apply upon them, was of course to be considered and allowed in the adjustment.

It is said that the delivery of the notes to the defendant created no immediate debt against him, and that no article can be charged on book, unless the right to charge it existed at the time of the delivery.    This is undoubtedly the general rule, but the circum-

stances already mentioned render it inapplicable to this case.    The allowance of the notes, whatever may have been the form in which they were presented and allowed, is nothing more in substance than an application of them in payment and extinguishment of the claim for the executions.    It is true that the notes, as allowed, with the other payments made by the plaintiff, exceeded by a small sum the amount of the executions ; but as the notes were received by the defendant to be collected and applied in payment, not only of the executions, but also, as the report further states, of *other charges the defendant might have against the plaintiff*, the surplus was properly allowed against the defendant's other charges.

<div align="right">Judgement affirmed.</div>

*Phelps*, for plaintiff.
*Woodbridge & Hawley*, for defendant.

### JOSEPH FISHER *vs.* COMMISSIONERS OF JAIL DELIVERY.

Where it was certified on an execution, by virtue of which a prisoner was confined, that the judgement was recovered in an *action of trespass on the case*, and that the cause of action accrued from the wilful and malicious act of the prisoner, and it appeared from the record that the judgement was rendered in an action of *assumpsit*,—it was held that the certificate did not preclude the prisoner from the benefit of the oath prescribed for poor debtors, and that the act of 1823 did not extend to cases where the action in which the judgement is rendered is founded on contract.

In such case a writ of *mandamus* was granted against the jail commissioners commanding them to proceed and examine the prisoner as though no certificate had been made.

This was an application to the Court for a writ of *mandamus* against the commissioners of jail delivery of Addison county to direct them to issue notice, and to proceed and examine the petitioner, and if found to be a fit subject for the benefit of the act provided for poor debtors, to administer to him the oath in such cases prescribed. From the records which were produced it appeared, that at the term of the county court holden at Middlebury in June, 1829, one John Wood recovered a judgement against *Fisher*, the petitioner, for $719,65 damages, and for $83,82 cost.    The declaration was in *assumpsit* for money had and received ; but the court adjudged the cause of action to have been wilful and malicious.    An execution was afterwards issued in which it was certified that the "judgement was recovered in an action of trespass on the case, the cause of which, it is adjudged by said court, accrued from the wilful and malicious act of the said *Fisher*."    *Fisher* having been committed to jail on the execution,

he applied to the jail commissioners for the benefit of the acts provided for poor debtors. The commissioners refused to proceed, on the ground that they were prevented by the certificate. *Fisher* then made this application to the Court for a *mandamus.*

The commissioners having been cited to appear and show cause why a *mandamus* writ should not be granted, appeared at this term and showed for cause the certificate aforesaid.

After argument,

PRENTISS, Ch. J., delivered the opinion of the Court.—The prisoner's application to the jail commissioners to be admitted to the poor debtor's oath, and discharged from imprisonment, was refused by them, because it was certified upon the execution on which he was confined, that the judgement was rendered in an action of *trespass on the case,* the cause of which was adjudged to have accrued from the wilful and malicious act of the prisoner. From the record which has been produced, it appears, that the judgement was rendered in an action of *assumpsit,* the declaration being in a plea of the case in common form, for money had and received ; and the question is, whether, such being the nature of the action in which the recovery was had, the adjudication certified upon the execution can have any effect, in law, to preclude the prisoner from the benefit of the oath provided for poor debtors.

The act *relating to jails and jailers, and for the relief of persons imprisoned therein,* passed in 1797, provides, that any person imprisoned in jail upon execution, issued upon a judgement recovered in a proper action of *debt, covenant, contract,* or *promise,* shall be admitted to the liberties of the prison on giving bond, and, if poor, shall be discharged from imprisonment, on taking the oath in the act prescribed.—*( Comp. Stat. p.* 219, 220, *s.* 10, 12.) By a subsequent act, passed in 1823, it is further provided, that every person, imprisoned by virtue of any execution, issued upon a judgement, recovered in any action of *debt, detinue, replevin, ejectment, trespass* or *trespass on the case,* shall be entitled to all the benefits and privileges of the first mentioned act, unless the court, at the time of rendering the judgement, shall adjudge that the cause of action accrued from the *wilful and malicious act or neglect* of such person ; in which case he shall not be entitled to the liberties of the prison, or to the poor debtor's oath.—*( Comp. Stat. p.* 240, *s.* 1.) The right to the liberties of the prison and the poor debtor's oath, given by the act of 1797, is confined to cases where the judgement is rendered in an action

RR

ADDISON,
*January,*
1830,

Fisher
*vs*
Jail Com.

ADDISON,
January,
1830,

Fisher
ve.
Jail Com.

founded on contract. Though the act speaks of an action of *debt* in general terms, it speaks of it in connection with *covenant, contract,* or *promise,* and was never supposed to extend to the case where the judgement is rendered in an action for a penalty or forfeiture for an offence committed. If the act of 1823 is confined to cases where the judgement is rendered in an action founded on tort, and does not extend to cases where the judgement is rendered in an action founded on contract, and especially to the case where it is rendered in an action of *assumpsit,* it settles the question in this case in favor of the prisoner. Against this construction, and to bring the prisoner's case within the act, it is insisted, that an action of *assumpsit* is an action of *trespass on the case,* and, therefore, the case is within the very words of the act; and in aid of the argument urged, it is further said, that *debt* is one of the actions specified in the act, and that *debt* lies on contract. Though *trespass on the case,* in the extended sense in which it has been sometimes used, may comprehend *assumpsit,* it is usually, and especially in modern times, used to designate actions founded on tort only. Thus *Mr. Chitty* says, " though *assumpsit* may be termed an action on the case, as falling within the provision of the statute of Westminster, it is now usually called an action of *assumpsit*; and when the term *case* is adopted in a statute, or otherwise, an action as for a tort, and in form *ex delicto,* is usually intended, and not an action in form *ex contractu.*"—(1 *Chit. Pl.* 88.) With respect to *debt,* it is very clear that it must be understood in the act in a limited sense, and as restricted to an action in that form for a penalty or forfeiture imposed by statute. *Debt* and *trespass on the case* are enumerated in the act with *detinue, replevin, ejectment* and *trespass,* which are confessedly actions of tort; and though this circumstance might not of itself be decisive, yet taken in connection with the words which follow in the act, *wilful and malicious act or neglect,* it is sufficiently manifest that the several actions enumerated are all actions founded on tort. An adjudication, in an action of debt on judgement, on specialty, or on simple contract, that the cause of action accrued from the wilful and malicious act or neglect of the party, would be inconsistent and absurd; and it would seem to be equally inconsistent to make such an adjudication in an action of *assumpsit.* It is true that where money has been received tortiously, or goods have been wrongfully taken and afterwards converted into money, the party entitled may recover the money in an action of *assumpsit* for money had and received, the law implying a contract in his favor. But in such case the tort is waived,

Addison,
January,
1830.

Fisher
vs.
Jail Com.

and the action proceeds, not on the tort, but on the implied contract.—(*Lindon* vs. *Hooper*, *Cowp.* 414; 1 *Chit. Pl.* 90.) The argument, that where a recovery is had in such case, the case is as much within the reason and policy of the act of 1823, as if the recovery was had in an action of trespass or case founded on the tort, may be urged with equal force in the case where a recovery is had in an action of *covenant* for the commission of waste by a wilful destruction of buildings or timber; and yet *covenant* is not mentioned in the act, nor the case pretended to be within it. It was not the intention of the legislature to give the court power to deprive a party of the liberties of the prison and the poor debtor's oath, generally, and in all cases, where the cause of action may have originated out of a tortious act, without regard to the form of action adopted, but only in actions of a particular form, and where the action is brought and grounded directly on the tort. The power, without such limitation, might be dangerous, and liable to great abuse. When it appears from the form of the action that it is founded on contract, and not on tort, the act of 1823 does not apply; but where upon the face of the record, the cause of action arises *ex delicto*, and is for a tort, the question may arise whether it accrued from the wilful and malicious act or neglect of the party, and the court may adjudicate upon it.

By the act of 1797, the right to be admitted to the liberties of the prison, and to the poor debtor's oath, is expressly given to every person imprisoned on an execution, issued upon a judgement, recovered in an action on contract or promise; and as this act, as we have already seen, is not repealed or altered by the act of 1823, the right claimed by the prisoner is clear and perfect under that act. The act of 1823, instead of modifying or restricting the operation of the former act, enlarges the right to the liberties of the prison and the poor debtor's oath, by giving it in cases not provided for in the first act. The one gives it in cases where the recovery is had in an action founded on contract; the other gives it in cases where the judgement is rendered in an action founded on tort, but limits and qualifies the right so given, by authorizing the court, in such cases, to adjudge and certify that the cause of action accrued from the wilful and malicious act or neglect of the party. The power to adjudge and certify applies only in the cases to which the right is thus extended, and is given to qualify and limit the right so enlarged, but not to restrict or affect the right given in any case by the act of 1797. This is the just

ADDISON,
January,
1830.

Fisher
vs.
Jail Com.

and reasonable construction ; and if so, the adjudication, certified upon the execution in this case, is nugatory, and without any effect in law.   The action was *assumpsit*, and was grounded on a contract express or implied.   To hold that the act of 1823 extends to the case where a recovery is had in an action of *assumpsit*, or to any case except where the judgement is rendered in an action founded on tort, would not only be contrary to the intent of the act, but would be allowing to the courts a power, which might, especially when exercised by single magistrates, who have an extensive jurisdiction in this state, be productive of much injury and oppression.

Rule absolute.

*Doolittle*, for Fisher.
*Bates*, for jail commissioners.

## LUMAN CASE *vs.* MARVIN BERRY.

An action on *book account* will not lie to recover for the use and occupation of land ; but

Where there are mutual dealings and accounts between the parties, and on one side charges are made of articles, or services, delivered or rendered, and, intended to apply in payment of rent charged on the other, the accounts may be adjusted in that form of action.

This case came before the Court on objections filed to an auditor's report in an action on *book account*.   It appeared from the report that the plaintiff had charged in his account, among other things, ten dollars for the use and occupation of land, which he claimed to have allowed him with the other part of his account. The defendant presented no account whatever.

The auditor rejected the charge for rent, as not being a proper subject of book charge, and found nothing due to the plaintiff on the remaining part of his account.

The plaintiff objected to the report on the ground that the auditor erred in rejecting the claim for rent for the reason stated in the report, and contended that it was a proper charge on *book*, and legally cognizable by the auditor.

The county court accepted the report, and rendered judgement for the defendant.   The case was reserved for the opinion of this Court.

*Phelps, for the plaintiff.*—It was formerly held that assumpsit would not lie for use and occupation except upon an express promise ; but that in the latter case assumpsit would lie.   Perhaps

the same distinction would be taken with reference to the action on book. But certainly no reason exists why a charge for the rent of a tenement, or a piece of land, where the sum is agreed upon by the parties, may not be made on book. The general practice as to making such charges, where the lease is by parole, would render it proper that a recovery should be had in that form of action. But however the rule might be as to a single charge or claim of this nature standing alone, yet where there are other dealings between the parties, as in this case, and where there is good reason to presume that the claim for rent was intended by the parties to be settled in their running account, it seems necessary to sustain the charge on book in order to carry into effect the understanding of the parties.

*Needham, for the defendant,* cited *Hitchcock* vs. *Smith, Bray. Rep.* 39 ; 1 *Sw. Dig.* 582.

PRENTISS, Ch. J. pronounced the opinion of the Court.—That *assumpsit* lies here for rent or the use of land, where there is either an express or implied promise, is settled by the case of *Howard* vs. *Ransom,* 2 *Aik. Rep.* 252 ; but it by no means follows that an action on book account can be sustained for rent. Though the action on book is in many cases a concurrent remedy with *assumpsit,* and can be sustained only where assumpsit will lie, there are numerous cases in which it will not lie where *assumpsit* may be maintained. It has been decided in several instances in this state, that rent cannot be charged on book, and recovered in this form of action ; and policy does not require us, nor do we feel at all disposed, if we were at liberty so to do, to extend the action beyond the limits prescribed to it by former decisions. We do not mean to say, however, that rent or the use of land can under no circumstances be an admissible charge on book. The course of dealings between the parties may shew that it was intended to be a matter of account between them, and to be entered and adjusted on book ; as where there are mutual dealings and accounts, and on one side charges are made of articles or services, delivered or rendered, and intended to apply, in payment of rent charged on the other. But in the present case, there are no such circumstances to take the case out of the general rule. The defendant presented no account ; and it appeared that all the items in the plaintiff's account, except the rent, had been paid and satisfied.

<div align="center">Judgement affirmed.</div>

<div align="right">ADDISON,<br>*January,*<br>1830.<br><br>Case<br>*vs.*<br>Berry.</div>

IRA SEELY, GEORGE BUCHANAN, HOSEA WILLIAMS, STEPHEN
CALKINS, SENECA HITT, PELEG NICHOLS, and SAVID BARTLETT
*vs.* CHESTER SPENCER.

Where an execution creditor received from several of the debtors a part of the amount
due on the execution, and agreed to discharge them from any liability for the re-
mainder of the debt,—it was held, on *audita querela* brought by all the execution
debtors, to set aside the execution, that the receipt or agreement was not a dis-
charge of the complainants, and could not avail them as such.

This was an *audita querela,* brought to set aside an execution
issued on a judgement recovered against the plaintiffs by the de-
fendant for the sum of $2043,48. On the trial of the issue joined
upon the plea of *not guilty,* the plaintiffs offered and gave in ev-
idence a receipt signed by the defendant, acknowledging to have re-
ceived of *Hosea Williams, Stephen Calkins, Seneca Hitt, Peleg
Nichols* and *Savid Bartlett,* the sum of $713,40, to answer on
the execution, and agreeing that they should not be made liable
on that or an alias execution, but the above sum should be to them
a full and complete discharge on the execution. The plaintiffs
contended, and the county court decided, that the receipt was a
discharge of the persons named in it, and consequently a discharge
of the other judgement debtors, *George Buchanan,* and *Ira Seely,*
on the ground that a release of one joint debtor is a release of all.
The cause was removed into this Court on exceptions filed by the
defendant.

*The plaintiffs' counsel* cited *Tuckerman* vs. *Newhall,* 17 *Mass.*
581 ; *Ward* vs. *Johnson et al.* 13 do. 148 ; *Clayton* vs. *Kynas-
ton,* 2 *Salk.* 573 ; *Sw. Dig.* 301 ; *Cro. Eliz.* 621 ; *Bac. Ab.*
(*Release G.*)

PRENTISS, Ch. J., delivered the opinion of the Court.—It is
well established, that the payment of part of a debt is no satisfac-
tion of the remainder, although the creditor agrees to receive the
sum paid, and gives a receipt, in discharge of the whole demand.
In the case of *Fitch* vs. *Sutton,* 5 *East,* 232, Lord *Ellenborough*
says, " It cannot be pretended that a receipt of part only, though
expressed to be in full of all demands, must have the same operation
as a release : acceptance of a less cannot be a satisfaction in law of
a greater sum due : there must be some consideration for the re-
linquishment of the residue, otherwise the agreement is *nudum
pactum.*" If, however, upon the faith of such an agreement, a
third person be lured in to pay, or become surety for, a part of the
debt, on the ground that the party will be discharged from the re-
mainder, the agreement will be binding upon the creditor ; but un-

RUTLAND,
February,
1830.

Seely et al.
vs.
Spencer.

less the part payment is made under a general composition agreement, or is paid by a third person, or security given, the receipt of part of a demand, as a discharge of the whole, is no satisfaction of the debt.—*(Steinman* vs. *Magnus,* 11 *East,* 391 ; *Lewis* vs. *Jones,* 4 *Barn. and Cres.* 506.) From evidence of payment of a smaller sum, however, with an acknowledgement by the creditor, that it was in full of all demands, the jury may infer payment of the whole.—*(Henderson* vs. *Moore,* 5 *Cranch,* 11.) If the receipt given in evidence by the plaintiffs in this case, though for a less sum than the debt, had been expressed to be in full satisfaction of the execution, the presumption would have been, that the sum expressed in the receipt was the balance of the execution agreed upon by the parties, and it would have devolved upon the defendant to shew that the whole debt was not paid. But the sum paid was not expressed to be in full satisfaction, but to *answer* on the execution, importing that all was not paid, and rendering it manifest that it was not intended to discharge the whole. The import of the receipt is that the payment, though not in full, should discharge the debtors who made it, and that resort should be had to the other debtors for the residue of the debt.

If the receipt of part of a debt, in discharge of the whole, is not a satisfaction of the debt, it follows, that the agreement in the receipt, in this case, that the several debtors, from whom the part payment is acknowledged to have been received, should not be made further liable, but the sum paid should be to them a full and complete discharge, is not in law a discharge of the plaintiffs, and cannot avail them as such. Indeed, it has been expressly decided, that a payment by one of two joint debtors of a part of the debt, with an agreement not to call on him for the residue, or that he shall be discharged, is no bar to an action against both. In the case of *Harrison* vs. *Close et al.* (2 *John. Rep.* 448,) where the plaintiff agreed with one of two joint and several promisors of a note, that if he would pay a certain part of it, he would not call on him for the payment of the note, but would look to the other promisor for the residue, it was held, that the payment of a part, under the agreement, without a release by deed, was no discharge. And in *Rowley* vs. *Stoddard et al.* (7 *Johns. Rep.* 207.) it was determined, that a receipt in full, given to one of several debtors on his payment of part of the debt, was not a release in law, and could not avail as a discharge of the other debtor. On the authority of these and the English decisions, we held in the case of *Spencer* vs. *Williams et al.,* 2 *Vt. Rep.* 209, decided in this

RUTLAND,
February,
1830.

Seely et al.
vs.
Spencer.

county in 1828, that though a release to one of several joint contractors operates to discharge the others, it must be a technical release, under seal, in order to have that effect. If the sum paid upon the execution had been the ratable proportion of the several debtors who paid it, perhaps the agreement that they should be discharged, and be no further liable, might, under the circumstances, be enforced in equity, by enjoining all further proceedings on the execution as against them.

<div style="text-align:center">

Judgement reversed, and cause remanded to the county court for a new trial.

</div>

*Williams,* for plaintiff.

*Child & Bates,* for defendant.

———————————~~◉~~———————————

LEONARD JARVIS, appellee *vs.* JUSTUS ROGERS, administrator of EASTUS BARKER, appellant.

Where a note was executed and put into the hands of a third person, but was not to be delivered to the payee until certain conditions were performed,—it was held that no recovery could be had on the note though a suit be brought for the benefit of the holder who has an interest in the note : and that

Where one of the conditions, on which the delivery of the note depended, was, that certain suits should be instituted in the name of the payee for the benefit of the signers of the note, it was not a performance of the condition that the suits were commenced, but were ordered to be discontinued by the payee.

This was an appeal from the determination of commissioners. In the county court, to which the appeal was taken, the appellee declared upon a promissory note, dated May 21st, 1825, for the sum of $613, payable November 21st, 1826, executed by Jaazaniah Barrett, jun. and the intestate, jointly and severally, to the appellee. On the trial it appeared that the note was executed under the following circumstances. The appellee, having a demand against *Jonathan F. Barrett, William Hitt,* and *Bradford Barnes,* delivered it to *William G. Hunter,* an attorney, for collection, who instituted a suit upon it. The writ was put into the hands of *Chester Spencer,* an officer, who served it by attaching certain property as belonging to *Jonathan F. Barrett,* and made a return of *non est inventus* as to *Hitt* and *Barnes.* The property attached was receipted to *Spencer* by *Jaazaniah Barrett, jun.* and a judgement being recovered in the suit against *Jonathan F. Barrett,* and he committed to jail on the execution, *Spencer* commenced a suit on the receipt. The intestate claimed the property, which had been attached and receipted, as his, and commenced

RUTLAND,
February,
1830.

Jarvis
vs.
Barker's adm.

a suit against *Spencer* for taking it. While these suits were pending, and while *Jonathan F. Barrett* was in prison on the execution, *Spencer*, *Jaazaniah Barrett, jun.* and the intestate, entered into an arrangement, with a view to put an end to the suits between them, and secure the demand due to the appellee. *Jaazaniah Barrett, jun.* and the intestate executed the note declared upon, and at the same time an agreement was signed by them and *Spencer*, stating that the note was executed by *Barrett* and the intestate, and delivered to *Spencer*, on the following conditions : That Spencer should give up the receipt which he held against Jaazaniah Barrett, jun. ; that the note should not be delivered to the appellee, nor to Hunter, his attorney, nor be controuled by them, until an agreement should be made in writing, and forwarded to the intestate and Jaazaniah Barrett, jun., stipulating that the commitment of Jonathan F. Barrett should remain for their benefit ; and that suits should be commenced at the next term of the county court, in Rutland county, against William Hitt, and, in the county of Bennington, against Bradford Barnes, on the original demand. Hunter, the appellee's attorney, testified that Spencer offered him the note in payment of the original demand, which he *refused to receive*, and that he never authorized the taking of said note ; that he never made any stipulation or agreement, that the commitment of Jonathan F. Barrett should remain for the benefit of the intestate and Jaazaniah Barrett, jun. ; that he never commenced any suit against William Hitt and Bradford Barnes on the original demand after the judgement was obtained against Jonathan F. Barrett, nor authorized any such suit ; but that on being informed that suits had been commenced against Hitt and Barnes, he caused them to be stopped, they having been commenced without his knowledge or consent. The appellee then proved that Jonathan F. Barrett had sworn out of jail on the original demand, Feb. 4th, 1826, about nine months after he was committed. It appeared in evidence that a suit had been commenced against Hitt, returnable to the county court in Rutland county, June term, 1825, and another against Barnes, returnable to the county court in Bennington county. The one against Hitt was served, but not entered in court, and the one against Barnes was returned *non est inventus*. It was not contended but that these suits were commenced agreeably to said stipulation. The appellee conceded that the agreement stipulating that the commitment of Jonathan F. Barrett should remain for the benefit of the intestate and Jaazaniah Barrett, jun. was not procured ; and there

SS

Rutland,
February,
1830.

Jarvis
vs.
Barker's adm.
was no evidence offered that Spencer had ever given up the receipt, mentioned in the agreement, nor was there any objection made to the validity of the note on the ground that the receipt was not given up. The defendant contended that the conditions on which the note was to be delivered to the payee not having been complied with, it was void, and that Hunter having refused to receive the note, and having pursued the original claim and collected the money, and having refused to enter into the written stipulations, or to authorize the suits to be commenced, agreeably to the conditions of Spencer's agreement, that a suit could not be maintained in the name of *Jarvis* for the benefit of Spencer. The court decided that the suit could be sustained ; that the material part of the conditions having been complied with, the note was valid ; that Spencer having caused suits to be commenced, he had fulfilled his agreement in that particular, as he did not agree to prosecute them to final judgement ; that as Jonathan F. Barrett, swore out of jail, it was not material whether the intestate and Jaazaniah Barrett, jun. had the written stipulations or not. A judgement was accordingly rendered for the appellee to recover the amount of the note. The defendant's counsel filed exceptions, which being allowed, the cause was thereupon removed to this Court.

After argument,

Prentiss, Ch. J. pronounced the opinion of the Court.—Considering the claim upon the note in question as prosecuted for the benefit of the appellee, it is very clear that no recovery could be had upon it ; for Mr. Hunter, the appellee's attorney, expressly refused to accept or recognise the note. But it was insisted on the trial, that the claim might be prosecuted, and a recovery had upon the note, in the name of the appellee, for the benefit of *Spencer ;* and it appears that this was the ground upon which the decision of the court below proceeded. The exceptions state that *Spencer* was interested in the note, but how does not appear ; though, probably, it was in consequence of his supposed liability to the appellee for the property attached in the suit on the appellee's demand against *Barrett, Hitt,* and *Barnes.* In the written agreement, he claimed to act, not in his own right, but as agent of the appellee, and took the note payable to the appellee ; and *it is* at least questionable, whether, as the appellee, by his attorney, refused to accept the note, and disclaimed having any interest in it, *Spencer* could recover upon it, in the name of the appellee, for

his own benefit.    But admitting that *Spencer* might avail himself of the note, and prosecute a suit upon it for his benefit, yet to enable him to recover, he must shew a performance of the conditions on which the note was executed.    The payment of the note depended on the performance of certain things which were in the nature of conditions precedent, and without the performance of which the note was to have no operation or effect.    One of the conditions was, that a stipulation in writing should be made and delivered to the makers of the note, securing to them the benefit of the commitment and imprisonment of *Barrett* on the execution in favor of the appellee ; and until that was done, it was expressly agreed, that the note should not be delivered to the appellee, or his attorney, or be subject to their controul.    But evidence being given, that, nine or ten months after the note and agreement were made, *Barrett* was admitted to the poor debtor's oath, and discharged from imprisonment, the court below decided, that the condition had become immaterial, and proof of its performance was unnecessary.    Where the performance of a contract depends on some act to be done by the plaintiff, the doing of the act is a condition precedent, which, according to the general rule, must be strictly performed, and no inquiry can be had whether its performance would have been beneficial or not.    If the parties by their contract make it material, the court cannot dispense with it ; but a performance, or some excuse for the nonperformance, must be shown.    But we can readily see that the stipulation, agreed to be made and delivered, might have been beneficial to the makers of the note.    Before *Barrett's* discharge from imprisonment, it would have given to them the benefit of the execution against him, and they might, perhaps, have shewn, that he was not entitled to the poor debtor's oath, and thus secured to themselves a benefit from his commitment.

The condition, which required that suits should be commenced against *Hitt* and *Barnes* on the original demand of the appellee, the court below considered had been performed.    It is true, that proof was given that writs were sued out on the demand against *Hitt* and *Barnes*, but it was also proved, that Mr. Hunter, the appellee's attorney, not only refused to authorize the suits, but as soon as he learnt that they were commenced he ordered them to be discontinued.    The suing out of the writs, under these circumstances, cannot surely be considered a performance of the condition.    It must be taken that the parties intended the institution of suits which might be carried on and prosecuted by the ma-

RUTLAND,
*February,*
1830.

Jarvis
*vs.*
Barker's adm.

kers of the note for their benefit; and it would be unreasonable to hold, that unauthorized suits, which the appellee's attorney immediately discontinued, and would not suffer to go on, satisfied the condition.

> Judgement reversed, and cause remanded
> to the county court for a new trial.

*Child*, for plaintiff.

## ASA BARBER *vs.* PAUL CHASE.

When the court adjudge that the cause of action in a case arose from the wilful and malicious act or neglect of the defendant, with a view to preclude him from the benefit of the acts provided for poor debtors, a minute of such adjudication must be inserted in, or indorsed on, the execution; otherwise, the debtor, if committed, may be legally admitted to the oath prescribed for poor debtors.

Where a debtor, under such circumstances, was admitted to the poor debtor's oath, and afterwards went at large, and an action of escape was brought against the sheriff, who pleaded in bar the regular discharge of the debtor by the jail commissioners,— it was held, on demurrer to the plea, that it ought to have been averred in the declaration, *that the execution contained a minute of the adjudication "that the cause of action accrued from the wilful and malicious act or neglect of the prisoner"*; and for want of such an averment in the declaration, the plea in bar was held to be sufficient.

This was an action of escape against the sheriff of the county of Windham. The declaration stated that the plaintiff, at March term, 1824, of Windham county court, recovered a judgement against Paul W. Kimpton, for $40 damages, and $29,36 cost, in an *action of trespass on the case*, in which it was adjudged by the court, at the time of rendering judgement, that the cause of action in said case accrued from the wilful and malicious act of said Kimpton; that an alias execution was issued thereon in due form of law, dated 24th September, 1824, and was on the 28th day of the same month delivered to the defendant, who on the same day committed Kimpton to jail, and on the 13th day of December following suffered him to escape. The defendant pleaded in bar, that on the 12th day of November, 1824, after the commitment, and before the escape of Kimpton, the legislature passed an act for his relief, enacting " that, on his complying with the requisitions of " an act entitled 'an act relative to jails and jailers, and for the re- " lief of persons imprisoned therein, and the several acts in addi- " tion thereto,' shall be entitled to the oath and all the privileges " granted to poor debtors, notwithstanding the certificate made " on the execution, on which said Kimpton was imprisoned." The plea then set forth that Kimpton afterwards made application to the jail commissioners of Windham county, and that they there-

upon caused regular process to be served on the plaintiff, sum-
moning him to appear before them and show cause why said Kimp-
ton should not be admitted to the benefit of the acts provided for
poor debtors, and,that no cause being shown,they administered to
him the oath in such cases prescribed ; that the said commission-
ers certified their proceedings, and delivered a certificate thereof
to the said *Paul Chase*, then keeper of the jail, and also one to
the said Kimpton,as required by law ; that the said Kimpton, after-
wards, to wit, on the 13th day of December, 1824, departed from
the liberties of the jail and went at large, specially traversing the es-
cape.    To this plea the plaintiff demurred, and the defendant
joined in demurrer.

The county court decided that the plea in bar was insufficient,
and rendered judgement for the plaintiff.    The cause was reserv-
ed for the opinion of the Supreme Court.

*Mr. Bradley, for the defendant.*—I. This demurrer puts the
general sufficiency of the plaintiff's declaration in question ;  and
the defendant contends that, if the declaration is sufficient as shew-
ing merely an ordinary judgement, commitment and departure, it
is sufficiently answered by the mere plea of regular proceedings
before the commissioners and delivery of their certificate to the
sheriff, at least, until the plaintiff by replication discloses further
matter : but that, if by the declaration the plaintiff intended to an-
ticipate such replication, and in the first instance set up that the
debtor was not a proper subject for the poor man's oath, the decla-
ration is manifestly defective ; because

1. It does not shew sufficiently the nature of the action in
which the judgement was rendered against Kimpton, so that the
Court here can see that the county court were authorized to ad-
judicate whether the cause of action was wilful and malicious or
not.    For they have not such power in actions of debt and case
when neither for penalties, forfeitures or torts, and the action here
having been " trespass on the case," might have been assump-
sit,in which predicament their adjudication would have been wholly
nugatory.

2. It does not set forth that any minute was inserted in, or en-
dorsed or certified upon, the execution.—*Stat. p.* 240.    It is not
sufficient to state that an alias execution was prayed out in due form
of law : the word " form" applies to the execution of the judge-
ment, rather than the minute, certificate or endorsement.    If the
execution issued without such minute, (especially at the prayer

WINDHAM,
*February*,
1830.

Barber
*vs.*
Chase.

of the creditor,) it would still be " in due from of law," and not erroneous, only the creditor would thereby waive the privilege of closely confining his debtor. It not appearing precisely by the declaration that the minute was made, it does not appear that the sheriff had any legal certificate or minute to warrant him in detaining his prisoner after a discharge by the commissioners of jail delivery. Nor is it aided by the recital of the statute in the defendant's plea, because the declaration must be good in itself ; and besides, the statute is no evidence of the fact, but only renders it nugatory if it exists.

II. If the declaration is in these points sufficient, still the plea in bar is a sufficient answer. For the legislature having removed *the exception* which prevented the prisoner from taking the poor man's oath, the discharge was regular. But it has been said that the act was unconstitutional. On this point the defendant contends, 1. It cannot now be holden, after the decisions in the U. S. courts, that it is any infringement upon the constitution of the U. S. or a law impairing the obligation of contracts. At most, it only affects the remedy. 2. It is not retrospective, since its whole operation is to commence *in futuro ;* and to this it is no objection that the subject matter, upon which the act was to operate, existed at the time of its passage, such being the case with most laws. 3. The powers of the legislature of a free and sovereign state, ( *Const. of Vt.* ) are not confined to the passage of public acts alone. Special acts of insolvency have been often passed and recognised to be law.—*Sturges* vs. *Crowninshield*, 4 *Wheat*. 135, 136, 137, 200, 201 ; 13 *Mass*. 9, 10, 11. The Lord's acts in England are also special acts of insolvency ; and yet no one ever doubted whether they come within the definition of an act within the powers of a sovereign legislature to pass. 4. It disturbes no vested rights. Since the act of 1823, our law does not consider the imprisonment of a debtor *unable to pay*, as a means of enforcing debts or damages ; but it inflicts it as a punishment, notwithstanding such inability, in certain aggravated cases; (4 *Wheat*. 200 ;) and this the legislature may discharge. No creditor can have a vested right in the perpetual imprisonment of his debtor, and, therefore, the argument proves too much, since the laws of imprisonment could on that supposition never be relaxed without disturbing vested rights. Suppose a person, who is disfranchised, becomes a debtor, and imprisoned, and the legislature by a special act restore him to his law, and he takes the oath ; would the creditor be permitted to allege that his vested rights were disturbed ?

WINDHAM,
February,
1830.

Barber
vs.
Chase.

*Mr. Phelps, for the plaintiff.*—The facts set forth in this plea in bar come within the principles decided in the cases of *Dupy* vs. *Wickwire,* 1 *D. Chip. Rep.* 237 ; *Starr* vs. *Robinson,* 1 *D, Chip. R.* 257 ; *Bates* vs. *Kimball,* 2 *D. Chip. R.* 77 ; *Ward* vs. *Barnard,* 1 *Aik. R.* 121 ; *Staniford* vs. *Barry,* 1 *Aik.* 314— and are therefore insufficient. 1. Because the supposed act of the legislature is an interference with the judiciary powers of the state. —*State Con. chap.* 2, *sec.* 6. 2. Because it is retrospective and partial, and partakes not of the nature of a law.—1 *Bla. Com.* 44, 46 ; *Federalist, No.* 81 ; 6 *Cranch,* 136 ; 11 *Mass. R.* 402 ; 7 *Johns. Rep.* 502.

PRENTISS, Ch. J., delivered the opinion of the Court.—By the act of 1823, it is provided, that every person who shall be imprisoned on an execution, issued on a judgement, recovered in an action of trespass on the case, or in any of the other actions therein specified, if poor, shall be entitled to take the oath prescribed in the act relating to jails and jailers and for the relief of persons imprisoned therein, and be discharged from his imprisonment, unless the court, at the time of rendering the judgement, shall adjudge that the cause of action accrued from the wilful and malicious act or neglect of such person, and *a minute thereof be inserted in, or endorsed and certified upon, the execution.*—*( Comp. Stat. p.* 240, *s.* 1.)

The plea in bar, in the case before us, sets forth the proceedings, by which the prisoner, for whose escape the defendant is sued, was discharged from imprisonment ; and they appear to be in all respects conformable to the provisions of the act relating to jails and jailers and for the relief of persons imprisoned therein. The matter contained in the plea, therefore, independent of the special act recited in it, shews a regular discharge of the prisoner, and is a sufficient defence to the action, unless it appears that there was an adjudication, that the cause of action accrued from the wilful and malicious act or neglect of the prisoner, and that a minute of the adjudication was inserted in, or endorsed and certified upon, the execution. Though the declaration, after stating the judgement, and the nature of the action in which it was rendered, alleges that it was adjudged by the court, at the time of rendering the judgement, that the cause of action accrued from the wilful and malicious act of the prisoner, there is no averment, that a minute of the adjudication was inserted in, or endorsed and certified upon, the execution ; nor is this deficiency supplied by any statement

<div style="float:left">WINDHAM,<br>*February*,<br>1830,<br><br>Barber<br>*vs.*<br>Chase.</div>

or admission of the fact in the defendant's plea. If the expressions, " *notwithstanding the certificate made on the execution,*" which are contained in the special act recited in the plea, could be regarded as an affirmation or admission in the plea of there being a certificate on the execution, they do not state or shew, what is certainly necessary, that it contained a minute of the adjudication, that the cause of action accrued from the wilful and malicious act of the prisoner. This ought to appear with certainty ; and it not appearing from any part of the pleadings, the jail commissioners had jurisdiction and authority to admit the prisoner to the poor debtor's oath, and discharge him from imprisonment, under the general laws. The defendant's plea, therefore, without the aid of the special act recited in it, is a sufficient bar to the plaintiff's action ; and as the validity of that act does not necessarily come in question, it is unnecessary to give any opinion upon it.

<div style="text-align:right">Judgement reversed.</div>

     *Phelps*, for plaintiff.
     *Bradley*, for defendant.

---

<div style="float:left">WINDHAM,<br>*February*,<br>1830.</div>

<div style="text-align:center">STATE *vs.* DANIEL WHEELER.</div>

A mere invasion of private property, without a disturbance of the peace, is not an indictable offence ; but is a private injury only, for which an action of trespass lies.

An indictment will not be sustained for " feloneously, maliciously, mischievously and wickedly killing a beast," the property of another ; and after conviction on such an indictment, the judgement will be arrested.

     This was an information by the state attorney, alleging, " That *Daniel Wheeler*, of &c. on &c. one two years old steer, of a red colour, of the value of twenty dollars, of the goods and chattels of one Ebenezer Davis, of &c. in a certain field belonging to one Simeon Morse, of &c., with force and arms, feloniously and wilfully, maliciously, mischieveously and wickedly, then and there did kill." There was a second count setting forth the offence as in the first, except that it alleged the steer was the goods and chattels of some person unknown ; and that the respondent with force and arms, &c., with a gun loaded with powder and balls of lead, did shoot and kill the said steer.

     The jury returned a verdict of guilty against the respondent. and he afterwards filed a motion in arrest of judgement for the insufficiency of the information, which was now brought up for the decision of this Court.

WINDHAM,
February,
1830.

State
vs.
Wheeler.

*Kellogg, for the prisoner.*—The defendant contends that the act set forth in either count of said information is not a breach of the peace, or, at least, not an indictable offence by the laws of this state.

The act complained of comes under the legal head of " offences against private property, and of that species called " *malicious mischief*," or damage, and, by the common law, was not punished criminally ; but for any damage the aggrieved party might sustain, by such malicious acts, he was left to his own proper action of trespass to recover.—4 *Blac. Com.* 243. Afterwards, indeed, in England these malicious acts were made penal by a multitude of statutes.—*Ibid.* Hence Blackstone, in his commentaries upon the statute, as well as common law of England, under the head of " offences against private property," describes that of " *malicious mischief*," and cites the various statutes of England, in which such offences were from time to time made penal. And it apears from him that an act, like that *intended* to be complained of in this information, was not penal in England until made so by statute of 22d and 33d *Ch. II. chap.* 7. *Ibid.* Now it has already been decided by this Court, " that we cannot treat those statutes as common law, nor as in force here."—*State* vs. *Briggs*, 1 *Aik.* 229. And it will be seen that those statutes are not treated as common law, or as in force in the state of Connecticut, by Swift in his digest of the laws of that state, *vol. 2d.*

Sir Matthew Hale, *chap.* 58, *p.* 626, of his history of pleas of the crown, " having considered the felonies that are by the common law, among which malicious private mischief is not to be found," proceeds to the handling of felonies by act of parliament, and among the multitude of such sort of created offences, comes at length to the act of 22d and 23d *Ch. II.*, wherein the maliciously and unlawfully killing horses and cattle, &c. *in the night time* is made penal.

If the position laid down in 2 Swift's digest, 287, is correct, " that all immoral acts that tend to the prejudice of the community, are punishable by courts of justice," which position is, however, hardly borne out by the authority he cites,—(2 *East Rep.* 5, 21,) still the one at bar does not come within that supposed rule. The act here complained of was attended with no actual disturbance of the peace, and did not tend to the prejudice of the community ; but to the prejudice of only one individual : and even this does not appear with any degree of certainty from the information. From all that therein appears, the owner of the

TT

steer may have been consenting, aiding and assisting, in the killing; and without sufficient certainty an indictment is as nothing.

In the case of the *King* vs. *Wilson* and others, 8th *T. R.* 360, *Kenyon, Ch. J.* says, "it is perfectly clear that a mere trespass, which is the subject of a civil action, and where the words *vi et armis* are introduced as matter of form, cannot be converted into an indictable offence." And the distinction appears to be taken, that when the trespass complained of does not occasion, or endanger, a breach of the peace, it is not indictable. But when such trespass is committed with great violence, and with multitude of persons, the offence would be indictable, because the peace would be endangered if it were not so.

We, therefore, insist that the act complained of in this information is not only not a breach of the peace, but is not necessarily unlawful. "To kill or shoot a steer," is certainly not in all cases unlawful; and the information does not even state that the act was done *unlawfully.* Nor does it appear that it was done against the will of the owner. The epithets made use of here to qualify the manner of killing, amount to nothing. The epithet *feloniously* is absurdly useless here; for the offence, whatever it may be, is certainly not *felony.* And the other terms, such as *maliciously,* &c., have reference most naturally and properly to the steer only—and surely it is not criminal to harbor malice against a steer, even if one, in the spirit of that malice, should wilfully, maliciously and wickedly kill him.

We, therefore, come to the conclusion, expressed by the Court in the case of the *State* vs. *Briggs,* before referred to—"that with force and arms to injure the property of another is a civil injury, for which the party aggrieved may have his remedy by action of trespass." And as no wanton cruelty to the beast is set forth in the information, as the *gravamen ;* and as no wounding or torturing the living animal is alleged, it would seem that upon the authority of the case of the *State* vs. *Briggs,* as well as *Ranger's* case, 2 *East's P. C.* 1074, and authorities before cited, that this information is insufficient.—2 *Chit. C. L.* 289 ; **3** *Burr.* 1701 ; 3 *Burr.* 1707 ; 3 *Burr.* 1731.

*Campbell, state attorney, contra.*—This is an offence that tends to the prejudice of community ; and all acts that tend to the prejudice of the community are indictable at common law.—2 *East's Rep.* 5.

The offence charged is a breach of the peace, and forcible en-

WINDHAM,
February,
1830.

State
vs.
Wheeler.

try, and such acts as are breaches of the peace, are indictable at common law.—8 *T. Rep.* 360; 3 *Burr.* 1698, 1731; *Sayer's Rep.* 225; 1 *Aik. Rep.* 226, *State vs. Briggs*; 1 *Aiken,* 311, *State vs. McLeran.*

As to the second count—If third persons are unknown, it is sufficient to describe them as such.—1 *Chit. Cr. Law,* 175. The defect of some of the counts will not affect the validity of the remainder; for judgement may be given against the defendant upon those that are valid.—1 *Chit. Cr. Law,* 205.

PRENTISS, Ch. J., delivered the opinion of the Court.—If the matter in the information is charged as a felony, and is to be considered as so laid, it would seem that judgment could not properly be rendered upon it as for a misdemeanor. Though it was held in some of the old cases, that when a misdemeanor was indicted as a felony, and there was a conviction on the indictment, judgement might be given as for a misdemeanor, it is fully established by the modern authorities, that the indictment in such case is bad, and that the judgement must be altogether arrested.—(*Rex vs. Westbeer,* 2 *Stra.* 1133; 1 *Chit. C. L.* 639; *Commonwealth vs. Newell,* 7 *Mass.* 245.) On an indictment for a felony, the prisoner must appear in person, and on trial, must here be taken and retained in custody in discharge of his recognisance; whereas on an indictment for a misdemeanor, he is allowed to remain on bail, and may in general appear and plead by attorney. These are privileges of which the party ought not to be deprived by changing the mode of proceeding against him; and they appear to be of sufficient importance to require an adherence to the common law rule.

Whether or not the fact alleged in the information is a misdemeanor, and can be the subject of a criminal proceeding, is a question upon which we have entertained doubts, but upon which we have at length formed an opinion. The distinction between those trespasses for which there is a private remedy only, and those for which there may be a public prosecution, is not laid down in the books with much accuracy or precision. It seems, however, to be clear, that though every trespass, which is a disturbance of the peace, is indictable, a mere trespass, which is the subject of a civil action, cannot be converted into an indictable offence. It appears to be the doctrine of the case of *Rex vs. Storr,* 3 *Burr.,* 1698, and of *Rex vs. Baker,* 3 *Burr.,* 1731, that no indictment lies at common law for a trespass committed to land or goods, unless

WINDHAM,
February,
1830,
──────
State
vs.
Wheeler.

there be a riot or a forcible entry. According to those cases, a mere invasion of private property, without a disturbance of the peace, does not concern the public, but is a private injury only, for which an action of trespass lies. In England, the killing or maiming cattle belonging to another, from motives of malice or revenge to the owner, is made penal by statute ; and there is no precedent in the English books of a conviction for killing or wounding an animal, nor any intimation that the act is an indictable offence, at common law. In *Ranger's* case, 2 *East's P. C.* 1074, which was an indictment at common law for unlawfully, with force and arms, and against the peace, maiming a horse, it was held, that the indictment contained no indictable offence ; for if the offence was not within the statute, the fact in itself was only a trespass. Although an intimation was thrown out in the case that the words *vi et armis* did not imply force sufficient to support an indictment, it does not follow that the mere laying of the special force which attended the act would have varied the case in principle. It would hardly do to act upon the distinction between actual and implied force, and to hold that every trespass to property, where there is actual force, is indictable. If such was the law, the wounding or injuring of an animal belonging to another from a sudden impulse of passion towards it, which is plainly an injury of a private nature, and amounts to nothing more than a trespass, would form the ground of a criminal proceeding. Indeed, the doctrine would make almost every trespass or injury to private property the subject of an indictment, and would give to the courts a fearful and alarming jurisdiction, which could be exercised in general to little other purpose than vexation and oppression. The epithets, *wilfully, maliciously.* &c., contained in the information, are words of mere form, which may be applied to every trespass or injury to private property ; and neither they, nor the special statement of the manner in which the act was done, showing actual force, can have the effect to make the act a public offence. In exercising criminal jurisdiction in common law cases, courts should be under the guidance and restraint of established principles and precedents, and should not allow themselves to go beyond them. An undefined jurisdiction, or an unlimited discretion, in criminal cases, is an arbitrary and dangerous power, incompatible with civil liberty, and ought never to be assumed or exercised ; and unless an act is made criminal by some statute, or is clearly defined to be an offence by the common law, it ought not to be treated or punished as such. The civil remedy which the law affords for

trespasses to property, is, in ordinary cases, a sufficient corrective ; but if the interest or protection of society requires that any class of them, not now indictable, should, on account of their mischievous nature or tendency, be proceeded against and punished criminally, the legislature can make the necessary provision.

<div align="right">WINDHAM,<br>February,<br>1830.<br><br>State<br>vs.<br>Wheeler.</div>

Judgement arrested.

———————◖◗———————

OVERSEERS OF READING, appellees vs. OVERSEERS OF WEATH-ERSFIELD, appellants.

<div align="right">WINDSOR,<br>February,<br>1830.</div>

Under the statute which authorized the select men of a town to warn persons to depart from the town to prevent them from gaining a legal settlement therein,—it was held that it must appear from the return of the officer who served the warning that a copy was left with each of the persons named in it, and that the service would be effectual only as to those persons with whom it appeared a copy was left.

Nothing can be *intended* in an officer's return but what is necessarily, or fairly implied from what is *expressed.*

This was an appeal from an order of removal of one *Isaac Carrier*, a pauper, from the town of *Reading* to the town of *Weathersfield*. It appeared that the pauper had, previous to the first day of December, 1803, gained a settlement in *Weathersfield*, and that about that time he went to reside in *Reading*, and had gained a settlement there, unless he was prevented from gaining such settlement by a warning, of which the following is a copy :

" State of Vermont,       } To either constable of *Reading*, in
" Windsor county, ss. }   the county of Windsor—Greeting.
" You are hereby required to summon *Isaac Carrier*, Polly
" Carrier, Green Carrier, Amos Carrier and Prudence Steward,
" now residing in *Reading*, to depart said town.  Hereof fail not,
" but of this precept, and your doings herein, due return make
" according to law.  Given under our hands at *Reading* this 23d
" day of December, A. D. 1803.

<div align="right">" <i>Elias Jones,</i>       } Select<br>" <i>William Howard</i>  } men of<br>" <i>Thos. Brown, jr.,</i> } Reading."</div>

" State of Vermont,   }
" Windsor county, ss. } Reading, January 4, 1804.
" This day served this precept by leaving a true and attested
" copy of this writ with my return thereon with the within named
" persons.

<div align="right"><i>Elisha Bigelow,</i> constable."</div>

The county court rendered judgement that the pauper was unduly removed.  The town of *Reading* excepted to the decis-

ion, and the case was thereupon reserved for the opinion of this Court.

Reading
*vs.*
Weathersfield.

*Aikens, for the town of Reading.*—1. The mode of service is prescribed.—1 *Stat. ( Tol. Ed.) p.* 400 ; and *Stat. (Slade's Ed.) p.* 64, *ch.* 7, *s.* 26. The officer has returned, that he has performed his duty, in the very language, in substance, in which the duty is prescribed, as appears by the following collocation.

*Statute.—The precept shall be served on the defendant or defendants,*
*Officer.*——I    this   day   served      this         precept
*by delivering     him, her, or          them a true and attested copy*
by leaving with the within named persons a true and attested copy
*of said writ, with the officer's return thereon.*
of said writ, with          my    return thereon.

2. The truth of the return is possible.

3. If any thing is to be supplied by intendment, it is as necessary for the *rule of conduct*, as for the *history* or *return* of it.  If, by intendment, the language of the statute is to be understood to require a *separate* copy for *each* person, by the same intendment, the same language in the return must be understood to import that a *separate* copy was *left with* each person.

4. The sufficiency of this return, under this statute, cannot be avoided, but by resorting to *conjecture*, where nothing is left to conjecture *;* and that conjecture must be *against* the grammatical and fair import of the language.  Who are " *the within named persons ?*"  Surely not *one* or *two*, but *all* of them.  And who are *all*, but each distributively ?  Then *all* have had " *a copy*" —and if all, then *each ;* or the return is false.  But as the return is possible, it cannot be adjudged to be false and void from impossibility.

5. This process is not penal, and does not affect the person of the pauper.  He is not bound to obey the precept, and he is as secure of his maintenance with this process against him as without it.  It is a mere *municipal* regulation.  *Notice*, to other towns, of the intention of a town to which a citizen removes, touching his future maintenance, in case of misfortune, is *all* that the legislature contemplated by the act providing for this process. When once that intention is fairly and substantially manifested by the record of the town, every object of the law is satisfied.  To overthrow the acts of a town, which are done in good faith, and to a certainty to a common intent, on the ground of technical niceties, bordering on quibble, is avoiding, in effect, every beneficial

object of the legislature in passing the law, and rendering it a source of vexatious litigation to the people. It is respectfully submitted, therefore, whether the courts have not already gone *far enough*,if not too far,in avoiding these notices on technical grounds.

6. It is notorious that many of these returns are in this form.

7. I am unable to discern, from any reported case, that this Court has ever gone so far as would be necessary to overthrow *this* return on technical grounds.

*Hubbard, for Weathersfield.*—The question will turn upon the service of the warning. The return states, " I this day served *this precept* by leaving a true and attested copy of this writ with my return thereon, with the within named persons." It has been uniformly decided in this Court, that the statute must be strictly pursued in the service of a warning-out process.—*Townsend vs. Athens*, 1 *Vt. Rep.* 284.

1. It does not appear upon *whom* the precept was served : the return does not state. The within named *persons*, are all the persons named,including the select men.

2. The service would not be good unless a summons was delivered to each of the paupers within named. One summons *could not* be delivered to each and all named.

3. The officer's return must show that he left his copy with the persons with whom he ought to leave it.—*Townsend vs. Athens*, 1 *Vt. Rep.* 286. Nothing can be supplied by parol to make the return good.—2 *Aik. Rep.* 272-5-6.

PRENTISS, Ch. J., pronounced the opinion of the Court.— Whether the pauper acquired a settlement in *Reading*, and thereby lost his former settlement in *Weathersfield*,depends upon the inquiry,whether or not, before his year's residence in *Reading* was complete, he was duly warned to depart from the town. The warning relied upon contains the names of the pauper and four other persons, and appears to be in the form prescribed by the statute ; and the question, and the only question in the case, is, whether the return upon the warning shews a sufficient and valid service of it upon the pauper.

The act, under which the warning was issued, provides, that the warning shall be served in the same manner as writs of summons are by law required to be served ; and unless it is served in that manner, the service is void. The statute, *(Comp, Stat. p.* 64, *s.* 26,) declares, "that all writs

*Margin note:* WINDSOR, *February,* 1830. Reading *vs.* Weathersfield.

WINDSOR,
*February,*
1830.

——————

Reading
*vs.*
Weathersfield.

of summons shall be served on the defendant or defendants, by delivering him, her or them, a true and attested copy of the writ, with the officer's return thereon ; or by leaving such copy at the house of his, her, or their usual abode," &c.   The delivery of a copy of the summons to the party, or leaving it at his usual abode, constitutes the service of the writ ; and where there are several defendants, to make the service valid upon all, it must appear affirmatively and expressly from the officer's return, that he has delivered a copy to each.—*(Smilie* vs. *Runnels et al.* 1 *Vt. Rep.* 148.)   The warning in the present case was served, as the return upon it states, *by leaving a copy with the within named persons ;* importing that only one copy was delivered ; and unless the delivery of one copy only would constitute a valid service upon all the persons named in the warning, it cannot be good service upon any of them, so long as no one in particular is named.   The only way in which the return can be supported, is, by construing it to mean, that a copy was left with *each* of the persons named in the warning.   But to give this reading to the return, we must add an essential word to it, or intend what is certainly not expressed.   If the officer delivered a copy of the warning to each of the persons named in it, it was easy for him to have said so.   Officers are bound to return specifically and expressly their doings; and where there is a material omission or a deficiency, we cannot supply it by intendment, without subverting the settled doctrine relative to officers' returns.   Nothing can be intended but what is necessarily or fairly implied from what is expressed ; and to go beyond this, would be giving countenance to vague and defective returns, and would lead officers into a very loose and irregular practice in the performance of their duties.   As the return in this case does not state, that a copy was left with each of the persons named in the warning, or with the pauper in particular, we are all clear that the return is insufficient, and shews no legal service of the warning upon the pauper.

<div align="right">Judgement affirmed.</div>

See *Waterford* vs. *Brookfield,* 2 *Vermont Reports,* 200, where the same point was decided.—*Ed.*

## Joseph Bigelow *vs.* Sewall Kinney.

Windsor,
*February,*
1830.

Where A, an infant, a short time before he became of age, purchased land, and exe-
cuted his notes and a mortgage to secure the purchase money, and, two days after-
wards, in consideration of the notes being given up to him, executed a quit-claim
deed of the premises to the person of whom he had purchased, who went immedi-
ately into possession, and he and his grantees remained in possession several years
before A intimated any intention to disaffirm the contract,—it was held, in an action
of ejectment, brought by A after having arrived at full age, against the person in
possession,

That A could not affirm the deed which conveyed the land to him and avoid the mort-
gage executed by him to secure the consideration money ; and

That, as the quit-claim deed was voidable only by the infant, on his coming of age, he
ought, if he meant to avoid it, to have given notice of disaffirmance, or otherwise
have rejected the contract, within a reasonable time after he became of age ; and,
not having done so, he was presumed to have affirmed the quit-claim deed, and,
therefore, was not entitled to recover.

This was an action of ejectment for land in Weathersfield,
being part of lot no. 22. On the trial of the general issue, the
plaintiff claimed title to the land under, and gave in evidence, a
deed from Joseph R. Williams to him, dated Nov. 12th, 1818.
The defendant gave in evidence a mortgage deed from the plain-
tiff to Joseph R. Williams, dated Nov. 12th 1818, and executed
at the same time of the first mentioned deed, to secure the pay-
ment of several notes given by the plaintiff to Williams for the pur-
chase of the land ; and also a quit-claim deed from the plaintiff to
Williams, dated Nov. 14th, 1818, which was executed in consid-
eration of the giving up by Williams to the plaintiff the notes des-
cribed in and secured by the mortgage. The defendant also gave
in evidence a deed from Joseph R. Williams to John P. Williams,
dated April 6th, 1820 ; a deed from John P. Williams to ——
Perkins in 1828, and a deed from Perkins to the defendant ; and
proved that Joseph R. Williams took possession of the land im-
mediately after the plaintiff executed to him the quit-claim deed,
and continued in possession until he conveyed to John P. Williams,
who entered into possession of the land in January, 1821, and
continued in possession until he conveyed to Perkins in 1828.
The plaintiff proved, that at the time he executed the mortgage
deed, and the quit-claim deed, to Joseph R. Williams, he was a
minor under the age of twenty one years ; that he arrived at full
age in May, 1819 ; that when he executed the quit-claim deed
Joseph R. Williams promised to pay him the sum of $100, being
the amount of what the plaintiff had advanced on the purchase,
whenever he should sell the land ; and that after Joseph R. Will-
iams conveyed to John P. Williams, the plaintiff demanded of

WINDSOR,
*February*,
1830.

Bigelow
*vs.*
Kinney.

Joseph R. Williams the $100 promised him, which Williams re-- fused to pay. The defendant proved that in 1821, after the conveyance to John P. Williams, the plaintiff applied to John P. Williams to buy the land, and afterwards applied to him to hire it, or take a lease of it ; but no bargain was concluded. The county court directed the jury, that if they found that the plaintiff, at the time he executed the mortgage deed and the quit-claim deed to Joseph R. Williams, was under the age of twenty one years, he was entitled to recover ; that the evidence given in the case did not amount to a ratification of the contract ; but if it did, that it was sufficiently explained if they believed that the plaintiff acted under the influence of the promise made to him by Williams. A verdict being returned for the plaintiff, and judgement rendered thereon in the county court, the cause was removed to this Court, on exceptions filed by the defendant to the directions given to the jury.

*Mr. Collamer, for the defendant.*—1. The deed of an infant is voidable only, and not void, if, as in this case, it might be beneficial. This is most advantageous to him ; yet this, like all other privileges of infants, is only to be so far extended as is necessary to his protection. As the deed is binding on the adult, the privilege to disaffirm should be exercised immediately on arriving at full age, or in a reasonable time after, or never. This is all his protection requires, and the safety of others is consistent with no other principle. Hence, mere silence, or permitting affairs to remain as before, is an affirmation. This the plaintiff did for nine years after he became of age.—1 *Swift's Dig.* 58 ; 1 *Kent's Com.* 195 ; *Kline* vs. *Beebe*, 6 *Conn. Rep.* 502–7 ; *Holmes* vs. *Blogg*, 4 *Com. L. Rep.* 10, (8 *Taun.* 35.)

2. Any act done, after full age, inconsistent with disaffirmance, is, in itself, an affirmance. Such were the acts of the plaintiff, consisting in offers by himself and through others, both to purchase and to hire the premises, keeping his notes, &c.

3. This silence, and these overt acts, amounting to an affirmance of the quit-claim deed, are in no way explained by the plaintiff. The pretended promise of J. R. Williams does not explain them. 1. Because the very terms of that promise, if relied on by the plaintiff, after age, were consistent only with affirmance ; and the refusal of Williams afterwards to pay, or the neglect of the plaintiff to enforce it, furnish no excuse or foundation for the present suit. 2. It could not furnish an excuse after 1821, as J.

Winnsor.
*February*,
1830.

Bigelow
*vs.*
Kinney.

R. Williams then refused payment, and, therefore, eight years remain unaffected by it.    3. The not recording the deed to J. P. Williams could furnish no excuse, as *the same was well known to the plaintiff*, as appears by his own testimony of his applications to both J. R. Williams and J. P. Williams; and the court should so have charged the jury.    4. The disaffirmance of a deed must be by some overt act or notice by an adult, and this must be previous to suit, or the title is not in him. The only reason why this may be dispensed with for an infant is, that the avoidance of a deed requires the same discretion as to make one.    5. By and upon disafirmance the parties should be restored to their respective rights unless impossible.    It should be " *status ante bellum*," not " *uti possidetis*." *Bigelow* should not be permitted to disaffirm his quit-claim deed, unless on replacing the notes, which were its consideration.    Nor indeed can the delivery of the notes for a deed, now to be considered void or inoperative, be considered payment of those notes.    The parties are then to be left on the first deed and mortgage, which are to be taken together, and constitute in law a mere conditional sale to the plaintiff, with which condition he has never complied, and has, therefore, no right to recover.

If the plaintiff, who, on arrival of age, is to be viewed like all other men, competent to understand and assert his right, had wished to avoid his quit-claim deed, he should have done so immediately, by replacing the mortgage notes.    If he had then wished to avoid the contract, it should have been done by notice and demand of the notes and pay he had made.    By this he would have entitled himself to recover whatever pay he had made, but not, as now claimed, the whole land.    *His neglect* to enforce the promise of J. R. Williams for the hundred dollars may have barred him. This neglect to make those disaffirmances and demands in season may now have barred him of recovering what he paid : but it cannot be true that *his own neglect* has now given him farther and much greater rights.

It will hardly be contended an infant on taking a deed of land, and at the same time mortgaging back for the purchase money, may immediately avoid his part of the contract, and hold the land absolutely.    This would, indeed, make his privilege a sword and not a shield.    If the plaintiff could not have done this at the time, when and by what professional finesse or legal legerdemain has he since acquired this right?

*Cushman, for the plaintiff.*—If an action was sustainable at all

WINDSOR,
February,
1830.

Bigelow
vs.
Kinney.

for the $100 when the sale was effected, upon the promise of Jo-
seph R. Williams to plaintiff, yet for eight years it could not have
been sustained, because, in the eye of the law, the premises were
not yet sold—the deed not being on record, nor any body in vis-
ible possession.   The question, then, of the acquiescence of the
infant is at rest here, because,  the fraud and collusion of the Will-
iams—1. in Joseph R. Williams in circumventing the boy,  and
2. in their covinous  management in the sale and legal transfer of
the premises afterwards, till the statute of limitations had run upon
the  promise—rebut all idea of  acquiescence in the infant, as crea-
ting a bar to his right ; and if conscience had taken any part in the
transaction, the $100 would have been paid, and this action pre-
vented.

But again, there is no pretence of acquiescence after this  covin-
ous sale in 1820, because,  he then told Joseph R. Williams, " you
will hear from this again."   Here is to be  seen the reason why
this deed was not recorded—under a combined determination to
cheat this boy ; and here then was notice that he should not rati-
fy the contract, and this immediately too after he became of age ;
for he became of age, May 6, 1819 ; and about eleven months af-
ter he was of age, he notified Joseph R. Williams, if he would not
pay the $100, " he would hear from him again."   Hence the
charge of the honorable Judge, who charged the jury in this case,
was most manifestly correct.   For, while relying upon this prom-
ise to pay the $100, for this period of eight years, and this too in
ignorance of his rights, if the plaintiff is to be barred by acquies-
cence, the shield of infancy is a mere cobweb to be  stripped off
by every unprincipled speculator, who may chance to have it in his
power to effect it.

The jury have found in this case that the plaintiff in delaying to
bring this suit, or, in other words, that his acquiescence grew out
of his reliance on the promise of Joseph R. Williams to pay him
$100 when the place was sold.   For this  was the very ground
upon which the Judge left the case to the jury.   That is, if any of
his acts, abstractedly considered, would be acquiescence, yet the
reliance on the promise, if believed, would destroy its effect.
That fact being found, then, by the jury, it will  forever settle
this case ; for to make acquiescence a bar, it must be  voluntary
acquiescence, and not brought about by the  contracts and man-
agement of the opposite party.

But the next question is, what is this acquiescence—about which
so much is said in this case ?  What lapse of time should

make it a bar to the plea of infancy? The infancy of a party pleading in all civil cases, should be a bar, unless fraud or necessaries can be replied, or a promise when of full age. The joinder in this case goes upon the ground of a promise when, or after, the plaintiff was of full age. The doctrine, that silence gives consent is a delicate doctrine, and in all cases should be handled tenderly. For to make a valid contract there must be parties and a proposition on one side and acceptance of it on the other, coupled with a good or a valuable consideration.—1 *Swift's Dig.* 173. Now this acceptance should be by some act, or by some word, written or spoken, in order to give it any validity.—*Reeves' D. Relations*, 240. But this contract has no affirmative word or act to sustain it. What has it then? I answer silence for eleven months, and that under a contract to pay, upon sale, $100. But what is this tacit consent? Why, it is forbearing to act where a man knows what is doing, and is not restrained by compulsion or contract.—1 *Swift*, 173, *last paragraph but one.* This forbearing to act or disaffirm for a great length of time is evidence of fraud in him if it cannot be explained. But it is essential that he should be acquainted with his rights also.—1 *Swift*, 174; 1 *Vesey* 6. That the plaintiff was ignorant of his on this occasion is manifest from the case. For, 1. No sale had been consummated. 2. He had hopes that the honor or conscience of Joseph R. Williams would induce him to pay. 3. Being poor and at a distance, he was unable to look up and investigate his rights. 4. To such a boy, under such circumstances, the law looked like a lottery or bugbear, and against such men, while poor, he would have regarded probably his remedy worse than his disease, had he known what his remedy was. But under all these circumstances this defendant asserts an acquiescence which confirms title, or ratification after he became of age! If this is confirmation of title, however, then the boasted power of the law to protect infants, is rather a net in which to catch and retain them for the slaughrer, than any substantial shield to protect their rights.

But a promise in order to be binding upon an infant after full age, must be made deliberately and with a knowledge that the party is not liable by law.—*Smith* vs. *Mayo et al.* 9 *Mass. Rep.* 62. The same evidence ought to be required of a voidable contract after full age, as of the execution of a new one.—*Hussay et al.* vs. *Jewett*, 9 *Mass. Rep.* 100; *Ford* vs. *Philips*, 1 *Pickering*, 202; 2 *Starkie's Ev.* 725. Note at bottom.

WINDSOR, February, 1830,

Bigelow *vs* Kinney.

WINDSOR,
February,
1830.

Bigelow
vs.
Kinney.

PRENTISS, Ch. J., delivered the opinion of the Court.—That the deed of an infant, which takes effect by delivery, and is not upon the face of it a prejudice to him, is not void, but voidable only, is a doctrine well established by the authorities, and particularly by the case of Zouch vs. Parsons, 3 Burr. 1794. The principle settled in that case has been confirmed by subsequent decisions in England, and has been generally, if not universally, recognised and adopted by the courts in this county. It is not only highly reasonable, but more beneficial to the infant, that it should be so ; for if the contract is void, it has no effect upon either party, and the infant himself can take no advantage of it. But if it be voidable only, he may either affirm or disaffirm it, after he arrives at full age, and is thus enabled to avail himself of the contract when it is beneficial, and to avoid it when it is prejudicial to his interest. In the present case, the plaintiff after he came to maturity had his election either to affirm or disaffirm the contract. If he disaffirmed it, he might have brought his action, and recovered back the money he had advanced on the purchase. If he affirmed it, his only remedy was by an action on the promise of *Williams* to pay him the sum of $100 whenever he sold the land. As the execution of the deed of quit-claim, however, was a transaction subsequent in point of time to the execution of the original deed and mortgage, and formed a distinct contract, the plaintiff might have elected to avoid the quit-claim deed only, leaving the original deed and mortgage in force. But he could not affirm the deed which conveyed the land to him, and avoid the mortgage executed by him to secure the consideration money. The deed and mortgage were made at the same time, were one transaction, and though distinct instruments, formed one entire contract, which could not be affirmed in part, but must be affirmed or disaffirmed in whole. Nothing is clearer, than that a party cannot affirm an entire contract in part and avoid it in part ; and to allow the plaintiff to avail himself of the deed conveying the land to him, and to avoid the mortgage given by him to secure the purchase money, would be no less repugnant to law than to the plainest dictates of justice. If the plaintiff, therefore, had elected, or was now at liberty, to avoid the deed of quit-claim, and take the benefit of the prior deed to himself, the mortgage given by him to secure the purchase money would be binding upon him ; and as the notes were given up in consideration of the quit-claim deed, and without payment, the debt would remain, and the plaintiff would have nothing but an equity of redemption in the land.

As an equity of redemption, after a breach of the condition of

Windsor,
February,
1830.

Bigelow
vs.
Kinney.

the deed is no sufficient title on which to recover in ejectment, against the mortgagee, or any one holding under him, the view already taken of the case is decisive against the plaintiff. But we also think, that, on the evidence stated in the exceptions, the deed of quit-claim was ratified and confirmed, so that even the plaintiff's equity of redemption was released and gone. Though it is laid  down, that a bare acknowledgement or recognition of the contract of an infant, after he comes of age, without an express promise, will not, where the contract is for the payment of money, or the performance of some personal duty, and remains executory, amount to a ratification ; yet in general, an express act done under a contract of his infancy, implying a confirmation of it, has been held to be sufficient. There are numerous instances in the books, in which an affirmation of a contract, connected with, or growing out of an interest in, lands, has been inferred from acts or circumstances ; as where an infant, after full age, continues in possession of lands purchased, taken in exchange, or leased, or receives or pays rent. Indeed, it is held in a late case, that in every instance where the contract is voidable only by the infant on his coming of age, he is bound by, and is presumed to ratify, the contract, if he does not within a reasonable time after he has attained full age, give notice of disaffirmance, or otherwise reject the contract.—(*Holmes* vs. *Blogg*, 8 *Taunt.* 35.) This principle is applicable of course to all grants or conveyances of real property to or from the infant ; and we do not see why it should not apply to all contracts executed and performed by him during his infancy. A deed executed and delivered by an infant, conveying land, remains good and valid, until it is avoided by him ; and as he alone has the power of avoiding the deed and rescinding the contract, he is bound, in reason and justice, after he comes of age, and is competent to exercise a discretion upon the subject, to make his election, and give notice of his intention. He ought not to be allowed to leave the grantee, upon whom the contract is binding, in a state of suspense and uncertainty ; and unless he makes known his determination in a reasonable time, it is just that the contract should become absolute against him. At any rate, silence on his part, while the grantee, or any one under him, is claiming, holding, and occupying under the contract, is an acquiescence from which a confirmation of the contract may be inferred. It was decided in the case of *Kline* vs. *Beebe*, 6 *Con. Rep.* 494, that the grant of an infant may be affirmed either by the performance of acts from which an affirmance may be reasonably implied,

WINDSOR,
February,
1830,

Bigelow
vs.
Kinney

or by the omission to disaffirm within a reasonable time; and accordingly, where an infant, after attaining full age, retained the notes given for the purchase of land, and the grantee was permitted to remain in the undisturbed possession of the land for a number of years, it was held, not only that these acts implied an affirmance of the deed, but that the omission of any act or' expression of disaffirmance alone, for such a length of time, was an acquiescence in the conveyance, amounting to a tacit affirmance. In a recent work of great excellence and value, the production of an accomplished and experienced jurist, justly distinguished for sound discriminating judgement, and surpassed by none in extensive and accurate erudition, it is laid down, that the confirmation of the act or deed of an infant may be justly inferred against him, after he has been of age a reasonable time, either from his positive acts in favor of the contract, or from his tacit assent under circumstances not to excuse his silence.—(2 Kent's Com. 195.) In the present case, nine years elapsed after the plaintiff came of age, before he intimated any intention or wish to disaffirm the contract ; during all which time Williams, or others holding under him, remained in possession of the land. In addition to this, the plaintiff, nearly two years after he became of age, demanded of Williams the $100 promised him, and applied to purchase the land of Williams' grantee, and afterwards to hire it. These acts denoted an intention not to disaffirm the deed of quit-claim ; and either they, or the lapse of time, were sufficient evidence of a confirmation of the deed.

Judgement reversed, and cause remanded to the county court for a new trial.

WASHINGTON,
March,
1830.

RUFUS KENDALL vs. JACOB F. DODGE and ARAUNAH WATERMAN.

A special act of the legislature discharging a judgement debtor from imprisonment on an execution is void.

In an action on a jail bond brought by the creditor against the signers of the bond, a plea, that more than six years had elapsed since the escape of the principal, and that the creditor had not pursued his remedy against the sheriff for the escape, was held to be insufficient.

In this case there was no averment in the plea that the creditor had ever made a demand on the sheriff to assign the bond to him; and, consequently, it did not appear that a cause of action had ever accrued against the sheriff.

The sheriff, to whom a jail bond is taken for the admission of an imprisoned debtor to the prison limits, can alone assign it to the creditor, whether such sheriff be in office at the time of the breach of the condition or not.

Where a sheriff having put his name and seal on a jail bond, delivered it to the creditor, with authority to write an assignment, which was afterwards done,—it was held to be a valid assignment of the bond.

WASHINGTON,
*March*,
1830.

Kendall
*vs.*
Dodge et al.

Action of debt on a jail bond, dated, August 10, 1816, executed by said *Dodge*, as principal, and *Waterman*, as surety, to Chapin Keith, sheriff, of Washington county, and by said Keith, on the 1st day of June, 1820, after the breach of the condition, assigned to the plaintiff and one John Kendall, since deceased, whom the plaintiff survived. The breach was alleged to have been on the 30th day of November, 1819. The defendants pleaded,

1st. *Non est factum*.

2d. That said sheriff did not on said first day of June, 1820, nor at any other time, after the condition of the bond was broken, assign it to the plaintiff and said John Kendall.

3d. That *Dodge* did not on said 30th day of Nov. 1819, nor at any other time after the making of said bond, until the 3d day of February 1820, escape from the liberties of the prison; that on said 3d day of February, 1820, at the time the condition of the bond was broken, long before, and ever since, until the 1st day of December, 1825, John Peck was legal sheriff of said county, and that Chapin Keith was not sheriff of said county on said 3d day Feb. 1820, nor at any time since the 30th day of Nov. 1819; and that the said Peck had not assigned the bond to the plaintiff.

4th. That on the 3d day of February, 1820, and not before, said *Dodge* escaped from prison and the liberties thereof, and went at large; by reason whereof an action accrued to the plaintiff against the sheriff of Washington county, then keeper in chief of said jail, for permitting *Dodge* to escape, of which said sheriff and the plaintiff had due notice; that the plaintiff had never pursued his legal remedy against said sheriff for the escape; and that since said cause of action accrued to the plaintiff against said sheriff six years and more had elapsed before the commencement of the present action.

5th. That after the commitment of *Dodge*, and before he had committed any escape, to wit, on the 8th day of November, 1819, the legislature of the state of Vermont passed an act exempting *Dodge* from arrest and imprisonment on civil process, for all debts contracted previous to the passing of the act, during the term of five years; and enacting *that the departure of Dodge from the prison in which he was then confined, or from the liberties thereof, should not be adjudged an escape to charge said Dodge or his bail*; and that thereupon *Dodge*, after the passing of said act, to wit, on the 3d day of February, 1820, and not before, went at large out of said prison limits; which was the supposed escape complained of by the plaintiff, and no other.

VV

WASHINGTON,
  *March,*
  1830,
  ───────
  Kendall
    *vs.*
  Dodge et al.

6th. That Chapin Keith was not sheriff of Washington county on the 1st day of June, 1820, (when the bond purported to have been assigned by him,) nor at any other time whatever after the 30th day of November, 1819, nor after the condition of the bond had been broken.

The plaintiff joined issue to the country on the *two first* pleas. To the *third* he replied, that at the time of the date of said bond, to wit, August 10, 1816, the said Chapin Keith was sheriff of said county, and so continued until the 1st day of December, 1819. To the *fourth* plea the plaintiff replied, that after the condition of said bond had been broken, by the escape of *Dodge*, to wit, on the 1st day of June, 1820, on the demand of the plaintiff, the said Keith, to whom said bond had been executed, by his endorsement in writing under his hand and seal, assigned the contents thereof to be paid to the plaintiff; of which assignment the defendants had notice, and thereby became liable to pay the plaintiff the penalty mentioned in the bond, to recover which the present action was brought; that since the assignment of the bond he had had no legal right to sue the said sheriff for the escape of *Dodge*, because it had not been ascertained that the signers of the bond would be unable to satisfy the judgement to be recovered thereon, nor that the plaintiff would be able to recover judgement on the bond on account of the neglect, *laches*, or default, of said sheriff; that, therefore, the plaintiff was not barred by the statute of limitations against the sheriff for the escape of *Dodge*. To the *fifth* and *sixth* pleas the plaintiff demurred.

The defendants rejoined, and demurred to the plaintiff's replication to the *third* and *fourth* pleas, and joined in the demurrer to the *fifth* and *sixth* pleas.

On the trial in the county court, it was proved that the signature of Chapin Keith to the assignment on the back of the bond, and the seal annexed thereto, had been put to the assignment by said Keith after the 1st day of June, 1820, (which was the date of the assignment,) and after the said Keith had ceased to be sheriff, at the request of William Upham, attorney for the creditors, who then had the bond in his possession; and that the words over said signature and seal were not written before, nor at the time, the name and seal were put upon the bond, but were written four or five days afterwards by said Upham.

The defendants' counsel insisted that the bond had not been legally assigned, and requested the court so to charge the jury. But the court instructed the jury that if the name and seal of said

Keith were put by him on the back of the bond, after the escape of *Dodge*, with a view to assign the bond to the creditors, and that the blank should be afterwards filled up by them, or their attorney, with proper words of assignment over the name and seal, and the same was afterwards, and before the commencement of the action, filled up accordingly, it constituted a sufficient assignment of the bond. The jury having returned a verdict for the plaintiff on the issues of fact, and assessed the damages, and the court having rendered judgement thereon, and on the several issues of law, for the plaintiff, the defendants filed exceptions, and the cause was thereupon removed to the Supreme Court.

WASHINGTON,
March,
1830.

Kendall
vs.
Dodge et al.

*Loomis and Merrill, for the defendants.*—The question raised by the *third* plea and replication is, whether the sheriff who took the bond, or he who was sheriff at the time of condition broken, should assign it. It is insisted by defendants, that the sheriff at the time of condition broken, is the only person who can assign the bond.—*(Statute, p. 200, s. 2.)* The debtor imprisoned has a right to demand of the sheriff the liberty of the jail yard, on executing a bond, as provided by statute, *page* 219, 220, *s.* 10, 11 : and *when the condition shall be broken*, the bond is *assignable* to the creditor—not to any other person—nor until after condition broken. The bond is assignable, not because the tenor of it is to the sheriff or his *assigns*, but by force of the statute. The bond is directed by statute to be given to the sheriff: it is not necessary to name him in the bond. He has the right to judge of the security, and is made responsible for it. He is still liable for the escape of the debtor. But the statute, *(page* 220, *s.* 11,) provides, that he may suspend the suit against himself by endorsing the bond—leaving it optional with him to suffer a suit against himself for the escape, or to endorse the bond to the creditor. The question recurs, *what sheriff* is authorized to suspend the action against himself for the escape ? Certainly, the sheriff who is liable for the escape. It is believed no doubt exists, but the sheriff at the time of condition broken is the only person liable for the escape.—*Swift's Dig.* 545 ; *Backus' Sheriff*, 20 ; *Wood* vs. *Gibson*, 6 *Johns. Rep.* 125 ; *The King* vs. *late Shff. of Midl'x.* 4 *East*, 604. And he is the person authorized by statute to assign the bond.—*Richards et al.* vs. *Porter*, 7 *Johns. Rep.* 137. The statute declares, no action shall be maintained, &c., if he will assign the bond, &c. ; which clearly shows that the officer liable to the suit should assign the bond to suspend the suit against himself. The

WASHINGTON, March, 1830.

Kendall
vs.
Dodge et al.

sheriff whose office has expired has no interest to have the bond assigned : he is not liable for the *escape of* the debtor ; but the interest of the acting sheriff is manifest.　He has no other indemnity.　The bond is taken to indemnify the *sheriff's department.* When the statute speaks of the sheriff, the acting sheriff is intended ; and as the bond is not *assignable* until escape made, the acting living sheriff is to assign.　This view of the case is fully supported by the statute, *(page* 233 *s.* 5,*)* where it is declared that whenever the sheriff of any county in this state shall discover that the bondsmen, &c., he may recommit the debtor.　The sheriff here authorized to recommit is the acting sheriff, whether the bond were taken by him or his predecessor.　And the close of the same section extends the right of recommiting to the high bailiffs, their executors and administrators, and to the sheriff who took the bond, after his office expires, and to his bondsmen.　The acting sheriff is the keeper of all bonds, files and papers, pertaining to the department, and to him the creditor applies for his bond.　If a sheriff take a bond, and, before condition broken, die, abscond, or be committed to jail, even on bonds, the high bailiff then acts as sheriff and keeper of the jail ; and if the debtor escape, the high bailiff is authorized to assign the bond, *(Stat. p.* 205–6, *s.* 17,*)* and may, before escape, recommit.　If the doctrine be established that the sheriff taking the bond must assign it, then he must have the keeping of it to be always ready to assign. This would, in practice, distribute jail bonds into any country or kingdom where a sheriff, or his administrator, or high bailiff, out of office, should remove, and place them beyond the controul of the acting sheriff, and where the creditor could never make a demand of the assignment ; and if demand of the acting sheriff, for an assignment of the bond, be good, *he* would be without remedy, though liable to creditors for escape.

As to the *fourth* plea, we say, no action of debt lies against a jailer for escape out of execution, but only an *action of the case.* *Jones* vs. *Pope,* 1 *Saun.* 38 ; 2 *Inst.* 382.　In case against sheriff or jailer for escape from execution, defendant may plead the statute of limitations.—1. *Saun.* 38. *n.* 2 ; 1 *Sid.* 306 ; *Vt. Stat. p.* 290.　On the escape of *Dodge* the plaintiff's right of action accrued against the sheriff for the escape, and the statute then began to run.　Right of action against an officer for taking insufficient bail, accrues from the return of *non est inventus—Rice* vs. *Holmes,* 12 *Mass.* 127 ; *Cesar* vs. *Bradford,* 13 *Mass.* 169 ; *Mather* vs. *Green,* 17 *Mass.* 60.　Right of action against an offi-

cer for insufficient service of an original writ, by reason whereof plaintiff lost the benefit of his attachment, (judgement having been reversed for that cause,) was considered as having accrued when the writ was returned into the clerk's office.—*Miller* vs. *Adams,* 16 *Mass.* 456 ; see also *Hinsdale* vs. *Larned et al.* 16 *Mass.* 65 ; 2 *East.* 254.   The bail have a right to avail themselves of the statute of limitations having run in favor of the sheriff.   If judgement be rendered against an administrator, and afterwards an action be brought against the surety on the probate bond to recover the amount of that judgement,the bail may avoid the action by pleading that the action against the administrator in which the judgement was rendered,was not commenced within four years from the time of his accepting the trust ; for the surety is not barred by the judgement against the administrator from a protection the law intended for his benefit.—*Daws* vs. *Shed* and others, 15 *Mass. Rep.* 6.   If sheriff on demand refuses to assign the bond, the creditor has a claim which will be barred by statute in six years; and if the sheriff assign the bond, it will enlarge the statute of limitation as to the creditor ; nor does it discharge the creditor's claim against the sheriff, but only suspends it, and enables the creditor to collect his claim against the sheriff from the bond.   He is not pursuing the bond as a debt due to himself, but collecting his claim against the sheriff.   Now if that claim be satisfied, the bond is no longer in force.   That claim is legally satisfied, on the creditor's neglect to pursue it for six years.   No equitable consideration will charge bail beyond their undertaking ; and six years having elapsed, as against the sheriff, the bail have a right to avail themselves of it ; and the sheriff by any promise cannot revive the claim as against *them.* The creditor's right to pursue the bond must cease when his claim against the sheriff is barred.

The question raised by the *fifth* plea is, whether the act freeing *Dodge* from imprisonment is valid.   On this point we cite 4 *Wheaton's Rep.* 200, 201 ; 12 *Wheaton's Rep.* 370.

The question reserved under the second plea is, whether the assignment, as it appears in the case, is valid.   Defendants contend it is not.   If a person affix his signature and seal to the back of a lease, it is not an assignment of the lease.—*Jackson* vs. *Titus,* 2 *Johns. Rep.* 430 ; 2 *Stark. Ev.* 589.   And if it be agreed that a third person shall write an assignmemt over the signature and seal, which he does, and delivers the deed to the assignee, the deed is a nullity.—*Ibid.*   Where blanks were left to be filled up with the christian name of the party, and which were afterwards

WASHINGTON
March,
1830,
————
Kendall
vs.
Dodge et al.
filled up with the assent of both parties, the bond was held to be void.—2 *Stark.* 481. And in general if blanks be left at the time of execution, and afterwards be filled up, the deed will be avoided, for it is no longer the same contract that was sealed and delivered.—*Ibid.*

*Upham, for plaintiff.*—1. The *first* question, and the only one, presented upon the *third* plea in bar, is, which sheriff ought to have assigned the jail bond? We maintain that Chapin Keith was the only person who could legally make the assignment. The bond was taken for his benefit; he always had the custody of it, and was the only person liable for the sufficiency of the bail; he alone had the power to recommit the prisoner in case the bail should become insolvent.—*Stat. p.* 233, *s.* 5. John Peck never had the possession of the bond, neither was he entitled by law to its custody. Consequently, he never had it in his power to make the assignment. Again, the statute, I apprehend, settles this question. The 11th section of an act relating to jails and jailers, (*page 220,*) declares that the *officer* who took the bond shall make the assignment to the creditors.

2. The *fourth* plea in bar we contend is well answered by the replication. No action has yet accrued to the plaintiff against the sheriff for the escape of *Dodge.* The jail bond was assigned by the sheriff to the creditor when demanded, and the suit upon the bond is still pending in court. If the sheriff will assign a jail bond to the creditor when demanded, no action accrues against him for the escape until after a failure to obtain satisfaction of the debt on the bond.—*Stat. p.* 220, *s.* 5. Again, the plea did not require any replication; it furnishes no bar to the plaintiff's cause of action, and would have been adjudged insufficient on general demurrer.—1 *Chit. Pl.* 460.

3. The *fifth* plea in bar is insufficient to bar the plaintiff's action. The legislature had no constitutional power to pass the special act set forth in the plea.—1 *Aik. Rep.* 121; *Bates* vs. *Kimball,* 2 *D. Chip. Rep.* 77; *Lyman* vs. *Mower,* 2 *Vt. Rep.* 517.

4. If the *sixth* plea in bar presents any question to the Court, it is simply this; which sheriff ought to have assigned the bond. This question has been sufficiently considered in our remarks upon the third plea in bar, which presented the same question.

5. The bill of exceptions presents only one question, to wit, was the bond legally assigned by the sheriff? The fact spread upon the record, we insist, shows a legal assignment of the bond.

The creditor, after the condition of said bond had been broken, demanded of the sheriff an assignment of the bond. The sheriff wrote his name upon the back of it, and thereunto affixed his seal, and delivered it to the counsel for the creditor, with directions to fill up an assignment of said bond over his name, which was accordingly done, before the commencement of the action. In the case of *Speak and others* vs. *U. States*, 9 *Cranch*, 37, *Story, J.,* said, " It is clear at the common law, that an alteration or addition in a deed, as by adding a new obligor, or an erasure in a deed, as by striking out an old obligor, if done with the consent and concurrence of all parties to the deed, does not avoid it." And this principle equally applies whether the alteration or erasure be made in pursuance of an agreement and consent prior, or subsequent, to the execution of the deed ; and the cases in the books in which erasures, interlineations, and alterations in deeds, have been held to avoid them, will be found, on examination, to have been cases in which no such consent had been given.—*Smith* vs. *Crooker et al.* 5 *Mass. Rep.* 588 ; *Hunt, admr.* vs. *Adams*, 6, *Mass.* 519 ; *Mackham* vs. *Garaston, Mason*, 547 ; *Pagot* vs. *Pagot*, 2 *Ch. Rep.* 187 ; *Zouch* vs. *Clay*, 1 *Vent.* 185 ; *Yelv.* 96, *n.* 2 ; *Russell* vs. *Longstaff, Doug.* 514 ; 2 *Stark. Ev.* 480, *a.* 1 ; *Ulen* vs. *Kittridge*, 7 *Mass.* 233 ; 13 *Johns. Rep.* 175. This cause we apprehend stands upon the same ground that it would, had the sheriff afterwards filled up the assignment himself. The assignment was written over his name by his direction, and it was in law his act. *Qui facit per alium facit per se.*—*Co. Lit.* 258.

6. The assignment of the jail bond being regular upon the face of it, parol evidence was inadmissible to explain or contradict it.

PRENTISS, Ch. J., pronounced the opinion of the Court.—The questions to be decided arise upon several issues of law joined in the case, and upon exceptions taken to the instructions given to the jury on the trial of the issue of fact.

The question presented by the fifth plea, which involves the validity of the special act of the legislature, discharging the judgement debtor from imprisonment on the plaintiff's execution, is settled by the case of *Ward* vs. *Barnard*, 1 *Aik. Rep.* 121, and the case of *Lyman* vs. *Mower*, 2 *Vt. Rep.* 517, decided at the last term in Windsor county ; and the question cannot be considered as open to discussion.

That the fourth plea is bad, is decided by the case of *Keith* vs. *Ware*, 2 *Vt. Rep.* 174, determined in this county in 1829. When

the sheriff takes a bond as security for the liberties of the prison, and the prisoner escapes, the creditor's right of action against the sheriff for the escape is suspended, until he has demanded the bond, and there has been a refusal to assign it, or he has failed to recover and obtain satisfaction upon it. As no right of action, consequently, has accrued to the plaintiff against the sheriff, the statute of limitations has not as yet begun to run in favor of the latter. But the plea, in effect, is a plea that the sheriff has not been damnified ; and it was decided in the case of *Lyman* vs. *Mower*, already mentioned, that such a plea is no answer to an action upon a bond of this description.

The third and sixth pleas present the question, whether the assignment of the bond by the sheriff to whom it was executed, but who was not in office at the time of the escape of the prisoner, is good and effectual in law to transfer the right of action upon the bond to the plaintiff. It is very clear from the statute, that the bond must be assigned by the sheriff who takes it, whether he remains in office until the breach of the condition or not.—(*Comp. Stat. p.* 220, *s.* 11.) He alone is ultimately liable to the creditor for the escape, and his successor in office can have no interest in the bond. Prisoners when admitted to the liberties of the prison are no longer in the keeping of the sheriff ; and a new sheriff, consequently, has no custody or controul of them, and is under no liability for their escape, unless they are recommitted to prison pursuant to the act of 1812 ; in which case the former bond, unless previously broken, becomes of no effect.

The remaining question arises on the exceptions. It appears that the sheriff put his name and seal on the bond, and delivered it to the plaintiff's attorney, who afterwards wrote over the name and seal a formal assignment ; and the jury were directed, that if the sheriff put his name and seal on the bond, after the escape of the prisoner, with a view to assign the bond to the creditor, and that the blank should be afterwards filled up by his attorney with proper words of assignment, and the same was afterwards, and before the commencement of the action, filled up accordingly, it constituted a valid assignment of the bond. In the case of *Jackson* vs. *Titus*, 2 *Johns. Rep.* 430, cited and relied upon by the defendants, a lessee put his name and seal on the back of a lease, and delivered it to a third person, giving him verbal authority to write an assignment of the lease on a certain event, and the assignment was afterwards written accordingly. The court considered, that the affixing the hand and seal to a piece of blank paper was

not an assignment by *deed* or *note in writing*, within the requisi- <span style="float:right">WASHINGTON,<br>*March*,<br>1830.</span>
tion of the statute of frauds ; and that to allow it to be good, would
open a door to fraud and perjury, and defeat the wise and saluta- <span style="float:right">Kendall<br>*vs.*<br>Dodge et al.</span>
ry provisions of the statute. But the statute of frauds having no
application to the question arising in the present case, the case
does not come within the principle of the decision cited ; and we
see no good reason why the assignment in this case should not
be good and operative in law. The bond was taken for the ben-
efit of the creditor, and could be assigned to no other person ;
and the sheriff having put his name and seal on the bond, and de-
livered it to the creditor's attorney, with authority to write an as-
signment, which was afterwards done, we think there was a suffi-
cient assignment of the bond.

<div align="center">Judgement affirmed.</div>

---

JONATHAN D. BRADLEY and WIFE *vs.* JUSTUS NORRIS, admin- <span style="float:right">CALEDONIA,<br>*March*,<br>1830,</span>
istrator of BENJAMIN NORRIS.

A bill brought to foreclose the equity of redemption of mortgaged premises is not with-
in the prohibition of the 58th section of the act relative to " Probate courts and set-
tlement of estates," which section provides, *that no action shall be commenced
against any executor or administrator to recover for any debt or legacy until the ex-
piration of the time allowed for the payment of the same.*

This bill was brought to foreclose the equity of redemption in
certain mortgaged premises, conveyed by the intestate to the
plaintiffs to secure the payment of a sum of money. *Shaw*, soli-
citor for the defendant, moved to dismiss the bill, on the ground
that the defendant was allowed, by the probate court, one year
from the time of taking upon himself the trust of administrator, to
pay the debts of the intestate, which had not elapsed, and that the
statute, *( Comp. Stat. p.* 344, *s.* 58,*)* prohibited any action against
the administrator until after the expiration of that time.

*J. Mattocks, for the plaintiffs.*

PRENTISS, Chancellor.—The section of the statute relied upon,
in support of the motion, is applicable to actions brought directly
for the recovery of debts or legacies, and was enacted to prevent
suits of that description, against an executor or administrator, un-
til he has had time to convert the assets into money. But the
proceeding in this case is not properly an action for the recovery

<div align="center">WW</div>

CALEDONIA,
March,
1830.

Bradley et ux.
*vs.*
Norris, admr.
of a debt ; no judgement can be rendered, or any execution had, against the administrator for the debt. The object of the bill is to foreclose the equity of redemption in the mortgaged premises ; and the bill is in the nature of a proceeding *in rem*, as much so as an action of ejectment on the mortgage, which is clearly not within the statute. The 97th section of the same statute declares that no action shall be commenced against any executor or administrator, after the estate is represented insolvent ; but this provision has never been construed to extend to an action of ejectment or a bill of foreclosure. The mortgaged premises may be insufficient security for the debt, and the administrator may not, and certainly in such case would not, redeem. If, however, the premises are in fact ample security, so that it becomes the duty of the administrator to redeem, the Court, in decreeing a foreclosure, will undoubtedly give such time, as the circumstances of the estate may require to raise money for the purpose of redeeming, whether it be one year or more.

<div align="right">Motion overruled.</div>

------~~~◈~~~------

BENNINGTON,
February,
1830.
OVERSEERS OF DORSET, appellees *vs.* OVERSEERS OF MANCHESTER, appellants.

An order of removal of a pauper, from which no appeal is taken, is conclusive against the town to which the removal is made, and may be given in evidence, not only by the town in whose behalf it is made, but by any other town.

When the matter in defence does not amount to a full and complete estoppel, and cannot be pleaded as such, or the party has no opportunity to plead it, he may shew it in evidence.

On an appeal from an order of removal, it was held that the appellant town might give in evidence an order of removal, warrant thereon, and actual removal from another town to the appellee-town, and that this order had not been appealed from.

This was an appeal from an order of two justices, removing a pauper from *Dorset* to *Manchester*. On the trial of the issue joined upon the plea that the pauper was unduly removed, for that his settlement was not in *Manchester*, the appellees proved a residence of the pauper in *Manchester* in 1815 and 1816 for more than a year. The appellants thereupon produced and offered in evidence the record of an order of removal from Middletown to *Dorset* in 1824, and of a warrant of removal issued thereupon, with a return thereon that the pauper was removed to *Dorset* pur-

suant to said warrant ; from which order no appeal was taken by *Dorset.* The appellees objected to the admission of this record in evidence, and the county court having rejected it, the appellants filed their exceptions : and a verdict being returned for the appellees, and judgement rendered thereupon, the cause was removed to this Court on the exceptions.

*Bennett and Aikin, for the appellants.*

*Smith, for the appellees.*

PRENTISS, Ch. J., delivered the opinion of the Court.—After the appellees had proved a settlement of the pauper in *Manchester* in 1815, by a year's residence there, without being warned out, the appellants, in order to shew a subsequent settlement of the pauper in *Dorset,* offered in evidence the record of an order of removal from Middletown to *Dorset,* made and executed in 1824. That this order of removal was evidence, and conclusive evidence, of the settlement of the pauper in *Dorset,* at the time the order was made, cannot admit of a question. An order of removal, unappealed from, is conclusive against the town to which the removal was made, and may be given in evidence, not only by the town in whose behalf it was made, but by any other town. Not only so, it may be given in evidence, and has the same conclusive effect, upon the question of settlement arising between any other towns. It was observed by *Buller, J.,* in *Rex* vs. *Kenilworth,* 2 *Term Rep.* 598, that there was no proposition in the law of settlements more clear, than that an order of removal, unappealed from, was conclusive as to all the world ; and that this was so clearly and so universally established, that it ought never to be impeached. And in *Rex* vs. *Corsham,* 11 *East,* 388, it was directly and expressly decided, that an order of removal, executed and unappealed from, is conclusive as to the settlement of the pauper, at the time of the order, between parishes not parties to the order.

The rule, that when a fact, to which an estoppel applies, is distinctly averred or denied by one party, and the other, instead of pleading the estoppel, takes issue on the fact, he waives the estoppel, and the jury are at liberty to find the truth, has no application to this case. A plea of estoppel must contain matter which precludes the other party from alleging or proving the fact* on which he relies ; and when the matter does not amount to a full

BENNINGTON, February 1830.

Dorset
vs.
Manchester.

and complete estoppel, and cannot be pleaded as such, or the party has no opportunity to plead it, he may shew it in evidence. Though the order of removal, which was offered in evidence by the appellants, was conclusive that the pauper's settlement was in *Dorset* in 1824, it would not estop or preclude the appellees from shewing that he had acquired a subsequent settlement in *Manchester*, and thus proving the fact alleged that his legal settlement was there. A judgement or decree, when given in evidence, as a collateral fact, between those who are not parties to it, is, in general, conclusive in its operation.

Judgement reversed, and cause removed
to the county court for a new trial.

GRAND-ISLE, January, 1831.

JOSEPH ADAMS, surviving administrator of JOHN STARK, deceased,

*vs.*

WARREN CORBIN, executor of PETER SAWYER, deceased.

On an appeal from the decision of commissioners, the claimant must declare, and the trial proceed, according to the nature of his claim.

A surviving administrator, appealing from the decision of commissioners disallowing his claim against the estate of his late co-administrator, for property that was in his hands as such, may declare in account.

In such case, the auditor has nothing to do with evidence, that might be proper on the subject of a division, but does not affect the accounting.

The appellant, recovering his claim, that was before disallowed, must recover cost.

*Joseph Adams* and *Peter Sawyer* were joint administrators of the estate of *John Stark*. While they acted as such, *Sawyer* had the custody and disposal of many articles of personal property, belonging to the estate of *Stark*, and died without settling his accounts about the same before the probate court. This left *Adams* sole administrator of the estate of *Stark*. *Sawyer* left a will in which *Corbin* was appointed his executor, who acted as such. *Corbin* represented the estate of *Sawyer* to be insolvent, and commissioners were appointed before whom the plaintiff exhibited his claim as administrator of *Stark*, for the property disposed of by *Sawyer* while he was co-administrator. This claim was disallowed by the commissioners; and, after their report was returned to the court of probate, the plaintiff appealed to the county court, where his claim was prosecuted in the form of an action of account. Judgement to account was rendered and an auditor appointed. The auditor made a report, containing a circumstantial detail of the points litigated, and the facts proved with regard

to each.   Exceptions were taken to  this report ;  but it  was ac-   cepted by the county court ;  and exceptions  were taken  to that   decision, upon which the cause came to this Court.   The points here litigated embraced but a small part of the report,with the ex- ception to the plaintiff's mode of declaring ;  and  sufficient is al- luded to in the  arguments, and in the  opinion of the Court, to be understood, without stating the report at large.

*Argument  for the defendant.*—1.  The  defendant  contends, the action of account will not  lie against *Sawyer*,  under the re- ported statement of facts, and, of course, the claim could not have been presented to commissioners.—*Stat.* 142.

2.  That,if the action be properly brought, the court have deci- ded incorrectly, in saying  that the plaintiff  ought not to  answer the question, " whether he is now holden to the creditors of *Stark's* estate for their dividends.

3.  That, if the action will lie, the defendant ought to have been allowed to put the question to the plaintiff,  " whether the plaintiff now has in his hands any of the estate of  *John Stark,* and, if so, how much ?

4.  That, if there should be a judgement for the plaintiff  in this case, he ought not to recover cost, but to pay cost to the defendant. —*Stat.* 354.

*Argument for the plaintiff.*—1.  The plaintiff, being the repre- sentative of the estate of *Stark,* has the legal title to the funds of the estate in whatsoever hands they may be found, unless  barred by some rigid rule of law.—*Stat.* 340.

2.  From the report it is evident, that the defendant's testator was indebted to that estate.   The question is, can the  defendant retain the property of *Stark's*  estate in his hands, and  refuse to account for it, or pay over to *Stark's* representative ?   Here is a debt, and the representative of all, who are interested in the fund, or estate, to  which  it is  owing;  and  why shall  it  not be paid to him ?  It would seem, if the defendant is not in a situation to hold, against all the world, the sum found by the  auditor to  be due from the estate  which he represented, that the  judgement of the county court, accepting  the report,  ought  to  be affirmed.— *Stat.* 142 ; 5 *Pick. Rep.* 96 ; *Executors of Smith* vs. *Chapman's executors,* 5  *Conn.* 14 ; *Executors of Loop* vs. *Administrators of J. B. Loop,* 1 *Vt.* 177.

3.  The questions, proposed by the defendant's  counsel to the

GRAND-ISLE,
January,
1831.
────────
Stark's admr.
vs
Sawyer's exr.

plaintiff, for the purpose stated by the auditor, were properly over-ruled : for 1. The declared object of the inquiry was frivolous and impertinent. 2. The inquiry cannot be considered proper in any point of view—The action is brought to compel the defendant to give an account of the property, which his testator had received as administrator, and which had not been administered upon.

4. The question as to costs depends upon a construction of the proviso to the 93d section of the probate act.—(Stat. 354.) A fair construction of this section, taken in connexion with the provisions made for exhibiting and litigating all manner of actions before commissioners, and with the nature of an appeal therefrom, on any one cause of action, will not sustain the doctrine contended for by the defendant.

HUTCHINSON, Ch. J., after stating the case, pronounced the opinion of the Court.—Three exceptions only are now urged. The first is, that this action of account does not lie—That it would not lie in favor of plaintiff against *Sawyer*, if he were living, and therefore will not now lie against his estate. This action would not lie in favor of the plaintiff against *Sawyer*, while they remained co-administrators ; and this for the good reason, that *Sawyer* would be as much liable to the creditors and heirs, as the plaintiff would ; and both and each must account before the probate court. This accounting is necessary to show their respective liabilities, in case of their defaults occasioning suits upon their probate bonds, and this, whether they had given one bond jointly, or each severally. If either ceased to be administrator, while living, by removing from the state, or in any way pointed out by statute, he ought to render his account before the court of probate ; and, if he neglects, his bondsmen are liable. But a suit upon the probate bond is at the instance of a creditor or heir. But if a sole administrator resigns, or is discharged while living, his successor may call from him the property he may have retained, belonging to the estate. And he may call it out by a proper action. If it is yet on hand, and he has no lien upon it, it may be called out by an action of trover. Possibly, circumstances might be such, that an action of account would be the most appropriate action. There probably would be no legal necessity of taking the remedy upon the probate bond, if the principal was sufficiently able to respond. In like manner if one of two administrators be discharged, while living, the one who continues to administer represents the whole es-

tate, and has the same powers to collect and administer the estate, as though he were newly appointed a successor to the former administrator.

GRAND-ISLE,
January,
1831.

Stark's admr.
vs.
Sawyer's exr.

But whatever course of proceeding the law would require between co-administrators, while living, no argument can be thence drawn to affect this case. *Sawyer* is not a co-administrator. He ceased to be such by his decease. His estate being represented insolvent, whatever claim there might be upon his estate must go before commissioners, or it would be forever barred. If a creditor or heir of *Stark* presented the claim, he might choose to present the probate bond. If his bail paid in his life time they might present a claim for remuneration. But the plaintiff, as surviving, and sole, administrator of *Stark*, has presented his claim direct for the property had and disposed of by *Sawyer*, and not accounted for. His claim was disallowed; and he appealed. The law requires him to file a declaration of his demands preparatory to a trial on the appeal; which then assumes the form of a suit at common law. And his declaration must be such as is suited to his claim. And, if he has a variety of demands, such as could not be joined in one declaration at common law, he must declare upon them all in separate counts. Otherwise the forms of the common law would destroy his rights under the statute; which must not be admitted, and these must be met by various pleas suited to their nature. And, on trial, verdicts must be formed, that amount to a finding on all the various issues. And, in some cases, the trials must be different. Thus, if the creditor has claims in assumpsit, and on account, and on book account, under our statute, after an appeal from the decision of commissioners, he must declare according to those several claims, and the assumpsits must be tried by jury, and the accounts go to auditors. This plaintiff has declared in account as bailiff and receiver. On examining the items of the account reported, this appears to be the proper mode of declaring. The items are not at all of a character to be charged on book account; for there has been no sale to *Sawyer*, of any of the property. It was emphatically property in his hands in trust to account for in some way. As he received it in his capacity of administrator—that he had paid it out as such in good faith, is good accounting; and that, and his services, might turn the balance against the plaintiff. If the property were goods and chattels, that remained unsold at the decease of *Sawyer*, if *Sawyer's* executor chooses to deliver them up on request, or as soon as *Sawyer* had deceased, treating the same as the property

GRAND-ISLE, of *Stark,* the plaintiff can have no further claim.  The course of
January,
1831,   proceeding here delineated seems necessarily to result from the
—————   regulations of our statute, regulating the settlement of estates rep-
Stark's admr.
   vs.   resented insolvent.  And, according to this course, the plaintiff
Sawyer's exr.
        is rightly pursuing his claim.  It has become his duty to complete
the settlement of the estate of *John Stark,* ; and he must get this, as
well as the other property of *Stark,* under his control, before he
can pay it out to the creditors and heirs.

Another question presented is this : At the hearing before the
auditor, the defendant's counsel proposed certain questions to the
plaintiff, while swearing to his account, with the professed view of
compelling a division, between the plaintiff and the estate of *Saw-
yer,* of what property should remain after paying the debts of
*Stark.*  These questions were, 1st, whether the plaintiff is now
holden to the creditors of said estate for their dividends ?  2d.
whether the plaintiff has now in his hands any of the estate of
*John Stark ;* and, if so how much ?  The auditor decided, that
the plaintiff need not answer these questions.  This decision was
correct.  The questions would be proper before the court of
probate, on a final settlement of the estate *;* but they lead to no
facts, with which the auditor had any concern.  They had no re-
lation to the accounting.  If the defendant had any right as heir,
as would seem probable by the facts stated in the report, that
would not affect this accounting ; but only would affect the divis-
ion, that must be ordered by the court of probate, after the ad-
ministrator has got the estate into his hands ready to be divided.

The remaining question is, whether the plaintiff shall recover
cost, or be compelled to pay the cost to the appellee.
The statute, page 354, provides, in general terms, that the
party recovering on such appeals, shall recover costs, as in
other actions at law.  Afterwards the courts are empowered
to tax costs either way in their discretion.  We think this discre-
tionary power was given for the purpose of checking frivo-
lous appeals.  Here the plaintiff's whole claim was disallow-
ed.  In that view his appeal cannot be frivolous ; especially as he
now recovers upon the merits.  It appears by the report of the
auditors, that, when the defendant was disposed to take advantage
of the statute of limitations, before the commissioners, the plaintiff
seemed to dislike it, and not care which way they decided.   By
this, the defendant must then have understood, that the plaintiff in-
tended to appeal if the claim was disallowed.   The defendant
now abandons that defence, which gave such umbrage to the plain-

tiff. The cost must be taxed for the plaintiff, as in ordinary ca-ses, for the recovering party.

The judgement of the county court is affirmed, with costs, and this decision must be certified to the court of probate, whence the appeal was carried to the county court.

*Smalley & Adams*, for plaintiff.
*Allen & Turner*, for defendant.

GRAND-ISLE, *January*, 1831.

Stark's admr.
*vs.*
Sawyer's exr.

————————✦————————

AARON ROBINSON *vs.* HEMAN SWIFT, administrator of MOSES ROBINSON, and ISAAC TICHENOR, executor of SAMUEL ROBINSON. (In Chancery.)

Where A was indebted to the estate of M in several promissory notes which were put in suit by the administrator of M, and the estate of M was also indebted to the estate of S, of which A and M were joint residuary legatees,—it was held that M's administrator could not be compelled to account to A for the moiety of the sum so due from the estate of M, by cancelling and delivering up the notes in suit; and a bill brought by A for this purpose was dismissed.

But it might have been ruled otherwise, had the executor of S been insolvent, or had colluded with the administrator of M.

The bill stated that the plaintiff was indebted to *Moses Robinson* in his life time on several promissory notes, executed by the plaintiff to him, amounting in the whole to $2000, upon which notes, *Heman Swift*, administrator of *Moses Robinson*, had commenced suits, which were pending against the plaintiff; that *Samuel Robinson* died several years ago, leaving a will of which *Isaac Tichenor* was appointed executor, who proved the will and took letters testamentary thereupon; in and by which will the said *Samuel* gave all the rest and residue of his estate, after the payment of debts and certain legacies, to the plaintiff and the said *Moses Robinson* as joint residuary legatees, and that the said *Samuel* left a large estate more than sufficient to pay his debts and the legacies given by his will; that the estate of *Moses Robinson* was indebted to the estate of *Samuel Robinson* in several sums of money, amounting in the whole to the sum of $5000, which remained unpaid, one half of which belonged and ought to be paid over to the plaintiff as one of the residuary legatees aforesaid; prayed that an account might be taken, and that the said *Heman* as administrator as aforesaid might be ordered to give up the notes in suit against the plaintiff, in part payment of the plaintiff's share of the money so due from the estate of *Moses Robinson*, and to pay over the residue thereof to the plaintiff. The defendants demurred severally to the bill.

XX

BENNINGTON,
February
1830.

Robinson
vs.
Swift et al.

*Smith, for the defendants.*—It is one of the first principles of pleadings, that the orator's bill must contain a positive and distinct statement of every fact and circumstance necessary to establish his claim. This rule is so well settled that if the answer states a new case, the orator cannot have relief according to the case made in the answer without amending his bill.—*2 Mad.* 168, 169. The same general rule applies as at law, that the proof must correspond with the allegations; for the court pronounces the decree *secundum allegata et probata.*—*2 Swift's Dig.* 203. A demurrer admits all the facts which are well pleaded, but denies that the orator is entitled to the relief sought. The court is bound to say whether, from the facts as stated in the bill, a decree can be made against the defendant.—*2 Mad.*281,282; *2 Swift*,216,217.

I. The bill prays for a decree against the administrator of Moses Robinson on the ground that the orator is residuary legatee to the estate of Samuel Robinson, and the estate of Moses Robinson is a debtor to that estate. It is contended that

1. The claim, if any, must be prosecuted in the name of the executor. The executor represents the testator, both at law and in equity, in relation to the personal estate.—*Toller's Executor,* 133, 157, 257, 431, 454; *1 Swift,* 444, 446; *Newland on cont.* 113, 512, 513. There is no privity between the legatee and the debtor, who is answerable only to the personal representatives of the testator.—*1 Mad.* 224,287; *2 Swift's Dig.* 220, 221 ; 6 *Vesey,* 757, *Alsagar* vs. *Rowly.* A collusion between executor and debtor is not pretended. It is not even alleged that the executor has been requested to prosecute. If the orator intended to rely upon a collusion, it must be specially charged. The common allegation to that effect is mere matter of form.—*2 Mad.* 169. A collusion existing, it would not enable the legatee to seize upon the personal estate, or prosecute in his own name. The remedy, and the only remedy, to be sought, is to apply to the court of probate, and have the executor removed ; or to a court of chancery, and have a receiver appointed ;—(*Stat. ch.* 44, *s.* 34, 35 ; 2 *Swift,* 159 ; *2 Mad.* 235 ;) or an order made that the executor file a bill within a limited time, or in default, that the legatee may be at liberty to file a bill.—*2 Mad.* 505. It would be strange, indeed, if the legatee can call every debtor into chancery to pay over one moiety of his debt. The other co-legatee must have the same remedy. The executor in both cases must be a party, and the result would be (the debts being no more than usual) that the executor must take up a permanent residence in chancery :

besides, the whole business of a probate court would be transfer-
red to the court of chancery.

2. On the ground of a set-off, no decree can be made against
the administrator of Moses Robinson. In cases of set-off a court
of equity adopts the same principle as a court of law. Both at law
and in equity the debts to be set off must be such as can be pro-
secuted at the suit of the defendant at law, and the orator in chan-
cery. The debts must be mutual, or, in other words, the parties
must be indebted to each other, and the debts must accrue from
a dealing between them.—2 *Swift's Dig.* 149 ; 1 *Wheat. Sel.*
117 ; 4 *Johns. Chan.* 11 ; 2 *Mad.* 661 ; 3 *Johns. Chan. Rep.*
358. The damages must be liquidated ; for on application for a
set-off, a court of equity, as well as a court of law, will not settle a
contested claim.—*Esp. N. P. (pt. 2,)* 75 ; 1 *Wheat. Sel.* 120 ;
2 *Swift's Dig.* 149. Although our statute extends the power of
courts of law on this point, it does not affect chancery powers.
A court of equity goes no farther than a court of law in cases of set
off, unless on the ground of fraud, accident, or mistake, a case is
made in the bill for equitable interference. And in this bill noth-
ing of the kind is alleged, or even intimated. The ground, and
the only ground, upon which equity is called to interfere for the
purpose of set-off is, that the orator is indebted to the estate of
Moses Robinson, and has a claim as a legatee on the estate of
Samuel Robinson, and that the estate of Moses Robinson is in-
debted to that estate. If the estate of Moses Robinson was insol-
vent, or any other circumstance existed which would render it
fraudulent in his administrator to recover at law upon the notes,
equity might compel an offset upon equitable principles. Not
upon the ground that chancery possesses a jurisdiction in relation
to offsets different from a court of law, but upon the ground that
equity will relieve against fraud in every shape from the lowest to
the highest grade.—1 *Swift,* 712 ; 2 *Swift,* 149 ; 2 *Mad. Ch.*
66 ; 1 *Swan. Ch. Rep.* 30.

3. By the will of Samuel Robinson, the orator and Moses Robin-
son's estate are residuary legatees, and, of course, the residue
belongs to them as tenants in common. It is alleged in the bill
the estate of Samuel Robinson amounts to seventeen thousand
dollars, and that there is a large amount of property to be divided
between the residuary legatees. It does not appear from the bill
there has been any division between the residuary legatees, or
that Moses Robinson or his representatives have received any part
or portion of the residue. Under such circumstances the orator

Bennington, cannot sustain a bill against his co-tenant for one moiety of the
*February,*
1830.     debt claimed to be due to the estate of Samuel Robinson.    If a
————      legacy is given to a debtor of the testator, the debt must be deduc-
Robinson
*vs.*      ted from the legacy, unless it amounts to more than the legacy.   It
Swift et al.  does not appear from the bill but that a large amount will be due
to the estate of Moses Robinson, after deducting the debt.    If
the orator can sustain a bill against his co-tenant in equity, it must
be framed upon the ground of a tenancy in common, praying for
a partition, or division of the whole residue.

II. From the facts stated in the bill there can be no decree
against the executor of Samuel Robinson.

1. The bill is not framed with a view to a decree against the ex-
ecutor for the payment of any money, or rendering any account to
the orator of his executorship.    The executor is made a party
merely to enable the orator to obtain a decree against the admin-
istrator of Moses Robinson, as the decree would affect his rights
as executor.    To give the bill a different construction would ren-
der it demurrable.    A claim against the estate of Moses Rob-
inson, and also against the executor for the residue generally, can-
not be united in the same bill, as it would involve matters and de-
mands of distinct and separate natures.—2 *Swift*, 202; 2 *Mad.* 294.

2. There can be no decree against the executor for the resi-
due, or any part thereof.    The allegation in the bill that the ora-
tor is entitled to a large sum, as a residuary legatee, without sta-
ting the facts from which it may appear, amounts to nothing.    It is
a mere conclusion of the bill, and is not at all supported by the
facts as stated in the bill.    It is not alleged that, aside from the
claim against the estate of Moses Robinson, there was any per-
sonal property belonging to the estate of Samuel Robinson.
The executor is not accountable for the real estate.    The
legatees may divide it among themselves, unless the executor
wants it for the payment of debts, &c.    It is not alleged the
debts and specific legacies have been paid.    It is alleged that after
the payment of the debts, &c., there *will be* a large amount of
property to be divided ; from which it would seem the debts
and legacies are not paid.    It is not alleged the executor has
closed his account in the probate court, or any order made or
proceeding had thereon for that purpose.—*Stat. ch.* 44, *s.* 44.
It does not appear any order has been made by the probate court
for the payment of the legacies, or for a division of the residue among
the residuary legatees.—*Stat. ch.* 44, *s.* 48, 58, 78, 79.    Under
such circumstances the legatees cannot call the executor into

chancey for the residue. If he wishes to prosecute his claim, his remedy is at law. The debts and special legacies being paid, the legatee may call the executor to account before the probate court, and, if dissatisfied with the decree, may appeal to the Supreme Court, (and this is our court of chancery,) and before both courts will have the benefit of the executor's oath. An order of the probate court, dividing the residue and fixing the time for the executor to pay or deliver the same to the legatees, is the next step to be taken. If the executor neglects to pay over, the legatee may bring an action on the probate bond. Or if he wishes still further to avail himself of the oath of the executor, he may bring an action of account.—*Stat. ch.* 10, *s.* 6. The probate court is organized to settle the estate of persons deceased, and, for this purpose, the power of all the courts are concentrated. To sustain a bill upon circumstances, as disclosed in this case, would delay and embarrass the settlement of estates, and transfer the whole business of the probate court to the court of chancery. If a bill can be brought in equity by the residuary legatee, it must be upon the disclosure of circumstances shewing that he has not adequate remedy at law. Courts of equity and courts of law have not, in our jurisprudence, concurrent jurisdiction.—2 *Swift,* 217, 218, 204, 205.

*Bennett and Aikin, for plaintiff.*—1. The first cause of demurrer assigned by the defendant, *Tichenor,* is, that the claim, if any, should be presented by him as executor of Samuel Robinson, and not in the name of the orator. This would be a good objection at law, but we think not in chancery.

The bill states, that after the payment of all debts, specific legacies, and the expenses of the settlement of the estate of Samuel Robinson, there will be a large amount of property to go to the orator and said Moses, or their representatives, as residuary legatees : and then proceeds to set out specific claims due the estate of Samuel Robinson, and then alleges the funds in the hands of Moses Robinson, or rather his administrator, to pay these claims, and then goes on to state, that in equity and good conscience the orator is entitled to have allowed him one moiety of the said claims.

No good reason can be assigned why the orator should not be permitted to sustain the bill. Chancery has jurisdiction over an executor to enforce payment of a legacy, and, if he recover possession of *assets,* he holds them as *trustee* for the *legatees.*— 1 *Mad. Ch.* 578 ; 2 *Fonb.* 316, *n. d.* So a bill for distribution

*[margin note:]* BENNINGTON, *February,* 1830,

Robinson
*vs.*
Swift et al.

BENNINGTON, of personal estate will be sustained in England, notwithstanding
February,
1830.
the jurisdiction of the spiritual courts in this matter.—1 *Vernon*,
───────
Robinson
*vs.*
Swift et al.
133, 134.   See also, 8 *Vin. Abr.* 548 ; *Andrews* vs. *Powers*,
2 *Vernon*, 47, *and note* ; 1 *Strange*, 666.   Sometimes chancery
will sustain a proceeding in spiritual courts for a legacy.—2 *Atk.*
420 ; 2 *Fonb.* 317, *n. d.*   Our probate law has no negative words
ousting chancery of its jurisdiction, and there is no reason why it
should be done by implication.   The rights of all parties are secur-
ed.—2 *Com. Dig.* 603, 3 *g.* 3 ; 1 *Vernon*, 94, 162 ; 2 *Vernon*,
205, 306 ; *Fonb.* 376, *n. p.*   To hold that the executor of Sam-
uel Robinson must prosecute the claims for the *benefit* of residu-
ary legatees, and the residuary legatees the executor, would re-
quire two suits, where all may be done by one.   It is true, if it
appears by the bill or answer that the executor wants the funds
for payment of debts and specific legacies, his claim is paramount ;
but this must appear, to defeat the equitable claim of the residua-
ry legatee into whosesoever hands the *assets* may be.   The princi-
ples of the English cases sustain this bill.

2. The 2nd cause of demurrer on the part of the executor of
Samuel Robinson, is, that the bill does not pray for a decree
against him for the payment of monies, or to render an account
of his executorship to the orator.   In answer to this objection it
may be said, that it is common for a person to be made a co-de-
fendant against whom no remedy is sought.   In the present case
the executor has the legal interest, and if the claims specified in
the bill were wanting for payment of debts, his right would be par-
amount to the orators.   Hence the necessity of making him a
co-defendant.   The subject of the bill is not to effect a settlement
of the executor's account ; and as the bill is not predicated on the
ground that the claims specified in it have gone into the hands of
the executor, there is no reason why a decree against him should
be sought.

The remaining objections to the bill by this defendant is of a
general character, *viz.* the orator has not made such a case as en-
titles him to any *discovery* or *relief* as against this defendant.   It
is true, no relief is asked against this defendant, and if we are
correct in our opinion, this is no cause of demurrer.

The objections made by *H. Swift* to the bill, as contained in
his demurrer, are,

1. The same as the one contained in the demurrer of *Tichenor*.
This is sufficiently answered.

2. That no decree can be made against him as administrator

Bennington,
February,
1830.

Robinson
vs.
Swift et al.

on the ground of a set-off. The funds, a moiety of which the orator claims, are in the hands of this defendant as the administrator of Moses Robinson, and the claim, upon which the offset is asked, is due from the orator to said *Swift* as such administrator.

Here is, in equity, a *mutuality* of interest, and chancery will decree set-offs in all such cases.

3. The next cause of demurrer is, that the orator and Moses Robinson's estate are tenants in common of the property which may belong to them as residuary legatees under the will of Samuel Robinson, and that the orator cannot sustain a bill against his co-tenant for a moiety of the debt claimed to be due the estate of Samuel Robinson, but must bring his bill for a *division* or *partition* of the *whole* of the *residue*. In answer to this objection, it may be said that it does not appear from the bill that the orator and the estate of Moses Robinson have any interest in common unsettled, under the will of Samuel Robinson, which will not be settled in this suit. The object of this bill is not to procure a settlement between the orator and the estate of Moses Robinson of their interest under the will, or to call a sum of money out of the hands of the administrator of Moses Robinson ; but to enforce an application of the funds in his hands by a decree making the set-off, the relief sought by the orator will be obtained. Again, this is a proceeding against the estate of Moses Robinson, the executor of Samuel Robinson, being a party *pro forma*, the funds, a moiety of which are claimed in the bill, not having gone into his hands, there is no pretence in the bill that there are further funds in the hands of the administrator of Moses Robinson, a moiety of which the orator can claim. But it will be contended, that, even admitting that it appeared in the bill that there are other funds which ought to be the subject of division, still this would be no cause of demurrer to this bill. If we are correct in our views, we are not only entitled to a discovery, but also to relief in the premises as against the administrator of Moses Robinson.

Prentiss, Chancellor, pronounced the opinion of the Court.— The bill, after stating that the plaintiff is indebted to the estate of *Moses Robinson* on several promissory notes, which are in suit against him, charges that the estate of *Moses Robinson* is indebted to the estate of *Samuel Robinson*, of which the plaintiff and *Moses Robinson* were joint residuary legatees ; and the object of the bill is, to compel the administrator of *Moses Robinson* to account to the plaintiff for one moiety of the sums so due from the

estate of *Moses Robinson*, by cancelling and delivering up the notes in suit against the plaintiff, and paying over to him the surplus.

A creditor, filing a bill against an executor, cannot make a debtor of the estate a party ; nor can a legatee institute a suit against the debtors to the testator's estate, for the purpose of compelling them to pay their debts to him in satisfaction of his legacy. Though the legatee, like a creditor, has an interest in the estate of the testator, and a right to have it applied to answer his demand in a due course of administration, and may have his remedy against the executor, yet, unless by the insolvency of the executor, or collusion between him and the debtors, a distinct ground is given for a bill by the legatee against them, it cannot be sustained. —(*Coop. Eq.* 175 ; 1 *Mad. Ch.* 287.) The executor's power over the estate is exclusive, and he alone is entitled to sue for and collect the *choses in action ;* and to permit legatees or creditors to proceed against the debtors would lead to confusion and embarrassment in the settlement of the estate. Their right to follow *the assets, and make both the executor and debtor parties to a bill in equity,* is allowed only in some special case, such as collusion or insolvency. In the case before us, there is no suggestion of collusion, or even of negligence, on the part of the executor. An executor, after payment of the debts and legacies, is bound to pay over the surplus to the residuary legatees ; and, in general, the probate bond is a sufficient security, and affords an ample remedy, to them. This is not a bill by one of two joint residuary legatees against the executor and the other legatee for an account and his portion of the residuum. Such is not the case stated in the bill. There is no allegation that the executor of *Samuel Robinson* has any assets in his hands, after the payment of debts and legacies, or that there is any thing to which the plaintiff is entitled, except the money alleged to be due from the estate of *Moses Robinson* ; nor is there any prayer for an account or decree against the executor. Relief is prayed for only against the administrator of *Moses Robinson*, and that solely on the ground that the estate of *Moses Robinson* is indebted to the estate of *Samuel Robinson*, of which the plaintiff is residuary legatee. The case comes within the general principle laid down, and the demurrers must be allowed.

                                        Bill dismissed.

JOHN H. KING, appellee *vs.* TIMOTHY FOLLETT, executor of the CHITTENDEN,
*January,*
will of GIDEON KING, appellant.                                    1831.

A sale or gift of stock in a steam boat company conveys the right to all dividends made
after such sale or gift takes effect, whether earned before or not.

This was an appeal from a decree of the court of probate for
the district of Chittenden.  *Gideon King*, by his will, not only
appointed *Follett* his executor, but gave him a legacy ; and after
sundry legacies, bequeathed the residue of his estate to *John H.
King*, and his brother, William King.  *Follett* proceeded to settle
the estate, and on a day appointed, with regular previous notice,
presented his account for settlement, and gave no credit to the
estate for what he himself claimed as legatee of the earnings of
stock in the Lake Champlain Steam Boat Company.   The said
*John H. King*, filed his petition before the court of probate, set-
ting forth, that the earnings of the steam boats, after the last divi-
dend, made in the lifetime of said *Gideon*, and before his decease,
amounted to such a sum, that his share of the same, as residuary
legatee, amounted to the sum of eight hundred dollars ; and pray-
ed that *Follett*, as executor, might be decreed to pay him said
sum.   The appellee so established these facts, that the court of
probate decreed accordingly, notwithstanding *Follett's* claim to
retain the same as special legatee.   The legacy to *Follett* was as
follows, to wit :  " I give and bequeath unto *Timothy Follett*, of
said Burlington, one hundred and sixty shares of stock, being all
my interest in the Lake Champlain Steam Boat Company, be the
same more or less ; provided, nevertheless, that said *Follett* shall
regularly pay, once in each year, to  *John H. King* the sum of
three hundred dollars, and to William King the sum of three hun-
dred dollars, to be paid annually as long as the dividends on my
said stock shall amount to the said sum so to be paid as aforesaid,
and no longer."  *Follett* appealed to this Court from the said
decree against him.

*I. P. Richardson, for the appellee*, contended, 1. That *Follett*
was not, by virtue of the 4th clause of the will of  *Gideon King*,
a special or general legatee of the will, but a trustee of *John H.
King*, and, also, that, if *Follett* had neglected to pay over to
*King*, as expressed in the proviso to said clause, the office of trus-
tee was at an end.

2. That if *Follett* should be considered by the Court as a resi-
duary legatee of said will, the legacies under the will are all subject

YY

CHITTENDEN to the claims against said estate in proportion to their respective
*January*
*1831.*  amounts.

King
*vs.*
Follett.    3. That the dividends of said stock, and all other personal es-
tate, ought to have been sold and applied in payment of the debts
of the estate, before the sale of the real estate, which the execu-
tor neglected to do.

4. That if the stock was an unconditional legacy or bequest,
still the dividends, which had accrued before the death of the
testator, belongs to the estate, and not to *Follett* as legatee.
—*Preston on legacies*, 190.   Legacy of money due on mort-
gage carries debt, not the interest.

5. That a construction, that said stock and the dividends be-
longed to *Follett* from the time of the death of the testator, as
long as the dividends, should amount to $600,00 *per annum*, and
no longer, would be inequitable and unjust; as it would be in the
power of the executor so to diminish its value, as wholly to de-
feat the claims of the other legatees.

6. This will, having been written by the executor and one who
claims under it, must be construed strongly against him.

7. The general rule is, that a bequest of so much stock is a
general legacy, unless there is some special ground for constru-
ing it specific.—*Roberts on wills*, 373.

8. The 4th clause shows a condition, which the executor must
show a compliance with, or he can claim nothing under it.—*Pres-
ton on legacies*, 193.

*C. Adams, for the appellant.*—1. The claim, made by the
plaintiff, was not properly made before the probate court, and
therefore the decree ought to be reversed.

2. That, by the will of *Gideon King*, the whole interest of
said *King* in his steam boat stock was devised to the defendant.

3. That, on the death of said *King*, the defendant became the
sole owner of said stock.

4. That dividends are parcel of the stock, growing out of it, and
must necessarily be paid to those who own the stock at the time
of the dividend.

5. The intention of *King*, that the whole should pass, is evi-
dent from the provision annexed to the legacy, that *Follett* should
pay out of the dividends $300 a year to each of the sons.

*Mr. Bailey*, on the same side, contended, that this was a spe-
cific legacy, and cited *Preston on legacies*, 53, 54; 2 *Mad. Ch.* 7,

11 ; 2 *Bro. C. Rep.* 108 ; 4 *Ves.* 555, 568 ; 7 *Johns. C. Rep.*
258 ; 1 *Atk.* 417.

That a specific legacy vests immediately on the death of the
testator.—*Barrington* vs. *Kistam,* 6 *Ves.* 345 ; *Prest. on Leg.*
54 ; 4 *Ves.* 748 ;—and that the value of a special legacy is to be
calculated at the death of the testator.—*Prest. on Leg.* 534,
160 ; 5 *Ves.* 205.

That it was the intention of the testator, by the clause in his will,
to bequeath to *Follett* all his interest in the Lake Champlain Steam
Boat Company, and that he had described in express terms the
benefit which he designed to secure to J. H. & W. King out of
this portion of his property ; that the stock carried with it whatev-
er was incident or appurtenant to it.—*Philips* vs. *Chamberlain,*
4 *Ves. Jun.* 51 ; *Rob. on wills,* 375, 190, 396 ; *Ray* vs. *Lawn,*
1 *Bro. Ch. Rep.* 76 ; *Page* vs. *Leapingwell,* 18 *Ves.* 463 ;
*Kent's Com.* 375 ; *Rockingham* vs. *Penrice,* 1 *P. Will.* 177 ; *Will-
iams* vs. *Williams,* 2 *Bro. Ch. Rep.* 87 ; *Gallimi* vs. *Noble,* 3
*Merr.* 691 ; 1 *P. Wms.* 598 ; *Morley* vs. *Bird,* 3 *Ves.* 628 ;
*Paris* vs. *Paris,* 10 *Ves.* 185 ; 2 *Bro. Rep.* 54 ; *Bandy* vs. *Wain-
wright,* 14 *Ves.* 66 ; *Witts* vs. *Steere,* 13 *Ves.* 363 ; *Watson*
vs. *Watson,* 7 *Johns. C. Rep.* 258.

*Mr. Allen, for the appellee,* replied.

HUTCHINSON, C. J., delivered the opinion of the Court.—The
decision, of which the appellant complains, affected the general
balance of his account, and his appeal brings up the whole account ;
and the decree of this Court fixes the balance, and it must be
certified to the probate Court, that he may be governed by it in
all future proceedings.   But the parties are disposed to litigate
nothing except the $800 decreed against the appellant.   And
here it should be distinctly noted, that the claim of the appellee
is not connected with the three hundred dollars a year to be paid
until a certain event, named in the will of *Gideon King,* should
happen.   For any claim of that kind the appellee must apply in
another way ; either commence an action for such three hundred
dollars, or claim in chancery a forfeiture of the legacy, on the
ground that nonpayment of the three hundred dollars would work
a forfeiture ; for the executor, as such, only accounts before the
court of probate for the estate as it was at the decease of the tes-
tator, adding such rents, interests and profits as accrued during
the settlement of the estate.

The foundation of this claim is, that the earnings of this steam boat stock, which might have composed a dividend at the decease of the testator, had the company seen fit then to have struck a dividend, should be considered as personal estate of the deceased, belonging, after the debts,&c., are paid, to the residuary legatees : or, in other words, the appellee contends, that the appellant can have nothing in his legacy of the steam boat stock, but what he would have been entitled to receive, if a dividend had been struck and paid immediately before the decease of the testator. This forms the question to be decided.

The clause in the will, giving to *Follett* 160 shares in said steam boat stock, adds, being all his interest in the same stock, be the same more or less. Now it is contended by the appellant, that this expression of interest, &c., has reference to,or may comprise, any property connected with this stock, aside from these shares ; and includes the very money now in dispute. But we think this expression was inserted to avoid any possible mistake in the number of shares. He supposed his shares to be 160 ; but what number he had he bequeathed to said *Follett*. This is the true construction of that part of the will.

In deciding this question, we are led to consider the nature of this property, and ascertain what a purchaser, or donee, is entitled to by his conveyance. A conveyance of stock, such as steam boat stock, canal stock, bridge stock, and the like, conveys the right of receiving the dividends of the income of such stock, and of conveying the same right to others ; and this necessarily includes a liability to pay assessments for out-goes in repairs, agencies, &c. ; for whenever a dividend is struck, the expenditures are first deducted from the incomes, and the net balance only is divided. And every person, purchasing such stock, purchases upon the risk of outstanding debts against the company ; for these have a lien upon the stock, in whose hands soever the title may be, and may secure themselves by requiring covenants against such pre-existing liens upon the stock. Suppose one or more of these boats, belonging to this company, had been consumed by fire, just before the decease of the testator, or exactly at his decease, or shortly afterwards ; in either case, it would have diminished the value of the stock, and its effect must have been felt in the next dividend ; and the loss, with regard to the 160 shares, must have fallen upon *Follett*, the owner at the time of such dividend : because the dividend must have been proportionably less, by deducting this loss ; and this, whether the loss was before, at, or after

the decease of the testator. Furthermore, the loss, in either case, might have been so great, that, instead of a dividend, there must have been a heavy assessment upon each share to meet the expense of reinstating the boats for business. In such case *Follett* must have paid this assessment to prevent a sale of his shares to pay the same ; for such assessment would have been, like any other debts, a lien upon these shares. Should the company refuse to make a dividend, and should *Follett* apply to a court of chancery for a decree compelling a dividend, all he could expect would be a decree that a dividend should be made by some day certain, and be made upon the principles we have just delineated.

We may present another view. Suppose the testator had conveyed these 160 shares to *Follett*, by an absolute deed, the same day that his will took effect. Could he or his executor claim a dividend of the prior earnings of the boats? We think not. His conveyance discharged him from any further corporate risks for losses, and left *Follett* the only person who could receive and discharge the dividends made afterwards ; and left him the only person, who could enforce a dividend, should the company refuse to make one, when his interests required it. This is the very case before us. If *Gideon King's* conveyance would have given to *Follett* this sum of $800, now in dispute, his bequest, taking effect at the same period, must have a similar effect.

The result is, that the decree of the court of probate must be reversed, so far as relates to this sum of $800, but affirmed as to all the remainder of the account ; and this decree must be certified to the court of probate from whose decree the appeal was taken.

*Adams, Bailey & Marsh*, for the appellant.
*Richardson & Allen*, for the appellee.

<div style="text-align:right">CHITTENDEN,
January,
1831.

King
vs.
Follett.</div>

———————

EDDY, MUNROE and HOOKER *vs.* HEZEKIAH HINE.

<div style="text-align:right">CHITTENDEN,
January,
1831.</div>

An auditor's report will be set aside, unless he reports the facts he finds proved, as the ground of his decision, upon each litigated item. He should not report the evidence of those facts, but the facts themselves.

HUTCHINSON, C. J.—This was an action upon *book account*, commenced before the county court, and, after judgement to account, an auditor was appointed, who made a report for the plaintiffs, which was accepted ; and the defendant filed exceptions, upon which the cause is brought up to this Court. The arguments before this Court comprise a number of points, in reference

CHITTENDEN
January,
1831.

Eddy et al.
vs.
Hine.

to different items; yet one principle, only, was recognised by the Court, of sufficient importance to be reported. The action was originally commenced against the present defendant, and his brother, William Hine, who died after the action was commenced. The plaintiffs' account was originally charged against William Hine, only; and the defendant denied his being liable for it as a partner with his brother, William. The auditor decided, from the testimony, that they were partners, and further detailed so much of the testimony, that it appeared he might well find this fact.

There appears to have been a large deal in lumber, which William Hine was to deliver to plaintiffs. Some he took on to White-Hall, where said Eddy then resided, and some, perhaps, to Troy, where Munroe and Hooker then resided. And the defendant produced a note, given by said Eddy to said William Hine, for two hundred and seventy six dollars, payable one day after date, with a memorandum at the bottom as follows : " Messrs. Eddy, Munroe and Hooker, will indorse on this his account, and charge same to me.— *Asa Eddy*." The present defendant contended, that, as *Asa Eddy* was one of the plaintiffs, and had given this note with such a direction at the bottom, this should operate as payment of so much of the account of the plaintiffs, or, at least, for so much of the same, as then existed, and might have been indorsed upon said note, according to said memorandum : but the auditor disallowed this wholly, but assigned no reason for his decision. The Court consider the auditor's report defective with regard to this note, as also about the claim and allowance for culls, as they are termed, of the lumber. The auditor expressly reports, that *Eddy* directed this note to be applied on the plaintiffs' account, in payment of the same. Now, whether this was right or wrong, to be sanctioned or not, must depend upon circumstances not here disclosed. If *Eddy*, at the date of said note, was indebted to the firm, and this note was given for his private debt, for which the partners were not holden either in law or equity, it ought to be rejected, and not be treated as affecting the account of the plaintiffs. But, if the company were then indebted to said *Eddy*, it might be otherwise ; and especially, which appears possible, if this note was given for property sold to the firm, and the papers drawn in this way, though not the most correct way, yet, if such was the substance of the transaction, we see no reason why it ought not to come in as part payment of the plaintiffs' account. The facts should be ascertained and reported, that the Court may see what the transaction was, and allow, or disallow, as justice might require. *Just*

so with regard to the claim and allowance for culls, as the parties <span>CHITTENDEN<br>*January*,<br>1831,</span> term them. It is objected by counsel, that the culls were made at White-Hall, whereas the lumber was to be delivered at Mallet's <span>Eddy et al.<br>*vs.*<br>Hine.</span> Bay. While the claim and allowance for culls is litigated, the rules of this Court require, that the auditor's report should state the facts, upon which this claim must be decided, if not in the form, at least, with all the substantial details of a special verdict. So of every litigated item in every account, that is laid before auditors. In this case, the auditor may have decided correctly ; but, with these defects in his finding of facts, we cannot ascertain whether his decision be correct or not. The judgement of the county court must be reversed, and the report set aside, and the case go out again to the auditor, to make report to this court at the next term.

\* \* \* \* \*, for plaintiff.

*C. Adams*, for defendant.

———————✺———————

BEZELE HOSFORD *vs.* ISAAC S. FOOTE. <span>CHITTENDEN<br>*January*,<br>1831.</span>

On a promise by A to pay, and save B harmless from three notes of less than one hundred dollars each, payable in three successive years, if A fails, and B is obliged to pay as they fall due, B may recover before a justice of the peace, upon each successive payment by him, and one recovery is no bar to the others.

A memorandum in writing, not signed by the party, is admissible evidence, accompanied with testimony of his concessions, that such memorandum contained the true contract.

This case was brought up from the county court upon exceptions allowed by the judges. The facts appeared to be these : The plaintiff, in the year 1820, gave three notes to one Johnson Foote, from forty to ninety dollars each ; and, in the year 1823, the plaintiff held a note against the defendant, which he delivered up to the defendant to be cancelled, also sold and delivered him a certain horse ; in consideration of which the defendant promised the plaintiff, that he would pay, and save the plaintiff harmless from, the said three notes, which said Johnson Foote held against the plaintiff, they being payable in three successive years. The defendant failed to pay said notes, or either of them, and the plaintiff was sued, and compelled to pay to Johnson Foote the note first payable ; and brought his action against the defendant upon his contract of indemnity, alleging, as a breach, what related to that note only, which he had thus been compelled to pay. This action was appealed to the county court.

CHITTENDEN
*January,*
1831.

Hosford
*vs.*
Foote.

Soon afterwards, the plaintiff was sued upon the note to Johnson Foote, which next became payable, and was compelled to pay this also. He then brought his action against the defendant, upon the same contract, alleging, as a breach,what related to said second note only. This action was, also, appealed to the county court,and was the one now under consideration. Both actions being in the same county court together,the plaintiff recovered judgement in the one first commenced. The defendant then insisted,that a justice of the peace could have no jurisdiction of this action; the entire contract,concerning the three notes,exceeding the sum of one hundred dollars. He,also, contended, that no successive actions could be sustained upon this contract; and, therefore, that the final judgement, recovered by the plaintiff in said first action, barred his right of recovery in this action. A further question was, also, raised. The plaintiff, in order to prove the contract, set up in his declaration, offered a memorandum in writing, not signed by any person, accompanied with parol proof, that this memorandum contained the true contract between these parties. The writing was objected to by the defendant, but admitted by the court.

The written pleadings closed in issues to the Court; and, upon the finding, by the county court, of the foregoing facts, they rendered judgement for the plaintiff. To their decision, upon the several points raised, the defendant excepted.

The exceptions were now argued by *C. Adams*, for the defendant, and by *H. Allen*, for the plaintiff.

HUTCHINSON, C. J., pronounced the opinion of theCourt.— The memorandum in writing, if offered by itself, would not be admissible; but it was offered in connection with parol evidence of the defendant's concessions, that it contained the true contract between them. This makes it the same as if the defendant, instead of referring to the writing, had stated over to the witnesses just what is contained in this writing. The writing is presented as a part of their testimony; and, as such, was correctly admitted. The want of coherence in the different parts of this writing, is slightly noticed by counsel. There is one expression in the writing, which, standing alone, would show, that the three notes to Johnson Foote were supposed not to exceed eighty three dollars; yet, taking the whole together, it is clear, that this expression was intended to relate to one of the notes, only; for, it goes directly on to describe two other notes,as being for fortytwo or forty three

dollars each; and, when it plainly speaks of the three notes, it says,
" they are supposed to contain one hundred and sixty five dollars."
Thus understanding the case, we have no doubt but this testi-
mony was correctly admitted.

The principal question seems to be, whether the action is with-
in the jurisdiction of a justice of the peace. For, if the action was
originally before a court that had no jurisdiction over it, the coun-
ty court could have no appellate jurisdiction to render a judge-
ment in favor of the plaintiff. The amount of the notes, or the
consideration of the defendant's promise, or the sum total of what
defendant was to pay, by virtue of his contract, would clearly ex-
ceed the jurisdiction of a justice of the peace. Is this, then, to
be considered as necessarily an entire contract, or virtually three
contracts? By reference to the written memorandum, it appears,
that none of these notes had become payable, when the defendant
made this contract, though all had become due, when the plain-
tiff was compelled to pay the one now in controversy. This was,
then, virtually a promise by the defendant, that he would pay the
first note when it should become due, and another promise with
regard to the second, and another with regard to the third. This
contract contains the most perfect analogy to a note for a given
sum, payable by three instalments. In such case, certainly an ac-
tion would lie upon each failure; and the jurisdiction would be
regulated by the sum to be recovered in each action. And it
forms no objection to these several actions, that they are all foun-
ded upon one consideration, large enough to support all the prom-
ises. The whole consideration and contract being set forth, the
assignment of the breach brings one particular instalment, and
that only, in controversy : and this as well in reference to jurisdic-
tion, as to the sum to be recovered.

It is urged, however, that all the notes to Johnson Foote had be-
come due before the plaintiff commenced either of his actions.
This does appear; but it also appears, that the plaintiff had not been
damnified by the subject matter of the present action, when he
commenced his first action; and the plaintiff might well rest easy,
till called on for payment. He might well suppose, that the de-
fendant was performing all parts of his undertaking, till otherwise
informed. Johnson Foote could call upon the plaintiff when he
pleased, after the notes were due; and the plaintiff, upon satisfying
that call, had a right to seek his indemnity. If the plaintiff had
been compelled to pay all these notes at one time, he ought to

YY

have sought his indemnity for the whole in one action ; but other-wise, when he is called upon for each note separately.

Our decision upon this point disposes of the remaining point also ; for, if the plaintiff has a right to his separate actions for his indemnity against the several notes, the judgement in one action can be no bar to another.

The judgement of the county court is affirmed.

*H. Allen,* for plaintiff.

*Chs. Adams,* for defendant.

## TRUMAN GALUSHA *vs.* JOSEPH SINCLEAR.

A deed may be admitted in evidence, though there be no date to the acknowledgement, the recording of the deed and acknowledgement being prior to any intervening title.

A demand of pay on execution at the debtor's house, in his absence, is sufficient.

No notice need be given to a debtor to appoint appraisers, when he is gone to parts unknown to the officer.

Such notice need not be given to the attorney in the suit, unless he has been specially appointed by the debtor, his agent for that purpose.

A defect in the description of the premises levied upon, that can be supplied with certainty from other parts of the same levy, does not vitiate.

A levy upon the interest of one tenant in common should be made upon a certain undivided portion of the whole.

One tenant in common has no lien for repairs, made upon the common premises, as against the levy of a creditor of the other tenant in common.

The defendant cannot be admitted to show an erasure from the note for which the judgement was rendered, which is the ground of the levy.

This was an action of *ejectment,* to recover the one undivided fourth part of an acre of land, with a sawmill thereon. Plea, not guilty, and issue to the jury. On trial the plaintiff offered a deed from the said *Joseph Sinclear* to Gideon O. Dixon ; to which the defendant objected ; because the acknowledgement was without date : but the court overruled the objection, and the deed was read. The plaintiff then offered the copy of a judgement, execution and levy, in his favor against the said Gideon O. Dixon ; to which the defendant objected, for the following reasons : because the levy was not made by the same officer who received the execution to levy ; that it did not appear that the officer levying the same had first demanded the money to satisfy it ; that it did not appear, any legal notice was given to Dixon, or his attorney, to appoint appraisers ; nor that the appraisers were legally sworn ; and that said execution was not extended on the whole interest of

Gideon O. Dixon in the land, on which the execution was levied. But the court overruled the several objections, and the levy was read.

The defendant then offered to show by the attorney of record of Gideon O. Dixon, that no notice had been given, by the officer levying said execution, of said levy, either to the said Gideon O. Dixon, or to said attorney ; to which the plaintiff objected, and the court rejected the evidence. The defendant also offered to show that he and Gideon O. Dixon were tenants in common of said mill ; that it was repaired by their mutual direction, and that, in such reparation, the defendant had expended the sum of five hundred dollars over and above his half of the expenses, and that he had a lien on said mill for the repayment. But the plaintiff objected to this testimony, and it was rejected by the court; and the jury returned a verdict for the plaintiff. The defendant also offered to show, that an indorsement had been made upon the note, specified in the suit of *Galusha* vs. *Dixon*, of eighty dollars paid to said *Galusha*, and that the same had been erased without the consent of said Dixon, and judgement rendered for the whole amount : but the court rejected the testimony.

To which several decisions of the court the defendant excepted, and the case was ordered to be removed to this Court.

*C. Adams, for the defendant.*—1. The deed from the defendant to G. O. Dixon ought not to have been read, for want of a due acknowledgement.

2. The levy of the execution ought not to have been read. 1. There was no legal demand of the debt and cost. 2. It does not appear, that any notice was given to said Dixon, or to his attorney, to appoint appraisers. 3. It does not appear what oath was administered to the appraisers. 4. The land levied upon is not sufficiently described. 5. It does not appear by the levy what those privileges were, which were appraised, and a reference to them, as set forth in another deed, is defective. 6. It does not appear by any record, that said execution has been recorded in the town clerk's office at any time *since* the levy. The Court will not decide that the entry, " *received for record, January* 17, 1827," is a mistake. 7. The execution should have been extended on all the interests of said Dixon in the land extended on.

3. The defendant should have been permitted to have shown that notice to appoint appraisers was not given to said Dixon, nor to his attorney of record.

4. Property owned by tenants in common is holden for all ne-

CHITTENDEN
January,
1831.

Galusha
vs.
Sinclear.

cessary reparation, made by either of the tenants, and that *Sin-clear* ought to have been permitted to show such reparation.— *Stanton* vs. *Bannister*, 2 *Vt. Rep.* 464; *Fitzherbert*, 127; *Carver* vs. *Miller*, 4 *Mass. Rep.* 559.

*Lastly*, The defendant ought to have been permitted to show the erasure of the indorsement of eighty dollars upon the note, on which the plaintiff obtained his judgement against Dixon.

*Wm. A. Griswold, contra.*—1. The first objection contained in defendant's bill of exceptions is deemed too frivolous to require an answer. The recording has amply supplied a date to the acknowledgement.

2. The execution was in the hands of Ezbon Sanford, deputy sheriff, at the time of the levy; and he had full authority to levy the same, notwithstanding the same may have been in the hands of another deputy of the same sheriff, at a former time.

3. There is no necessity for the officer to demand the money of the debtor in any case, before a levy on land. But in this case it appears, that the debtor was absent, and gone to parts unknown, and that the officer demanded payment of the debtor's wife, and, no other property being shown, the levy was made.

4. As it respects the other objections to the levy, it will appear, that the officer's return is in strict conformity with the provisions of the statute, and that the same is conclusive between the parties, and cannot be impeached by parol testimony.—See *Stat. p.* 210; *Hathaway* vs. *Phelps*, 2 *Aik. Rep.* 84; 11 *Mass.* 163; 17 *Mass.* 433.

5. The 7th section of the statute, directing the levying and serving of executions, provides, " that when the real estate of any debtor shall be held in joint tenancy, or tenancy in common, with the real estate of other persons, the officer holding the execution may extend the same on such estate or part thereof," &c.—*Stat. p.* 212.

6. Although the defendant might have made repairs upon the mill, while he and Dixon, the debtor, occupied it as tenants in common, and to a greater amount than his equal share, yet this does not, in law, create any lien upon the land, so as to prevent a levy by judgement creditors. Nor can the same be set off against the rents, due from defendant to plaintiff in this action, which accrued since the title became absolute in the plaintiff.

7. The judgement in favor of the plaintiff against Dixon cannot be impeached by defendant: it is conclsive as to him until set

aside; and especially, since he had acquired no legal interest in
the land as against Dixon, the judgement debtor.

HUTCHINSON, C. J., after stating the case, delivered the opinion of the Court.—The decision of the county court was correct, in admitting the deed from the defendant to Dixon. The acknowledgement is in due form, except, that it is without a date as to the year. But the deed and acknowledgement are both regularly recorded. The deed bears date May 14, 1811. It was acknowledged May 14, without stating the year. It was received for record, and recorded May 29, 1811. Of course, all must have taken place in May of the same year, 1811. This must be good, especially, as the defendant sets up no claim under any title, that accrued while the time of the acknowledgement remained uncertain.

Several objections were made to the levy of the execution in favor of the plaintiff against Dixon, which was read in support of the plaintiff's right to recover. These relate to the want of a demand of the money before the levy; the want of notice to Dixon to appoint appraisers; the regularity of the oath administered to the appraisers; the description of the land, and privileges contained in the levy; and a supposed impossible date to the recording of the execution and levy.

The officer states, in his return, that he repaired to the usual place of abode of said Dixon, the judgement debtor, in said Jerico; and Dixon being absent from home, and gone to parts unknown, he made demand of the money, &c., of the wife of Dixon, &c., and, by direction of *Galusha*, the creditor, he extended said execution upon one equal, undivided fourth part of a piece of land in Jerico, containing one acre and three fourths of an acre, and bounded as follows : he fixes a very definite corner to begin at, on the south side of a certain road named, thence running sixty degrees west on said road nine rods and ten links to the corner of the Dixon garden, thence south 29 degrees east fourteen rods to a stake, and so on to the place of beginning ; with all the privileges and appurtenances thereto belonging, with the saw-mill thereon standing, together with its privileges, as described in a deed from Truman Barney to Joseph and Samuel Sinclear. And the said parties, their agents and attornies, neglecting to choose appraisers, he applied to a justice of the peace of the same county, &c., who appointed three appraisers. This appointment is also certified by the justice on the execution. The officer says in his return, " which appraisers being duly sworn by me agreeably

CHITTENDEN to law, did on view, &c., appraise," &c.  This levy bears date
January 1831.  January 17, 1828.  The town clerk's minute, upon the execution,
of his recording it, is dated January 17, 1827.   The county
Galusha *vs.* Sinclear. clerk's certificate of his recording bears date  January 19, 1828.
This Court consider, that, Dixon being absent, the demand made
at his house, for the payment of the execution, was all that the
law requires.   It might be made there, and be sufficient, without
more ; and the officer's saying that he demanded of Dixon's wife,
does not vitiate.   It may be considered as surplussage.   Dixon's
absence to parts unknown, also, rendered unnecessary any notice
to him to appoint appraisers.   And there is no intimation that he
left any agent or attorney with authority to make such appointment,
unless it be his attorney in court whose name is  certified by the
clerk on the back of the execution.   It is not a matter of  course,
that this attorney has authority to appoint appraisers in such case.
His being employed to  manage the suit does not give him  any
such authority.   It is a different business, requires different skill,
and requires a knowledge of the judgement of  men, which  he as
attorney may not possess.   The officer was  under no necessity
to call upon this attorney to make such appointment.

The objection, that it is uncertain what oath was  administered
to the appraisers, seems rather refined, when the officer has cer-
tified, that they were duly sworn by him agreeably to law.   This
very strongly asserts that he administered to them the oath in such
case by law prescribed.   The law having fixed what oath shall be
administered in  such cases, the general assertion of the officer is
sufficient.   The objection to the description of the premises is ful-
ly answered upon the principle, that that is certain, which can be
rendered certain.   The uncertainty here is, that the officer says,
"running from the place of beginning sixty degrees west ;" without
saying north or south sixty degrees west.   But the place of  be-
ginning is very definite, and is in  the south side of ·a road  about
which there is no uncertainty.   And this sixty degrees west is to
run in the south side of said road nine rods and  ten links.   This
can be done by any person.   Furthermore, this nine rods and ten
links is to reach to the corner of the Dixon garden.   Hence, run-
ning westwardly from the place of beginning  nine rods  and ten
links on the south side of said road to the first corner of said gar-
den, that comes in contact with the south side of said road, cannot
fail to be the true boundary.   If there were any  difficulty in this
it would be obviated by going to  any of the  several  boundaries
named in the survey and surveying back to the place of beginning.

Chittenden,
January,
1831.

Galusha
vs.
Sinclear.

It is further urged, however, that it does not sufficiently appear what privileges are levied upon, as contained in the deed from Barney to the Sinclears. That deed is of record, and a reference to it shows the privilege to be definite, to wit: that of erecting a dam on or against the premises so high as may be convenient, without flowing the works above, and of taking water for any machinery, other than a grist-mill, which neither party may erect without paying the other two thousand dollars. This leaves no such uncertainty as should hurt the levy.

With regard to the certificates of the recording of the levy, the obvious mistake in writing 1827 for 1828, can injure no one. Its being recorded in season answers the requisitions of the law. While the return bears date January 17, 1828, and is recorded by the county clerk the 19th of the same January, the certificate of the town clerk, that he recorded it January 17, 1827, thus carrying back the recording a year before the existence of the thing recorded, can but be a mistake ; and the mistake is the wrong way to admit a doubt of the records being made in season.

It was further objected, that the levy ought to have been made upon all the interest of Dixon in the premises, and not on an undivided part of said premises. The debt being large enough to cover the whole of Dixon's interest, the levy is correct in this respect, as it now is. If the debt had been much less than Dixon's interest, still the levy must have been upon such an undivided part of the whole premises, as the amount of the execution and cost bore to the value of the whole premises. The creditor could not, by levying upon Dixon's half of one acre of the premises, have prevented the other tenant in common from claiming such a division as would have fallen to his lot if no levy were made. The levy might have been good after a partition made, if that partition placed the part levied upon to the share of Dixon. But a creditor must not be compelled so to levy as to assume the risk of having his title pressed down by that of the other tenant in common with Dixon. These exceptions to the decision, admitting the levy, are overruled.

With regard to the exclusion of the testimony, offered to prove, that notice was not given to Dixon or his attorney to appoint appraisers, the decision upon this point was correct. The offer was not to show some known agent or attorney, legally authorized to act, and he not notified ; but merely to show, that neither Dixon nor his attorney in the suit were notified. Dixon's absence, and

CHITTENDEN
January,
1831.

Galusha
vs.
Sinclear.

the want of authority in his attorney of record, furnish a full reason for excluding the testimony.

With regard to the lien for repairs made by defendant upon the common property, we recollect no law, that will imply such lien ; and the case states no contract creating such a lien.   If there were such a contract, it would need to be in writing and of record to be valid against an attaching creditor.   The testimony upon this point was correctly excluded.

The only remaining point, urged in argument, is the excluding testimony to show an erasure of an indorsement of eighty dollars from the note upon which the plaintiff recovered his judgement against Dixon.   If Dixon would seek a remedy for this erasure, now after judgement, it must be by a petition for a new trial under our statute.   He could not attack the judgement in this collateral manner.   But the defendant has shown himself in no situation to attack this judgement by petition, or in any other way whatever.

The judgement of the county court is affirmed.

LUTHER STONE, Jr. executor of AMMI FULLER *vs.* BENJAMIN GRIFFIN.

A church or society, that has no legal incorporation, cannot hold real estate under a will; still less can persons in the name of office, derived from such church or society, hold such real estate.

But such church or society may take the use of real estate devised to trustees for their benefit.

If the trustees fail to execute, or decline, the trust, the heir at law must hold in trust, or the court of chancery may appoint other trustees.

After the real estate is divided off to heirs or legatees, the executor cannot maintain ejectment to recover any part of those lands thus divided off.

This was an action of *ejectment* for lands in Charlotte, in Chittenden county.   The defendant recovered judgement in the county court, and the plaintiff filed exceptions, upon which the action was brought up to this Court.

It appears by the exceptions, that, in 1822, *Ammi Fuller* owned the lands in question, and made his will, in one part of which he devised as follows : " I give and devise to the Methodist Episcopal Church in Charlotte, to be disposed of as hereafter directed, the remaining fourth part of the real estate of which I shall be possessed, or have a right to possess, at my decease, forever : the interest of which is to be appropriated for the support and payment of the constant preaching of the gospel in Charlotte, by

the ministers of the Methodist Episcopal Church or Society; the principal, or original stock, to be kept whole and unexpended, and the interest thereof, only, annually appropriated, and expended as aforesaid." He then proceeded to provide for the expenditure of the surplus, if any, in erecting a meeting-house, or purchasing books for said Church or society. And, in case said Church or society should become extinct, the interest was to be placed at the disposal of the annual conference of methodists, whose bounds might comprise said town of Charlotte. The will then proceeds as follows : " I hereby name and appoint, as agents and trustees for and in behalf of the said Methodist Church in said Charlotte, Ithiel Stone, Jonathan Breakenridge, Asa Forbes, Joseph Simonds, Thomas N. Hickox, Jonathan Breakenridge, Jun. and Myron Breakenridge, and their successors in office, who may be hereafter appointed for that purpose, according to the rules and regulations of said Church, to receive, possess, improve, and take charge of the aforesaid one fourth part of the real estate for the use and benefit of said Church, as aforesaid ; to place and always keep the same at interest, and see said interest appropriated as before montioned ; always, however, in all things subject to the rules, regulations, and discipline of the said Methodist Church."

The plaintiff was the sole acting executor of the said will, and, in March, 1827, by a decree of the court of probate, the lands in question were divided off to said Church or society. This action was brought in January, 1828. The defendant being then in possession of the premises, under said church or trustees.

After argument, by *Adams & Allen*, for the plaintiff, and *Bates & Bailey*, for the defendant,

Hutchinson, C. J., pronounced the opinion of the Court.— The plaintiff brings this action for the benefit of the heirs at law of *Ammi Fuller*. Hence, he contends, that the devise to the Methodist Church or society, under whom the defendant claims to hold, is void. And the principal question presented and urged is, in whom is the legal estate vested ?

It is conceded by the defendant's counsel, that the Church or society, having no legal perpetuity, cannot take a fee. Indeed, nothing but the use or interest is given them by the will. And if, at any time, this Church or society should become extinct, and there should, also, cease to be any conference of churches of the Methodist order comprising said town of Charlotte, there would

be no *cestui que trust,* and this interest would revert to the heirs at law.

The will then appoints, as agents and trustees, seven persons, naming them, and their successors in office, who might be thereafter appointed, according to the rules, &c. of said Church and society, to receive, possess, improve and take charge of said real estate, for the use and benefit of said Church, as aforesaid. It was obviously the intention of the testator, that these persons and their successors should take the same care of this real estate as they might do, if a title in fee were vested in them : yet he has not used very apt words to vest the fee in them. But, aside from this, a question arises, whether these agents or trustees possess sufficient perpetuity to support a fee ? They clearly do not. They are, if possible, more fragile than the Church or society itself. The manner, in which they are named in the will, supposes, that they are already in office, by appointment of the Church, to take care of the temporal concerns of the Church : their successors to follow them in this case must be so appointed ; and the case shows, that they were so in office at the date of the will, and some were out before the decease of the testator. And the will makes no provision for the survivors to act upon the decease of some. It therefore virtually makes those persons trustees who then held, and should from time to time hold, the offices named by such appointment from the church or society. Therefore, these cannot, by any possiblity, out-live the Church or society : but the latter may continue, and yet neglect to make such appointments. That is, the *cestui que trust* may continue, but there will be no trustees. Now, what is to be the result of this state of things ? Shall the *cestui que trust* lose the use for want of a trustee ? We think not. In England, according to the authorities cited in argument, the heir must stand as trustee, on failure of the trustees appointed.

By the operation of our statute the executor must be the trustee while the estate is settling. When that is done, the heirs hold in trust for the *cestui que trust :* and they, in whom the legal estate is, must recover at law, in order to enable them to execute their trust.

According to the manifest intention of the testator there is yet no failure of a *cestui que trust ;* for the case shows this Church or society to have had an existence as such for more than twenty years, and still to retain that existence. They must have this interest : and the heirs at law must hold this real estate and manage it, according to the intention of the testator, for the benefit of

this Church : or, if they refuse or neglect, the court of chancery, on a proper application, will appoint others who will execute the trust. In executing this trust, whether the land ought to be retained and cultivated, or sold, and the avails put out at interest, must depend upon circumstances not now disclosed to us. But the expressions of the will go far to show, that the testator supposed a sale would be most prudent and profitable. He does not say that the Church shall have the net profit of ths farm, but shall have the interest, the principal being kept good. Again, it is to be placed on interest. It may by this time be supposed, that our decision will allow the plaintiff to recover, and he, and the heirs after him, hold in trust, and account with the defendant or with the Church for the interest; for the defendant cannot hold by virtue of his title, through want of power in the acting trustees, who put him in possession.

The plaintiff, however, labors under no small difficulty. He brought this action in January, 1828, in his capacity of executor. Ten months before this, to wit, March, 1827, this same real estate was, by a committee appointed by the court of probate and a decree of the court, divided off according to the will to these trustees, or to this Church; so that his right over it as executor had ceased before he commenced his action. Therefore the defendant's possession is sufficient title for him, till some person with a better title would oust him.

The judgement of the county court is affirmed with costs.

<div style="text-align:center">———⟐———</div>

## Moses Catlin vs. Daniel Hurlburt.

*Chittenden, January, 1831.*

A covenant in a deed of land, *that the grantor is well seized in fee simple, and has good right to bargain and sell the premises,* imports a covenant of title.

In such case the measure of damages is the consideration money and interest thereon.

That the covenantee had conveyed away the land by deed of warranty, is no defence for the covenantor.

In case of a recovery, by the covenantee, on the covenant of seizin, the court will order stay of execution till he shall have lodged a discharge, or quit-claim deed, from his grantee.

That the plaintiff had cut timber on the land subsequently to the date of the deed from the covenantor to him, cannot be given in evidence in mitigation of damages, because he is liable to the owner of the land for such injury.

This was an action of *covenant,* brought upon the covenants in a deed given by the defendant and one Benjamin Boardman to the plaintiff. The words of the covenant declared upon were, *that*

<div style="text-align:right">Chittenden, January, 1831.<br>Fuller's exr.<br>vs.<br>Griffin.</div>

CHITTENDEN, *the said Hurlburt and Boardman, at the time, &c., were well*
January,
1831. *seized of the premises in fee simple, and had good right to bar-*
——— *gain and sell the same,* &c. The defendant pleaded, 1st. That
Catlin
*vs.* he and Boardman were well seized, *&c.* 2d. That the defen-
Hurlburt. dant alone was well seized, &c. The issues were joined to the
jury. The defendant showed a deed of warranty from the plain-
tiff to one Lynde Catlin of the same premises. The defendant
also attempted to show a charter-title in himself and Boardman,
but wholly failed. There was a verdict for the plaintiff for the
consideration money and interest, and exceptions allowed, on
, which the action was removed to this Court.

*Bailey & Marsh, for the defendant.*—1. The signification of
the word *seizin* is limited to possession, and seizin or possession
may be actual or constructive. In the latter case, it is called sei-
zin in law ; in the former, seizin in deed. If there be actual pos-
session, whether tortious or lawful, it matters not, that is a good
seizin in deed. He who has an hour's actual possession, quietly
taken, has a seizin *de droit et de claime.-Perkins,* 457, 458.
Seizin in law is colour of title,whether by purchase or inheritance,
not perfected by possession. There are many cases of good sei-
zin in law without title or possession. If the defendant was seiz-
in either in law or deed, it is sufficient, though it might be by de-
feasible title; for the covenant is general, *well seized,* without say-
ing how. A tortious seizin in deed is a good seizin to satisfy
this covenant.—*Bearse* vs. *Jackson,* 4 *Mass.* 408 ; *Twambly* vs.
*Henley, do.* 441 ; *Prescott* vs. *Trueman, do.* 627 ; *Marston*
vs. *Hobbs,* 2 *Mass.* 433 ; *Chapel* vs. *Bull,* 16 *Mass.* 213. For
similar reasons, a claim, accompanied with colour of title, which
could at any moment be converted into an actual seizin, must be
a sufficient seizin in law to satisfy this covenant, at least, when,
as in the present case, the grantee does in fact, acquire a perfect
seizin in deed under, and by virtue of, the conveyance. It can-
not, therefore, be said that nothing passed by the deed ; for it was
by virtue of the deed that plaintiff acquired his seizin in fact ; and
he having received this benefit at our hands, ought not to be per-
mitted to say, even in an action on this covenant, that nothing
passed by the deed. We have thus far treated the case on common
law principles ; but a reference to the statute will make the point
still clearer. By the 3d section of the act regulating conveyan-
ces, *(Stat. p.* 167,) livery of seizin is dispensed with, and it is
provided, that the recording of a deed, properly executed and

acknowledged, shall be sufficient to pass the title. Now if the deed to the grantors had been accompanied with livery of seizin, they would have had a good seizin in deed, within the meaning of this covenant. But the deed to the grantors was accompanied with that which by statute is equivalent to livery of seizin, viz. recording. Consequently, as the grantors claimed under a well executed deed, and as neither the deed to them, nor their deed to the plaintiff, was void by reason of adverse possession, nor for any other cause, and was effectual to give actual sezin, it is a satisfaction of the covenant. It may, therefore, be safely contended, that the words, " *well seized,*" do not import a covenant of title.

2. Whatever may be the opinion of the Court on the first point, it is clear, that if plaintiff recovers he can recover only nominal damages. No actual damage is shown. The loss of the land, and, consequently, of the consideration paid, is not a damage necessarily resulting, in legal contemplation, from the want of title in the covenantor *;* for, *non constat,* that the grantee's possession will ever be disturbed. The actual damage shown in evidence must be the rule of recovery. The grantee may, at any time, entitle himself to recover damages by purchasing in the outstanding title, which is in the nature of an incumbrance ; but till he has done so, or has been evicted, he has, in contemplation of law, sustained no damage, and shall recover nominal damages only.—*Prescott* vs. *Trueman,* 4 *Mass.* 627 ; *Delevergne* ys. *Norris,* 7 *Johns. Rep.* 358 ; *Wyman* vs. *Ballard,* 12 *Mass.* 304; *Deforest* vs. * * * * * 16 *Johns. Rep.* 122 ; *Stannard* vs. *Eldridge, do.* 254. If a grantee can recover more than nominal damages in such a covenant as this, it is on the ground of the probable contingency of an eviction. In the present case—*Moses Catlin,* having disposed of his whole interest in the land, is no longer liable to eviction, or any other direct damage, and the contingency can never happen as to him. His right, therefore, to damages on this covenant cannot be any thing more than nominal, unless it is because he is liable over to Lynde Catlin on the same covenant in his deed. But the case shows he never can be liable to Lynde Catlin on the covenant of seizin, because, before the conveyance to him, he had, under one deed, a good seizin in fact, and he and none other, had good right to convey *;* and their seizin has been kept good by various and continued acts of ownership, up to the commencement of the suit. It would be great injustice for plaintiff to recover back the consideration money paid, and yet retain that received by him of his grantee. Upon a breach of the covenant of

CHITTENDEN
January
1831.

Catlin
vs.
Hurlburt.

warranty, Lynde Catlin might recover full damages against the defendant ; and a recovery in this action would be good, neither as a bar, nor in mitigation of damages ; and so the defendant would be compelled to pay double damages for a breach of the same covenant.—*Wyman* vs. *Ballard,* 12 *Mass.* 304.

3. But if the Court should be against us on this ground, also, there is no good reason why the plaintiff should not account for the timber cut from the land. Having purchased it of us, he is, for this purpose at least, estopped to deny our title ; and it not appearing that he has been obliged to account for it else where, he ought to allow it to us.

*C. Adams, for the plaintiff.*—1. The covenant in this case was broken at the execution of the deed ; and, therefore, the right of action is in the plaintiff, and not in Lynde Catlin. The doctrine has long been established, that the covenant of seizin is a personal covenant—that it does not run with the land ; but the suit lies in the name of the original party.—*Williams* vs. *Wetherbee,* 1 *Aik.* 238 ; *Garfield* vs. *Williams,* 2 *Vt. Rep.* 327 ; 4 *Kent's Com.* 459.

2. There is nothing in this case, to take it out of the general rule. It appearing, that defendant having no title to the lands, plaintiff's entering on them, was tortious, and, by cutting timber, he became a trespasser, for which he is responsible to the true owner of the land. In the case of *Garfield* vs. *Williams,* nominal damages were given ; but that is a peculiar case. The plaintiff there had continued upon the land, until all right of action against him was gone. His title had became perfect. He could not be made responsible either for the original entry or for any subsequent act. For whose benefit, then, should the title thus acquired be ? Undoubtedly for the benefit of both parties. Garfield was not obliged to have remained : he might have abandoned, and recovered his consideration and interest ; but, having remained there, until his title became perfect, he must be considered as having waived the damages, *quoad hoc;* and the only question was, whether there should have been any damages. If, subsequent to a conveyance without title, the grantor procures a good title to the grantee, which is by him accepted, and he continues in possession, it would seem that all right of action on the covenant is gone. But that is not the case before the Court. Plaintiff here never was in possession of the land, and the difficulty is, he cannot get it.

HUTCHINSON, C. J., after stating the case, pronounced the opinion of the Court.—The defendant's counsel object, that the plaintiff has no right of action, upon the facts, which appear in the exceptions.   The issue being taken on the alleged breach of the covenant of seizin, and found for the plaintiff, that establishes the plaintiff's right to recover something if the instructions to the jury were correct.   That breach existed at the date of the deed from the defendant and Boardman to the plaintiff; and the plaintiff's right of action for that breach could not be assigned to Lynde Catlin, so as to enable him to maintain an action at law, except in the name of the present plaintiff.   According to repeated decisions, that covenant does not run with the land, because, if ever broken, it is broken at the date of the deed containing that covenant.

The defendant's counsel next urge, that the plaintiff, if he recovers, is entitled to nominal damages only, when in fact the instructions to the jury warranted, and the jury have found, full damages; that is, the amount of the consideration of the purchase, and interest on the same to the time of trial.   It is said, in support of this objection, this covenant of seizin is satisfied by a seizin in fact or in law ; and the decisions in the neighboring states are produced as authorities in point.   These are applicable on a covenant of seizin only.   It is probable that covenant was anciently introduced into deeds, to guard against such an adverse possession as would render the deed void; as would have been the case at common law, and is now the case by virtue of our statute, if there be an adverse possession.   While we had no such statute in this state, and there was no special reason for inserting that covenant, except to follow existing forms, the phraseology of that covenant has been varied ; and it has generally been considered synonymous with the covenant of title, and frequently has been so worded as necessarily to be a covenant of title.   The covenant in this case never could have received its exact form from any supposed danger of adverse possession.   Hence the authorities adduced do not exactly apply ; nor are we called upon to say, what we should decide, if the covenant were only, that the grantors were seized.   The present covenant declared upon is, " that the grantors were well seized of the same land in fee simple, and had in themselves good right to bargain and sell the same in the manner in said deed mentioned."   These expressions, and those of similar import, have always been considered, in this state, as amounting to a covenant of title.   They have been inserted,

CHITTENDEN
*January,*
1831,

Catlin
*vs.*
Hurlburt.

CHITTENDEN
January,
1831.

Catlin
vs.
Hurlburt.

that they should be so considered. It is argued, however, that this means nothing more than that the grantors were in possession, claiming to hold in fee simple.

This alteration might as well be incorporated, by construction, into all the covenants, that decidedly relate to title in the whole deed. That they were well seized in fee simple, means, that they were actually in possession, claiming to hold in fee simple. That they had good right to sell and convey, means, that they claim to have such right. That the premises are free from all incumbrances, means that they claim, that they are thus free. This is not the most natural and obvious meaning of the usual expressions in deeds of warranty. They say nothing about claiming. They speak of realities. Fee simple denotes a permanent estate. Well seized in fee simple, denotes a seizin of a permanent estate. Such would be the most rational construction, without the aid of concurrent circumstances. But when we recollect that this deed was made and executed at a time and place, when and where such expressions were universally understood to relate to title, it would do injustice should we give to them a different construction.

There is, however, a difficulty, against which we must guard, to prevent injustice in this particular case. The deed from the defendant and Boardman to the plaintiff, and the deed from plaintiff to Lynde Catlin, contain alike the usual covenants of warranty, which run with the land. Now, if the plaintiff should recover the whole damages on this covenant of seizin, and he had sold to Lynde Catlin with warranty, and Lynde Catlin should be evicted, and sue defendant in his own name upon a covenant that runs with the land, the defendant might be exposed to be twice charged for the same damages. This also may be viewed in connection with the idea suggested by the defendant's counsel, that, it not appearing but that the plaintiff, or his assignee, enjoy the peaceable possession of the premises, they may never be disturbed, but the inchoate title, derived from the defendant, may grow into a perfect title. We think these possibilities must not form a defence to this action. The defendant, having conveyed that, to which he had no title, should make his grantee good in some way. Nothing appears that any other remedy is yet matured except the one sought in this action. Probably this action is brought in the name of the plaintiff for the benefit of his grantee, Lynde Catlin. We know not how that may be. Should it be so, and should he receive the money comprised in this verdict, that would operate as a defence in whole or in part to any action Lynde Catlin

CHITTENDEN,
January,
1831.

Catlin
vs.
Hurlburt.

might hereafter bring upon any covenants which run with the land. And we must take care, as we can, now the case is before us, to attach such appendages to our judgement, as will prevent injustice in any event whatever. But, as we understand the law, it is deficient in guarding the rights of the grantor in a case that may arise. The grantor may have honestly purchased the premises, and taken possession; after his sale, his grantee may have taken possession. The first grant proves defective; but he, in whom the legal title is, does not interfere. These possessions, continued, will soon form a good title. If there is a recovery on the covenant of seizin, these possessions should go for the benefit of him, of whom the recovery is had. This presents a fit subject for legislation. A statute might provide, that the covenant of seizin should run with the land, and the action upon it be brought in the name of the last grantee, and the recovery and collection revest all right and possession in the grantor, from whom this recovery and collection is had. This would do justice in all cases, that should come within it.

The defendant has urged one more point as important to reduce the damages. It appears there was evidence tending to show, that the plaintiff, and also Lynde Catlin, had cut and taken off timber from this lot; and the county court erred in not instructing the jury to deduct from the damages the value of this timber. This would be correct, if the subject could only be stirred between the plaintiff and defendant; but this is not the case. The actual owner of the land has a right to treat all as trespassers, who have cut timber on the premises. The plaintiff is liable to such owner for what he has cut, and Lynde Catlin is holden for what he has cut, and the defendant has no more right to this timber, than he has to the land itself. The exceptions urged are all overruled, and the judgement of the county court is affirmed. But, to secure the defendant against all possible injury from the other covenants, that run with the land, to Lynde Catlin, the Court order a stay of execution until the plaintiff procures from Lynde Catlin, and lodges with the clerk, for the benefit of the defendant, either a quit-claim deed of the premises, or a suitable discharge of all the covenants of warranty, contained in the defendant's deed to the plaintiff.

BBB

JOHN POMEROY *vs.* EPHRAIM and THOMAS MILLS.

One who owns a proprietor's right in a town may *recover in ejectment* against any one who is in possession without a title.

And he can so recover, even if the land sued for is a part of a public highway, or court-house common.

The defendant's having taken a lease from the town of the land in question, for a building-spot, and erected a building thereon, does not vary the plaintiff's right to recover : and

If this even made defendant a tenant in common with the plaintiff, it would operate as an ouster, and no demand would be necessary before the commencement of the action.

This was *ejectment* for a small piece of land in Burlington, being a part of the court-house square. Plea, not guilty, and issue to the jury.

At the trial in the county court, the plaintiff produced in evidence the charter of the town of Burlington, and a deed from Daniel Voorhees, one of the original proprietors, to himself, dated June 22d, 1807.

The defendants then produced in evidence a lease from the select men of Burlington to themselves, executed on the 9th day of April, 1821, and proved that they entered and had possessed the premises under said lease, paying rent as stipulated in the lease.

The plaintiff then produced in evidence a vote of the proprietors of Burlington, passed in the year 1798, setting out the court-house square for public purposes, and offered to prove that the whole town of Burlington, except the square aforesaid, had been long since severed and divided among the proprietors. This evidence was objected to, and rejected by the court. He also offered to prove that the rents paid by defendants were expended by the town for purposes other than those authorized by statute in reference to the public rights of land. This evidence, being objected to, was excluded by the court. The plaintiff next gave in evidence certain votes of the town of Burlington relative to the leasing of the premises, passed March 27, 1821, together with the warning of the town meeting which passed said votes, which were made a part of the case reserved.

It was testified by witnesses, that the square was laid out and opened about the year 1797, or before ; that the court-house, jail, and jailer's house, stood upon it in 1797 ; that in 1802, the court-house was rebuilt upon a different part of the square, and the jail removed from the square ; that the jailer's house was then,

or before, converted into a tavern house as the private property of a Mr. King, who had built the same at his own expense; that Mr. King, having conveyed to the town or county another piece of ground in the village as a site for the county jail, received from the town officers a lease upon nominal rent of the ground covered by his house, and also of a piece of ground parcel of the square aforesaid whereon to erect an addition to his house; which arrangement was confirmed by act of the legislature in A. D. 1808; that the town authorities had exercised some control as to the location of the court-house in 1802, as also of the court-house and jail which existed previously; that the square had always continued open and unoccupied by any buildings save the court-house, the tavern house aforesaid, and the jail, previous to 1802, until about the beginning of the year 1821, when the town commenced leasing out parcels thereof with reservations of rent to the town, and had given two or three such leases, besides the one to the defendants; and that the pieces thus leased were all situated on the east of the square, in a line with the court-house and tavern house aforesaid.

On the evidence thus detailed, the parties submitted the cause to the direction of the court, who ordered a verdict for the defendants; and the verdict being returned accordingly, and judgement thereon rendered, the plaintiff excepted to the several decisions aforesaid, as also to the direction thus given to the jury, and the case was thereupon removed to this Court.

*Pomeroy and Allen, for the plaintiff, contended,* I. That the parties were not tenants in commmon.

1. Because the lease to the defendants was void; because it did not appear on the face of it that the select men were acting within the scope of their authority, but the contrary.—*(3 Halst. Rep. 90; 5 Am. Dig. 435.)* Because they have not pursued their authority, but have conveyed a different estate than the statute warranted.—*(R. 2 Jon. 111; Stead's Exrs. vs. Converse, 4 Cranch, 403; Yancey vs. Hopkins, 1 Munf. 419; 5 Term. Rep. 567; 1 Atk. 558; Willes, 169; 1 Term. Rep, 705; 2 East, 376; 10 do. 158; 3 Cowp. 26.)* Because the lease was not executed by all the select men.—*(Franklin vs. Osgood, 14 Johns. Rep. 527.)* And because one tenant in common cannot convey a distinct part of the estate to a stranger.—*(9 Mass. 34; 12 do. 348.)*

2. Because, the select men did in fact execute the lease by au-

*[margin: CHITTENDEN January, 1831. Pomeroy vs. Mills et al.]*

CHITTENDEN
January,
1831.

Pomeroy
vs.
Mills et al.

thority of a vote of the town, independent of the act of the legis-lature.

3. Because, by the dedication of the public square, and the long continued use of it as such, the town had already parted with the *use* of the premises, which was all the right the act gave them : and the parties cannot be said to be tenants in common of that which neither have the right to occupy.—*Jackson* vs. *Davenport*, 18 *Johns.* 295 ; *Brayton*, 66 ; 10 *Johns. Rep.* 5.

4. Because, admitting the lease to have been good and valid to convey the pretended right of the select men under the statute, it is contended that by defendants' own showing the select men had been already quieted in more than their proportion of the public square.

II. Admitting the parties to have been tenants in common—was a demand necessary ? We contend not, because there was an *actual ouster*, as appears, 1. By the conveyance, which is for the *whole* estate.—*Adams on Eject. p.* 56 ; *Vin. Abridg.* 14, 512. 2. The entry of the defendants could not be consider-ed as made for co-tenants, it being against their will and intent, as expressed in the dedication, and to be inferred from the use.

III. We contend that the law is settled, that the plaintiff in the action of ejectment may declare for the whole, and recover ac-cording to his right.—1 *Chit. Rep.* 41; *Gist* vs. *Robinett*, 3 *Bibb*, 2.

IV. Where tenants in common have set apart or dedicated a piece of land for a specified purpose,and there is an entry and pos-session of the premises, contrary to the dedication, by one of the persons dedicating, he may be ousted in an action of ejectment in the name of a co-dedicator.—3 *Burrows*, 1290.

*Adams, for the defendants.*—Plaintiff and defendants both showing an interest in the town, the only questions, which can arise, are, 1. Has the *locus in quo* been dedicated to public use ? 2. If it has, what is the effect upon the respective rights of the parties ?

If it has not been dedicated, then these parties are tenants in common, and this suit cannot be sustained without showing an ac-tual ouster, or a demand to be let in ; and of this there is no pre-tence of any testimony.

In relation to the only two questions, which we suppose can arise in the case, we contend, 1. That the evidence does not show any dedication of the square, or rather of that part in ques-

tion, to the public. 2. That the town have never consented to any dedication of the east side of the square. 3. If the square was dedicated, such dedication must operate equally upon the rights of the parties, and cannot give one any right over the other. 4. No abuse of the rights derived from such dedication can operate as a forfeiture of the private rights of the parties.

HUTCHINSON, C. J., pronounced the opinion of the Court.— This action was before this Court a year ago this present term, and was heard upon a case very similar to the present, and a new trial was granted to the plaintiff. The question about tenancy in common, of plaintiff and defendants, was not then urged. No other material question is newly raised. The decision of this Court, granting the plaintiff a new trial, established his right to recover the premises, as against the defendants, considering them strangers to title under any proprietors. That decision seems not yet reported,* and I would not greatly anticipate the report, but yet explain concisely the grounds of decision, as the same question is now urged, with considerable confidence, by the defendants' counsel. It appears by the case and papers referred to, that the proprietors of the township of Burlington, on the twenty sixth day of June, 1798, voted as follows, to wit, " That the block containing two and half acres of land, whereon the court-house and jail are built in said Burlington, shall and hereby is set off for the use of the public, for erecting all necessary county and town buildings, for public use." This vote implies, that the plot had before acquired a known boundary, so that an allusion to it as the plot, whereon the court-house and jail were then erected, was a sufficient description in the vote. The land now in dispute lay open for public use till 1821, about twenty three years before the erection by the defendants. It is highly proper and necessary, that public buildings should be accommodated with a vacant common, for the convenience of the public, that would use such public buildings. The quantity of land, appropriated in this case, shows, that a public common, as well as a place for public buildings, was intended. Such a common is as a public highway, both as respects the public and the original owners. Every individual may travel upon either at pleasure; but he must exercise no right over either, but such as every other citizen may exercise. The erection of an edifice upon such a highway, or common, for private use, destroys the public use. And he, who thus encroaches upon the rights of

* That case has since been reported.—See present volume p. 279.—Ed.

CHITTENDEN *vs.* January, 1831.

Pomeroy *vs.* Mills et al.

the public, is liable to be indicted for the nuisance ; or the original owner of the soil may maintain trespass or ejectment, as the case may require, and recover his damage just as if there had been no dedication to the public ; for all the rights any individual may enjoy, consistent with the dedication to the public, belong exclusively to the original owners of the soil. If the plaintiff recovers in ejectment, he must hold only in a way consistent with the rights of the public. He may be liable to an indictment for continuing the nuisance, should he continue it. But no individual, as such, can call him to account for that, which is no injury to such individual, otherwise than in common with the rest of the community.

But it is urged against the plaintiff's right to recover, that, if he recovers, the defendants will be entitled to betterments, they having entered under a lease from the select men, executed according to the vote of the town. If this be so, still it forms no bar to a recovery. If the plaintiff has a right, he must recover ; and, if he chooses to pursue his right in an action at law, he must claim subject to the rights the law secures to the defendants. That is, if the defendants are entitled to betterments, the plaintiff must pay them, or risk a levy upon the premises. But how is the fact ? The defendants have taken a lease, permanent in the outset, but liable to be defeated by the town's paying for improvements made by the defendants. This is a lease of a small piece of land notoriously a part of the public common. It had long been used as such without interruption. If the defendants had taken a lease of a part of any man's farm and gone into possession under it, they might nearly as well talk about a supposed title as in the present case. But what are the betterments in this case ? A mere public nuisance, liable to be prostrated, by the proper mandate of the law, at any time. There can be no value; nothing to recover in the form of betterments.

But, as having some bearing upon this point, and more still upon the tenancy in common, it is said, the town have a right to possess certain public rights of land in town. I should think it doubtful whether the town could be tenants in common with other proprietors, in consequence of their control over any public rights. The law provides for their taking the use in a certain way ; but supposes the rights severed from the other lands, by the proprietors, and gives the towns no agency in this severance. They probably might proceed in chancery and compel a severance. Be this as it may, the right given to the

CHITTENDEN,
January,
1831.

Pomeroy
vs
Mills et al.

town is to lease out, in a certain way prescribed by law, the land thus put under control, and apply the rents to such definite purpose as the law allows.   Now, there is nothing about this lease that indicates to what right this land belongs, or that marks the legal destiny of the rent.   Indeed, the town assumes to be absolute owner of this land, without reference to any public right whatever ; and their lease does not amount to a supposed title. Moreover they assume an exclusive ownership.   Such a lease of the premises, if their be a co-tenant, is void as against such co-tenant.   He would be entitled to his partition, and to hold where his portion fell, just as if no lease were made, and such buildings were erected as mere acts of trespass.   If it were not so, this lease of the entirety, and holding under it in such an exclusive manner, as appears in the case, is itself an ouster, and the plaintiff was under no necessity to make a demand to be let in as tenant in common, before commencing his action.   The plaintiff has shown a good title as against a stranger to title, and the defendants have shown no title that can avail them.

<div align="center">The judgement of the county court is<br>
reversed, and a new trial is granted.</div>

*Pomeroy & Allen*, for plaintiff.

*C. Adams, Bailey & Marsh*, for defendants.

<div align="center">HENRY TICHOUT *vs.* WILLIAM W. CILLEY.</div>

CHITTENDEN,
January,
1831.

When an original plaintiff is sued for what is done under his execution, it is no defence, that he had sold the note upon which his judgement was rendered, before his suit was brought.

Doubted whether an execution from a justice's judgement for over fifty three dollars damages, made to run sixty days only, is to be considered absolutely void, or only voidable.

This was an action of *trespass* and *false imprisonment*, tried in the county court, where the defendant obtained a verdict, and the plaintiff filed exceptions, which were allowed by the court, and the cause was brought up to this Court for a hearing upon those exceptions.   By the exceptions allowed, it appears, that *Cilley* was plaintiff in an action against *Tichout* upon a note ; that judgement was rendered in said action in favor of *Cilley* for a sum in damages, which exceeded fifty three dollars ; and an execution issued upon that judgement, returnable within sixty days from its date.   Upon this, *Tichout* was committed to prison, which was

CHITTENDEN
January
1831.

Tichout
vs.
Cilley.

the trespass and imprisonment complained of.  *Tichout* contended that the execution was void, by reason of its not running one hundred and twenty days.  *Cilley* offered to prove in his defence by parol testimony that, before his action was commenced, he *bona fide* sold the note in question to Prentiss and Taylor, who commenced said suit in the name of *Cilley*, and carried it on for their own benefit.  This evidence was objected to by plaintiff, but admitted by the court.  The testimony showed, that the defendant, *Cilley*, was to be holden to Prentiss and Taylor for the ultimate payment of said note, if Taylor and Prentiss should prosecute *Tichout* to judgement and execution, and he should swear out of jail.  The witness, who testified to this, also testified, that, upon notice to *Cilley*, from Taylor and Prentiss, *Cilley* procured a person to turn out some property on a prior execution.  Upon this testimony the instructions, requested by the plaintiff's counsel, were, that *Cilley's* sending an agent to turn out property, to be attached or levied upon, showed such a participation in the proceedings as would render him liable for the illegal arrest and imprisonment complained of.  The county court refused so to instruct the jury, and directed a verdict for the defendant, if the testimony of sale gained credit with the jury.  The verdict was in favor of *Cilley*.

*Maeck, for the plaintiff.*—We contend, that the court erred in admitting the parol evidence to show, that, before the process was originally sued out against *Tichout*, the note was transferred from *Cilley* to Taylor and Prentiss.  For, it was not the best evidence in the power of the party to produce.  If there was any sale from *Cilley* to Taylor and Prentiss, its terms were in writing, and it was in the power of the party to produce it.

But if the evidence was admissible, still, the court ought to have charged the jury to find for the plaintiff.  1. From the mere fact alone, that the defendant was a party of record in the suit upon which the plaintiff was unjustly imprisoned.  The inquiry then will be, how far were the parties bound by the record ; or, in other words, what, as between these parties, did this record prove ? So long as it was not vacated or reversed, it was incontrovertible proof, that *Cilley*, acting as plaintiff, did, at such a time and before such a court, recover judgement against *Tichout*, and for the cause therein expressed.  These facts the present plaintiff would be estopped from denying ; and, as all estoppels are mutual, so likewise is the defendant estopped from denying it.  If these po-

sitions are correct, it follows, that, as between *Cilley* and *Tichout*,
*Cilley* must be subject to all the liabilities of a party ; and one of
the liabilities, to which the party to the suit may be subject, is,
where a defendant has been illegally imprisoned under colour of
a writ, sued out against him, the party, at whose suit the writ is-
sued, and the attorney, are liable in this action.—3 *Wills*. 341,
368, 376 ; 2 *Black. R.* 845 ; 1 *Lev.* 95.   The party of record,
in all the books, is considered as the principal and prime mover ;
and no case is to be found where an action of false imprisonment
has been sustained, for acts done under process, where it has not
lain against the plaintiff in the suit.   They all go upon the ground,
that the party, by suffering his name to be used, has placed others
in a situation to commit a wrong ; therefore, he is not wholly
without fault ; that he must answer to the persons, who have
been aggrieved ; and his agents must be answerable over to him.
To support the contrary doctrine would give him all the benefit,
that could be derived from legal process, and yet shield him from
its liabilities.   All the authorities expressly recognise the position,
that, where a party is identified as being the party in the record,
he is bound by all the acts done under colour of the record ;
and that, in point of fact, it is immaterial, whether the party ever
became party to the record by his own voluntary consent, or
by the fraud of the attorney.   In England and New-York the
appearance of the attorney and his acts are binding upon the prin-
cipal, as between him and the other party, whether the attorney
was ever employed or not, and he must look to the attorney for
redress.

2. Though the party in the present case may not be liable
from the mere fact, that he is party to the record without his as-
sent, yet, where he becomes a party to the record with his assent,
either express or implied, and permits his name to be used as a
prosecutor, he is then clearly liable for all acts done under colour
of the record.   It is a well settled principle, that in trespass all
are principals, and that, whoever commands, aids, assists, pro-
cures, or assents, either before or subsequent to the act, is a tres-
passer.—*Co. Litt.* 57, *a.*; 2 *Inst.* 183.   The plaintiff in the
suit is as much liable as the attorney, who sues out void process,
though the plaintiff may not have directed the particular process
to issue, but only authorized the attorney to issue process, on the
ground, that the party is always liable for the unskilful acts of his
agent.—3 *Wills.* 341, 368 ; 2 *Wills.* 285 ; 1 *Bos. and Pull.*
404.   In point of fact, the plaintiff is scarce ever otherwise in

CCC

CHITTENDEN fault, than having employed unskilful agents.  But wherever an
January,
1831.   individual conveys a power to be exercised in his name, or on his

Tichout   behalf, and, in the exercise of that power, an injury is done, the
vs.   person doing that injury, as well as the person, who placed him in
Cilley.   that situation to do it, must be liable to the party injured.  If, then,
the present injury could not have happened to *Tichout*, without
a licence from *Cilley* to make use of his name, it follows, as a
matter of course, that he has been the prime mover, and set the pro-
cess in motion ; and though he never contemplated the wrong in
question, yet, if it has ensued in consequence of his delegated au-
thority, he is liable in law.   The case finds, that the defendant
owned the note in question, upon which the process was founded ;
that he sold it to Taylor and Prentiss, and, at the time of the
sale, not merely gave them a licence to sue *Tichout* upon it, but
expressly enjoined them to do it, and was not to be liable himself
until *Tichout* had sworn out of jail.   In what attitude, then, did
Taylor and Prentiss stand towards *Cilley*?  They were his agents
to collect that note of *Tichout ;* and *Cilley* was to be benefited
by their act.

*Lastly,* on the score of public policy alone, the defendant
should be held liable.  This never has been,nor ever should be lost
sight of, in judicial decisions.   Laws are publick property ; and,
whenever civil injuries arise, the remedy should be obvious.  The
doctrine advanced by the court in 1 *Bos. and Pull.* 404, *et seq.*
is a safe, and salutary doctrine, to be adopted here.   To say this
defendant is not liable, would lead to great inconvenience, if not
dangerous consequences.

*Chs. Adams, contra.*—From the evidence in this case, the fol-
lowing facts appear to be made out ; that the note, on which the
judgement and execution was founded, was sold by defendant to
Taylor and Prentiss ; that Joseph Porter was their attorney, and
by their direction made out the writ ; and that defendant authoriz-
ed and directed the turning out the property on the attachment ;
but subsequently had no further agency in the business ; and that
the execution was directed by said Porter, or by Taylor and Pren-
tiss, without any actual knowledge or participation on the part of
defendant.

From this state of facts the defendant contends, that any direc-
tion,which he may have given in relation to the attachment does not
make him a party to the illegal execution.   That the execution
being in his name, does not necessarily make him a party to any

proceedings under it. Having assigned the note to Taylor and <span style="float:right">CHITTENDEN<br>*January,*<br>1831.</span> Prentiss, he was bound to allow them to make use of his name to collect it ; and, unless in *fact* he gave directions relative to the execution, he is not a party.

<div style="float:right">Tichout<br>*vs.*<br>Cilley.</div>

HUTCHINSON, C. J., pronounced the opinion of the Court.— The objection urged by the plaintiff's counsel, that the sale of the note should not be proved by parol testimony, seems hardly to arise in the case ; for it no where appears, that there was any writing upon the subject. There might be a valid sale without any writing, and such sale might well be proved by parol.

The other objection, urged to this testimony, is more important. It seems, the defendant was permitted to show a sale of the note to Taylor and Prentiss before the action was brought upon it in his name ; and by such showing obtained a verdict. The authorities adduced are in point against this decision. Some of them even go so far, as to decide, that a man is liable for an injury, resulting from a suit commenced in his name by an attorney without any employment from him, and without his knowledge or consent. In such case, if judgement is rendered against him the execution will come against him for the cost, and he may be obliged to pay it, and seek his plain remedy upon the person using his name without any authority from him. But, if any action were brought against him for any other damages, resulting from such unauthorized suit, I doubt the right to recover without showing his consent to the suit, either expressed or implied. But we have no such case now before us. *Cilley*, the present defendant, had a note against *Tichout*, the present plaintiff. He sold this note to Messrs. Taylor and Prentiss. This, without more, authorized them to use his name for the collection of the note. He might take care to secure himself from harm at the time of his sale. He might even require an indemnifying bond. If he has not done it, he has concluded to run the risk of their so proceeding as not to subject him to injury. Whereas, if such a sale of a note would throw the responsibility off of the plaintiff, it might often place it where there would be no responsibility to make good the party injured. But when this sale was made, *Cilley*, not only impliedly, by the sale, authorized a suit in his name, but expressly stipulated, that his accountability, to Messrs. Taylor and Prentiss, should depend upon their having prosecuted the signer of the note, and his having sworn out of jail. The suit was not only in the name of *Cilley*, but was commen-

CHITTENDEN
January,
1831,
——
Tichout
vs.
Cilley.
ced for his benefit : and his knowledge of it, while progressing, is made manifest by his receiving notice and sending an agent to turn out property.  The truth is, if a wrong has been done, all concerned in it are liable to the party injured ; and there is record proof, that the defendant was concerned in it.   Both parties have proceeded upon the ground, that this execution, by running only sixty days, as it well might, if it were a few dollars less in amount, is absolutely void.   We are under no necessity of giving, or forming, any opinion upon this point, while the counsel do not choose to litigate it ; but we entertain some doubt whether it ought to be treated as a nullity, till set aside by some regular process.   Perhaps the parties feel no wish to raise this question.   It may be of no use ;  for the execution, when set aside, would cease to avail the party justifying under it.   On account of the admission of the testimony offered in the defence, and the instructions given to the jury, the judgement is reversed and a new trial is granted.

ROYCE, J., not being present at the argument, or when the judgement was pronounced, took no part in this decision.

————————

GRAND-ISLE,
January,
1830.
DAVID STEVENS, JUN. vs. JOHN BROWN.

The return of an officer, levying an execution on real estate, is conclusive upon the parties and all claiming under them.

F executed a deed of land to H, and, at the same time, gave H a receipt on a copy of the deed, acknowledging that he had received the original for the purpose of getting it recorded.  F having neglected to procure the original deed to be put upon record, the copy, with the receipt upon it, was afterwards recorded.  It was held in an ac-tion of ejectment brought by S, who had levied an execution on the land as the pro-perty of F, that the said copy of the deed, with the receipt thereon, though recorded before the plaintiff's levy, was not admissible evidence to defeat his title.

This was *ejectment* for lots no. 5 and 6 in the town of Vineyard. Plea, not guilty.   At the trial in the county court it appeared in evidence, that in July, 1821, one Samuel H. Farnsworth recover-ed the seizin and possession of the premises, in an action of eject-ment against one Helmes, commenced in the year 1818 ;  that soon after the recovery of the judgement he took possession by virtue of a writ of *habere facias seisinam*, and put one Wait into possession of the premises as his tenant, who continued in posses-sion till the spring of 1823, when the defendant brought a written message from Farnsworth to Wait, stating that Farnsworth had sold the premises to the defendant, and requesting Wait to deliver up the possession to him ;  that thereupon Wait delivered pos-

session to the defendant, who entered and had continued in the occupancy of the premises ever since ; that the plaintiff on the 9th day of August, 1826, attached the land in a suit against Farnsworth, and afterwards recovered judgement in the action, and levied his execution on the premises.

The defendant offered to prove by the testimony of two of the appraisers named in the officer's return on the execution, that the land which they appraised was not the same which was described in the return. This testimony was excluded by the court. The defendant then, in order to show title in himself, produced in evidence a deed of the premises from Amy Hatch, Betsey H. Farnsworth, and Charles B. Hatch to himself, dated January 26, 1827, and a deed of the same from Charles Hatch to Amy Hatch for life, with remainder in fee to Betsey H. Farnsworth and Charles B. Hatch, dated January 22, 1821, and recorded March 13th, 1827. The defendant then offered a writing purporting to be a copy of a deed of the premises from Samuel H. Farnsworth to Charles Hatch, dated March 11th, 1819, with a receipt on the back of the writing, signed by said Farnsworth, acknowledging that he had received a deed, of which the within was a true copy, for the purpose of procuring it to be recorded ; which writing, with the receipt thereon, had been recorded January 21st, 1823 : and the defendant proved by a Mr. Lamb, that, in 1819, he witnessed a deed from Samuel H. Farnsworth to Charles Hatch, which the witness understood conveyed land lying in some one of the islands. To this writing the counsel for the plaintiff objected ; and, there being no other evidence of the execution and acknowledgement of the original deed, or of its loss or destruction, the court were of opinion that the writing, and testimony given in connection therewith, was not proper evidence to show title in the defendant, and directed a verdict for the plaintiff. The defendant's counsel filed exceptions on which the case was brought to this Court.

After argument, the opinion of the Court was pronounced by

PRENTISS, Ch. J.—The testimony offered by the defendant to show that the lands described in the return upon the execution against Farnsworth, under the levy of which the plaintiff claimed title, were not the lands which were in fact appraised upon the execution, went to contradict the officer's return, and was properly rejected. It is settled, that the return of an officer, levying an

GRAND-ISLE,
January,
1830.

Stevens
vs.
Brown.

execution on real estate, is conclusive upon the parties, and all claiming under them.—(*Hathaway* vs. *Phelps*, 2 *Aik. Rep.* 84.)

The defendant, in order to show an elder title to the lands in question, derived through several persons from Farnsworth to himself, offered in evidence a writing, purporting to be a copy of a deed, duly acknowledged, from Farnsworth to one Hatch, with a receipt on the back of the writing signed by Farnsworth, acknowledging to have received a deed, of which the writing was a true copy, for the purpose of procuring the same to be recorded ; which writing, with the receipt thereon, was recorded prior to the plaintiff's attachment and levy.   Though it is held, that where a party has expressly acknowledged the execution of a deed by a recital under his hand and seal, the existence of the deed may be proved by such recital, against the grantor, and all persons claiming by title derived from him subsequently, yet the writing which was offered in evidence in this case was not under seal, and being a mere parole acknowledgement or admission, the original deed was higher and better evidence.   But admitting that the writing was admissible as secondary evidence of the execution and contents of the deed, upon the ground that the defendant was not a party to the deed, or in possession of it, and it was not in his power to produce it, yet the deed had never been recorded, nor was there any proof that the plaintiff had notice of it.   An unrecorded deed, though good against the grantor, his heirs, and strangers, is void against a subsequent purchaser or creditor, claiming under a right derived from the grantor, unless the purchaser or creditor had notice of the prior deed.   The writing which was offered in evidence was not entitled to be recorded, and the record of it, therefore, could not operate as notice to the plaintiff.   If the record of a copy is not in law a record of the original deed, and is no evidence of title, it is a nullity, and cannot be good for the purpose of notice, or avail to any effect in law.

Judgement affirmed.

*Smalley & Adams*, for plaintiff.
*Royce*, for defendant.

Rufus and Jonathan Wainwright *vs.* Joseph Berry.

The act passed October 29, 1811, directing where certain suits, to recover for goods, wares and merchandise sold and delivered, shall be brought, does not apply to a single act of selling, on a particular occasion, by one who did not use or follow the trade of vending goods, wares or merchandise, or, if he did, was only transiently in the town in which the sale was made, and had no established business there.

Where a promissory note has been executed for goods, wares and merchandise, sold and delivered, said statute does not apply.

This was an action of *assumpsit* on a promissory note commenced before a justice of the peace, and appealed to the county court. The defendant there pleaded in abatement the following plea :

" That by a certain statute passed October 29, A. D. 1811, it is provided, ' that any action which shall hereafter be brought, before any justice of the peace, to recover any debt, dues, or demands, for any goods, wares or merchandise, sold and delivered in any town in this state, the plaintiff having removed from or not residing in such town, such action shall be brought in the town in which such goods, wares, and merchandise, were sold and delivered, and in which the contract was, or shall be, made, or in the town in which the defendant resides.' And the defendant says, that, at the time of giving the note in the plaintiffs' declaration specified, and for a long time before and ever since, the plaintiffs have been engaged in the business of manufacturing stoves of cast iron, and of transporting the same to various parts of the state for sale, as an article of merchandise, and that the plaintiffs in the course of their said business, did transport to the town of Grand-Isle, in the county of Grand-Isle, a quantity of stoves to be there vended and disposed of, as aforesaid, by their agent, by them authorised for that purpose. And the defendant avers, that in November, 1826, he purchased of the plaintiffs one of the said stoves, by a contract made with them through their said agent ; which contract of sale and purchase was made in the town of Grand-Isle, in the county of Grand-Isle : and the said stove so purchased by him of them, as aforesaid, was delivered to the defendant agreeably to said contract, at Grand-Isle, in the county of Grand-Isle, on the 25th day of November, 1826, and that the note specified in the plaintiffs' declaration was then and there given for the said stove, and for no other consideration whatever. And the defendant further states, that, at the time of the purchase of said stove, as aforesaid, and ever since, he, the defendant, has resided in the town of Alburgh, in the county of Grand-Isle, and still resides there. Wherefore he says, that the said suit ought not to have been brought in the said town of Middlebury, in said county of Addison, but should have been brought either in the town of Grand-Isle, or in said town of Alburgh. All which he is ready to verify, &c."

The plaintiffs replied, " that the stove for which the note was

ADDISON,
January,
1831.

Wainwright et al
vs.
Berry.

given was not purchased by the defendant of any agent of the plaintiffs to whom a quantity of stoves had been sent or transported, or who had a quantity of the plaintiffs' stoves to be sold in the town of Grand-Isle, or any other town in this state."

To this replication, defendant demurred. The court decided that the replication was sufficient, and that the defendant answer over. The defendant excepted to the decision, and the case was reserved for the opinion of this Court.

After argument by *Linsley*, for the defendant, and *Bates*, for the plaintiffs, the opinion of the Court was delivered by

PRENTISS, Ch. J.—The general provision, in relation to suits cognizable before a justice of the peace, directs that they shall be brought and tried in the town in which the plaintiff or defendant resides; but there is a special provision, which requires, that actions brought to recover any debt, dues, or demands, for any goods, wares, and merchandise, sold and delivered in any town in this state, the plaintiff having removed from, or not residing in such town, shall be brought in the town in which the goods, wares, or merchandise were sold and delivered, or in the town in which the defendant resides.—(*Com. Stat. p.* 149.) The question presented by the pleadings is, whether the case is within the latter provision. Although the words of the provision are somewhat general, yet the reason and object of it confine it to cases, where a person opens a shop or establishes business in a town, as a dealer or trader in goods, wares, or merchandise, and afterwards removes from the town, or transacts the business by his agent, not residing there himself. The act applies to a sale made by one who has thus established and carried on business in a town, in which he did not reside, or from which he has removed, and was never intended to apply to a single act of selling on a particular occasion, by one who did not use or follow the trade of vending goods, wares, or merchandise, or, if he did, was only transiently in the town in which the sale was made, and had no established business there. On a different construction of the act, if two persons residing in Middlebury should casually be in a remote town in the state, and one should there sell to the other an article of goods, it would be in the power of the vender to bring his action, to recover for the article sold, in such remote town.

But the action is brought upon a note of hand, and it may well be doubted, whether the act ought to be construed to extend to

such a case. The note is an entire and perfect contract in and of itself, and the action being founded upon that, it would seem to be an anomalous proceeding to inquire into the consideration of the note for the purpose of deciding where the action should be brought. Where a note is negotiated, and an action is brought upon it by the indorsee in the town in which he resides, to allow the action to be defeated by a plea, that goods, sold and delivered in some other town, formed the consideration of the note, would be as unreasonable as it would be vexatious. There appears to be no necessity for such an enlarged construction of the act, since the words of it may be sufficiently satisfied, by applying it to actions brought professedly and directly to recover for goods sold.

Judgement affirmed.

*Addison,*
*January,*
*1830.*

Wainwright et al
*vs.*
Berry.

———————⟨image⟩———————

### Joseph I. Tobias *vs.* John Francis.

*Addison,*
*January,*
*1830.*

Where the owner of a wool-carding factory sold and conveyed it, with all the machinery, and, at the same time, took from the vendee a mortgage deed of the same premises to secure the payment of the purchase money, and the vendee entered, and remained in possession,—it was held that the machinery, which was connected with the building in which it was worked only by a band, but could not be taken out of the building without being first taken in pieces, was personal property, and liable to attachment at the suit of a creditor of the vendee, notwithstanding the mortgage.

This was an action of *trover* brought to recover the value of certain carding machines. Plea, the *general issue.* At the trial in the county court it appeared in evidence, that the plaintiff had conveyed, by deed, to John F. Hutchinson a small piece of land, with a woolen factory standing thereon, *and all the machinery therein and thereto belonging ;* and, at the same time, Hutchinson executed to the plaintiff a mortgage deed of the same premises, including the machinery, to secure the payment of the purchase money. Hutchinson, immediately after the sale, took possession of the premises, and carried on his work, using the machinery which was there, until the said carding machines were taken away by the defendant. It appeared that said machines were placed in the building, and connected by a band with other wheels in motion, by which the machines were propelled, in the usual way, and were not otherwise fastened to the building, but remained stationary, by reason of their own weight, while the wheels were in motion ; that they could not be carried out at the door of the building without being taken apart, but might easily have been

DDD

ADDISON,
January,
1830.

Tobias
vs.
Francis.

taken in pieces so as to be carried out. The plaintiff had obtained a decree of foreclosure against Hutchinson of the mortgaged premises, embracing all the notes given for the purchase, and no part of the redemption money had been paid. The defendant justified the taking and sale of said machines by virtue of regular executions against Hutchinson, issued on judgements, recovered in suits in which the machines had been previously attached. The court instructed the jury, that the machines, in the situation in which they were, when taken by the defendant, were real estate, attached to the freehold, and were not liable to be attached or taken in execution as personal property. The jury thereupon returned a verdict for the plaintiff. The defendant filed exceptions, on which the cause was removed to this Court.

*Collamer, for the defendant.*—The deed from *Tobias* to Hutchinson, vested in Hutchinson all the real and personal property therein mentioned, including the carding machines now in question. No mortgage of the machines, if they be personal property, could so vest them in *Tobias* as to protect them from attachment by the creditors of Hutchinson, while he remained in possession.

I. The first question is, are carding machines, set up and used in a building, a part of the freehold, as fixtures and appurtenances, or are they personal property? Whether an article be a *fixture* seems, by the courts, to have been at times decided from a consideration of the object and author of its erection, which does not so much determine what is a fixture, as who is its owner. This may be seen by comparing *Penton* vs. *Robart*, *(2 East,* 88,) with *Elwes* vs. *Maw,* *(3 East,* 55.) But these points should not be confounded, as it is important, especially under the practice of the attachment law, to determine by the intrinsic character, and by inspection of the property, whether it be personal. This cannot depend on the author or object of its erection:—1st. Because by inspection the question could not be settled. 2d. Because, if so, the same article, without visible alteration, might, by mere change of ownership, change its character.

Whether an article *be a fixture* must be determined by intrinsic circumstances, and this depends on a consideration of these facts. 1st. Can it be separated without violence or injury to the freehold? 2d. Is it particularly adapted to that place, or can it be as beneficially used elsewhere? Tested by these, or any other principles adopted in the books, carding machines are not

ADDISON,
January
1830.

Tobias
vs.
Francis.

fixtures. If so, they are simply personal property, and not within any of those decisions which go to settle to whom fixtures belong. 1st. They are not *affixed* to the ground or realty. 2d. They could be removed without injury to them or the building. 3d. They have no adaptation peculiar to the building, but could be as well used elsewhere. 4th. They, or a smaller machine similarly *fixed*, would be the subject of larceny. 5th. They are merely of a personal nature, to carry on a trade. 6th. They have ever been so treated in this state by attachment and sale, and have never been considered as passing, as appurtenant to the freehold, by deed thereof, unless particularly mentioned, and were so treated by *Tobias*. 7th. To decide otherwise, and to hold for the plaintiff, that they were essential to the beneficial enjoyment of the freehold, and constituted a part of it, would necessarily hold that, if put in by a tenant, they vested in the landlord. 8th. All this has been fully decided, especially in New-York and Massachusetts.—*Penton* vs. *Robart*, 2 *East*, 88 ; *Elwes* vs. *Maw*, 3 *East*, 55 ; *Taylor* vs. *Townsend, &c. Mass. Rep.* 411 ; *Gale* vs. *Ward*, 14 *do.* 352 ; *Cresson &c. 4 Johns. Rep.* 116.

II. Being simply personal property, they could not be mortgaged so as to protect them from attachment by the creditors of the mortgagor, he remaining in possession ; nor does the fact of being used upon, and mortgaged with the real estate, constitute an exception. 1st. All courts, even those who have not holden that *sales* must be accompanied with possession to be binding on creditors, have ever holden that a mortgage or pledge of personal property must be. Indeed, it is difficult to understand how a mortgagee or bailee of personal property, having neither *ownership* nor *possession*, can be considered as having any legal right in the property, even as against the mortgagor, as the debt would remain. 2d. It would be inconvenient and dangerous to make the case of machines, or any other personal property mortgaged with real estate, an exception to the general rule of attachment, as the property of the possessor ; because the wholesomeness of the rule is beginning to be universally acknowledged, so much so, that in Massachusetts its legislative adoption is called for, and every exception breaks in upon its unity and destroys certainty and confidence. If it is to be an exception, it would confound all principles and rights. Personal property mortgaged has no equity of redemption, but vests absolutely, on failure of payment. Now would this mortgagee take this personal property absolutely, and yet have his claim on the realty for his debt ? Or how can it be

Addison,
January,
1830,

Tobias
vs.
Francis.

apportioned ? How can the creditors of either of the parties attach this personal property ? and with what proportion of the debt does it stand encumbered ? Does not the attaching creditor, the defendant in this case, entitle himself to some right, and what ?   3d. This point has also been decided.—*Taylor* vs. *Townsend*, 8 *Mass. Rep.* 411; *Gale* vs. *Ward*, 14 *do.* 352 ; 17 *Johns. Rep.* 116.

*Phelps, for the plaintiff.*—This case naturally resolves itself into two questions, viz. *First,* Is the property in question to be regarded to the purposes of this mortgage, and between these parties, as a part of the realty ? *Secondly,* If it be not so considered, still is it not protected by the mortgage ?

1. As to the question, what is a part of the realty in reference to fixtures or erections for the purposes of trade,and connected with manufacturing establishments, I apprehend no general rule can be laid down.   But it depends mainly upon the particular relation between the claimants ; and what the law regards [as real estate, between certain parties, would not be so considered as to others. There is one rule between the *heir* and *executor.*   Another between tenant for life and *remainderman.*   And a third between *landlord* and *tenant*, and a fourth, I believe I may add, between *seller* and *purchaser.*   In this case it is contended that the machinery is to be considered as attached to the realty, and partaking of its nature, so far as to be, to the purposes of the mortgage, a part of it.   The factory or establishment, with all its running gear and machinery,was sold by the plaintiff to Hutchinson entire, and a mortgage taken in the same way.   The machinery passed attached to, and a part of, the realty—was so treated by the parties—was indispensable to the enjoyment of the realty to the purposes, and in the manner, contemplated by the parties, and formed an integral part of the thing sold.   Had the machinery been disconnected with the land, or put in by Hutchinson after his purchase, the case would have been different.

As to what is a part of the realty,the question should be considered with reference to the nature and natural uses of the property.   A mill or factory is an entire thing,useful and valuable only as such,and necessarily comprehends something more than an empty building. The machinery is not only a necessary, but often constitutes the principal,part of its value. It should also be considered with reference to the relative rights of those who may be claimants.   And it is believed that under any rule of the common law, the proper-

ty will be found to belong to the plaintiff. *First,* as between the *heir* and executor, property thus situated would unquestionably belong to the *heir.*—See *Com. Dig. title, Biens (B)*; 1 *H. Black.* 259, *note*; *Ambler,* 395; 1 *Swift's Dig.* 534; 3 *Atk.* 13. This case is not analogous to the case of executor and heir, and bears no analogy to that of *landlord* and *tenant.—Rogers vs. Page, Sup. Court, Jan.* 1819. *Secondly.* If the case were analogous to the case of tenant for life and *remainderman,* or land-lord and tenant, the result would be the same, if we consider the mortgagor in this case as the tenant of the plaintiff, the mortgagee, which is the most favorable view for the defendant; yet all the cases cited by the defendant will be found inapplicable. They all relate to the right of the tenant to remove fixtures *erected by himself during his term.— Com. Dig. tit. execution, C 4*; *Swift's Dig.* 534. If Hutchinson had put in machinery after his purchase, it is admitted, it would have been subject to attachment. But it was never supposed that a tenant for life or years had the right to remove fixtures attached to the estate by the landlord, before the commencement of his term. Indeed, if he should attempt it, he would be liable for waste, and a court of chancery would enjoin him. If Hutchinson had no right, as between him and the plaintiff, to remove the machinery, most certainly no person, claiming under him, had. Regarding Hutchinson as a mortgagor or vendor, the question as to the property in the machinery depends, as between him and the plaintiff, upon the terms of the mortgage. This is specific as to the machinery. The result is, that his creditors could not lawfully attach and remove the property unless the mortgage could be avoided as fraudulent.

II. Admitting that the machinery in question is to be deemed personal property, still the question arises,is it not protected by the mortgage ? As the mortgage is good between the parties to it, the only ground upon which the defendant can prevail, is, that the possession of Hutchinson was fraudulent as to creditors. The general rule upon this subject is not now to be disputed ; but it admits of various exceptions. In the language of *Judge Kent,* (9 *Johns.* 337, *et seq.*) such possession is to be considered fraudulent, unless for special reasons to be shown and approved of by the court. The reason for the possession of Hutchinson in this case is a strong one. The machinery was connected with the real estate, and necessary to the enjoyment of it—was a necessary and integral part of the property purchased, and of little or no value, except as attached to the freehold. Without it, the object of the purchase would be defeated. Indeed, his possession was a mat-

ADDISON,
January,
1830.
———
Tobias
vs.
Francis,

ter of necessity.    Cannot the vendor of such a property, who sells it entire, take an entire security which shall be valid ; or must he, to render his mortgage security valid, dismantle the property, and render it useles to all parties ? It may well be doubted whether sound policy requires such an extension of the rule.    The idea of fraud is inconsistent with the statement of the case.    For it is certainly reasonable that the plaintiff should have a security by mortgage upon the entire property.    The idea of a false credit is also done away, for the recorded title of Hutchinson to this property shows that the property was purchased entire, and at the same time mortgaged in the same manner.    The rule, although it may have been extended to mere tools, and without being attached to the realty, has never been extended to machinery of this description.

There are two cases similar to this which have been decided in this country, which deserve a particular notice.    In *Gale* vs. *Ward*,(14 *Mass*.352,) the machinery was held subject to the attachment.  But in that case the machinery was not embraced by name in the mortgage, and the question was simply whether, without being named in the mortgage, it was in such a sense a part of the realty  as to be necessarily, and by mere operation of law,  bound by it.    That case, however, is professedly founded on *Pool's case*, *(Salk*. 368,) and the reason  given in the  latter case, why  the property was liable to attachment, was, that the tenant might himself remove it at any time during his term.    The court in Massachusetts either went upon this ground first suggested, or they failed to discover the  difference  between *Pool's case* and the  case where the mortgagee not only sells the property attached to the realty,   but fixes it in that state by the express  terms of  the mortgage.    The other case is *Cresson* vs. *Stout*, (17 *Johns*.  116.) This decision is pointedly in our favor.    A part of the machinery in that case was attached to the real estate, and sold with it.  It was also named in the mortgage.    A part was put in afterwards, and the whole was levied upon, before the mortgagee took possession. The court decided that, with respect to the first, the plaintiff was entitled to hold it against the attachment, whether it was real or personal estate, and this, although the rule  as to  fraud there obtained to its full extent.    The case, therefore, *is a direct authority* to show that the possession of the mortgagee, under such circumstances, is not fraudulent.    They did, indeed, decide that the property was personal.    But this was in answer to a position taken by the plaintiff, that the machinery put in after the mortgage, became so identified with the real estate as to become subject to the mortgage.    On the whole this case decides two points ; 1st. That

when the mortgage embraces the machinery by name, it protects the machinery against the creditors of the mortgagor. 2d. That the possession of the mortgagor of the machinery is not fraudulent.

PER CURIAM.—The carding machine was not connected with the building in which it stood otherwise than by a band, and might be removed and used in any other similar building ; and situated as it was, it must be regarded as personal property, and as such liable to be taken and sold on execution. The other point in the case is not so clear. The general rule is, that a mortgage of a personal chattel is of no validity against the creditors of the mortgagor, without a delivery of possession to the mortgagee ; but whether this case, under the particular circumstances of it, ought not to be considered an exception to the general rule, is a matter upon which an opinion has been formed after much hesitation and doubt. In the case of *Gale* vs. *Ward*, 14 *Mass.* 352, where the owner of a wool manufactory sold and conveyed it, with all its appurtenances, and at the same time took from the vendee a mortgage deed of the premises to secure the payment of the purchase money, and the vendee entered and remained in possession, it was held, that the machines for carding wool, in the building, were personal property, and liable to attachment at the suit of the creditors of the vendee, notwithstanding the mortgage. The case cited is exactly in point ; and the judge who tried this cause in the court below, though now absent, heard the argument at the last term, and is decidedly of opinion that the doctrine of that case ought to be adopted ; and on the whole, the conclusion is that the judgement must be reversed.

> Judgement reversed, and cause remanded to the county court for a new trial.

## GERSHOM CHEENY et als. *vs.* ALANSON CLARK.

Where a number of persons formed an association for the purpose of building a meeting-house, and, in pursuance of the articles of agreement, subscribed by them, appointed three of their number a committee, called a building committee, to superintend the erection of the building,—it was held in an action brought against the committee to recover for services performed on the building, that, without an express undertaking, or funds placed at their disposal for the purpose of paying for the services, the committee were not liable.

*Semble*, where a number of individuals associate together, and subscribe sums of money, for the purpose of building a meeting-house, they are partners in the undertaking, and, therefore, a subscriber, who performs services on the building, cannot maintain an action therefor against the building committee who are subscribers in the same undertaking, on account of the partnership.

RUTLAND,     This was a *writ of error* to reverse a judgement  rendered by
January,
1830.      the county court, in  an  action on  book  account, in  which  the
Cheeny et als.  plaintiffs in error were defendants, and the defendant in error was
vs.       plaintiff.    The auditor's report, on which the judgement was ren-
Clark.
dered, and to which exceptions were taken in  the court  below,
stated, that the services charged in the plaintiff's account were per-
formed by  him on the congregational meeting house in Rutland ;
that the defendants were a committee appointed to superintend the
building of said house  agreeably to  certain articles of agreement
subscribed by the share-holders, which were  annexed to the re-
port ; that before all the  services were  performed,  *Abel Page*,
one of the defendants, was by  the  proprietors of  said house  dis-
charged from said committee,  and *John Barr*  appointed in  his
place ; but after the appointment of *Barr* payments were made to
the plaintiff to a greater amount than the services performed  after
said appointment.    The articles of agreement were signed by the
proprietors, amongst whom were  the plaintiff and  the defendants.
The parts of  said  articles, material to be stated, are  as follow :
" We the undersigned, desirous of erecting an edifice, to be dedi-
cated to Almighty God, in the east parish of Rutland, for the  use
and benefit of said east parish as a congregational meeting-house,
hereby bind ourselves to pay to a committee to be appointed as here-
in after provided, or  to their  successors, or  their order, for  the
number of shares annexed to our  names respectively upon  the
consideration herein after mentioned.

1.  The meeting house and  ground attached thereto is  estima-
ted to cost six thousand six hundred dollars, and the  mumber of
pews or slips on the lower  floor  to be erected  thereon shall  be
sixty six, which at $100 each will amount to the aforesaid estima-
ted cost of said meeting-house.   The number of pews shall there-
fore be sixty six, and the price of each share  shall be $100,  and
the person  who shall subscribe for one share shall be  entitled to
one pew or  slip.

2.  The place on which said meeting house shall be erected, and
also the plan of erecting the same, shall be  determined by  a ma-
jority of the subscribers or  share-holders, each  subscriber voting
according to his number of shares.

3.  The third article prescribes the mode of  calling  meetings
of  the subscribers.

4.  The erecting said meeting house shall be superinteuded by
a committee of three, who shall be  called the building committee,
who shall be appointed from among  the subscribers or  share-hol-

RUTLAND,
February,
1830.

Cheeny et als.
vs.
Clark.

ders, and exercise their duties during the pleasure of the subscri-bers or share-holders.    Provided that said committee are and shall be subject to the controul and direction of the subscribers or share-holders in all things pertaining to their duties ; and provided also,that the subscribers or share-holders may at all times remove one or more of said committee,and appoint other or others,and also fill all vacancies that may happen therein by resignation or death.

5. When the meeting house shall be completed, the location of each subscriber's right to a pew or pews shall be determined by putting the choice at auction in numerical order until all the pews are disposed of, and the highest bidder on each choice shall be entitled to the choice he shall purchase.    And the aggregate sum, as also any surplus that may remain unexpended, shall, after paying all contingent expences which may be incurred, be averaged among the subscribers according to their number of shares.

6. The sixth article provides that the amount of each share subscribed for shall be paid by instalments of $20 each, at different times, the last being payable in a year and a half."

*Royce and Hodges, for the plaintiffs in error,*—contended, That,in the absence of all evidence of an express understanding on the part of the committee, the presumption arising from the facts reported, taken in connection with the articles of association, showed that the credit of the society, and not that of the committee, was pledged for the payment of the defendant's account, and that the parties themselves must have so understood it—That the society was formed in reference to a statute passed November 10, 1814, *(Rev. Stat.* 602,) and was, consequently, an incorporated society, and could sue and be sued ; and that inasmuch as the plaintiff below contracted with the defendants below as a committee of the society, he could not recover without showing an express engagement personally to be accountable.—(*Sw. Dig.* 329 ; *Proctor* vs. *Webber,* 1 *D. Chip. R.* 371 ; *Mann* vs. *Chandler,* 9 *Mass.* 335 ; *Hodgson* vs. *Dexter,* 1 *Cranch,* 345 ; *Moneypenny* vs. *Hartland,* 11 *Com. Law Rep.* 414, 416 ; *Holmes* vs. *Higgins,* 8 *do.* 27 ; *Witte* vs. *Derry Fishing Company,* 2 *Conn. Rep.* 260 ; 14 *Johns. Rep.* 118 ; 18 *do.* 60.)—That the society, either as a corporation or as so many persons voluntarily associating themselves together, and doing their business by a committee, would be liable, and, therefore, the defendants below could not be made responsible on the ground that they had not power to bind their principals—That if the so-

EEE

RUTLAND,
February,
1830.

Cheeny et als.
vs.
Clark.

ciety was not a corporation within the statute, yet upon common principles, regulating the liability of principals and agents, the committee would not be liable, unless money was shewn to be in their hands, and this should be shown by the party who seeks to charge them, when he knows the character in which they are acting—That without an express promise, the committee were not liable, on the ground that *Clark* and the committee, as well as the other subscribers, stood in the relation of partners—That John Barr should have been joined as a defendant ; and that if the committee were made responsible at all, it should be the committee in charge of the business when the building was completed, and who had made the collections.

*Williams and Thrall, for the defendant.*—1st. Notwithstanding the defendants below were the agents of the subscribers for building the meeting-house, yet they were agents for a limited and specific purpose, and had no authority, either express or implied, to bind their employers. Funds were placed in their hands for a specific purpose, and in the disbursements of these funds they could make such contracts as they thought proper ; but in such contracts would only bind themselves. If an agent exceed his authority and does not bind his principal, he makes himself personally liable.—*Sw. Dig.* 327, 330 ; 13 *Johns.* 58 ; *Mann* vs. *Hoffman, do.* 307 ; 2 *Kent's Com.* 492.

2nd. The plaintiff below had no claim against Barr, the other committee-man : his first employment was by the defendants below, and, after the removal of one of them, Page, and the apointment of Barr, more was paid than the amount of services rendered while Barr was one of the committee.

3d. If the services were performed by Clark at the request of *Cheeney, Strong* and *Page,* there can be no good reason why he should not maintain an action on book. The services were rendered on their employment ; and if from the nature of their appointment they could not bind any other one, they bound themselves ; and it is believed that no other action would have been appropriate. No action could be brought by him against them for not disbursing the funds as monies by them received ; for this they are alone accountable to those who employed them, or the subscribers or share-holders in the meeting-house.

PER CURIAM.—The subscribers to the articles of agreement, not being constituted a society under the statute with corporate

powers, but being a mere voluntary association of individuals, the question is, whether the defendants, who acted as their committee in superintending the building of the meeting-house, were personally answerable for the services performed by the plaintiff upon it. It does not appear that the defendants made any express promise, or pledged their individual credit and responsibility, so as thereby to impose a personal obligation upon themselves; nor does it appear that any moneys were in their hands, or that any funds remained at their disposal, to answer or pay for the services. They were appointed by the body of the subscribers to execute a mere trust; were bound to act under the direction and controul of the subscribers, and liable to be removed at their pleasure; and it appears that one of them was in fact removed, and another person appointed in his place. The plaintiff was one of the subscribers by whom the defendants were appointed; and, in the absence of any express contract or undertaking, he can have no legal or equitable right to look to the personal security or liability of the defendants, and hold them answerable out of their private funds, for work done by him for the benefit of the subscribers generally. Indeed, as the subscribers to the articles of association were all equally interested in building the meeting-house, and the plaintiff and the defendants were members of the association, the case would seem to fall within the rule, that one of several persons jointly concerned in a common purpose cannot maintain an action against all or any of the others for work and labor performed for their joint benefit. In *Holmes* vs. *Higgins*, (1 *Barn.* & *Cres.* 74,) where a number of persons associated together for the purpose of obtaining an act of parliament and making a railway, and subscribed for shares of £50 each, it was held, that they were partners in the undertaking, and that a subscriber, who acted as their surveyor, could not maintain an action for work done by him in that character, against all or any of the subscribers.

Judgement reversed.

Rutland, *February,* 1830.

Cheeny et als. *vs.* Clark.

### Solomon Wright *vs.* Thomas Brownell.

Bennington, *February,* 1830,

Where an amendment of a declaration does not make the bail liable to a greater sum, nor subject him to any new or additional responsibility, he is not thereby discharged, though the amendment be by a new count.

On the trial of this cause the judgement was rendered, by con-

BENNINGTON,
*February*,
1830.

Wright
*vs.*
Brownell.

sent of parties, for the defendant, subject to the opinion of the Supreme Court on the following case :

On the 21st of March, 1821, the plaintiff and Elijah Lovett, since deceased, sued out a writ of attachment, as well for themselves, as for the treasurer of Bennington county, against Caleb Eldred, returnable to the next term of the Supreme Court, and such proceedings were had in the suit, that at the February term, 1822, the plaintiffs in that suit recovered a judgement against said Eldred for $600, damages, and their costs. Eldred reviewed, and on that occasion the said *Thomas Brownell*, as bail and surety of Eldred, then and there acknowledged himself bound unto the plaintiffs in that suit in a bond of recognisance of the sum of $800, conditioned, "*that the said Eldred should prosecute his review to effect, and answer and pay all intervening damages occasioned to the reviewees by their being delayed, with additional cost, in case said judgement should be affirmed.*" After the review had been entered, the said Lovett died, and his death was suggested on the record at the February term, 1823. The declaration in the suit, in which the recognisance was taken, originally consisted of one count only, which was as follows :

The defendant is attached " to answer unto *Solomon Wright* and *Elijah Lovett*, both of Pownal in the county of Bennington, who as well for Joseph Burr, of Manchester, aforesaid, treasurer of the county of Bennington, as for themselves, in that behalf, prosecute in a plea of the case, wherein the said *Solomon* and *Elijah*, who as well for said treasurer, as for themselves, in his behalf, prosecute, declare, and say, that on the 5th day of July, A. D. 1818, at Pownal aforesaid, one Mumford Eldred, of Pownal, aforesaid, was indebted to the said *Solomon* and *Elijah* in the sum of fifteen hundred dollars, to wit, on one certain promisory note, dated the 31st day of March, A. D. 1818, for the sum of fifteen hundred dollars, payable sixty days from the date thereof, which said note was and is a just and *bona fide* debt, due and owing from the said Mumford to the said *Solomon* and *Elijah* : and the said Mumford on the day and year last aforesaid, was seized and possessed in his own right, in fee, of certain tracts or parcels of land, situate and being in the towns of Pownal and Bennington, aforesaid, to wit, in Pownal of the home farm of the late Daniel Eldred, deceased, and certain lots and parcels of land adjoining thereto, which the said Mumford bought of John Stanton and Stephen Eldred : also one other piece of land lying in the southwesterly part of Bennington, in said county, containing about eighty acres, it being the farm the said Mumford purchased of William Burlison : and the said Mumford, on the day and year last aforesaid, at Pownal, aforesaid, was possessed and was the

owner of certain goods and chattels, to wit, of two horses, three
cows, one yoke of oxen, thee hogs, two sleighs, and one cart, all
which at Pownal, aforesaid, on the day and year last aforesaid,
was well known to the said *Caleb* ; nevertheless, the said *Caleb*,
contrary to the form, force and effect of the statute in such case
made and provided, wickedly conspiring with the said Mumford,
and subtilly, craftily, deceitfully, and fraudulently, intending to
cheat, injure, and abuse the said *Solomon* and *Elijah,* and to avoid
the said debt due to them from the said Mumford, and to prevent
the said *Solomon* and *Elijah* of their right to recover payment
thereof on the said land and personal property, aforesaid, and
wholly to defraud them of said debt, did afterwards, to wit, on the
6th day of July, A. D. 1818, in said county of Bennington, by
virtue of a certain writ of attachment in his favor against the said
Mumford, dated the 6th day of July, A. D. 1818, signed by Da-
vid Fay, councillor and justice of the peace, and made returnable
to the county court then next to be holden at Bennington, in the
county of Bennington, on the 3d Monday of December, A. D.
1818, demanding in damages four hundred dollars, caused all of
the said real and personal estate of the said Mumford to be attach-
ed at his, the said *Caleb's,* suit aforesaid ; aad also on the same day
and year last aforesaid, the said *Caleb* intending and contriving, as
aforesaid, caused a certain other writ of attachment, dated the 6th day
of July, A. D. 1818, and signed by David Fay, councillor and
justice of the peace, as aforesaid, demanding in damages the sum
of five thousand dollars, and made returnable to the county court
then next to be holden at Bennington, within and for the county
of Bennington, on the 3d Monday of December, A. D. 1818, to
be served upon all the said real and personal estate of the said
Mumford, aforesaid. And the said *Caleb,* contriving, and intending,
as aforesaid, did cause said last mentioned writ to be entered in
said county court, at the said December term, A. D.·1818, afore-
said, and such proceedings were had thereon, that the same was
continued to the term of said county court holden at Bennington
aforesaid, on the first Monday of December, A. D. 1819, at
which term the said *Caleb*, by the consideration of said court, re-
covered against the said Mumford the sum of $2465,54 dama-
ges, and $33,59 for his cost of suit; and afterwards, to wit, on
the 10th day of April, A. D. 1820, caused the execution on said
judgement, for the sums so recovered, as aforesaid, to be levied
in due form of law on the real and personal property, so attached,
as aforesaid. Which said writs of attachment were founded on and
brought to recover certain pretended false, fictitious and fraudu-
lent demands, in no wise due and owing from the said Mumford
to the said *Caleb*. By reason whereof, and by force of the statute
in such case made and provided, an action hath accrued to the
said treasurer, and to the said *Solomon* and *Elijah,* as well for
the said treasurer as for the said *Solomon* and *Elijah,* in this be-
half, prosecuting to recover of the said *Caleb,* to wit, the value of
the said real estate, and goods and chattels, aforesaid, the sum of

BENNINGTON,
February,
1830.

Wright
vs.
Brownell.

five thousand dollars; for the recovery whereof, with just costs, this suit is brought."

After the recognisance had been taken for the review, as before mentioned, to wit, at February term, 1823, the plaintiff was allowed to amend his declaration by adding the following count:

"And also, for that whereas the defendant, on the 6th day of July, A. D. 1818, at Pownal, to wit, at Bennington, aforesaid, was a party to a certain fraudulent and deceitful suit against one Mumford Eldred, in which said suit a certain fraudulent and deceitful judgement was, at the term of the county court begun and holden at Bennington on the first Monday of December, A. D. 1819, recovered by the defendant against the said Mumford Eldred for the sum of $2465,54 damages, and $33,54 costs of said suit, to the purpose and intent to avoid the right and debt of the said *Solomon* and *Elijah*, the said *Solomon* and *Elijah* then being creditors to the said Mumford Eldred on a certain promisory note, dated the 31st day of March, A. D. 1818, for the sum of fifteen hundred dollars, payable in sixty days from the date thereof to the said *Solomon* and *Elijah*, and the said suit and judgement, the defendant being party and privy thereto, did then and there justify to be made, had, executed, and recovered, *bona fide*, and upon good consideration; by reason whereof, and by force of the statute in such case made and provided, an action hath accrued to the said *Solomon* and *Elijah*, who sue, as aforesaid, (they the said *Solomon* and *Elijah* being the parties aggrieved by said fraudulent and deceitful suit and judgement,) to have and recover for the treasurer of said county of Bennington, and for themselves, the said *Solomon* and *Elijah*, the sum of $2499,13, being the sum of money contained in said fraudulent and deceitful judgement, recovered by the defendant against said Mumford Eldred, as aforesaid, which is on file."

After the declaration had been so amended, to wit, at February term, 1827, final judgement was rendered in the action against Eldred for $2558,68 damages, and $328,99 costs, on which execution was issued, and, within thirty days, given to an officer, and a *non est inventus* return duly made thereon. The plaintiff then brought the present action on the bond of recognisance, taken on the review as before mentioned; and the principle question was, whether the recognisance was discharged in consequence of the amendment of the declaration.

*Bennett and Aiken, for the plaintiff.*—I. The courts of this state have power " at any time" to grant amendments in the process and pleadings upon such terms, as they, *in their discretion*, shall prescribe.—*Comp. Laws, p.* 73, *s.* 51. See also *Swift's Dig.* 639. A new count may be added for the same cause of

action. The court, in the exercise of this legal discretion, order-BENNINGTON,
*February*
1830.

Wright
*vs.*
Brownell.
ed the amendment in question, and this order, we contend, is con-
clusive on the rights of the parties.

II. What effect has an amendment of the declaration on the
rights of bail, for costs of prosecution—on the back of the writ—
or for a review—where the amendment is ordered after review is
granted? Here we assume the fact, that the cause of action is not
changed by the amendment. 1st. Such amendment made at
any time during the suit, by fiction of law, has relation back to its
commencement.—2 *Strange*, 890 ; 1 *Wills*. 149, 163; 2 *Term
Rep*. 707 ; 4 *Burr*. 2447. 2d. The right of amendment is a
power incident to the court, and the parties are at all times sub-
ject to the exercise of this power. It would seem equally rea-
sonable that those collaterally interested in the suit, as bail, should
be equally subject to the exercise of the same power. For, oth-
erwise, the beneficial effect of the statute of amendment would be
in a great measure defeated, as bail would be discharged by every
amendment in substance. Besides, every one becomes bail with
a full knowledge of this discretionary power of the court, and
impliedly assents to the exercise of it, under all proper circum-
stances. 3d. There are numerous adjudged cases in which it is
established as a principle, that such amendments do not discharge
the liabilities of bail.—1 *H. Black*. 310; 5 *T. R*. 402 ; 1 *Wills*.
277; *Tidd's Prac*. 84 ; 18 *Mass. R*. 204 ; 5 *Con. Rep*. 587.

III. The new count, we contend, introduced no new cause of
action. Where the same evidence supports the several counts in
a declaration, it may safely be pronounced that the cause of action
is the same. If the present case be tested by this rule, it will be
apparent, that the facts set forth in the first count, if proved, would
sustain the new count. The only difference is in the conclusion
of law drawn from the same facts. Drawing a different conclu-
sion, cannot be setting forth a new cause of action ; the conclusion
is unnecessary, and surplussage.—1 *Chit*. 359. If the pleader
draw a wrong conclusion, the court will draw a right one. The
conclusion drawn in the second count might have been drawn
from the facts stated in the first count. The *ad damnum* remains
unaltered.

*Isham, for the defendant*, contended,—That the cause of action
in the new count, on which the judgement was rendered, was dif-
ferent from that contained in the declaration at the time the re-
cognisance was taken, as the rule of damages under the original

BENNINGTON,
February,
1830.

Wright
vs.
Brownell.

count would be the value of the property fraudulently attached, which might be more or less, according to the estimation of a jury; but the rule of damages under the second count was the amount of the judgement recovered, far exceeding the amount that could have been recovered under the first; and as the evidence on the part of the plaintiff, that would have supported the first count, could not have been received under the second, and the evidence on the part of the defendant, that would have constituted a good defence to the first count, would constitute no defence to the last. 1 *Phil. Ev.* 254 ; 2 *Aik. Rep.* 326—That if the cause of action was different in the two counts, the issue was correctly found in the court below, for the matter, or cause of action, reviewed, had been so prosecuted to effect that no judgement upon it had been recovered by the plaintiff, and, consequently, the defendant was discharged from the recognisance.—13 *Mass. Rep.* 93 ; 17 *do.* 591 ; 1 *Pick. Rep.* 156. 192 ; 2 *Conn. Rep.* 377; 3 *do.* 157, 431 ; 5 *do.* 538, 590 ; 6 *Mod. Rep.* 266. The counsel also contended, that any act done which tends to enhance, or in any way affect, the liability of bail, will discharge him, though the cause of action is not changed ; and cited 2 *Saund. Rep.* 72 (*n.a.*); 2 *H. Bla. Rep.* 278 ; 1 *Sel. Prac.* 236, 238 ; 1 *Salk. Rep.* 241, 249 ; 6 *Term Rep.* 364 ; 2 *Bos. and Pul.* 358 ; 2 *New Rep.* 82. It was also contended that the suit should have been commenced as well for the plaintiff as for the county of Bennington, else the county would be defeated of their interest in the judgement.

PRENTISS, Ch. J., delivered the opinion of the court.—The original action, in which the defendant became bail, was brought by the plaintiff, to recover of *Caleb Eldred* the forfeiture incurred by him, under the statute, as a party to a fraudulent and deceitful judgement. After the defendant entered into the recognizance for the review of the action, the plaintiff, by leave of court, amended his declaration, by filing a new count ; and it appears that final judgement was recovered by him on the new count.

In the English practice, if the plaintiff declares against the defendant on a different cause of action from that expressed in the writ, the bail is discharged ; and there is no doubt of the principle, that where the plaintiff, in an action in which bail is taken, files a new count for a cause of action not contained in the original declaration, and judgement is rendered on the new count, it will discharge the bail. But the court are authorized to permit either

of the parties, at any time, to amend any defect in the process or pleadings, upon such conditions as they shall, in their discretion, prescribe ; and though the addition or substitution of a new count for a new cause of action, is not within the statute of amendments, yet adding or substituting a new count for the same cause of action is undoubtedly within the power of the court. The obligation of bail is assumed with a knowledge of this right and power to amend, and with an understanding that the action is subject to the exercise of it ; and where the amendment does not make the bail liable to a greater sum, or subject him to any new or additional responsibility, he has neither in law or justice any ground of complaint. On examination of the record, in the original action, it is very apparent that the same evidence would maintain both counts, and that the cause of action is the same in both. The original count stated the facts, which constituted the cause of action, particularly and at length. The new count is more brief, but states the material facts, which formed the ground of action, and they appear to be the same contained in the original count. The only difference between the counts consists in this : in the conclusion, one demanded the value of the property taken to satisfy the covinous judgement as the forfeiture, and the other demands the amount of the money contained in the judgement. But the amount of the judgement, and not the value of the property, was the forfeiture given by the statute ; and the conclusion demanding the value of the property was nugatory and void. The whole amount recovered by the plaintiff on the new count must have been recovered, if any thing, on the original count, and there could be no difference in the rule of damages upon them. A wrong conclusion of a count is one of the defects which the court have power to amend, and whatever may be the form in which the amendment is made ; whether by altering the original count, or adding or substituting a new count, it does not affect the responsibility of the bail.

> Judgement of the county court reversed,
> and judgement entered for the plaintiff.

FFF

Rutland,
February,
1831.

## Joseph Allen vs. Jacob Edgerton.

When a contract, requiring labor in a factory, has been running and the labor performed, several weeks, one cannot rescind, so as to divest the property he had conveyed to the other, by such contract.

Especially when he cannot place the other party in the same state as at the beginning.

A joint possession of vendor and vendee of personal property must amount to a joint control of it, or it does not amount to a fraud in law, as to creditors.

This was an action of *trover* for certain goods, wares and merchandise. The defendant justified the taking under, and by virtue of, a writ of execution in favor of one Benjamin Knower against one Ira Seely, who had formerly owned the goods, and of whom the plaintiff claimed to have purchased them. The plaintiff recovered a verdict in the county court, and exceptions were taken to some decisions and the charge to the jury ; and the cause was brought to this Court for a hearing on said exceptions. The facts stated in the exceptions, as attempted to be proved, so far as important to the points urged in argument before this Court, were as follow : The plaintiff was surety for Seely, to the Farmers' and Mechanics' Bank in Albany, upon a note of about $1500; and afterwards became holden to James M'Daniels for his paying and discharging the debt. Seely being then the owner of certain goods, wares and merchandise in a retail store, and of cloth, yarn, &c., in an unfinished state, in a factory, and a quantity of wool, agreed with the plaintiff to let him have the possession of said goods, and Seely was to assist or have a voice in the manufacture and sale of them. Neither Seely nor the plaintiff were manufacturers. The plaintiff was to apply the avails in satisfaction of the debts for which he was holden for Seely, in the first place. The plaintiff, pursuant to said contract with Seely, came into possession of said property, and conducted the manufacturing for several weeks. The goods were under an attachment against Seely, but it did not appear for what amount nor in whose favor the attachment was. Knower made some proposition to the plaintiff about manufacturing the wool and redeeming it from the attachment. The particulars of this proposition did not appear in the case. In the evening before the attachment or levy made by the defendant, the plaintiff informed Seely that he should not consent to the proposition of Knower, but would dispose of all the goods at once, and have nothing further to do with them. Seely repeatedly urged the plaintiff to go on with the contract in good faith. The plaintiff told Seely if he agreed to manufacture the wool he would not do it. Seely then told the plaintiff he should not be bound by the

contract on his part ; and immediately after, the defendant took the goods, which is the wrong complained of by the plaintiff. The defendant also adduced testimony to show, that, in point of fact, although the plaintiff came into possession of said factory and store, Seely was advising as to their manufactures ; and further to show, that there was a joint possession of the plaintiff and Seely in the said property, prior to the taking by the defendant. And the defendant contended, that this joint possession, of the vendor and purchaser, rendered the sale void as against creditors. The court, among other things, instructed the jury, that, if the plaintiff had purchased the goods of Seely and was in possession of them, his after refusal to perform as above mentioned,would not divest him of the possession, nor render the goods liable to be taken by the creditors of Seely ; and that a joint possession of the plaintiff and Seely must be considered a fraud in law, and would render void the sale as to creditors : but, if the sale was *bona fide*, (explaining what constituted a *bona fide* sale,) to render it void as against creditors, it must appear that the possession and use of the vendor was of the same description as that of a joint owner in using, occupying and disposing of the property. The defendant excepted to the charge, as also to the decision of the court in rejecting evi·dence by him offered, tending to prove, that M'Daniels, when he paid said debt to the bank, had Seely's property in his hands to a larger amount than he then paid.

After argument,

HUTCHINSON, C. J., (after stating the case,) *pronounced the opinion of the Court.*—I am inclined first to dispose of the exception to the decision of the court, rejecting the testimony, offered by the defendant, to show, that M'Daniels had the property of Seely in his possession, when he paid the debt to the bank. We consider, that this testimony was correctly rejected ; for nothing in the case shows, that the plaintiff had any means or power, to compel an appropriation of that property to relieve his liability ; nor that M'Daniels ever undertook to pay, or paid, the bank debt in consideration of his having that property in his possession. He seems accountable to no person for that property but to Seely. At any rate, the defendant,or Knower,the creditor, for whom he has acted, had as much control over that property, as the plaintiff had.

The instructions to the jury, about joint possession of vendor and vendee, were, that it must be considered a fraud in law which would avoid the sale as to creditors. Thus far it is all the defen-

Rutland,
February,
1831.

Allen
vs.
Edgerton.

dant contends for. But his objections are urged to the after ex- planation, that (supposing the sale *bona fide,*) in order to render it thus void, the possession and use of the vendor must be of the same description, as that of a joint owner, in using, occupying and disposing of the property. Now, it is not easy to perceive, that any thing short of this would furnish any evidence, that he yet re- mained the owner. That is the reason why possession must be changed, to announce a change of ownership, and prevent the for- mer owner from gaining a credit by his continued possession. His laboring about the factory or shop as an underworkman would not have the effect to give him a credit. In such case, an impor- tant inquiry is, who is at the head, controling the business ? If a candid observer would find it difficult to determine which of the two had the chief control, that, according to the charge, and ac- cording to our former decisions, would be deemed a joint posses- sion. This part of the charge refers to the manner of carrying on the business, from which the world might infer, that one or the other, or both, remained owners, and entitled to credit as such. In this natural view of the instructions upon this point, they are cor- rect, and correspond with our decisions in the cases of Durkee and Mahoney, and Mott and M'Niel.

There remains an exception to that part of the charge, which relates to the plaintiff's refusal to go on with the contract, just be- fore the defendant attached. It appears, that the goods, &c., were under a prior attachment from which Knower proposed to redeem them, on terms proposed by him ; to which the plaintiff would not consent. It does not appear, that the plaintiff knew of this attachment, till that time. Nothing was said about it in the agreement between Seely and the plaintiff, under which the plain- tiff took possession. Possibly the knowledge of this attachment had some effect to discourage plaintiff about proceeding to manu- facture, &c. under his contract. But, whether it had or not, had Seely a right to be off of the contract on his part, and divest the plaintiff of his right to, or lien upon, the property, and leave plain- tiff with no security for his liability to M'Daniels ? We think he had no such right. The plaintiff had carried on the business several weeks under his contract. Seely had no right to put an end to the contract without putting plaintiff in the state he was in at the beginning. This could not be done without discharging plain- tiff's liability to M'Daniels, and accounting for plaintiff's labor, &c., while he carried on this business. This as much re- quired the concurrence of both, as did the making of the original

contract. If Seely should sue the plaintiff for a breach of his contract, in that action it might be litigated and decided, whether the plaintiff had good reasons for not proceeding further ; and, if not, what damages would make Seely good. But we recollect no case in which one party alone can so rescind a contract, as to divest the property conveyed, except where that party, who would rescind, has discovered a fraud on the part of the other in making the contract, and can himself restore what he received from the other in as good a plight, as it was in when he received it. This, surely, is not such a case. The instructions given to the jury upon this point, also, are correct.

The defendant's counsel suggest some supposed inaccuracy of the case. The action has been laid over once or twice, to give him an opportunity to apply to the presiding judge, to advert to his minutes, and amend the case, if any thing is incorrect. No amendment is produced ; and we must follow the rule, we have often recognised, that the party excepting must procure sufficient to be placed upon the record in the case, to show an incorrect decision of the court that tried the cause. That the defendant has not done in this case ; and the judgement of the county court is affirmed.

Royce & Hodges, for plaintiff.
Clark & Bates, for defendant.

RUTLAND,
February,
1831.

Allen
vs.
Edgerton.

------~~~⊡~~~------

LEONARD JARVIS vs. EASTUS BARKER's administrator.

RUTLAND,
February,
1831,

One for whose benefit a suit was commenced, but is not the nominal plaintiff of record, cannot be rendered a competent witness for the plaintiff by an assignment, executed on trial to a third person, of his interest in the demand on which the suit is predicated.

A note, originally negotiable, loses its negotiability by the decease of the signer, and an adjudication upon the note by the commissioners.

This was an appeal from an allowance of commissioners on the estate of *Eastus Barker*. The declaration was in *assumpsit* on a promissory note, executed by *Barker*, and made payable to the plaintiff or order. It appeared, on the trial in the county court, that the note in question had been taken by Chester Spencer, for his own benefit, and that a written contract had been entered into at the same time by Spencer, on the one part, and by *Barker*, the intestate, and Jaazaniah Barrett, jun. on the other part, which contained certain conditions precedent, on the performance of

RUTLAND,
February,
1831.

Jarvis
vs.
Barker's admr.

which the validity of the note depended. There was an endorsement on the back of the note, without date, by which it appeared the plaintiff had ordered the note to be paid to Spencer. It appeared by evidence introduced by the defendant, that the conditions precedent mentioned in said contract had not been performed. The plaintiff then offered in evidence an assignment of Spencer's interest in the note to Abial Child and Morley Hall, executed on trial by Spencer, and a sealed release of all claims arising from said note, executed at the same time by said Child and Hall to Spencer; which having been admitted by the court, the plaintiff then offered Spencer as a witness to prove, among other things, that the intestate had, after the making of the contract between him and Barrett and Spencer, waived a performance of the conditions precedent; and that the endorsement of the note was made after it had been presented to the commissioners, and their report had been made thereon. The defendant objected to Spencer as an incompetent witness, and he was rejected by the court. The plaintiff then offered other evidence tending to show that the endorsement of said note was made after it had been adjudicated upon by the commissioners on the intestate's estate, and their report thereon. This evidence, being objected to by the defendant, was rejected by the court. A *non suit* having been entered in the action, the plaintiff filed exceptions to the said decisions of the court, and thereupon the case was reserved for the opinion of this Court.

After argument,

HUTCHINSON, C. J., *pronounced the opinion of the Court.*—We will first enquire whether Spencer, the witness offered by the plaintiff, was correctly excluded from testifying? It appears in the case, that the note was executed for the benefit of this witness, but made payable to *Jarvis,* the creditor, whose process the witness had served probably in hopes, that he would receive this note as new security for his debt. But there was a writing cotemporaneous with this note, containing a condition precedent to the validity of the note. The plaintiff, not being able to show this condition to have been performed, attempts to show something tantamount, to wit, a waiver of the condition by the deceased in his life time. To prove this, the plaintiff offered said Spencer as a witness. But the plaintiff offered first to remove his interest, by showing, that he then in court had conveyed all his interest to Messrs. Child and Hall, who also had released all claim upon him

Rutland,
February,
1831.

Jarvis
vs.
Barker's admr.

an account of this note, or this sale. His interest before was manifest. The note was originally taken for his benefit, and he had always, till then, been the owner. The question now arises, whether that interest is so discharged, as to render him a competent witness ? We think it was not. No discharge is produced from *Jarvis*, who, it seems, has never consented to receive this note in lieu of his original debt. Nothing appears how Child and Hall were to account with Spencer for this note, and this suit. The assignment from Spencer to them purports to be without consideration. Perhaps a sufficient consideration might be proved. We need not anticipate what decision would be required upon any different papers, produced to discharge his interest. As he then stood, he was correctly excluded. It savors too strongly of a case of a real plaintiff to a suit in another's name selling out his interest, for the purpose of becoming a witness to a point, not otherwise capable of proof.

Another important point is raised by the exceptions. The nominal plaintiff, *Jarvis*, had assigned this note, which in terms is negotiable, to this witness, Spencer, by an assignment without date. This would *prima facie* divest *Jarvis* of all right to pursue his action, and drive Spencer to his action in his own name. In which case the defendant would be entitled to a nonsuit in this action. The plaintiff, to avoid this difficulty, offered to show, that this assignment, which is thus without date, was made after the decease of *Barker*, and after his estate was represented insolvent, and commissioners were appointed to receive and report the claims against his estate, and after this note had been exhibited to and adjudicated upon by them. This testimony was objected to by the defendant, and excluded by the court. We now consider, that, so far as that assignment of the note was to affect the trial, the plaintiff had a right to this testimony to avoid its effect. All demands that go before commissioners, must be treated as they were at the decease of the debtor. So of claims in favor of the estate. The commissioners must strike and report the balance. Any transfer after the decease cannot affect the decision of the commissioners. It may convey the equitable interest ; but cannot change the nominal plaintiff or defendant. On this point, the decision of the county court was incorrect. But if this testimony had been admitted, the plaintiff could not have recovered, without proof upon the first point now decided, in which he wholly failed. Yet it is possible, that justice has not been done by the nonsuit. Plaintiff now, on his motion to set aside the nonsuit, shows an assignment of this

RUTLAND,
February,
1830.

Jarvis
vs
Barker's admr.

note to Child and Hall, by Spencer, that appears probably exe-
cuted at its date, and which bears date January 28th, 1828.    It is
said this was mislaid, or not brought with the other papers to court;
which was the reason of executing the one at the trial.    The ap-
peal came into the connty court, from the decision of commis-
sioners, April term, 1828.    If this paper had been  present, and
proved genuine, it might  have presented  the question of Spen-
cer's interest in a different view ; as at the date of this assignment,
there was no action pending,  but rather a final decision in  favor
of the note.

The Court have a discretionary power  to remove this nonsuit
for the purpose of attaining justice, and this on such terms as  will
do substantial justice.   We have come to the conclusion, to grant
the motion for setting aside the  nonsuit, and open the  cause for
a new trial, on the terms, that the plaintiff  pay to the defendant
all the taxable cost of this term, and of the term, in which the ju-
ry trial was, and that he take  no cost for said two terms,  should
he finally recover.

> *Royce & Hodges*, for plaintiff.
> *Thrall & Webber*, for defendant.

---

BENNINGTON, **ENOS STEVENS**, administrator of **SAMUEL STEVENS** vs. **DANIEL**
February,                                    **GRIFFITH**, et al.
1831.

> Where a deed expresses no other consideration except the words, *"for good consid-
> eration me thereunto moving,"* the jury, without any direct evidence on the subject,
> may, from other circumstances proved,  presume a legal consideration.
>
> So they may presume the execution of a deed, bearing date before any statute of this
> state required acknowledgement and  recording, with no other proof than its being
> long acquiesced in as a valid deed.
>
> A division, *in fact*, of land among proprietors, not made conformable to law, may be-
> come binding upon all concerned, by an acquiescence of fifteen years.
>
> The plea of the *general issue*, in an action of *ejectment*, denies the whole cause of ac-
> tion, and the plaintiff cannot recover, without proving the defendant in possession of
> the premises at the time the action was commenced.
>
> A deed, executed before any statute required acknowledgement,  may be proved like
> other writings, though not acknowledged.

This was an action of ejectment for lot no. 2, in the 13th range
of lands in Winhall, which came up from the county court upon
the following bill of exceptions.   The  defendant's  plea was the
*general issue* only.

" The plaintiff gave in evidence, on the trial, the  charter of
Winhall, by which it appeared, that Ebenezer Fisk was an origin-

al proprietor, and the grantee under whom the plaintiff claimed
the right in question. The plaintiff next offered a deed from
Ebenezer Fisk to Samuel Bishop, jun., dated March 31, 1763,
expressing no other consideration except these words, " to wit,"
" *for good consideration me thereunto moving*." Which deed
was objected to for want of consideration expressed in the deed,
but was admitted by the court. The plaintiff further offered in
evidence a paper, purporting to be a deed from Samuel Bishop,
jun. to *Samuel Stevens* of the above right, and one other, dated
7th November, 1770, purporting to be witnessed by David Austin
and Moses Wells, without being acknowledged ; also the receipt
of the payment of taxes by *Samuel Stevens* on that right and
several others, in February, 1802, 1806, 1810 ; also parol evi-
dence, tending to show, that *Samuel Stevens* attended all the pro-
prietors' meetings, and claimed and voted upon that right and
many others, as his own ; that no other person ever claimed, or
voted on said right, and that there was no other deed on record
of said right, from Bishop or any other, as evidence tending to
show the execution of said deed, without showing the death of
either of the witnesses, or the hand writing of said Samuel Bishop,
jun. or that of either of the subscribing witnesses ; or that they
were out of the reach of process. Which said deed and evidence,
so offered, were objected to by the defendants, but admitted by
the court.

The plaintiff having given no evidence tending to show the de-
fendants to have been in possession of the said lot, at the time of
the commencement of the action, or at any other time, the defen-
dants moved the court that the plaintiff become nonsuit, for the
want of such evidence. Which motion was overruled by the court.

The defendants having produced several acts of the legislature,
deeds and records, tending to shew a legal title in themselves by
a vendue sale of the original right of Moses Lyman, in said Win-
hall, for the nonpayment of a tax of three cents per acre on land in
said town, laid by the Legislature at their session, October, 1818,
the plaintiff then offered in evidence, to show a division of the
lands in Winhall, and that the lands in question were severed and
set to the right of Ebenezer Fisk, copies of the proprietors' records,
together with a plan or map, contained therein, of the allotment of
the 13th and 14th ranges ; and also, evidence tending to show, that
the warning of the proprietors' meetings, mentioned in said records,
was published in one newspaper only printed in this state ; and
also an act of the legislature passed on the — day of — 1799, pur-

GGG

Bennington,
February
1831.

Stevens's admr.
vs.
Griffith et at.
porting to confirm, and make valid, certain divisions of land in said Winhall therein mentioned; and, also, parol evidence tending to show, that all the proprietors of Winhall met at one of the proprietors' meetings, and agreed upon a division of the undivided and unlocated lands in said town, lying between the 12th range and the east line of Manchester, into the 13th and 14th ranges, and the allotment of the same into 64 lots; and having made a plan of such division, into the 13th and 14th ranges, and divided these ranges into 64 lots on paper, without any actual survey thereof by any committee or otherwise, the proprietors drew for the lots as there numbered, and that lot no. 2 in the 13th range was drawn to the right of Ebenezer Fisk; and also that all the proprietors agreed to and did appoint a committee to attend the legislature of this state, and procure the act of the legislature, offered in evidence as aforesaid, to confirm the said division so made as aforesaid. To which records, the publication of the warning of the proprietors' meeting in one newspaper only, the act of the legislature, and the parol evidence, thus offered as aforesaid, the defendants objected, as illegal and impertinent evidence to be given to the jury in the trial. The objection was overruled by the court, and the evidence admitted.

In charge, the court, among other things, instructed the jury, that, as the defendant had not disclaimed, but had put the plaintiff on proof of title, if the plaintiff had succeeded in shewing title in himself, he would be intitled to a verdict, with nominal damages, notwithstanding he had not shown the defendants in possession. And thereupon a verdict was returned for the plaintiff and accepted by the court. To which decision and charge the defendants excepted, &c."

*Sargeant, for the defendants.*—1st. The defendants insist, that the plaintiff has shown no title to the lands in question. There is no consideration expressed in the deed from Fisk to Bishop. The expression, " *for good consideration me thereunto moving,*" is no consideration. The consideration, required in a deed, may be a good consideration, as love and affection,—some mention of an act done,—or a valuable consideration, as a sum of money,—or some article of value,—which implies a *quid pro quo*; and must be so expressed in the deed.—3 *Com. Dig.* 278; 4 *Cruise's Dig.* 27; 4 *Binney,* 21; 16 *Johns. Rep.* 47; 3 *Conn. Rep.* 398, *Rogers* vs. *Hillhouse*; 1 *Co. Abr.* 12; 2 *do.* 15; *Hunt* vs. *Maynard,* 6 *Pick. Rep.* 492,

The deed from Bishop to *Stevens* was not proved according to any known principle of statute, or common law. It was not shewn that the subscribing witness was dead, or without the reach of process from the court ; nor was the hand writing of Bishop attempted to be proved. On this point, let the following authorities be examined.—1 *Archb. Practice*, 141, 145 ; 1 *Starkie's Ev.* 337, 340 ; *Peake's N. P.* 6, 31 ; 2 *Esp. Cases*, 240 ; 7 *Term. Rep.* 266 ; 3 *Camp.* 31, 232 ; *Bull. N. P.* 255 ; *Peake's Ev.* 100–3–13–14. The age of the deed is no evidence of its execution, unless it is accompanied by possession.—1 *Starkie's Ev.* 66–7–8, 345, *note* 1 ; 1 *Camp.* 309, 311.

BENNINGTON,
*February,*
1831.

Stevens's admr.
*vs.*
Griffith et al.

To entitle a plaintiff to recover, he must show that he has a legal interest or estate in the land ; also a right of entry ; and that the defendant had committed a trespass, or was wrongfully in possession.—*Adams Ejectment*, 247—9. This has been the uniform mode since the alteration of the form of action by statute in this state. In the present case, the court permitted the plaintiff to take a verdict, and yet leave the very gist of the issue unproved ; which took the defendants by surprise. If the legislature ever contemplated that a plaintiff in ejectment should recover without proving so material an allegation in the declaration, why have they required the courts to certify whether the possession be wilful or not ?

On the next point, the defendants having shown themselves tenants in common of the lands in Winhall, the plaintiff undertakes to show a division. To effect a division our statute points out a simple and easy course. When a statute declares how a thing shall be done, it must be done in that way, and that strictly, altho' there be no negative words. The record read, under the objection of defendants, does not show the statute complied with, either in publication of the warrant, (being in one paper only,) or in any other particular ; but records a set of proceedings unknown to any law. Again. The act of confirmation does not help the plaintiff. Such an act has in no other case been admitted, unless it appear from the *act itself*, that *all persons interested* acquiesced in it. The act purports *arbitrarily* to make valid, what has been done in violation of a public general statute ; and varies the interest and rights of individuals. It is a private act, and retrospective in its operation. It varies and totally changes vested rights.

BENNINGTON,
February,
1831.

Stevens's admr.
vs.
Griffith et al.

*Bennet* and *Aikens, for the plaintiff.*—I. It is said the deed of Fisk, ought not to have been admitted in evidence, it not importing to have been executed upon consideration. The expression is, upon "*good consideration.*" But if the deed was executed without consideration, the legal estate passed to the grantee, though it might be in trust.—1 *Swift's Dig.* 121 ; 2 *Black. Com.* 296. Besides, the objection is made as to the admissibility of the deed, and we think, if the question was as to the equitable estate, the deed would be admissible, and the true consideration might be averred and proved.—1 *Shep. T.* 222 ; 1 *Phil. Ev.* 424 ; *Dyer,* 169.

II. As to the objection of Bishop's deed, we answer, the deed was executed in 1770, at Newhaven, Conn.; the grantor then residing there. As this deed was executed before the revolution, it is to be governed by the laws of England, and, by those laws, no acknowledgement was necessary.—2 *Bla. Com.* 309, 338, 323; 1 *Shep. Touch.* 203, 221, 320; 6 *Mass. Rep.* 24 ; 14 *do.* 491 ; 7 *do.* 384. As to its execution, we say the deed proved itself, by its great antiquity.—See *Philip's Ev.* 350 ; 5 *Term Rep.* 259 ; 9 *Johns.* 171 ; 10 *do.* 477 ; 2 *Esp. Rep.* 666. It is said, it is true, that possession must follow the deed ; but this can only apply to cultivated lands, and where there is a possession *in fact*, and not to wild lands. Besides, the deed was recorded in 1784, which shows it then to have been in being ; and the other facts given in evidence, accompanying the deed, were competent to go to the jury, from which it might be left with them to infer the genuineness of the deed. They show an abandonment of all right on the part of Bishop, and the exercise of all proper acts of ownership by *Stevens,* according to the nature of the property. The witnesses to ancient deeds are supposed to be dead ; and, in the present case, must be presumed to be out of the state, if living. Witnesses to ancient deeds need not be produced, though shown to be living,—1 *Philip's Ev.* 343.

III. We see no objection to the division of the 13th and 14th ranges. The testimony offered tended to show, that all the proprietors were present, and agreed upon the division, and they all united in procuring the act of 1799, confirming it. No objection can be made to this act, if all in interest procured it to be passed. A statute may become binding upon a corporate body, or individuals, by *subsequent assent ;* and if so, most clearly it would be binding, where the act was procured by the party to be affected by it.

BENNINGTON
February,
1831.

Stevens's admr.
vs.
Griffith et al.

IV. The case shows no title whatever to any lands in common with the plaintiff in Winhall. It barely states that the deeds and records, produced in evidence, *tended* to show a legal title in the defendants to the original right of Moses Lyman. If the court have decided wrong in regard to the evidence in respect to the division, they will not grant a new trial. If the records and deeds were a part of the case, they would show no title.

V. The charge of the court, we think, correct. By the statute of 1797, (*p.* 85. *s.* 89,) in the action of ejectment the defendant " shall answer for such part of the premises, only, as he shall dis- " tinguish and set forth in his plea, and disclaim the remainder ; " and if he disclaim the whole, the defendant shall recover his " costs, unless the plaintiff shall prove him in possession of the " whole or a part of the premises." By a fair construction of this statute, if the defendants do not disclaim, the trial proceeds on the title ; if they disclaim, then on the possession. This is a most salutary construction, and, as we understand, adopted by the judg- es of this court upon consultation, though we know of no judicial determination. Without this construction, the statute is senseless, and without meaning : for, at the common law, the defendants would recover their costs against the plaintiff, unless the plaintiff prove the defendants to have been in possession of the whole or a part of the premises.

The opinion of the court was pronounced by

HUTCHINSON, C. J.—If there were any validity in the objec- tion to the deed from Ebenezer Fisk to Samuel Bishop, jun., it should not operate to exclude the deed from the jury, unless to await some testimony, from which a valid consideration might be inferred; for this testimony, when adduced, must be weighed by the jury. And the case recites testimony from which the jury might well infer an abundant consideration. Some of this testi- mony applies, as well to the deed from Bishop to *Stevens*, as to that from Fisk to Bishop. It appears, that this deed from Fisk to Bishop bears date in the year 1763 ; and Bishop's deed to *Stevens*, in the year 1770. Also, that *Stevens* always claimed a right to act, and was always permitted to act, in all proprietors' meetings, as owner of this right of Ebenezer Fisk ; and no other person for more than sixty years, has ever laid any claim to this right. Whatever claim the defendant has to any land in said town, is a claim to another right. It also appears, that *Stevens* has paid three taxes upon this right ; one in 1802 ; one in 1806 ;

BENNINGTON,
February,
1831.

Stevens's admr.
vs.
Griffith et al.

and one in 1810.   Here was a total abandonment by Fisk, from the time he conveyed to Bishop; and a well known claim of Stevens, sufficiently ancient to afford the presumption of a grant, or so many and such grants, as would vest the title in Stevens, and more so still, to afford the presumption of a valid and satisfactory consideration for Fisk's deed of 1763, and the execution of the deed to Stevens of 1770.   Moreover, the deed to Stevens has certified upon it a proof to its execution, before a justice of the peace, by the oath of one of the subscribing witnesses, in the year 1784; and another certificate of its being recorded afterwards in the same year.   We know of no authority in a justice of the peace to take and certify such proof.   Yet those certificates tend to show that the deed was then in existence.   This was above forty five years ago.   We consider both deeds correctly admitted; and, there being no exception to the charge with regard to them, we must presume that the court gave the jury correct instructions upon the testimony in this behalf.   We ought however to notice another point urged against the deed to Stevens, to wit, that it ought to have been acknowledged before it could be read.   It has been often decided, that deeds executed before any statute, in force here, required acknowledgement, may be proved like any other writings, without acknowledgement.   The statute attaches a benefit to acknowledgement and recording; and this benefit cannot be enjoyed, without a compliance with the statute.   Yet a deed in existence, and good to vest an estate, before the statute, cannot be rendered void by the statute; but the estate must be holden, and the deed proved, in the same manner as if the statute had never passed.

The testimony, offered by the defendant to show, that he owned a right of land in town, and of course was tenant in common with the plaintiff, was admitted without objection.   This drove the plaintiff to prove a division of the land into severalty, and an allotment of the lot in question to this right of Fisk.   The testimony, offered for this purpose, was objected to, but admitted.   This testimony comes short of showing a division, legal in its origin.   But we consider the testimony admissible to show a practical division.   There was a proprietors' meeting warned and holden; but the advertisements, warning the same, were not published according to law.   Yet the meeting was holden with all the proprietors present, and a division upon paper agreed upon, and a plan made, presenting a view of all the lots in the thirteenth and fourteenth ranges, enough for one to each proprietor; and a

draft made ; and this lot, no. 2 in the 13th range, was drawn
to the right then owned by *Stevens,* the plaintiff's intestate.    The
case states no actual survey of the land into lots ; but shows the Stevens's admr.
*vs.*
Griffith et al.
data, by which any lot might be surveyed with accuracy.     Here
was a sufficient division in fact, to be rendered legally binding by
acquiescence of the proprietors.    The application for the statute
of 1799, confirming these proceedings as a division, was at least
the commencement of an acquiescence. The statute was procured,
declaring such confirmation ; and no further attempt is shown to
make any other division of the lands, comprised in those divisions
named in the statute.

We need not decide upon the validity of this statute, to produce
the effect contemplated by it.    For, if it were not thus valid, all
these proceedings, standing as above named, over fifteen years,
indeed, about thirty years, establish the division too firmly to be
now shaken.

The only remaining point regards the plaintiff's right to recover, without proving the defendant in possession of the premises.
The county court seem to have considered, that the defendant's
pleading the general issue, with no disclaimer, was admitting his
possession.    We think this not a correct view of the statute.  The
declaration, following our statute form, charges, that the plaintiff,
at such a time, was seized of the premises, and that the defendant, without law or right, thereinto entered, and ejected, expelled and amoved the plaintiff therefrom, and hath ever since kept,
and still keeps, the plaintiff from the premises, taking the whole
profits to himself.    The defendant pleaded that he was not guilty
in manner and form as the plaintiff hath alleged.    Now, according to every general rule of pleading, this plea puts the plaintiff
upon the proof of his whole declaration.    It seems a very direct
denial of those things, charged as tortious acts in the defendant ;
the chief of which are, his ejecting the plaintiff, and taking, and
keeping, possession himself.    We must now enquire, whether this
natural effect of the plea is varied by the statute, relating to a
disclaimer.    This statute is found on page 85th, section 89th.
And it appears to contain one provision, favorable to the plaintiff,
and one, favorable to the defendant.    The first is, that the plaintiff shall not have his writ abated, by omitting to sue all the tenants, who may be upon the land he discribes in his declaration.
He owns a tract of land, of which several persons have wrongfully
obtained possession.    He brings his action against all he finds
there, or against all he recollects, when his writ is filled ; but

still omits some who are not made defendants. This omission cannot abate his writ. But, if the statute stopped here, it would work injustice to the other party, in many cases. The same statute, section 88th, provides, that the plaintiff, if he recovers, shall recover as well his damages as the seizin or possession of the premises. If, then, the plaintiff sues but half the persons, who are on the land he describes in his declaration, and those, sued, cannot abate the writ, and the plaintiff recovers, of the half, the damages done by all, it would be a hardship that would require relief. This was foreseen by the legislature, and they made provision, in the 89th section, that the defendant shall answer for such parts of the premises only as he shall distinguish by his plea, and disclaim the remainder. That is, he may disclaim all connection with that part of the land, possessed by others, and with which he has never intermeddled, and plead not guilty as to the rest. The trial will then proceed, as if none were described in the declaration, except that possessed by the defendant, and he is safe from any damages on account of the possessions of others. This provision is equally necessary, where all the persons on the premises are sued, but they do not possess jointly. Their possessions being several, it would be unjust to force upon them a joint liability for the whole possessions. Under this provision of the statute, each may disclaim that possessed by the other, and be liable only for the injury done by himself. But this 89th section is of no use, and has no application to any case, where one defendant only is sued, and his liability extends alike over all the premises described in the plaintiff's declaration.

This statute has interposed a barrier against any injury to the plaintiff from a wrongful disclaimer. For, if plaintiff proves defendant to be in possession of all or a part of that which he disclaims, the issue, *quoad hoc*, must be found for the plaintiff. But if the defendant disclaims the whole, he must recover his cost, unless the plaintiff can prove him in possession of the whole or a part. The necessary construction of this statute seems to be, that a disclaimer admits the plaintiff's title to the part disclaimed, and puts the possession only in issue : but a general plea of not guilty puts in issue both title and possession. The Court are not satisfied, that they have the power to preclude the defendant from putting the whole declaration in issue by his general plea.

We suppose the practice to comport with our present views upon this point. Asa Porter brought an action for the whole town of Corinth, and sued a part only of the inhabitants. They plead

ed severally the general issue only. The circuit court held the plain- tiff to proof of possession. Several recovered their cost through want of such proof. General Mattocks and myself were once employed to defend a suit in the circuit court. We pleaded the general issue. The proof was, that the defendant took possession of the lot sued for, in the fall, and began clearing, and building a house, but abandoned the premises before the action was brought. The court decided that this evidence did not support the action. Several cases have been so decided in the county courts, and not carried up. But one case has been carried up which was decided in the year 1817. See *Brayton's Rep.* 70, *Everts* vs. *Dunton et al.* In this, there were five defendants, and they severally pleaded not guilty. The testimony showed but two in possession. The court charged, as in this case, that if the jury found for the plaintiff, they might find all the defendants guilty. The Supreme Court decided, in bank, that the plaintiff could recover against those defendants only, who were proved to be in possession, and a new trial was granted.

The result is, that, on account of the instructions to the jury, upon this point of possession, the judgement of the county court is reversed, and

<p align="center">A new trial granted.</p>

## LYMAN PATCHIN *vs.* ISAAC DOOLITTLE et al.

When a road is laid out, as a public highway, for the accommodation of sundry individuals, who had previously given a bond to save the town harmless from the expense of making such road, it has so far become the business of those individuals to make such road, that they are not trespassers in making it, at a suitable season of the year.

The certificate of the select men, *that a road is opened,* cannot with propriety be made till after the road is made.

This was an action of *trespass,* for breaking and entering the plaintiff's close in Bennington, treading down the grass, and injuring the soil. The defendants pleaded in bar an application to the select men to lay out a public highway; their refusal; an application to the road commissioners, who also refused, till the petitioners had given a bond to the town, securing them against any expense in making the road; that this bond was given, and the road laid out three rods wide, and the survey regularly recorded, with the order of the road commissioners, that the road be

<p align="center">HHH</p>

BENNINGTON, made and opened within one year, from the time of laying out
February,
1831.     and establishing the same ; and that the defendants, as servants

Patchin     to the petitioners, and by their command, entered upon that part
vs.      of the plaintiff's close, which was within the survey of said road,
Doolittle et al.
took down the fence and made the road, doing no unnecessary
damage, &c.; which was the same trespass complained of, &c.
To this plea the plaintiff demurred. The county court rendered
judgement, that the plea was sufficient. To this decision the
plaintiff excepted, and the cause was sent to this Court for a hear-
ing upon the same question.

After argument, by *Bennett* and *Aikens*, for the plaintiff, and
by *Isham* and *Smith*, for the defendants,

HUTCHINSON, C. J., *pronounced the opinion of the Court.*—
In the argument of the demurrer to this plea, which is the defen-
dant's third plea, no question is made but that this road was regu-
larly laid, and liable to be opened, at some time, by the select
men of the town. Yet it is objected, that no persons had a right
to enter the plaintiff's inclosure and make the road, till the same
was opened by the select men, in the way pointed out by statute ;
to wit, by their causing a certificate, that it is thus opened, to be
recorded in the town clerk's office. We think this objection not
well founded. It cannot be possible, that the legislature should
have intended that this certificate of the select men should
operate as notice to the select men themselves, when they
might commence making a road; nor that it should be notice
to the owners of land to prepare their fences, that the road
might be made and travelled, without injury to the crops.
It could be of no use to the select men, who must know their own
intended movements, without such a certificate ; and must know
them before they could make the certificate. It could be of no use to
the land owners, unless a time were given them to arrange the fences
of their inclosures, after the certificate is recorded. This is not
required by the statute ; but the time of the lodging the certificate
for record is to be considered the time of opening the road, for
every purpose. The legislature must have intended other and
more valuable objects by this provision. When the select men
lay out a public highway, and there is an application for damages,
not allowed by the select men, this application must be made
within sixty days from the recording of this certificate. Again,
this record of the certificate of the select men is the annunciation

to travellers, that they may now travel upon this road, as they might upon other public roads, with the same exception of finding a road upon which they can travel, and with the same security for damages, if they sustain an injury through want of repairs. These objects are both important and necessary. Both, and more especially the last, imply, that the road is made ready for travel, before the certificate is made and recorded. It now may be, and always should be, so recorded, before an application is made for higher damages, than those allowed by the select men. There is no averment in this plea that such a certificate was made and recorded. There need be none, to justify the making of the road, ready to be opened and travelled. The duty of the select men must be a practical duty. Upon this construction, it is so. A road is laid out and a time fixed, in some cases by law, and in some by the order of the commissioners, within which the road must be made. It cannot be opened to any good purpose, till it is made. The select men have a right to enter the inclosures within the survey, at a suitable season of the year, and there, in a prudent manner, proceed in making the road, doing no damage upon any of the land not included in the survey of the road, and carefully putting up the fences, which they take down within the survey, as they pass on the surveyed road, to and from their daily labor to make the road.

As an appendage of this objection, it is urged, that the order of the commissioners is void, by its not following the injunctions of the statute. They may fix a time not less than one year for the making of the road. The order, in the case before us, is, that the road be made within a year from the laying out. This gives a full year, in which to complete the road. The statute formerly required all roads to be made within a year from the time when they were established. A very proper discretionary power is now given to the road commissioners, and ought to be given to all committees, to give further time than the general laws allowed, for the making of the road by them laid. But they cannot require it made in a less time. They may direct, that one piece be made within one year; another piece in a year and a half; another in two years; and thus give as long time to complete the whole, as they deem proper, considering both the necessity of the road for public use, and the ability of the town to make the expenditure.

A further objection is urged to this plea, that the petitioners had no right to enter upon the plaintiff's land and make this road,

BENNINGTON, unless employed by the select men, whose duty it is alleged to
February, be to make the road. The plea avers, that the defendants acted
1831. as servants of the petitioners. To support this averment, and
Patchin render unnecessary the averment that they acted as servants of
vs. the select men, the defendants have set forth in their plea a chain
Doolittle et al. of facts, which they intend shall show, that it had become the duty of the petitioners to make this road. They have alleged, that
. the road commissioners at one time refused to lay the road ; at
another time, upon the petitioners having given a bond to the town,
to secure the town against the expense of making it, they laid and
established it ;—that the select men drew an order upon the town
treasurer for the damages assessed, &c. This kind of proceeding is objected to as improper—That the commissioners have no
right to regard such a bond, or the want of it, when deciding
whether to lay out a road or not.

It is obviously the duty of the road commissioners to consider
the expense of making the road ; the ability of the town to defray that expense; how far the road, if made, would be of extensive public utility, or how far limited to the use of a few individuals only ; and if, considering these individuals as forming a part of
the public, they are convinced that its public utility will not warrant an order upon the town to defray the expense of the road,
they do right in refusing to lay it. Still, whenever that difficulty
is removed, they would act consistently in laying the road. Sometimes individuals so unwisely select a site for their buildings, that
they have no just claim upon the public to make a road to accommodate them. If they will, at their own expense, make such a
road as will accommodate their own interests, they may, possibly, have a claim that it should then become a public road, and
be repaired at the expense of the public. There is no difficulty
in cases, where the owners of the land will consent to the making
of the road before it is laid. The refusal to lay will usually produce their consent. But, where the owners will not thus consent,
and there can be no right to make the road, but what is created
by the laying it out, this difficulty can never be removed, but in
the way of security to the town, as set forth in this plea. No person can be injured by such a course. The town cannot be injured by it : it may be a salutary course, and seems to have become
very necessary in the case before us ; and we are disposed to sanction it as a legal course.

To what then do these averments amount ? None can doubt,
but they place the whole burden and expense of making this road

upon the petitioners. They are to save the town harmless fromBENNINGTON,
*February*
1831. these expenses; but whether this was to be done by their making the road, or paying others for making it, the plea is silent. ThePatchin
*vs.*
Doolittle et al. equitable construction would be, that they would do it in the way most convenient for themselves, while it would be as good for the town as any other way. It seems that this road was so completely the road of the petitioners, that the town would do nothing about making it, nor would the road commissioners compel them to do more than pay the forty six dollars damages assessed, until the road was completed. The select men drew their order upon the treasurer for these damages, thereby acquiescing in these proceedings without taking any appeal. Neither the town nor the select men are now complaining of any wrong, or expressing any dissent to the proceedings of the petitioners, in their making the road by aid of the defendants. The plaintiff complains of the technical defect, that the defendants should, in form, justify under the select men, and not under the petitioners. This is the substance of the plea, but not the form. The plea alleges what shows the petitioners to have taken upon themselves a burden, which otherwise would have been on the town, if the road had been laid out without this assumption by the petitioners; and the receiving the bond from the petitioners, and paying the damages assessed, is an assent of the select men, that the petitioners make the road in some way so as to save the town harmless. The worst difficulty with this plea is, that it comes at this substance in an argumentative way, in some sense declaring upon the evidence, rather than according to the operation of law. Had the plaintiff demurred specially on account of these difficulties, the plea must have been adjudged bad; but there are too many substantial facts in the plea to be borne down by a general demurrer.

The judgement of the county court is affirmed.

### SAMUEL ANGEL *vs.* TOWN OF POWNAL.

BENNINGTON,
*February,*
1831.

The select men of a town cannot, without a vote of the town for that purpose, discharge the interest of a witness so as to render him competent.

Neither can that be done by an agent, appointed to defend the suit, by virtue of his general powers as agent.

This was an action brought against the town of *Pownal*, for the neglect of Jason Bushnell, constable of said town, in not serving or returning an execution. On the trial in the county court, the

BENNINGTON, defendants offered Bushnell as a witness, who was objected to
*February,*
1831. by the plaintiff on the ground of interest, he being ultimately lia-

Angel ble to indemnify the town for his neglects. The select men of
*vs.*
Pownal. the town then gave him a discharge, and the court admitted him, to
prove that the plaintiff had staid the execution. A judgement
having been rendered for the defendants, the plaintiff filed excep-
tions on which the cause was removed to this Court, and the only
question was, whether Bushnell was properly admitted as a wit-
ness.

After argument,

HUTCHINSON, C. J., *pronounced the opinion of the Court.*—
There seems no doubt but that the receipt in question would be
sufficient to discharge the interest of the witness, if the select men
had authority to execute such a release. But this would be the
bartering away a sure cause of action against the constable and
his bail, for an indemnity, for the chance of getting rid of the pres-
ent suit. This is not among the prudential affairs of a town, to
which the statute refers. If they could discharge the liability of
their constable and his sureties, without receiving the amount,
they might do the same of any debt due the town. The monies
are to be paid to the town treasurer, not to the select men, gene-
rally speaking. When a receipt for money is executed by any
town officer, it is evidence of payment to him, and nothing more.
One, who would receive such a receipt without actual payment,
should expect it would be treated as a fraud upon the town.
When a writing is executed by the select men, not purporting to
be a receipt for the full sum due, but purporting, for some valua-
ble consideration, to discharge a debt, it is not binding, unless
their power to execute such a discharge, can be found in some
statute, or some vote of the town. The town might authorize
such a measure by a vote at some meeting legally warned for
that purpose. They might authorize their select men or their
agent to give such a discharge ; or they might, perhaps, pass a vote
so expressed as to be itself a discharge of the interest of the con-
stable and his bail.

The case of *John Moar* vs. the *Town* of *Pownal*, submitted
with this of *Angel*, is like it in all respects, except that the agent,
appointed by the town to defend the suit, joined with the select
men in executing the discharge. This does not help the dis-
charge. It has never been considered, that the attorney of re-

-cord in the suit could discharge the interest of a witness. This agent has no more power than an attorney regularly appointed. His power to employ an attorney and procure witnesses to attend court, has no connection with the business of discharging debts due to the town. All agencies must be confined within their proper object. Hence it has been decided in Massachusetts, that an attorney of record, to prosecute a suit,cannot discharge an execution so as to bind his client, unless he actually receives his pay, and receives it in money.

In each of these cases, the judgement of the county court is reversed, and a new trial is granted.

*Kellogg & Spencer*, for plaintiff.

*H. Hall*, for defendants.

<div style="text-align:right">BENNINGTON,<br>*February,*<br>1831.<br><br>Angel<br>*vs*<br>Pownal.</div>

---

## MILLS MAY & Co. *vs*. CHAUNCEY BROWNELL.

<div style="text-align:right">WINDSOR,<br>*February,*<br>1831,</div>

Lottery tickets, regularly issued, and authorized by the laws of this state, may be sold and charged on book, and the value recovered in an action of book debt.

If there is a dispute whether the plaintiffs owned the tickets charged, letters from the manager of the lottery to the plaintiffs, the hand writing being proved, may be evidence to this point, as a part of the *res gesta*.

If lottery tickets are issued contrary to our general statute, and without authority by a special statute or grant, they are of no value; and if sold and charged on book, the vendor can recover nothing for them.

The manager of a lottery, granted by statute of this state, which requires bonds previous to his right to act, cannot delegate his whole authority, and have the lottery proceed, while he resides out of the U. States.

When the grant of a lottery requires three managers, and provides a mode of filling vacancies, one can never legally act alone.

By reason of a provision in our statute, matters proper to be pleaded to the action, if not so pleaded, may yet be urged before auditors, and they report the facts to the court in the form of a special verdict.

This was an action on *book account*, in which judgement to account was rendered in the county court, and the accounts were submitted to an auditor, who had the parties before him, and audited their accounts, and returned into court a long special report, presenting several points of controversy, and many documents, relating to the grant of a lottery to one Jabez Rogers, in the year 1791, authorizing him to raise £1,200 to remunerate his loss of a brewery by fire.

Sundry exceptions were taken by the defendant to this report, calculated to affect the allowances made by the auditor in favor of the plaintiffs. After a hearing upon these exceptions, the

county court rendered judgement on the report for the defendant to recover his cost.

The plaintiffs excepted to this decision ; and the action was removed to this Court that that decision might be revised.

It is unnecessary to insert the report or exceptions, as all the important facts are sufficiently referred to in the arguments of counsel, and the opinion of the court.

*Hubbard and Marsh, for the plaintiffs.*—The auditor reported, as the balance due the plaintiffs, $400,54.

The account reported as charged,

| | | |
|---|---|---|
| 1826, July 27, To 100 tickets in the first class, | $262,50 | |
| "     Aug. 9, Cr. by 59 tickets returned, | 154,87 | |
| | 107,63 | |
| "     Aug. To 100 tickets in the 2d class, | 250 | |
| | 357,63 | |
| Interest allowed by the auditor | 42,91 | |

*1st. Exception :* That the tickets were not a subject matter of charge on book.

*Answer :* 1. We deny any such principle.   2. It is as usual to charge tickets, as any other article of sale.—1 *Swift's Dig.* 582. 3. If available, it should be pleaded before the court.—*Stat. p.* 141.   The party is entitled to trial by jury.   After judgement to account, the court are to appoint auditors to *adjust the accounts.* Whatever goes to the whole *case* must be pleaded—*Cro. Car.* 116; 1 *Sel. N. P.* 4.   4. A matter which might have been pleaded cannot be pleaded before auditors.—1 *Com. Dig.* 126, *(E.* 11.*) ;* 3 *Wils.* 73 ; *Cro. Eliz.* 830.

*2d. Exception :* That Mr. Hough's letters were admitted.

*Ans.* 1. The facts stated in the letters were sworn to in his deposition.   2. They were proper for many purposes.   3. They are part of the *res gesta.*

*3d. Exception :* That the auditor received the testimony of *Mills May,* one of the plaintiffs, as to the contract and condition of sale.

*Ans.* This is right ; both parties are made witnesses by the statute.—2 *Aikens' Rep.* 81 ; *Ibid.* 386.

*4th. Exception :* Because the auditor admitted the deposition of A. Rhodes, as sufficient to prove his appointment.

*Ans.* 1. The deposition was pertinent : the appointment was made by the *Judges,* and no record of the appointment was made or required.   2. The appointment appears also from the bond.

Windsor,
February,
1831.

May et al.
vs.
Brownell.

3. The auditor was the sole judge of the weight of the evidence.

*5th. Exception:* Because Hough acted under a power of attorney from Rhodes in issuing the tickets : such power could not be delegated.

*Ans.* 1. The tickets were issued in the name of Rhodes, as appears by the scheme. 2. This may be done by an agent : much of the business must be so done. 3. But if so, it should have been pleaded to the action.

*6th. Exception :* Rhodes vacated his trust as manager by moving out of the state.

*Ans.* 1. There is no law requiring a manager to live in the state. 2. An administrator might live out of the state till the statute.— *Stat.* 339, *s.* 34. 3. If Rhodes was never appointed, or if he vacated his appointment, that should have been pleaded to the action.

*7th. Exception :* Because there is no proper evidence that proper bonds were taken.

*Ans.* 1. It does so appear from the bond itself, the only proof required. There was no record ; none was required. 2. The bond was taken by the proper officer. He was the judge of its sufficiency. 3. If none was taken, it would not render void the sale.

*8th. Exception :* Because the auditor did not allow the defendant for the tickets returned.

*Ans.* 1. This is not within any exception taken before the auditor. He states merely that they were returned. 2. The auditor is sole judge of the matters of fact. 3. He found the contract of sale.

*Mr. Collamer, for the defendant.*—The plaintiffs charge on book, and claim to recover, for a quantity of lottery tickets, and the defendant insists that these are not a proper subject of book charge.

Since the court have holden the party in book debt competent to testify to any collateral matter, however special, and all check has become unlimited on that branch, it becomes the more important to restrain the action to originally intended limits, to such business and dealings as usually exist in the ordinary dealings of life. Such certainly is not the present transaction.

The articles here charged have no intrinsic value,—are mere certificates of third persons, depending on a contingency. They are not to be compared to personal securities passing between the parties, and, by consent, entered in account. For these *indebi-*

III

*tatus assumpsit* is sustainable at common law; but not for the note or bill of a third person.

The next exception, that the letters of Hough to plaintiffs were improperly admitted, being "*res, inter alias, acta*," is unquestionably clear in itself; and it becomes important, when taken in connection with other parts of the case. By Hough's letter to *Brownell*, (no. 9,) it appears Hough sent the first tickets. By the credit in the account and by Hough's deposition, it appears the defendant had a right to, and did, return the unsold tickets, to Hough. By Hough's letter, (no. 10,) and by *Brownell's* order, (no. 7,) it appears, *Brownell* ordered the 2d tickets from Hough, at his solicitation; and a large quantity of unsold tickets are on hand and returned to Hough and into court. It is therefore as important to the defendant's rights, to determine *with whom* he was dealing, as to determine the terms. From the facts above stated it is apparent the defendant must have understood his dealings to be with Hough, and the same is much confirmed by the following, to wit: It appears by Hough's deposition, that the scheme price of tickets in the 2d class, was $2,25, and that the plaintiffs had them at that price, and a commission for taking at their own price and selling: from this, it is conclusive, the defendant could not have taken them as now charged at $2,50, at his own risk, without commission. The defendant must have understood his dealings were with Hough and not the plaintiffs. There is no testimony or fact reported, by which the auditor was authorized to say, the defendant dealt with plaintiffs, or that he could so have understood it; and these letters, passing between Hough and the plaintiffs, unknown to defendant, ought not to have been admitted to his prejudice.

From the fourth exception to the end, the ground taken for the defendant is this: It not only *does not* appear said tickets were issued lawfully under the authority of the state, but it *does appear* they were unlawfully, and unauthorisedly issued. The same statute (*p.* 267) which forbids the lottery and exposes the persons erecting it to penalties, under the same circumstances, renders the tickets void. Tickets, inasmuch as lotteries are by law forbidden, are never to be *presumed* good. The plaintiff is to show them legally issued; and in attempting to do this, the plaintiffs have shown these *unlawfully* issued.

1st. The only testimony of Rhodes ever having been appointed manager is his deposition, (no. 4.) From which it does not appear by whom he was appointed; and, as the judges of the coun-

WINDSOR,
February,
1831,

May et al.
vs.
Brownell.

by court were to appoint, it must have been by writing to be an official act ; the existence, loss or contents of which writing are wholly unproved.

2d. The manager, as a condition precedent to his authority, must have given a bond. A copy of the bond he gave is annexed, (no 5,) and is defective, because it is premature, given in anticipation of appointment ; and it is a bond for joint managers, and does not authorize proceedings by Rhodes alone ; and so the tickets void.

3d. The acts granting the lottery, even the last one, authorizing the judges of the county court to appoint managers, all expressly provide for a joint managership, and therefore Rhodes never was, and never could be, sole manager ; and so the tickets void.

4th. Rhodes was resident of Canada ; and a removal out of the government, beyond responsibility to our courts, and all legal controul, vacates the appointment.

5th. The *non user*, for thirty years, had vacated the trust. The franchise was not to be exercised under this trust, the bond having expired, and not now to be supposed as having life or responsibility, and the manager out of the United States. Why would not one of the old managers, who it appears by Rogers's deposition, run away, have as good a right as Rhodes to set up a lottery by attorney. Nor will it do to say any man may usurp the trust, and become " *de facto*" manager ; as the same facts, which render him liable, render the tickets void.

6th. The trust to manager is *personal* and not to be delegated, as public security demands this. But it appears these lotteries were enacted, these *schemes* struck out, and tickets issued by Hough ; Rhodes exercising neither controul, judgement or concern in the matter.

7th. By the grant (no. 1) it was a condition precedent, that Rogers should give bonds, that the avails should be expended in erecting a brewery, &c. Such were never given, and he actually sells out.

HUTCHINSON, C. J., *pronounced the opinion of the Court.*— This cause was argued a year ago, and not decided ; but laid over for further argument. After the full argument at this term, we are all agreed upon the points of sufficient importance to be noticed in our decision.

The plaintiffs' counsel urge, as an answer to some of the defendant's exceptions to the report, that these points should have

WINDSOR,
February,
1831.

May et al.
vs.
Brownell.

been presented by pleading to the action, and not litigated before the auditor. Upon this we may observe, the provisions of our statute require the auditor to adjust all accounts down to the day of his hearing the parties.

These accounts consist of numerous items, wholly separate and distinct from each other, in every point of view ; and not being like branches from one common root, as the items of a bailiff's account rest on the contract, which constitutes him bailiff. It seldom happens, in an action of book account, founded upon our statute, that any defence could be set up by a plea, that would meet the whole action, unless it be a settlement or discharge, and the statute of limitations. Sometimes the statute would bar some items, and not others. Whereas, in an action against one as bailiff, that he never was bailiff, meets the whole, though the account might consist of a thousand items. Not so in an action of book account. In this there is no general issue, that can be tried, and the cause afterwards go to auditors. If the jury were to adjust the accounts and return the balance, as was formerly done in actions appealed from the judgement of a justice of the peace, *that there is nothing due and in arrear*, might form an apt general issue. But by our statute, the defendant must account, unless he pleads some special matter, which shows, that he ought not to account. Such plea must be tried by the jury ; and, if they find for the plaintiff, auditors are appointed. As a defendant may have such matter to plead, that would meet a part of the account and not the remainder, and pleading it would increase the number of trials in the same action, and produce great delay and expense, this Court settled a practice, before I had the honor of a seat here, and it has been continued ever since, that a defendant may omit to plead such special matter, and may present it before auditors as a defence, in whole or in part : when it becomes the duty of the auditors to report, not the evidence exhibited before them, but the facts they find proved, as the ground of their decision. This should be in substance as a special verdict. The facts being thus found, and presented to the court, the decisions upon points of law can be revised by the court, as they could upon a special verdict. This practice requires, that the facts, upon all litigated items, should appear in the report, or it will be set aside for the defect, or recommitted for amendment. This disposes of one class of the errors pointed out by the plaintiffs' counsel.

A question is raised, whether lottery tickets can be the subject of an action on book. We think they may. If they are legally

issued, they are of value as evidence of a debt ; as evidence of a chance to receive a debt, large or small. The current sales a few years past have attached a value to them, almost as to bank bills. It is difficult marking any line of distinction between what may, and may not, be charged on book, any more definite than this ; that articles of personal property sold and delivered, the title vesting in him, who receives the property, and he becoming debtor for it to the other, may be charged on book. These lottery tickets, with the currency attached to them, by the eagerness of people to deal in chances, must be considered as property, and be the subject of book charge. With regard to charges of tickets, and of money, and of other things, proper to be charged on book, where there might be difficulty in detecting a wrong charge, it is not a matter of course that they can be supported by the oath of the party merely. He is a competent witness to testify ; is made so by statute ; and so is the opposite party to the same items. And the auditors must decide, according to the convictions on their minds, of the correctness or incorrectness of the several charges, after weighing all the testimony adduced, which tends to support or defeat the charges.

The defendant excepted to the auditor's receiving, as evidence, certain letters from Hough, who issued the tickets, and who forwarded a part of them to the defendant, which letters were directed and sent to the plaintiffs. Should this exception, and this only, avail the defendant, its effect would be to reverse the judgement of the county court, and send the accounts again to auditors ; for it cannot now be known what effect was produced by those letters upon the mind of the auditor. But, so far as the defendant urges in his defence, that these tickets were not so the property of the plaintiffs, that they are entitled to the pay for them, but that he is accountable for them to Hough, if to any person, these letters may be properly admitted upon that question, as a part of the *res gesta*. They tend to silence any claim, that Hough could have, to be owner of these tickets, after the date of those letters. There is no other view, in which they could have any legal bearing upon the cause.

Another point litigated is, whether Rhodes could delegate to Hough all his authority as manager. It appears by the auditor's report, that Rhodes, claiming to be manager, gave Hough, or undertook to give him, full power to perform all the duties of manager : in fact, to make him manager, but to act in the name of Rhodes. It also appears, that Rhodes lives out of the United States, and did

WINDSOR,
*February*
1831.

May et al.
*vs.*
Brownell.

WINDSOR,
February,
1831.

May et al.
vs.
Brownell.

so *when he executed his power of attorney to Hough.* There are many acts, which the manager of this lottery must be able to do by sub-agents, such as selling tickets, receiving pay for them, &c.; but we think the whole power of arranging schemes, fixing on the number and price of tickets, and the number and amount of prizes, when to draw the lottery, &c., cannot be thus exercised by proxy. The whole system of this grant, regulated by three statutes, treats the managers as officers of the government, in some sense. They are required to give bonds to the treasurer, to secure their fidelity, before they enter upon their business as managers. It must be treated as a personal trust in the managers, to act upon their own judgement in the principal concerns of the lottery.

If Rhodes had thus acted upon his own judgement in the business, was he a legally constituted mannager, at the time of issuing these tickets? This leads to an examination of the several statutes upon the subject, to see what constitutes a person manager. The first statute appoints the managers by name : the second supplies vacancies by inserting the names of the persons appointed : the third provides, that the judges of the county court of Addison county may appoint persons to fill vacancies as occasion may require. All these statutes require a bond to the treasurer, as already mentioned. Rhodes is not one of the persons named as manager in either of these statutes. There is no evidence of his having been appointed, except his own deposition, and the copy of his bond to the treasurer. In his deposition, he does not pretend to *know* how, or by whom, he was appointed, or when ; but *thinks it was* by judge Strong, of Addison, and one or more of his associates. But he expresses, that he has no doubt but he was legally appointed in some way ; but whether to be *sole* manager, or jointly with Samuel Miller, or some other person, he does not know. His bond to the treasurer bears date in February, 1798, and purports to have been signed by Jabez Rogers, Jabez Rogers, jr., said Anthony Rhodes, and Lebbeus Harris ; and the condition is that, whereas the said Rhodes and Harris are, and are about to be, appointed managers of said lottery, if they shall faithfully perform, &c. We think this testimony does not show Rhodes ever to have been legally appointed manager. If he was appointed by the judges, their certificate of such appointment would be the most natural and correct evidence of it. Indeed, it is scarcely a supposable case, that they would make such an appointment, without such a certificate. If such there was, Rhodes would be the keeper of it. He neither accounts for not producing,

WINDSOR,
February,
1831.

May et al.
vs.
Brownell.

it, nor knows it's contents. Again, the bond would seem of no force at all, unless accompanied with further testimony. It purports to be the joint official bond of Rhodes and Harris, *appointed, and to be appointed, managers.* This bond ought not to be considered of force to secure the fidelity of either as sole manager, but of both acting jointly. Such and such only was the undertaking of the sureties. The testimony reported neither shows an appointment, nor a regular bond.

We are under no necessity of deciding, what should be presumed at this late day about the regularity of appointment and bonds. My own individual opinion is, that, from the facts presented in this report, it ought to be presumed, that the object of the lottery was satisfied thirty years ago, or else that the whole was then abandoned. If the managers had all this time been exercising their right as such, and this was suffered by the government, it might furnish a ground of presumption that their appointment was once regular. But the entire *non user*, exhibited in the report, tends wholly to a contrary presumption. It is not a supposable case, without proof, that a bond, with four signers, executed in the year 1798, is now of any avail to secure the faithfulness of the managers, in their proceedings of a recent date. There ought, at least, to have been a new bond to the treasurer, binding persons of property, who are known to be living.

A further question has been raised, whether Rhodes, even if regularly appointed, had any power as sole manager. We are of opinion he could have none at all. These statutes all require three managers ; and the provision for filling vacancies extends to all vacancies, so as to keep three managers in any event whatever. If the legislature could have intrusted this business with one person alone, they have not done it ; and no one can have any power, till two others are qualified to act in conjunction with him.

The result of these considerations is, that there was no authority to issue these tickets, that they are wholly void, and not a subject of contract or sale, and, for this reason, no subject of book charge ; and it is not readily discovered, why those who sell them are not subject to the penalties of our general statute, as for selling tickets in private lotteries.

The judgment of the county court is affirmed.

WINDSOR,
February,
1831.

ALMIRA DUNBAR *vs.* JOHN and JOSEPH DUNBAR, executors of
OLIVER DUNBAR.

When a testator gives all his personal estate to his wife, and makes no provision for
the payment of debts, the law makes the debts a lien upon the personal estate ; and
it operates like his giving her his personal estate, upon condition of her paying the
debts.

When a devise of $200 is made to the widow, as a lien upon a farm devised to others
upon condition of paying this $200, the executors may, if they choose, let the de-
visees of this farm take possession at the end of one year, and do not thereby render
themselves liable for this $200 : but the widow must pursue her lien upon the land,
by a bill in chancery.

The widow, in such estate, has no claim upon the executors to account for the rents
and profits of the real estate, as personal estate, any longer than one year ; there
being no extension of the time for settlement, by the court of probate.

This was an appeal from a decree of the court of probate for the
district of Hartford, allowing the account of the executors on the set-
tlement of the estate of Oliver Dunbar. The testator, by his will,
bequeathed *all the personal* estate, except some trifling articles, to
his widow, *Almira Dunbar* ; and also the *home farm* to her, for life,
and remainder over to *John* and *Joseph Dunbar*, the executors, upon
certain trusts and conditions. A farm called the Ben Campbell farm,
and a small piece of land adjoining, were devised to *Joseph Dunbar*,
one of the executors. A farm called the James Campbell farm,
or rather a certain part of it, lying east of the road, was devised to
William B. Waldron, Oliver D. Waldron, and Andrew Jackson
Waldron, minor children of Jonathan Waldron, upon their
paying in money or labor two hundred dollars to *Almira
Dunbar*, the testator's widow. The widow continued in pos-
session of the home farm, taking the profits, during the first
season after her husband's death, when she released her life
estate to the executors by bond, &c., and they immediately
entered, and had ever since taken the rents and profits. *Joseph
Dunbar* immediately entered, on the death of the testator, (which
happened 1st May, 1828,) into possession of the Ben Campbell
farm, and had ever since taken the rents and profits. The execu-
tors, at the end of one year from the death of the testator, put the
guardian of the young Waldrons into possession of the James
Campbell farm devised to them, without payment, or securing to
be paid, the $200, to the widow, and had not rendered any ac-
count for the rents and profits. The debts and expenses of ad-
ministering had all been paid out of the personal estate. The
executors rendered their account to the court of probate, and, in
the account rendered, no credit was given for the rents and profits
of any part of the real estate. The court, however, ordered the

Windsor,
February,
1831.

Dunbar
vs.
Dunbar's ex'rs.

executors to account for one year's rent of the Ben Campbell farm, which was accordingly credited ; and the court refused to order them to account any further for rents and profits ; nor had the executors paid the widow the $200, charged on the estate devised to the young Waldron children, nor charged the estate with such payment. From the allowance and exceptance of this account, an appeal was taken to this Court by the widow.

*Mr. Marsh, in behalf of the appellant,* contended,—1. That the executors were liable to account for the rents and profits of all the real estate, till a final settlement of the estate, and until the estate devised is set off to the devisees by order of the court of probate ; and that these rents and profits are to go into a general fund for the payment of debts, or for the benefit of those, who are entitled, under the will, to the *residuum* of the personal estate. 2. That the executors cannot exhibit, and have their accounts settled, until they put the widow in possession of the two hundred dollars, which is a lien on the estate devised to the young Waldrons.

1. The executors are liable to account for the rents and profits of all the real estate, till the devisees are entitled to enter under an order of the court of probate. No such order has passed the court. On the death of any one, whether testate or intestate, all the estate vests in the executor or administrator, in trust to be disposed of according to law, either *under the will*, or *under the statute of descents*, or distribution, as the case may be. The executor or administrator is required, by the statute, to cause to be made a true and perfect inventory of all the estate, both real and personal, of the deceased, and exhibit the same to a committee of appraisal, who are to return their appraisal to the court of probate, and deliver an attested copy to the executor or administrator ; and must account for the inventory at the appraisal, &c.—*Stat. p.* 340, *s.* 41, 44. The personal estate of every person deceased (with certain exceptions) shall stand chargeable with the debts and funeral expenses of the deceased ; and if the same shall be insufficient, the real estate, except the widow's dower, shall stand chargeable for such part thereof as the personal estate shall be insufficient to pay.—*Stat.* 341, *s.* 46. The executor and administrator, neglecting to sell real estate (when necessary, and when he can obtain license) for the payment of debts, shall be deemed guilty of waste.—*Stat. p.* 343, *s.* 51. It is made the duty of executors and administrators to keep, and maintain in tenantable re-

KKK

Windsor,
February,
1831.

Dunbar
vs.
Dunbar's ex'rs.

pair, all houses, buildings, and farms, appertaining to the estate of the deceased, *out of the avails thereof*, and the same to deliver over to the devisees or heirs, in such repair, at the time the probate court shall direct.—*Stat. p.* 344, *s.* 55. Executors and administrators are empowered to commence, and maintain, an action of trespass *quare clausum fregit*, or ejectment, or any other proper action, to recover the seizin or possession of any houses, lands, tenements or hereditaments, or any damage done thereto, in the right of the testator or intestate; or may prosecute any such action, already commenced by testator or intestate, to the use of the devisees, heirs or creditors of such estate, as the case may be; and no such action shall be maintained by any heir or hiers, devisee or devisees, until such estate be set off to them by order of the court of probate.—*Stat. p.* 346, *s.* 63. It is made the duty of the administrator of every solvent intestate estate, to furnish, out of such estate, a support for all minor children of the intestate, until they arrive at the age of seven years; unless the heirs shall give bonds to furnish the same.—*Stat. p.* 344, *s.* 56.

It is understood to have been often decided in this Court, that all heirs and devisees must take and hold through the administration; and the statute seems to be express to this point. The heir or devisee has no right of entry, until he obtains it through an order of the court of probate, on the final settlement of the estate. It would seem, therefore, that he can have no right to the accruing rents and profits, till his right of entry is complete by such order. The whole and entire right of possession, and all remedies known in law to obtain it, are expressly given to the executor, and as expressly taken from the heir and devisee. The action of trespass and ejectment are given to the executors to enable them to recover for any damage done to the real estate; and this for damage done during the life time of the testator. Such damage, when recovered by the executor, must be personal estate, and go into the personal fund, for the general purposes of the estate; that is, in the language of the statute, *(63d section,)* " *to the use of the devisees, heirs or creditors, as the case may be.*" Such damages, and also the rents and profits, when received, are undoubtedly personal estate, and come into the hands of the executor as such, and as such must be by him inventoried; and the statute, *(sec.* 46,) makes the personal estate chargeable in the first instance with the debts. The 55th section makes it the duty of the executor to keep, &c., the real estate in repair *out of the avails*, that is, the rents and profits; but how can he do this, if the

WINDSOR,
*February*,
1831.

Dunbar
*vs.*
Dunbar's ex'rs.

devisee has a right to the immediate perception of the rents and profits? And how is the administrator of a solvent intestate estate to provide for the children under seven years of age, "out of such estate," (*sec.* 56,) if the older heirs have a right to enter immediately upon their shares. "Out of the estate," probably means out of the rents and profits ; as no authority is any where given to sell for this purpose. The executors, in this case, no doubt had a right to take immediate possession. When possessed, however, they hold not as devisees, but as executors ; that is, in trust, or to account —to account for the lands if sold, and for the rents and profits,to the general fund, on the final settlement of the estate. It will be observed, that the will does not, in terms, make any provision for the payment of debts, funeral expenses, or the expense of administration ; but the law charges all these on the personal estate in the first instance. The real estate, with the exception of a life estate to the widow in one farm, is all devised away to others, and the personal estate all, or nearly all, is bequeathed to the widow. The executors, who are also the principal devisees, enter on the real estate, occupy it for themselves without account, and go on and administer the estate, pay the debts, &c., out of the personal fund which is all given to the widow, and constitutes her principal interest in the estate. If the money, arising from the rents and profits of the real estate, were wanted for the payment of debts, and expenses of administration, can it be pretended, that they should go to the devisees, and have the lands sold to raise money for the payment of debts ? If not, then the rents must go into the personal fund for that object. If they must go into the personal fund, in that case, it is because they are, in the hands of the executor, personal estate, and, if so, they must go into that fund in every case. There is no other consistent way of reconciling the various provisions of the statute. According to this view of the subject, the rents of all the estate, from the decease of the testator to the time of the final settlement of the estate, and the order of the court of probate to deliver the possession of their respective shares of the real estate to the respective devisees, belong to the fund of personal estate.

It appears, that, at the end of the first season after her husband's death, *Almira Dunbar*, the widow, released her title to the home farm, in which, by the will, a life estate was devised to her, to *John* and *Joseph Dunbar*, the executors named in the will. This deed is a mere release of the life estate, which she held under the will. This she did not hold as dower,nor was it given in lieu of dower. She held, like others under the will,merely as devisee.

Windsor,
February,
1831.
―――
Dunbar
vs.
Dunbar's ex'rs.

Whatever, therefore, she was entitled to, as such devisee, and that only, would pass by the deed. It will follow, if a correct view has been taken of the rights of the devisees under the will, that the executors, notwithstanding this release, are still bound to account to the general personal fund for the rents and profits of this farm, as well as of the other real estate. By the conveyance, she merely places them in her shoes as devisee in relation to the life estate in the homestead. If she could not enter immediately on the death of the devisor, and take rents and profits as against the executors, as devisee, then certainly she has not conveyed to them the right to the same thing, in relation to the general interests of the estate. The statute seems to us to have adopted a broad and general system for the settlement of estates ; and this system is based on broad, uniform, and consistent principles. The great outline of this system, and its uniform object, appears to have been, to vest the title and right of possession, and controul, of every thing pertaining to the estate, except the widow's dower, in the personal representatives of the deceased ; and not only to place, but to keep them there, till, in the first place, the widow should have her dower assigned, and such provision made for her out of the personal estate, as she might be entitled to under the statute ; and until, in the second place, all the debts, funeral expenses and legacies should be paid ; and, in the third place, an order passed by the court of probate, assigning to each heir or devisee his share in the estate, according to the statute, or the will, as the case might be. When this is all done, and not till then, can the executor or administrator be said to have *fully administered* ; and he is then, and not till then, entitled to his *quietus*. To effect these important objects, the statute has given to the personal representative adequate power, and laid him under all the responsibility necessary for the security of all concerned. It is believed, that this system is more perfect, and better calculated to point out the duties, and secure the responsibility, of the executor and administrator, and the rights of all concerned, than is to be found in any other code of law extant. As a system it is perfectly simple, but as such system, it must be administered on general principles. The executor is to inventory and account for every thing, which comes to his hands, either at first or at any subsequent period. The rents, like other property, must be inventoried, or credited, as received. If, under *any* circumstances, the executor must credit and account for rents, he must under *every* circumstance. If for the payment of debts

they must go into the general fund, so they must, in all cases, go there, for the benefit of the *residuum*. If the creditors have a right to insist on their forming a fund for their benefit, then those, who are entitled to the *residuum* have a right to insist, that they shall be applied to the payment of debts in aid of the *residuum*.

Windsor,
*February*
1831.

Dunbar
*vs.*
Dunbar's ex'rs

2. The remaining question is, whether the executors, in executing the will, are not bound to keep the possession of the farm devised to the Waldrons, till, out of the rents and profits, or sale of the estate, they can raise the two hundred dollars, bequeathed to the widow out of that estate. No remedy is given by the will to the widow to enforce the payment, and yet the payment is a lien on the estate ; and the payment is a condition precedent to the right of the devisees to take possession. The executors are bound to execute the will, and have the right, and it is their duty, to retain the possession, till this payment is made. This lot is given to the devisees *upon their paying*, &c., that is, if they pay, or when they pay, &c.

*Mr. Collamer, for the appellees.*—I. 1st. The executors contend, that they are not chargeable with the use of the real estate ; that a devisee takes *by the will*, and the estate vests on the decease of the testator. That this is the case by the common law there is no doubt. The devisee is entitled to immediate possession and use.

2d. This is not altered by our statute. The 49th section of the probate act, and those which follow, only give to the executor a lien on the real estate, on a certain contingency, for the benefit of creditors and legatees, (where the sum is certain,) that is, on failure of personal assets. This is in no way inconsistent with the immediate possession and use of the devisee or heir. If the contingency does not happen, no right exists in the executor.

3d. The *use* can never be claimed for any purpose, to which the *estate itself* could not be appropriated. This widow has a legacy of the personal property. The *law* charges that personal property with the debts. She is therefore merely residuary legatee of the personal estate. The residuary legatee cannot claim sale of the real estate. Though the estate may be sold for payment of debts and *legacies*, yet this cannot include a residuary legacy, as by the very *terms* of the legacy, it is to be the *residuum* after payment of debts and specific legacies. The *amount* to be raised for such legacy by sale could never be ascertained. As the lien on real estate was never, by law, made for the benefit of

WINDSOR,
February,
1831.

Dunbar
vs.
Dunbar's ex'rs.

a residuary legatee, she can therefore claim, in this case, no benefit from the real estate, or its use. It is to be presumed, the testator as much intended the persons, to whom he gave his real estate, should have the immediate and entire use and benefit of it, as of any specific legacy whatever; and the law should not, when unnecessary to creditors, interfere to transfer, by construction, any of this benefit to another.

4th. Under a statute, in this respect precisely like our own, in Massachusetts, it has been decided, that lands *devised* are not subject to sale for the payment of *legacies* of any kind.—*Sheple* vs. *Farnsworth*, 4 *Mass. Rep.* 632; 2 *Dane*, 245. Why, then, the *use* be taken?

II. The objections to this doctrine are founded on two certain sections of our statute.

1st. The 55th section of the probate act provides, that the executor shall keep buildings, &c., in repair, and deliver them to heirs and devisees, at the time the probate court shall direct. In regard to this, it is insisted, 1st. That the repairs are to be made "*out of the avails*" of the estate. Now, if these went into the general fund, why does the statute provide out of what fund the repairs are to be made? 2d. The section is general, and is to be construed with reference to the different purposes, for which it was designed. The last clause is intended for those cases, where division is required by order of court, under the statute. The probate court, as one of limited and statutory jurisdiction, makes no decrees, but when expressly authorized and required. None is directed here, none necessary, nor was one ever made in the state except on division. 3d. This statute is a compilation from the old laws. By the 50th section of the statute of 1797, precisely the same provision is made as in this section, except the last clause; and there it says, " until division or partition thereof shall be made." The present section amounts but to the same provision. 4th. The time directed by the court only makes it *imperative* on the executor; but if he actually delivers the possession, and it is actually received, as in this case, it is equally good without an order.

2d. It is said, the 63d section, which provides for the actions, " *quare clausum frigit*," and of " *ejectment*," in the name of the executor, for the *use* of the devisees, heirs, or creditors, and prohibiting any such action to heirs or devisees, until " set off" to them by order of court, implies, that the executor is to have possession and use. To this, it is answered, 1st. This being express-

WINDSOR,
February,
1831,

Dunbar
vs.
Dunbar's ex'rs.

ly provided to be " *to the use*" of the devisee, &c., is not to be construed to be for the *use* of the executor. 2d. The words, " *set off,*" clearly imply that this is a provision only for such cases as require division or partition. 3d. This is only making certain the form of action, appointing a trustee ; and no more gives the *use* than any other case of legal trustee for suit. 4th. This has nothing to do with use and possession as between executor and devisee, but only as against third persons.

III. If however it should be considered that our probate system requires, that the executor have the possession and use of real estate, for a term in the first instance, and that the proceeds go into the personal fund, though not necessary to the payment of debts, still the executors insist, that this does not extend beyond one year.

1st. The words *devisees* and *legatees* are, in our statute, frequently used as synonimous or convertible terms ; as in section 49, (*page*, 343,) and it may be considered, that, by this statute, devisees and legatees are intended to be put on the same ground, as to the commencement of their right ; *both* to be paid by order of court, and *both* to hold by testament and administration, even if the legacy or devise be certain and specific.

2d. If this be so, it becomes important to inquire, when does a legacy become due ? By the 48th section, the only one on the subject, debts and legacies are to be paid, when the court order, " not exceeding in the first instance one year ;" subject to being extended by the court another year. The 58th section prohibits any suit until the expiration of such term. But in this case, the court made no order ; and both the one and two years had expired, and no order could be made. Is the legacy never to be due ?

3d. In such case, it is insisted, the legacy is due at the expiration of the first year, at farthest ; and as it is so by common law, the executor has no right to withhold under an order which is never made.—2 *Dane*, 242.

4th. Every legacy is payable *with interest*, if there are assets ; and, therefore, the executor is not to withhold it, unless by an order under the statute.

5th. This order of *time* for payment of a legacy or debt, or delivery of a devise, is only necessary where the right depends on it, or the executor will not pay without ; but the right to a debt, legacy, or devise, given absolutely, is anterior to, and independent of, the order ; and, therefore, the executor may pay or deliver it as soon as he pleases without order, if creditors are not injured ;

and in this case, having delivered possession, and creditors not injured, his interest is ended.

HUTCHINSON, C. J., *pronounced the opioion of the Court.*— The testator having bequeathed to the widow, the appellant, all his personal estate, and made no provision for the payment of his debts, she now claims whatever the law will give her, to replace that part of the personal estate, which went to pay debts. It is probable, the testator wholly forgot to make provision for the payment of his debts, or else he thought he owed little or nothing ; and, for that reason, made no provision for their payment. But it seems, that claims to the amount of $1,200, or more, have been substantiated against the estate, which absorbs more than half of the available personal property. The law makes the debts a lien upon the personal estate, first, and then upon the real estate. Under the circumstances of this case, the import of this legacy to the widow is, that she have what remains of the personal estate after paying all the debts. The ingenuity of counsel has been displayed in devising some consistent method to take this burden, of paying the debts, off of the widow. Whatever of the rents and profits of the real estate, during settlement, can be added to the fund of personal estate, it would relieve *pro tanto*. The court of probate allowed these rents, for one year after the decease, of all the real estate not occupied by the widow. She now claims that the executors be charged with the after rents, till the settlement in fact took place. We see no way in which to support this claim. The creditors, legatees, and devisees, have a like claim to the possession and use of their portion of the estate, at the end of the year allowed by law for settlement, unless the executors procure a further time to be allowed by the probate court. None was allowed nor prayed for, as we learn. It is probable the debts and legacies were paid, and the legatees took possession at the end of the year, given for settlement. If it were not so, the neglect of the executors to settle their accounts, could not alter the rights of the different persons interested. It certainly could not transfer the profits of a legacy in real estate to the personal fund, for the benefit of the widow. In considering her claim to be treated as residuary legatee, *pro tanto*, we find the same difficulty. Indeed, there is nothing but these profits of the real estate to be called a *residuum*. The specific legacies must all be first satisfied before we can talk about a residue.

This will has fixed no time for the payment of any of the lega-

ies. There is, therefore, no better rule, than for the executors to occupy the year allowed by law in settling, and ascertaining what claims there are upon the estate, and take care of and improve the estate in the mean time, and render their acconnt at the end of the year, and charge the repairs and credit the income thus far, and let the court then make the closing orders concerning the estate. And, if the settlement is delayed for any longer period, let the accounts be closed as of that period, and let the executors make each as if he received his portion at that time, and this will do justice to all. The decision of the court of probate, making the executors account for the rents of the real estate during the first year, and permitting the legatees to hold possession without account, after the year, amounts to the same thing now named.

*Windsor, February, 1831.*

Dunbar
*vs.*
Dunbar's ex'rs.

A case might occur, in which justice would require that repairs should be made on the portion of one devisee, and he bear the expense ; but nothing of that appears in the present case.

A further claim is urged by the appellant, that the executors ought not to have permitted the Waldrons to take possession of their legacy, until the two hundred dollars fixed as a lien upon that legacy was paid to the appellant. We discover no necessity for compelling the executors to interfere with this legacy, nor with the two hundred dollars. The will has pointed out no particular duty to the executors in this respect. The two hundred dollars are not given to the appellant, as a legacy to be paid by the executors. All that is said about it is, that the land is given to the Waldrons upon their paying the appellant this sum. We think the most practicable way is to treat this as a lien upon the land which the appellant can enforce. She may bring her bill in chancery and obtain such a decree as will ensure her the money, or the land instead of it.

The decree of the court of probate is affirmed with costs ; and this decree must be certified to the court of probate.

### The State *vs.* Chester Hodgeden,

*Orange, March, 1831.*

An indictment is not defective merely by its being written with the usual initials and numerical figures for dates, as A. D. 1830, when the same are plainly legible.

This was an *indictment* for *theft*, upon which the respondent was arraigned, and tried, and convicted, in the county court. After verdict, the respondent filed the following motion in arrest,

LLL

which was overruled, and sentence passed upon him; by virtue of which he was sent to the state prison.

The respondent filed exceptions to this decision, and the proceedings were brought up to this Court.

" And now the said *Hodgeden*, after verdict, and before judgement and sentence, comes and moves the court here, that all further procedings in said case be arrested, and no judgement be rendered therein; and for causes of arrest, sets down the following :—That the said indictment is insufficient in law, for this, that the times and dates therein mentioned are set forth in Arabick or numerical figures, and not written out at full length in the English language, with Roman characters."

Early in this term, a *quære* was suggested to the Court, by the attorney for the government, whether this court would issue a *habeas corpus* to the keeper of the state prison, commanding him to bring the respondent before the court, or whether they would proceed to a hearing in his absence. The court, learning that the respondent's counsel had no wish for the trouble and expense of a *habeas corpus*, if the Court considered it regular to proceed, and hear the arguments while the prisoner was in custody, but not in court, admitted the hearing to proceed without sending for the prisoner.

*The respondent's counsel proceeded in argument.*—1st. In support of this motion, the statute of Vermont is cited, (*chapter 7th, sec. 50th,*) which enacts, " that all writs, processes, declarations, indictments, pleas, and answers and entries, in the several courts of justice within this state, shall be in the English language, except technical terms." In this indictment, " *in the year of our Lord*," is expressed by *A. D.*, the initial letters of *Anno Domini*, two Latin words, signifying, " *in the year of our Lord*."

2d. All " *abbreviations in indictments are prohibited.*" They must be written out in words at length.—4 *Bla. Com.* 306, *note; Hale P. C.* 170, *note; Chit. C. L.* 145 ; 2 *Sw. Dig.* 374. In this indictment, it will be seen, that, " in the year of our Lord," is abbreviated to *A. D.* The objection here may arise, that this provision is by statute of England, and, therefore, not binding here. To this it may be answered, that is not a remedial statute, remedying some defect in the common law; but is a declaratory statute, merely explaining and declaring what the common law is, and always has been.

3d. It is expressly stated in the above authorities that " no fig-

ORANGE,
March,
1831.

State
vs.
Hodgeden.

" ures can be allowed in indictments, but all numbers must be " expressed in words at length." In this indictment the numbers are all expressed in figures, instead of being written out at length, in words with Roman characters.

*Mr. Buck, state attorney, contra.*—The three causes for arrest of judgement, in this case, may be resolved into, and considered as embracing, two distinct propositions. 1st. That the indictment is not given in the English language. 2d. That, if it be considered as given in the English language, yet characters, abbreviations, and numerical figures, are used in a manner inconsistent with the policy, expediency, and strictness, which prevail in criminal proceedings.

As to the *first* point, I say, that the indictment is given in the English language, and in characters adopted into, and constituting a part of, and universally received as belonging to, the written language. The letters, " *A. D.*," the character " *&*," and the numerical figures " 1830," have their appropriate signification, are taught in our schools, and with which every school boy is familiar. The statute requiring proceedings in court, to be in the English language, is equally applicable to civil as to criminal process. Now this mode of writing universally prevails in civil process, as the records and files of this court will show. Yet it has never occurred to any one, that they were void for not being in English.

As to the *second* point, there may appear, at first view, some plausibility in the position assumed by the motion in arrest : but a little attention will show us that the ground assumed is untenable. The strictness, so much talked of in criminal proceedings, &c., has reference only to the nature and legal effect, of the facts set forth, as constituting the crime charged ; to the certainty and perspicuity, with which these facts are set forth ; so that it shall appear clearly, and certainly, to the legal apprehension of the court, what the nature and circumstances of the crime are. It has not reference to, and does not involve, the mode of writing, or the chirography of the indictment. The practice of the English courts admitted of abbreviations, and the use of figures to express numbers. For, while indictments were drawn in Latin, false Latin did not vitiate the indictment ; (2 *Hawk. P. C.* 338, *s.* 86 ;) [*Lond. ed.* 4 *vol. p.* 49 ;] and abbreviations, if sanctioned by legal usage, were permitted, such as " *dno.*" for *domino ;* "*R. Rs.*" for *regni regis.*—(2 *Hawk. P. C.* 340, *s.* 87 ;) [*Lond. ed.* 4 *vol. p.* 50.] That figures were admitted, appears from 3d *Bac.*

Orange,
March,
1831.

State
vs.
Hodgeden.

*Abr.* 116, and 2 *Hawk. P. C.* 340, *s.* 87, provided they be Roman figures, as XIX for nineteen, XL for forty, &c., though the editor of *Bacon's Abridgement* doubts whether this restriction existed. Chitty says, on the authority of a case in Leach, in the time of Lord Mansfield, that " *recev'd*" is good, and shall be understood for " *received*."—(1 *Chit. Cr. L.* 141.) These instances show, that, when indictments were drawn in Latin, and more recently while in English, no principle of strictness or expediency prohibited the use of abbreviations or figures to express numbers in the indictment. I am aware, that Chitty, Burns, and other authorities, say, that " indictments must be in words at length ;" and, therefore, " no abbreviations can be admitted ; nor can any figures be allowed in indictments ; but all numbers must be expressed in words at length." This assertion seems to rest upon the statues, 4 *Geo. II. c.* 26, and 6 *Geo. II. c.* 14. But I think the effect and provisions of these acts have been entirely overlooked.—2 *Hawk. P. C.* 341. The strict and particular provisions of the 4 *Geo. II. c.* 26, are repealed, by the 6 *Geo. II. c.* 14, being, in England, the rule as to writing indictments and other process, which, in this state, ought to be regulated only by common usage. This indictment, I trust, I have shown to be written according to the common usage and rules of the written English language, and therefore ought to be sustained.

HUTCHINSON, C. J., *pronounced the opinion of the Court.*— On inspection of this indictment, we perceive, that the characters and figures used, are such as are in common use among us, and have been so from time immemorial. They are such as all persons, who write, and read writing, read and understand alike. These are so plainly written, according to the accustomed form of these characters and figures, that no two persons at all familiar with our daily manuscripts, could read and understand them differently. This exception attracted but a slight attention from the bench of the county court ; because we readily determined not to let off a prisoner, who had been found guilty of a crime by the jury, upon an objection so merely technical, before the principle, on which that objection was founded, had received the sanction of this Court. We are not aware, that this question has before been raised before this Court. If the objection prevails, it must be on account of some positive law, that we deem binding upon us. This strictness is not required by the safety of the prisoner. His rights can be fully guarded by the caution that no indictment shall

ORANGE,
March,
1831,

State
vs.
Hodgeden.

bc considered good, unless so plainly written, whether in characters and figures, or in words at length, that there is no doubt of its furnishing a bar to another prosecution for the same offence. That, which the respondent relies upon as positive law in England, was never extended to civil process there ; and was founded upon a statute, never in force here, and made there to introduce the English language, as a uniform dialect in their judicial proceedings, to the exclusion of the Latin language, once used,and the intermixture of various dialects, with which the English language was corrupted. If this statute restrained the expressing of numbers by figures, that restraint was removed by the subsequent statute, cited by the state's attorney. But, if the restraint yet remained in England, it being imposed by statute, and not a regulation of the common law, it is not binding upon this Court. While our statute requires our judicial proceedings to be in the English language, it requires this alike in civil cases and criminal. And these initials and figures have ever been used in civil proceedings in this state. They seem to be incorporated into our English language, and become a part of it, as well understood as any other part of it. If the respondent could object, that this indictment is so badly written that it cannot be read, or that different persons would understand it to mean different crimes, by reason of which a conviction on this would be no sure bar to another prosecution for the same offence, his objection would seem more formidable. He is free from all danger of this kind, in the case before us.

The respondent takes nothing by his motion.

*Smith, & Peck, & Collamer*, for respondent.

*Buck*, state's attorney, for the state.

### ISABELLA SMITH *vs.* JOHN L. WOODS.

ORANGE,
March,
1831.

An *ex parte* deposition, filed with the clerk *less* than thirty days before court, but remaining there through the term, and till the succeeding term of the court, may then be read.

In an action of *account* against one as bailiff and receiver, the plaintiff's interest must not be joint with any other person.

Plaintiff is entitled to an accounting for notes in defendant's hands, and money received upon such notes, though the plaintiff was *feme covert* at the date of the notes, but not so when they became binding upon the signers.

Such notes being payable to the defendant, does not obstruct the plaintiff's recovery, if they were executed for the sole benefit of the plaintiff.

This action was tried in the county court, and the plaintiff obtained a verdict. The defendant filed exceptions to the decisions of the court, upon which the action was brought up to this court. These exceptions give a full history of the case, and were as follow :

" This was an action of *account* against the defendant as *bailiff* and *receiver* of certain notes, signed by Andy L. Smith, and by said Andy and another person, as his bail ; and of certain monies received by the defendant upon said notes. Plea, that *the defendant was not bailiff and receiver to the plaintiff.* On the trial of the action, testimony was introduced, tending to prove, that, in the year 1815, the plaintiff was the lawful wife of said Andy L. Smith, having two small children ; that said Andy deserted her, and went to the state of New York, and lived with another woman for many years ; that the plaintiff supported herself and children by her labor and the property left by the said Andy, a year or two, when she broke up house-keeping, and went, with her children, and lived with her father, John Scott ; that she labored there in the family, as one of the family, for some time—it did not appear exactly how long ; that she went and lived at Wells-River for the purpose of educating her children ; that she was alternately at and from her father's for several years ; that one of her children was there the most of the time, and the other not ; that, while there, they received their support from the said Scott, except what was compensated by the plaintiff's labor, and the labor of said children. One witness testified, that such labor paid, or nearly paid, for said support. The evidence further tended to prove, that, for three or four years next previous to the first of March, A. D. 1825, the plaintiff did work and labor for said defendant as his house-keeper, and that, in March, aforesaid, an arrangement was made by and between the plaintiff and defendant, for the defendant to go to the westward and procure, from the said Andy L. Smith, something for the past and future support of the plaintiff and her children ; that, as the plaintiff was then the wife of the said Andy, and could support no claim at law against him for such support, *Woods* proposed to John Scott, the father of the plaintiff, that the account for such support should be made out in the name of Scott, who also should execute to *Woods*, a power of attorney to prosecute the same ; that Scott hesitated, saying, he had no interest in it, and wished to do nothing but what was right ; that upon being reminded, that the plaintiff could not sue in her name, Scott consented, and signed said

ORANGE,
March,
1831.

Smith
vs.
Woods.

account and power of attorney, which were prepared by *Woods*, and then, and at other times, said it was for the benefit of the plaintiff; that said defendant went to the westward, found said Andy L. Smith, and commenced a suit against him in favor of Scott, and also procured a warrant against him on a charge of bigamy; and afterwards effected a settlement with said Smith, in which he procured the notes in question, being eight notes of $100 each, signed by said Smith and his surety, and two notes of eighty six dollars each, signed by Smith alone, and payable one in each year, successively, for ten years; which notes were made payable to *Woods*, and were lodged with a third person, agreed upon by Smith and *Woods*, to remain till *Woods* should, without any expense to Smith, procure for the plaintiff a bill of divorce from Smith; which bill was obtained at the Supreme Court in September, 1825; and *Woods* discharged the demands, Scott *vs.* Smith; soon after which, said notes came into the possession of the defendant, and he received the pay on some of them to the amount of three or four hundred dollars; that the plaintiff after said divorce, and after the notes came into the possession of the defendant, and before the commencement of this suit, called upon the defendant for a settlement, and demanded said property; and that the defendant refused or neglected to deliver it up; that defendant told said Andy, when the notes were given, that all was for the benefit of the plaintiff; and was heard to say the same on several other occasions; and that said Scott died about a year and a half ago, and left no account or claim for any of this property; and always, in his life time, said he had no such claim. But there was no evidence of any assignment of the same, or any part thereof, by Scott to the plaintiff. The depositions of William Wood, Henry Wells, Solomon Goodall, Andy L. Smith, and of Samuel Hutchins were read and made a part of the case. The deposition of Goodall was adduced by the plaintiff, and objected to by the defendant, on account of a defect in the caption, and because it was not filed in the clerk's office thirty days before the term of the court, to which the same was made returnable; but the court learning that said deposition had been exhibited in court last June term, and been on file in the clerk's office ever since, overruled the objection. The administrators of Scott's estate testified, that there was no claim in favor of said estate for said notes and money, nor any account for the same. There was also read an account current between the plaintiff and defendant, in the hand writing of the defendant, which is made a part of the case. The defendant also read in evidence a contract in writing,

ORANGE,
*March,*
1831.

Smith
*vs.*
Woods.

entered into by certain persons in the state of New-York, dated April 25, 1825, and made a part or the case.   The defendant objected to the plaintiff's proving her beneficial interest in said notes and money, by parol testimony, but the court overruled said objection and admitted the same.

The defendant requested the court to instruct the jury, that this action of account could not be supported in favor of the plaintiff, but must be pursued, if at all, in the name of John Scott, or his legal representatives ; or the plaintiff must resort to a court of chancery for relief.   But the court declined so to instruct the jury, and did instruct them, that though the plaintiff was a married woman at the date of said notes, yet if she had a beneficial interest in said notes and money, and the defendant knew and recognized this her interest after said divorce, the defendant was to be regarded as *bailiff* and *receiver* to the plaintiff after the granting of said divorce ; and that, if they should find, that the plaintiff had during that time, the whole beneficial interest in said money and notes, and that recognized by *Woods,* they should find for the plaintiff; but if they found any part of said notes and money to belong to the estate of John Scott, to find for the defendant.

The jury found a verdict for the plaintiff ; to which decision and charge, and refusal to charge, the defendant excepts, and his exceptions are allowed."

*J. Mattocks, for the defendant.*—The defendant's counsel contend, that the plaintiff is not entitled to account, because she, being *feme covert* when the defendant went to the westward and procured these notes, could not appoint him her *bailiff* and *receiver.*   And her interest, before, and after her coverture ceased, cannot be severed,   And the defendant's admitting her interest cannot entitle her to recover in her own name.   The business was done for Scott, the plaintiff's father; the defendant acted under a power of attorney from him, and was accountable to him.   He went to secure a debt in favor of Scott; and the action, if it will lie at all, should be in favor of Scott's administrators.

2d. Parol or verbal evidence ought not to have been admitted to contradict, and explain away, the settlement of *Woods* with Andy L. Smith, and transfer the apparent liability of *Woods* to John Scott, and make it enure to the plaintiff.

3d. A bill in chancery, in favor of the plaintiff against *Woods* and John Scott's representatives, was the only remedy between Scott's estate and the plaintiff, which would also protect *Woods,*

At any rate, account will not lie, even if she could recover, in an action for money had and received, the money he received after the divorce.

4th. The deposition of Ira Goodall ought not to have been received. The statute requires, that an *ex parte* deposition shall be filed with the clerk, and opened for the inspection of both parties, thirty days before the court to which it is taken to be used. This is an *ex parte* deposition, and it was not so filed.

*Argument in behalf of plaintiff.*—The question is, whether the property in the hands of defendant, and obtained as stated in the case, is in such sense the property of plaintiff, that she can sustain this suit at law for its recovery ; or whether she must be turned round to a suit at law in the name of the administrator of John Scott, or to a bill in chancery, to obtain her right.

It is contended, that though the proceedings were at first had in the name of John Scott, as a trustee for the plaintiff ; yet, after the bill of divorce was obtained, so that plaintiff could hold in her own right, (and the obtaining the divorce was a condition precedent, on which the notes were to be delivered, and were in fact delivered,) that, then, the subsequent delivery of the notes, expressly for the benefit of the plaintiff, constituted the defendant the agent or trustee of the plaintiff ; and John Scott was no longer in the way, or had any legal or equitable interest in the property. John Scott never had any equitable interest in the subject of this controversy. The account in his name was merely the measure, by which the sum allowed the plaintiff for her past and future support was meted out ; but it was not the meritorious cause, or consideration, or even inducement to any allowance.

The consideration and inducement to the allowance was the support of the plaintiff ; but this could be yielded only on the ground of her obtaining the divorce. The whole transaction and the rights of all the parties were in abeyance till this was done. And, on the performance of this condition, the notes became due to the defendant ; but the title, the legal title, became then vested in the plaintiff ; and, from that time, the defendant became the bailiff and receiver of the plaintiff, and John Scott had no longer any legal interest in the property. The notes being delivered, and the money, so far as collected, being received after the divorce, and in consequence of that condition being performed, the property became vested in the plaintiff ; and she immediately acquired the right to call defendant to account. Neither plaintiff,

MMM

Orange,
March,
1831.

Smith
vs.
Woods.

defendant, nor John Scott, had any interest, claim, or cause of action, on the notes, till the bill was obtained. Until the fulfilment of that condition the mere naked right of action rested in defendant. But for whose benefit? who had the legal and equitable right to the money received thereby? Surely not John Scott. For whose benefit was the expedition undertaken? For whose benefit did Smith agree to give the money? and who performed the conditions, on the performance of which, the notes, and money secured thereby, became due? Law, equity, reason, and common sense, all respond to each of these enquiries, *Isabella Smith!* The defendant engaged and promised Andy L. Smith to account for it to plaintiff for her support, and, on that consideration, and her obtaining a divorce, he agreed to furnish the money. Now, whose money is it? So far as money has been received on those securities, cannot plaintiff maintain money had and received? Is it not money received to her use? If not, to whose use was it received? Not to the use of John Scott; he had no interest in it. It was not designed for him. He paid no consideration for it. If recovered in his name, the plaintiff might maintain money had and received against him, or his representative, to recover it back. Why this circuity of remedy?

It is believed, not only, that the plaintiff can maintain this action, but that no other person could maintain a suit at law or in equity, to adjust this controversy. Surely neither John Scott, nor his representative, could sustain any suit. The legal interest, the right of action on the notes, is in defendant; the legal and equitable interest, in the money secured by them, is in plaintiff. The notes were given for money equitably due to the plaintiff, but made payable to one, whom she had employed as her agent. Now, is it possible to say, that the circumstance of defendant's making out an account, and taking a letter of attorney from John Scott, who was merely nominal, and had no interest in the subject matter of this transaction, can vary the legal, or equitable, rights, liabilities, or remedies, of the parties? It would seem impossible. The jury have found, under the charge of the court, that John Scott had no interest in the property secured by the notes in question.

The Court will probably expect us to cite no authorities in this case. There is no objection to the form of action. But the question is, on general principles of law, to whom does the legal and equitable property in the notes, and the money secured thereby, belong? In other words, do they belong to the plaintiff

in such sense, that she can sustain an action at law for their recovery?

We refer the Court to 12 *Mass. Rep.* 183, *Chickering* vs. *Hosmer*; 4 *Burr. Rep.* 2069, *Faikney* vs. *Reynous, et al.*; *Blake's Chancery,* 30, 31.

HUTCHINSON, C. J., *pronounced the opinion of the Court.*— We will first dispose of the objecton to the deposition of Goodall. This deposition was taken without notice to the opposite party, and taken to be used at June term ; and was filed with the clerk, but not so many as thirty days previous to said term. The action lay over from June to December term,and this deposition remained on file ; it was then admitted to be read,though objected to by the defendant. This filing of the deposition is not at all within the statute in reference to the June term of the court. It was not within the letter of the statute, in reference to the December term following : but for this term, its filing was perfectly within the object and meaning of the statute. The evils that existed before the statute were, that a deposition might be taken without notice, and presented and read on trial ; and the opposite party have no possible opportunity to cross examine the witness, or procure him to attend court, and testify on the stand, or to procure the attendance of witnesses, acquainted with the deponent, and who would impeach his character for truth. The statute remedy for these evils is, that the deposition shall not be read, when thus taken without notice, unless filed, and lodged with the clerk and open for the inspection of both parties, thirty days before the term, at which it is taken to be used. This would enable the opposite party to prepare to meet the deposition in any of the ways allowed by law. He might give notice, and take the deposition of the same witness, that may operate as a cross examination, or procure him to attend in person. This statute regulation answers a valuable purpose,also,for the party who wishes to use it. If there is any defect in the certificate of the caption, he can know it thirty days before court, and have time to prepare his testimony anew. With propriety, also, may the deposition bear more weight, when the opposite party has this opportunity to impeach, or otherwise meet it, than when his first notice of it is its production on trial. Now all these objects are as fully attained, and perhaps more so, by the deposition's being on file six or eight months, as if it were there thirty days only. We consider, that there was no error in admitting this deposition.

ORANGE,
March,
1831,

Smith
vs.
Woods.

The only remaining questions are, whether the court correctly admitted parol testimony to show, who was the actual owner of these notes, notwithstanding the writings of John Scott, and the notes being made payable to the defendant; and whether the instructions given the jury were correct. The bare statement of the case forces to a decision, that the parol evidence was correctly admitted; otherwise, an agent would forever screen himself from liability to any one, by taking notes to himself, which belonged to his employer. We know of no law against proving, by parol, a trust with regard to personal property, or personal agencies, or personal securities, indeed, all trusts, except those concerning real estates, affected by restraining statutes. This testimony does not contradict the writings at all, as suggested by defendant's counsel. In reference to a suit upon the notes, they speak for themselves, and must be sued in the name of the nominal payee, or legal assignee; and this cannot be varied by parol testimony. But a person owning a note, not payable to himself, nor indorsed to him, if it is converted by another, may maintain trover for it, in his own name, as well as if it were payable to him. He must give it a true description; but alleging, and proving, himself to be the owner, gives him the cause of action in his own name. Just so, if defendant has received, and has in his possession, notes payable to himself or any one else, parol evidence is admissible to prove, that he received them as *bailiff* of the plaintiff; and such evidence will support the action of account as *bailiff*.

Upon the same principle, parol evidence is admissible to show, that the demand, in favor of Scott against Andy L. Smith, was equitably a demand of the present plaintiff, but made out and forwarded in the name of Scott, her father, as the most prudent and efficacious method of securing and collecting it; yet entirely for her benefit. Scott, having no claim against Andy L. Smith, which he supposed legal, or which he was disposed to set up against him, for he intended what he had done for his daughter as a gift to her, yet he was willing to become her trustee, and let his name be used for her benefit.

These facts may as well be proved by parol, as any other facts whatever.

This brings us to the consideration of the instructions given to the jury. Here, we may observe in the outset, that, though the notes, which are the object of this suit, are made payable to the

ORANGE,
March,
1831.

Smith
vs.
Woods.

defendant, and are in his possession, he has no pretence of owning them, any farther than the amount of his lien for his expenditures and services in the business of his agency. He does not pretend to have gone to the westward to secure this debt for himself; but to have gone as agent for some person. His lien we are disposed to protect. Whoever would now claim that he acted as their agent in this transaction, must admit his lien upon these securities for his reasonable compensation. Had the defendant been willing, upon satisfaction of this lien, to deliver over the residue of these securities and money, and assign them without recourse, that would have been all that could have been required by any one claiming to be owner. But the case shows that he refused to deliver them up, without predicating any excuse upon his lien.

The defence before the jury, in this case, consisted chiefly in a denial of the plaintiff's right to demand, and receive this property. It is urged, that the defendant, if liable at all, is liable to Scott's representatives; for he acted in Scott's name, and by virtue of a power of attorney from him : and the plaintiff was then a *feme covert*, and could make no *bailiff.*

The testimony, which we have now decided was correctly admitted, shows that Scott had no interest in the matter ; and even entertained doubts of the propriety of shaping the writings so as to sanction a pursuit in his name. To this, however, he assented, affirming that he had no interest in it ; that it was all for his daughter, the plaintiff. He has since died, leaving no account or writing, which intimates any claim of his to this property. The assertions of this defendant, and of Andy L. Smith, tend to show, that the plaintiff, and not Scott, was the beneficial owner of this property. As to the plaintiff's being then *feme covert*, and destitute of power to make a contract, which would constitute the defendant her *bailiff*, this presents a difficulty more plausible than substantial. The defendant did not urge this objection, when he undertook the business, which terminated in the procurement of these notes. And these notes were executed on the express terms, that they were to be of no force, till the plaintiff should be rid of her coverture, by obtaining a bill of divorce from said Andy L. Smith ; and all this with the understanding of all parties, that these notes would then be for her benefit. She obtained the divorce, and became able to contract, and appoint a *bailiff*. She then affirms her former proceedings, and continues the defendant her *bailiff*, and as such he receives the notes from

ORANGE,
March,
1831.

Smith
vs.
Woods.

him to whom they were before delivered as an *escrow*, to await this very event of her divorce. Therefore, though the plaintiff was a *feme covert*, when the notes were written and signed as an *escrow*, that difficulty was over, before the notes had any binding force upon the signers, and before the defendant received them into his custody. If the jury found the facts thus, as they probably might, the plaintiff was the substantial owner of these notes ; and the defendant received them in trust for her, and was her *bailiff*, and ought to account. Such were the instructions to the jury, upon this point. But, upon the question of Scott's interest, the instructions were as contended by the defendant, that the plaintiff could not recover, if Scott was sole owner, or owned jointly with the plaintiff ; that, in the last case, the plaintiff must resort to chancery.

The judgement of the county court is affirmed ; and auditors must be appointed to take the account. These auditors must consider, that the defendant had a lien upon the notes first payable, for his reasonable cost and charges. They must not consider, that any particular bargain, made by the plaintiff during her coverture, for any particular sum as a compensation, would now be binding upon her ; nor would it in chancery. But she must be considered as having contracted with the defendant to transact this business for a reasonable compensation.

*J. Mattocks*, for defendant.
*Burbank & Marsh*, for plaintiff.

---

SAMUEL C. RAYMOND *vs.* SILAS SOUTHERLAND, et al.

The certificate of the jail commissioners is not only *prima facie*, but conclusive, evidence of the notice to the creditor, averred in such certificate.

But, if it were not conclusive, evidence would not be admissible to show, that the creditor was away from his family in another town in the same county, and did not know of the citation, served as the law directs where his family lived.

This was an action of *debt* upon a jail bond. The declaration was in the usual form.

The defence was presented in a special plea in bar, which set forth a petition from the principal debtor to the jail commissioners for his liberation on taking the oath prescribed by law for poor debtors ; the citation issued by said commissioners to the creditor, and service and return of the same ; the decision of said commissioners admitting him to said oath, and their making and

BENNINGTON,
February,
1831.

Raymond
vs.
Southerland
et al.

delivering two certificates, in the form prescribed by law, one to said debtor, and the other to the keeper of the prison ; which service of said complaint and citation was alleged, in said plea, to have been duly and legally made by Samuel Canfield then sheriff of the said county of Bennington, "*by leaving a true and attested copy thereof, with his return thereon indorsed, at the then known residence of the said plaintiff in the said town of Manchester, and the place designated as the plaintiff's residence in the original writ and execution, on which said commitment originated, in the hands of the plaintiff's son, a person of sufficient discretion then resident therein, and the known clerk and agent in the business of the plaintiff.*"

The plaintiff's replication admitted all the facts set forth in the defendant's plea, except what relates to the residence of the plaintiff, and the service of the citation ; and, with regard to them, proceeded as follows : "Yet the plaintiff says, that, at the time when said application was made, and said citation issued, and the pretended service thereof made, to wit, on, &c., he was established at Bennington, in said county, in a permanent business, as the cashier of the Bennington Bank ; and that he then had no other residence in said Manchester, except as his wife and family then resided at said Manchester, whom he occasionally visited ; which was then well known to the said Otis, (the principal debtor,) and the defendants, (his bail,) and that the said *Samuel C. Raymond* had no knowledge or notice of the said application, or citation, or of the said pretended service of the same ; that he was not at said Manchester, &c. : and the said discharge was without the knowledge or consent of the said *Samuel C. Raymond, &c.,* and without his having any opportunity or means of appearing and showing cause, &c.: all which he is ready to verify, &c., and prays judgement, &c." To this the defendants rejoined, that the plaintiff at the time, &c. &c., had other residence in said Manchester, beside occasional visits to his family ; to wit, that, at the time, &c.: and for a long time before and since, he was engaged in a permanent business as a merchant and vendor of goods, wares and merchandise, at said Manchester ; nor was any other pretended residence of the plaintiff know to the said Otis, at the time of his praying out said citation and procuring said discharge ; and that said *Samuel C. Raymond,* had due and legal notice of said application and citation, and full opportunity to appear and show cause against said discharge, if any he had; whereof the defendants put themselves on trial. The plaintiff likewise

BENNINGTON,   On the trial of this issue, the defendants offered a regular cer-
February,   tificate of the discharge, signed by the jail commissioners, accom-
1831.
   panied with no other testimony whatever. This was objected to
Raymond
vs.   by the plaintiff, but admitted by the court. The plaintiff then
Southerland
et al.   offered to prove the same facts set forth in his replication. This
was objected to by the defendants, and the court excluded the
same, and decided, that the said certificate of the jail commission-
ers was conclusive evidence to prove the issue joined between
the parties in said cause. And there was a verdict for the defen-
dants. The plaintiff filed his exceptions to these decisions, which
were allowed by the court; and the cause ordered to the Supreme
Court for a hearing upon these exceptions.

*For the plaintiff it was argued*,—I. That the plea in bar very
properly sets forth all the *prior proceedings* to the granting of the
discharge.

1. The averment in the plea, that the citation was served by a
copy left at the usual place of abode of the plaintiff, is, *prima facie*,
an averment of notice. 2. Courts of jail delivery have but a spe-
cial and limited jurisdiction, and all such courts must substantiate
every fact necessary to give jurisdiction, both of the *subject mat-
ter*, and the person.—1 *D. Chip.* 39, *Payne* vs. *Ely et al.*; 1
*Vt. Rep*, 253, *Hubbell* vs. *Dimick*; 1 *Vt. Rep.* 81, *Bates* vs.
*Hazeltine*; 2 *Mass.* 213; 11 *Mass.* 510; 4 *Mass.* 643,
*Bridge* vs. *Ford*; 6 *Johns.* 282; 2 *Wils.* 382; 10 *Coke*, 77;
3 *Cranch*, 331. Nothing is to be *intended* in favour of their ju-
risdiction.—8 *Term Rep.* 181. 3. Without notice, the court have
no jurisdiction over the person; all is "*coram non judice.*"—1
*Aikens' Rep.* 107; 2 *Vt. Rep.* 341; 11 *Mass.* 510; 14 *Mass*,
222; 17 *Mass.* 81.

II. The replication puts in issue the fact of notice. The evi-
dence admitted by the court was not competent, even *prima facie*,
to prove the issue. 1. This follows from the principle, that the
prior proceedings must be set forth in the plea in bar. It would
seem, that, if they must be specially pleaded, they must be as
specially proved. 2. By the statute 5 *George II. c.* 30, *s.* 7,
the certificate of the bankrupt is made evidence of the proceed-
ing *anterior* to the obtaining the discharge.—1 *Bacon*, 432. This
however applies to cases only where the certificate is obtained
prior to action brought. If afterwards, the proceedings must be
specially set forth, and the certificate is not evidence.—1 *Bacon*,
452, *note*; 4 *Term Rep.* 156; 2 *Chit. Pl.* 427, *note u*; 6 *East*,
413; 1 *Strange*, 533. 3. But still the certificate, though made

evidence,is held to be but *prima facie.*—1 *Dallas,* 380 ; *Cowp.* BENNINGTON, *February,* 1831.
823; *Doug.* 155; 2 *Strange,* 1042. In the state of New York
their statute-makes it *conclusive.*—1 *Johns.* 91. 4. But it is said Raymond *vs.* Southerland et al.
this doctrine ought not to be applied against the surety. We
contend it well applies, and that it is so settled by two adjudged
cases.—1 *D. Chip.* 39 ; 1 *Vt. Rep.* 253, above cited.

III. On principle it must be so. The condition of the bond
is, that the principal shall remain on the liberties of the yard, un-
til " lawfully discharged." They both stand on the same floor,
and what will discharge *one* will discharge the other ; both having
assumed *one* and the same *joint responsibility.* The very object
of taking bail is, that he should answer for the *default* of the prin-
cipal. And every party, who procures any proceeding at law,
must, at his peril, see that those proceedings are regular. If they
are not, the bail must be equally responsible with the principal.

The case of *Hubbell* vs. *Dimick* is not opposed by the case of
*Simms et. al.* vs. *Slacum,* 3 *Cranch,* 300. In that case, it is
true, the Court decided that the *fraud* of the insolvent, in obtaining
his discharge, does not vitiate it. But that case is decided on
the ground, that a judgement obtained by the fraud of the party,
is not *absolutely void,* and that all acts performed under it are
valid as it respects third persons.

*Argument of defendant's counsel.*—On the part of the defend-
ants, we insist that the certificates are *conclusive,* as to facts
which they contain ; and are *all* the evidence which the statute
has provided to establish the facts of a legal discharge. These
are placed in the hands of the debtor and sheriff for their protec-
tion against the creditor.—*Bray. Rep.* 199, 200 ; 1 *Johns.* 92 ;
1 *Caines,* 249 ; 3 *Cranch,* 300. The form of these certificates
is prescribed by the statute, which requires the fact to be certified,
whether the creditor was, or was not, notified—whether he did,
or did not, attend, as well as the fact that the oath was adminis-
tered—and must be as strong evidence of the one fact as the oth-
er. No other evidence is contemplated by the statute. The
commissioners have no clerk—are not required to keep any record
of their proceeding—or even preserve their files.

*Again.* To require sureties to furnish evidence, beyond the
certificates, would be requiring more than they are bound to *pro-
fert,* and more than the commissioners are bound to give ; and in
many instances would be requiring an impossibility.

But in the present case, the antecedent process is set forth, to-
gether with the service, in strict compliance with the statute, and

Bennington,is not denied by the plaintiff's replication : hence no proof of any kind could be necessary.

*February,*
*1831.*

Raymond
*vs.*
Southerland
et al.

*Again.* Equally absurd is the idea of admitting evidence on the part of the creditor, to contradict the certificate, and show a want of notice. Cases may, and often do, arise, where notice cannot be inferred from the officer's return, and notice is proved by *parol* before the commissioners. In such case, after a lapse of time, this fact would not be susceptible of proof, in any other way, than by the general averment in the certificate, that the creditor " *having been duly notified.*" As well might the creditor come into court and disprove that part of the certificate, which declares the oath was administered to the debtor.

It is further insisted, in the present case, that, if the plaintiff's testimony had been admitted, it could not have entitled him to recover. The debtor had done all in his power, to entitle himself to the oath ; all that the statute required of him.

The plaintiff should be estopped from denying his residence in Manchester. He treated that place as his residence for the purpose of bringing the debtor there for trial and judgement ; dates his execution there, calling himself *Samuel C. Raymond* of Manchester ; and if it be a sufficient residence for these purposes, it must be, also, for all the purposes of the debtor. Where else should the commissioner send his citation ? If a creditor see fit to leave his residence between the time of issuing execution and the citation, it is his own fault, and he could not be entitled to any notice. At all events, the copies left with his known agent must be good notice. Any other doctrine would sanction the grossest fraud, on the part of the creditor, towards his imprisoned debtor.

It has been held on demurrer, that the antecedent process must be set forth in the plea ; but, when this is done, it is but inducement, and the taking the oath is the gist of the proceedings ; and, should issue be taken on the fact of notice, the certificates prove that as well as the other facts, which it states.—1 *Vt. Rep.* 253 ; *D. Chip. Rep.* 37. In the cases last cited, it appeared from the pleadings, that the courts of jail delivery were acting without jurisdiction. And the decisions seem to be in perfect harmony with the doctrine laid down in the case of *Smith et al.* vs. *Quinton, Brayton,* 200, where the certificate was regular upon the face of it. See also *supplement to Viner,* 264, *Moody* vs. *Thurston ; same case,* 1 *Str. Rep.* 481.

There can be shown no good reason, why the *certificate* of jail commissioners should not have the same validity as that of a sheriff,

clerk, or any other officer, whose duty it is to certify any particu‑
lar fact under his office oath.—4 *Mass. Rep.* 478, *Slayton* vs.
*Chester ; Brayton's Rep.* 85, *Hawks* vs. *Baldwin et al.*

At all events, it is believed the Court will not grant a new trial
to the plaintiff, where the whole amount of his damages claimed is
not sufficient to defray the expense of such trial, and where it is
manifest, that substantial justice has been done.—1 *Aikens' Rep.*
53, *Ross* vs. *Bank.* This suit stands between creditor and surety,
without any equitable considerations in favor of the plaintiff, more
than the defendants, so that, if any principle can be brought to
bear in favor of the defendants, they are entitled to its benefit.

HUTCHINSON, C. J., after stating the case, delivered the opin-
ion of the Court.—The members of the Court are not exactly
agreed, with regard to the principal point intended to be submitted
to us by the parties ; yet are agreed in the final disposition of the
cause.

The issue joined by the parties seems to embrace the question,
whether the creditor, *Raymond,* had notice of the complaint and
citation, and an opportunity to appear, and object to the debtor's
being admitted to take the oath. The exceptions to the decisions
on trial present two questions, that have now been argued.
The defendants produced no testimony, except the certificate,
to prove the issue on their part ; and the court considered this
conclusive, and excluded the evidence offered by the plaintiff ; and
seem to have excluded it on the ground that the certificate was
conclusive. Whether this be conclusive, as an abstract question,
and in one view here presented, I am unable to concur with my
brethren in opinion. I perceive no necessity, in this case, nor any
other, of losing the analogy of well settled principles, when the
analogy is obvious. When a sheriff justifies an alleged trespass
by showing a regular execution from a court of competent jurisdic-
tion to issue such execution, and showing that he acted within its
mandates, he makes a good justification, without producing a tran-
script of the record of the judgement. But, if the creditor is
obliged to justify the same trespass, the execution is of no avail
to him, unless accompanied with the transcript of the record of
the process and judgement. To this he was a party, and for its
regularity, so far as could affect the jurisdiction of the court, which
rendered the judgement, he is responsible. I consider if the
sheriff were sued for an escape, the certificate, lodged with him,
would be sufficient of itself ; for the sheriff is under no obligation

Bennington,
February,
1831.

Raymond
vs.
Southerland
et al.

to look further than the certificate. But, if the creditor could prove, that there never was any complaint, nor citation, nor notice to the creditor, so that the commissioners could have no jurisdiction to act upon the subject, and that all this was well known to the sheriff when he received the certificate, this proof should remove from the sheriff all benefit of the certificate. If he knew the whole to be a false and fraudulent management to discharge the debtor, he ought not to connive at it, nor let the prisoner go. This suggestion is not wholly without authority. The case of *Adams* vs. *Mattocks*, very shortly reported in *Brayton*, was decided when Messrs. Aldis, Skinner and Fisk composed the court, if I mistake not. That was an action for an escape. The defence was, that the prisoner was regularly admitted to the poor debtor's oath before the escape. The facts were, that an idea was generally prevalent, that a prisoner might be admitted to the oath, without notice to the creditor, unless such creditor lived in the county, or had an agent there. The prisoner was committed, and forthwith made his complaint, and was admitted to the oath without notice, the creditor living in another county, and having appointed no agent in the county where the prisoner resided. The certificate showed that no notice had been given. The Court decided, that these circumstances afforded no excuse for not notifying the creditor ; and held the sheriff liable for the escape. Here the sheriff was informed, by the certificate, that there was no notice. But, if the certificate had shown notice in the usual form, and the sheriff knew that the prisoner was committed and discharged on the same day, when the law required twenty days' notice, such a false certificate, known to him to be false, ought not to vary his liability. In the case before us, the sheriff is not sued. This suit is upon the bond, which is in form a security to the sheriff against any escape ; but by law it is, in all its substance, a security to the creditor, that the debtor shall remain within the prison limits till the debt is paid, or till he, in some way, is lawfully discharged. The discharge relied upon, in defence of the suit upon this bond, is one procured by the debtor from the commissioners of jail delivery. He produces their certificate, in the statute form, that he had made application ; that the creditor had been duly notified, and that the prisoner ought to be discharged. Now the commissioners had no jurisdiction to act upon this subject, until a written application to them by the debtor, followed by their citation, and service made upon the creditor by a copy, as in cases of writs of summons. The argument, however, is, that

this certificate is conclusive proof of all these prior proceedings. <span>BENNINGTON,<br>*February,*<br>1831.</span>

The statute has attached no such consequence to this certificate. It must be given by construction, if in any way. Why not attach such consequence to the recital of a judgement in an execution? It is so done in case of the officer, as before suggested; but never as regards the creditor. He must produce the transcript of the record of the judgement; and that cannot be read, unless accompanied with a copy of the writ and service, which would show the parties to the judgement regularly before the court. <span>Raymond<br>*vs.*<br>Southerland<br>et al.</span>

Against this is urged the want of records of the doings of the said commissioners of jail delivery. No law requires them to make records. Suppose we treat this certificate as the record of their judgement, or as a certified transcript of that record; what hinders the production of copies of the complaint, citation and service? That these, or the originals, are not to be had, in matters of recent date, is not a supposable case. There is a further answer to this suggestion. There never was any law in this state, till the year 1821, requiring a justice of the peace to keep, or make, any record of his proceedings; none, that said any thing about his preserving his files. Yet, from the dawn of our jurisprudence, no judgement of a justice of the peace could be proved before any of our judiciary tribunals, without a regular copy of the judgement, and of the foundation process. And, during all that time, as now, the sheriff could justify by his execution only. That he was bound to obey, and by that he must be justified. If there be actually any difficulty of proof for want of records, in this case, I would apply a different and safe remedy; safe at least for the debtor. I would treat this certificate as only *prima facie* evidence of notice; and let the creditor bear the burden of resorting to the files and records of the jail commissioners, and proving the real facts about notice. The statute expressly requires six days' notice to the creditor. The necessary inference of law, and one supported by judicial decisions in analogous cases, is, that proceedings without any notice are wholly void. If a case should happen, that a debtor in prison, by fraud, accident or mistake, obtains a certificate, when the creditor has had no notice; say there is a service made upon some other person of the same name as the creditor; or there is no pretence of any service, and no return whatever upon the citation, and this overlooked by some carelessness of the jail commissioners; in any such case, should the debtor leave his certificate with his bail, and be off, a decision, that this certificate should legalize proceedings, so

BENNINGTON,
February,
1831.

Raymond
vs.
Southerland
et al.
illegal and void, beyond the reach of any remedy for the creditor, is one to which I cannot subscribe.  I would at least let him prove them thus void, and restore his remedy.

While the hardship of the defendants is urged, they being bail only, I need only observe, that the bail has undertaken for the principal, and become jointly and severally holden with him ; and, if the principal debtor has committed a breach of the bond, that is the very and only thing, that should, and does, fasten the debt upon the sureties.   The debtor can do nothing, without the concurrence of the creditor, that would discharge his bail from a suit upon the prison bond, but what would discharge himself also.

The defendants' counsel have cited a case from *Cranch*, in which it was decided, that a discharge of this character is a bar to any action upon the prison bond, though such discharge was obtained fraudulently.   It must be noticed, that the proceedings, and notice, and certificate of discharge, in that case, were all perfectly regular.   The fraudulent procuring was the debtor's false swearing on the hearing of the merits, and taking the insolvent oath.   He thus became liberated from his imprisonment. The statute in that case, like our statute, enacts, that the debtor thus swearing falsely shall take no benefit by the proceeding. The Court decided, that no action lay upon the bond, while that discharge remained in force, but the debtor was liable to be again imprisoned for the same debt.   That decision can be supported upon the well settled principle, that a judgement is binding upon those who are parties to it, while it remains in force.   Third persons may attack collaterally, in certain cases ; but a man who would avoid the force of a judgement to which he is party, must institute process to reverse it, or set it aside and obtain a new trial. If we are told, that there is no method thus to set aside the decision of jail commissioners ; in such a case, of a discharge procured by perjury, a court of chancery would readily enjoin the debtor from using such discharge; and, if the bail had in no way connived at the iniquity, the discharge might be left in force for his use.   We must not lose sight of the distinction between a wrong decision of the commissioners, by reason of fraud or ignorance, on the merits of a case, where the parties are regularly before them, and a decision that may be just upon the merits, in a case not so brought before them, as to give them jurisdiction.   In the former case, it is valid till set aside.   In the latter, all is void ; and the party injured ought at least to be permitted to show this irregularity and avoid the force of the decision.   Thus should it

be, so far as relates to the parties, the creditor and debtor ; not forgetting the exception, already mentioned, in favor of a sheriff, who discharges his prisoner, on receiving a certificate, apparently regular, and which he has reason to suppose was regularly obtained. In such case the remedy of the creditor would not be upon the sheriff; but upon his debtor, by action of debt, or *scire facias,* on his judgement.

My brethren seem to consider my views opposed to the current of decisions in this state. All the decisions were reviewed in the case cited by the plaintiff's counsel, decided in this county two or three years since. I allude to the case of *Hubbell* vs. *Dimick et al.* That opinion was announced, in all its substance, if not its form, as reported, and now before us; and I considered that the members of the Court then present were perfectly agreed in that opinion. I had no intimation to the contrary. In that case, the defence was overruled ; the board of commissioners being composed of persons, who might have jurisdiction, if the facts would warrant; but, as the facts were in that case, they had no jurisdiction.

As the counsel have labored this question, it was deemed proper to express our views upon it. Yet I view it rather as an abstract question, than as one upon which the action must turn. The plaintiff's plea sets forth a regular complaint, and citation ; and a service of the same by the sheriff of the county, describing that service with great particularity, as has already been noticed. The plaintiff's execution described him as of Manchester. The sheriff left his copy at the then known residence of the plaintiff in said Manchester, in the hands of the plaintiff's son, a person of sufficient discretion, then resident therein, and the known clerk and agent in the business of the plaintiff. This return shows a service in all respects regular and perfect, except its not mentioning the absence of the plaintiff, as a reason for leaving the copy with the son. Whatever might have been the result of a plea in abatement, urging this defect, it surely is not a defect, that can render the proceedings void. To avail at all, it must be urged by a plea in abatement. This plea, after stating the proceedings thus far, adds the decision and certificates of the commissioners. All this presents a legal discharge, a full defence to this suit upon the bond. How, then, is this met by the plaintiff ? He does not traverse any one of these facts. His replication affects none of these facts, except that which supposes the residence of the plaintiff to be in Manchester. The replication attempts to show,

BENNINGTON that Manchester was not the place of the plaintiff's residence in *February,* such a sense, that the copy should have been left there. For
1831. such a sense, that the copy should have been left there. For

Raymond that, though the family of the plaintiff remained at Manchester, he
*vs.* was established in business at Bennington in the same county, as
Southerland et al. cashier of the bank there, and only visited his family occasionally, &c. The parties, at length, join issue upon the question of residence and notice. The defendants read their certificate, and the plaintiff offers to do away its force, by proving the fact of his being established at Bennington as above mentioned. If the certificate were not conclusive for the defendants, this testimony is of no force to do it away. The plaintiff and his family living at Manchester, and suits brought by him describing himself as of Manchester, his going to Bennington himself, as he alleges, and leaving his family at his former residence in Manchester, and leaving his son there also, as his clerk and agent, as alleged in the plea, and not denied, is no such change of residence as prevented the leaving the copy with the son at Manchester. A man's residence is where his family is, unless he has totally abandoned them, or they him; neither of which is pretended in the present case. If the plaintiff had no notice in fact, he must blame his son and agent, who received the copy from the sheriff, and whose duty it was to deliver the same to the plaintiff. We are all agreed, that this testimony was correctly excluded. I am disposed to observe, that the pleadings in this cause are protracted, by declaring upon the evidence. The question should have been presented by a direct allegation, that the plaintiff's residence was at Bennington. Then the question for decision would have been, whether the facts proved, or offered to be proved, supported the issue.

The judgement of the county court is affirmed.

WILLIAMS, J.—We all agree in this case in affirming the judgement of the county court, but our views are not the same as to the effect of the certificate. A majority of the judges present consider the certificate given by the commissioners of jail delivery as conclusive evidence of the facts set forth therein, in that the creditor was duly notified, as well as that the debtor was admitted to the oath.

These commissioners are not constituted a court of record, and they are not required to keep any record of their proceedings. On application to them they are to issue a citation to the creditor, and when they administer the oath they must give two certificates, one to the imprisoned debtor, and the other to the keeper

BENNINGTON,
February,
1831.

Raymond
vs
Southerland
et al.

of the jail, and it is their certificates which entitle the debtor to his release from jail. When the one directed to the keeper of the jail is delivered to him, if it is in regular form and from a board having jurisdiction, he is bound to let the debtor depart out of his custody ; or if the debtor is within the limits, he may depart, and neither his bail nor the sheriff have any further control over him. And it is difficult to conceive how a departure from the prison or the liberties, under the licence or authority of a tribunal constituted for the express purpose of determining upon the propriety of giving such licence, and regular upon the face of it, can subject the person departing, his bail, or the sheriff, to any liabilities in consequence of such licence being improperly granted.

But if we consider the board of commissioners as a court, the reasons for considering their certificate as conclusive of the facts set forth therein, are still more forcible. It is their duty to give notice to the creditor, and they must decide upon the sufficiency and regularity of the notice. It is a principle which applies to all judicial tribunals, whether superior or inferior, that their judgements, in cases within their jurisdictions, are conclusive, and cannot be impeached collaterally. As it is the province and duty of these commissioners to determine whether the creditor has been notified, if they adjudge that he has been, and grant their certificate accordingly, their judgement in this particular cannot be questioned.

If they undertake to decide that notice in a particular case is not necessary, or if they decide that notice to a person other than the creditor is sufficient, and this appears upon their certificate, the certificate itself may be void, and no protection to the debtor : but if they directly certify that the creditor has been notified, I know of no way in which their judgement can be questioned.

The county court have to decide frequently whether notice to a defendant who was out of the state at the time of service is proved. This Court have to decide, in cases of divorce, whether the residence of the party petitioning is proved. In neither case can their decision be questioned elsewhere. The same reason which forbids that their judgements in this particular should be reexamined before another tribunal, applies to the determinations of the commissioners of jail delivery.

The danger of having this subject open to discussion has very great weight with me. The commissioners are called on to adjudge whether a citation is regularly served ; they determine that it is, and proceed to administer the oath to, and discharge the

BENNINGTON,
February,
1831.

Raymond
vs.
Southerland
et al.

imprisoned debtor. It would be manifestly wrong to subject the debtor or his bail to a large amount because another tribunal thought their decision erroneous.

But this question has been fully settled. The decisions in this state have been more uniform upon this subject than upon any other. The cases of *Childs* vs. *Morse* and *Osgood, 2 Tyler,* 221 ; *Brush* vs. *Robinson et al. do.* 358 ; *Adams* vs. *Mattocks, Bray.* 199 ; *Thornton* vs. *Robinson* and *Howard, do.* 199 ; *Smith et al.* vs. *Quinton, do.* 200, are direct authorities upon this point. Judge PADDOCK, in giving the opinion of the Court in a case decided last winter, of *Haight* vs. *Richards et al.\** expressed the same opinion. And from a conversation I have had with the late Chief Justice PRENTISS, I know his opinion to be that the certificate is conclusive evidence of notice. His opinion delivered in the case of *Hathaway* vs. *Holmes,* (1 *Vt. Rep.* 405,) is to the same effect, and so is the decision of the Supreme Court of the United States, in the case of *Simms* and *Wise* vs. *Slacum,* 3 *Cranch,* 300.

I cannot consider the case of *Hubbell* vs. *Dimick,* as in any way overruling these authorities. That case does not determine of what the certificates are evidence ; but it appears to me that both the want of jurisdiction and notice appeared on the face of the certificates. All that the Court was required to decide was, that if a judge of the county court is called on to act as a commissioner of jail delivery, and grants a certificate, the reason of his being so called should appear in the plea setting forth the proceedings of the commissioners. The general jurisdiction of all cases of that kind is given to the commissioners ; and if a judge takes the place of a commissioner for the reasons pointed out in the statute, the reason of his so taking the place should be set forth in a plea, to shew that he has jurisdiction. The Court were also, by that case, required to decide that service on a person other than the creditor named in the execution was not in conformity to the statute. The correctness of these decisions cannot be questioned. They were warranted by the case of *Adams* vs. *Mattocks,* before mentioned, and are recognised to the full extent of what the Court were required to decide. And no case is an authority any farther. I apprehend the decision in the case of *Hubbell* vs. *Dimick,* does not conflict with the authorities before cited, but is rather in accordance with them, and leaves the decision unshaken, that the certificates given by the commissioners of jail delivery, if in regular form, are conclusive evidence of the facts therein set forth,

*Ante, page 77.

and cannot be questioned collaterally in any other action. Judges Royce and Thompson concur in this opinion.

Thompson, J., said he yielded to the weight of authorities, in favor of the opinion expressed by Williams, J., but upon principle, aside from the authorities, he agreed with the Chief Justice.

*Bennet & Aiken,* for plaintiff.

*Sargent,* for defendants.

———————

Abner Hill et al. appellees *vs.* The Town of Sunderland appellants.

The section of the statute of 1828, which allows an appeal from decisions of the road commissioners, made before the passing of said statute is unconstitutional and void, as respects the damages and costs awarded to individuals.

The appellees were petitioners to the road commissioners for the laying out of a public highway through the town of *Sunderland.* The highway was laid out, and cost taxed in favor of the petitioners against the town of *Sunderland*; and the survey of the road was regularly recorded. All this was done as early as September, 1828. On the thirtieth of October, 1828, the legislature passed an act, allowing an appeal, in certain cases, from the decisions of the road commissioners ; and one section of the act allowed an appeal from decisions already made, if applied for within ninety days from the passing of the act. Under this section, the select men of *Sunderland* entered their appeal to the county court. The counsel for the appellees filed their written motion, praying the county court to dismiss the appeal, and take no further cognizance of it. The county court overruled this motion, and appointed a *committee* under the directions of *said* new act, and according to the request of said appellants. The appellees filed exceptions to this decision, which were allowed,and the question directed to pass to the Supreme Court for a rehearing.

*The counsel for the appellees.*—1. By the act of 1827, the commissioners are required to make personal inspection of the subject matter of the petition, and "to adjudicate and make order thereon, *which shall be final and conclusive ; and to tax costs for the successful party,*" and issue execution therefor. The adjudication and decision of the commissioners laying the road, their assessment of damages, their taxation of cost, indeed, all their acts, under this statute,

BENNINGTON,
February,
1831.

Hill et al.
*vs.*
Sunderland.

were final and conclusive. By these proceedings of the commissioners, the several land owners were immediately vested with a right to recover their damages, the petitioners freed from a liability for costs, and vested with a right to the costs taxed, and *Sunderland* charged with the payment of these damages and cost. By the law then in force these rights and liabilities were *conclusively fixed.*

2. Any act, subsequently passed, authorizing these rights to be divested, is retrospective in its operation and void.—*Bates* vs. *Kimball,* 2 *D. Chipman's Rep.* 77 ; 7 *Johns. Rep.* 502 ; 2 *Aikens' Rep.* 284. The effect now attempted to be given to the act of 1828, we claim, comes within this principle. And, in this respect, it is analogous to acts granting appeals and new trials in special cases, where, by the general law, no such rights existed. —See 1 *N. H. Rep.* 199.

3. But it has been said, that, though the legislature could not, by a subsequent act, divest individuals of rights acquired under the act of 1827, yet, so far as the interest of the public is concerned in the right of way, and in the continuance of this *easement,* effect may be given to the act of 1828, in this case. Grant that the *easement* is at all times under the controul of the public, and may at any time be discontinued at their option ; still it is perfectly apparent, that a bare discontinuance of the *easement,* was not the object of the act of 1828 ; and, as we think, cannot be its effect. This could have been done, by calling out the commissioners in the ordinary course of proceedings, for that purpose ; or, perhaps, by an act of the legislature, going only to a discontinuance of the public highway. The object of calling out the committee under this appeal is, to *revise the adjudication and decision* of the commissioners, and to affirm or reverse it as they shall think the public good requires. The committee, on appeal, are required by the act, " *in all cases to tax cost to the successful party."* In case of a reversal of the decision of the commissioners, the committee must therefore tax costs against the petitioners, who were before entitled to costs. And the necessary consequence of such reversal must be, to *vacate* and *annul* the judgement of the commissioners, awarding damages to the land owners and costs to the petitioners. Another consequence of such reversal would be to protect *Sunderland* from paying damages and costs, assessed and taxed by the commissioners, if not paid, and to entitle the town to recover back the monies if collected.—*Feltham* vs. *Terry, B. N. P.* 131 ; *Cowp.* 416 ; and 1 *D. & E.* 387 ; *Lazell*

vs. *Miller*, 15 *Mass. Rep.* 207.   These, at any rate, would be the legitimate consequences of a reversal on an appeal taken from the decision of commissioners, made since the passing of the act of 1828 ; and we cannot perceive why they would not be in the present case.  But one course of proceeding is pointed out for the two cases.

BENNINGTON,
*February,*
1831.

Hill et al.
*vs.*
Sunderland

It is further to be remarked, that the public has no pecuniary interest whatever in this proceeding.   The only certain interest is between the *parties ;* to wit, the *petitioners* and the *town* of *Sunderland.*   In a certain event the land owners acquire a *pecuniary interest* in the proceedings.   And here the event had happened, and the interest accrued, prior to the appeal.   We think it quite clear, that this appeal cannot be sustained, so as to divest and jeopard the *vested pecuniary* interest ; and in what way these rights shall be secured, and the appeal permitted to go on, so that it shall affect the public interest, alone, without touching the private rights, we are unable to devise.

*The counsel for the appellants, contra.*—It will probably not be denied, that the whole subject of public highways is exclusively under the control of the state ; and that, in all cases, the legislature has power, either directly, or through the instrumentality of its agents, to direct the laying, opening, repairing, making and discontinuing,any and every highway in the government.   No one can doubt but this authority must rest somewhere ; and where will it be found if not in the legislature ?  The public roads, which have, at any time, been laid under the authority of the legislature, are constantly and daily altered and discontinued, under the same authority ;  and no  one ever doubted the right.   If roads, already laid, made and improved, may be thus altered or discontinued, surely such, as have not been made, may be discontinued and forborne.   As to the form or manner of effecting this end, it cannot be material, whether it is done by petition direct to the court for that purpose, or by appeal from the road commissioners.

It may be urged, that the cost allowed and taxed by the road commissioners, and the damages assessed to the proprietors, through whose land the road is laid, were, by the decision of the road commissioners, according to the then existing law, finally determined, and that no subsequent statute can affect them.  We submit, whether the right of the petitioners and proprietors, arising under the decision of the road commissioners, is involved in the question before the Court.   The commissioners are presumed to

BENNINGTON,
February,
1831.

Hill et al.
vs.
Sunderland
have done their duty, in making orders for damages, and issuing executions for costs—and whether, if the money has been paid, it may be retained, or, if not paid, it may be recovered, may or may not be the subject of future enquiry between the parties.

Admitting the legislature have not the power to vacate the orders or the executions, or to direct the money refunded, if paid, (upon which, it is to be noticed, the act is entirely silent,) yet there can be no objection to the appeal. If the town be remediless, as to their damages and costs, and are disposed to submit to this evil, they ought not to be deprived of the privilege of attempting to show the injustice of subjecting them to a greater evil, in being compelled to make, and maintain, a useless road. But, if the consequences should be otherwise, it is insisted that the law is not unconstitutional, as opposed to the construction of this or the U. States.

It is not an *ex post facto* law, in as much as the subject matter has no reference to crimes and misdemeanors. It is not a law *impairing the obligation of contracts* ; as no contract can be affected thereby. It is indeed intimated, in the opinion given in the case of *Bates* vs. *Kimball, 2 D. Chip. Rep.* 77, that a judgement of a court is a contract of the nature contemplated in the constitution. This is unsupported by any authority, and opposed to the opinions of the most enlightened jurists. The decision, in that case, does not rest upon that ground. That principle is not alluded to in the case of *Staniford* vs. *Barry.* The term *contract,* in the constitution, is to be understood in its ordinary acceptation, and may apply to covenants, agreements, grants and undertakings, in which the mind and will of the parties are supposed to have been exercised. Chief Justice *Marshall* and judge *Washington* define it to be *a compact between two or more parties.* It is not perceived how the act in question can be regarded as the exercise of judicial power, or of individual legislation ; *that is,* an attempt to give to, or take from, particular individuals, rights and privileges to the exclusion of all others in like circumstances The law is general in its application to all cases of the like nature existing in the state. Is the act retrospective in its operation, and are vested rights thereby changed or affected ? Although some acts, having this effect, have been severely censured by judges of courts, yet, it is believed, no case is to be found, in which a statute has been held void upon this principle alone. Neither the constitution of this state, nor of the U. States, imposes any restraint upon the legislature in this partic-

ular.   Many laws of this character are to be found in every stat-
ute book, and some the most salutary.   No restraint of this kind
would be safe.   The people have left the subject to the discretion
of their representatives.   If the law is general in its operation, not
confined to individual rights in the nature of a sentence, order or
decree, there can be little danger of oppression.

The following are some of the acts of this description, and have
never been questioned, and by which courts have been uniformly
governed.   The statute of 1797, converting all joint tenancies in-
to tenancies in common.   The statute of 1823, authorizing the
discharge of persons imprisoned for tort.   All the acts relating
to betterments.   The act of 1804, directing recording officers
in their office and duty.   The various acts, legalizing the
proceedings of public officers.   The statute of 1809, suspending
process, &c., *page* 103.   The statute of 1822, authorizing re-
views, &c., 2 section.—4 *Con. Rep.* 209, *Goshen* vs. *Stonington.*

[A case was argued in Addison county, and one is pending in
Windham county, in each of which the same question, of consti-
tutionality of this section of the statute, is raised ; and the Court
concluded to postpone a decision in each till all were argued.
The one at Windham county was argued during the following week;
after which the justices, all being together at Woodstock, arrived
at the conclusion contained in the following opinion, WILLIAMS, J.,
dissenting.]

HUTCHINSON, C. J.—It is a conceded point, that public high-
ways, so far as regards those interests, which are common to all
the citizens, are subject to the control of the legislature, and may
be altered or discontinued by force of statutes, from time to time
enacted.   But the appellees contend, that their individual inter-
ests are affected, in this case, and, therefore, that the section
in question has an unconstitutional operation upon these interests.
The parties, in argument, seem to consider this section necessa-
rily either constitutional and binding, or unconstitutional and void.
This view is correct, if there is no distinction in the cases, upon
which it may operate.   That is, if all these cases alike involve the
interests of individuals, or alike the interests common to commu-
nity.   The road commissioners have no power to lay out a road,
till they receive a petition for that purpose, signed by a given
number of freeholders.   Then a citation issues to, and is served
upon, the towns interested, or who would be liable to make the
road, if laid out by the commissioners.   The commissioners in-

BENNINGTON spect the rout, and decide, whether to lay out the road or not. If
*February,*
1831.      they lay it, they tax costs for the petitioners against the towns,
————        and issue execution for the same.  If they decide not to lay the
Hill et al. road, they tax costs for the towns against the petitioners, and issue
*vs.*       execution for the same.  Again, if they establish the road, they
Sunderland  make order for the towns to make and open the same by a given
time.  If not then made, they fix the sum necessary to be expend-
ed in making the road, and issue execution for the same.  Again,
if they assess damages for any individual, through whose land the
road runs, they make order for the town to pay it, and, if neces-
sary, issue execution against the towns for the same, in the same
manner as the county courts could before do in cases before
them.  And whatever the road commissioners do in all these par-
ticulars, under the statute of 1827, is final and conclusive.  The
words of the second section are very emphatical.  " The said
road commissioners shall make personal inspection of the subjects
of the petition made to them, and adjudicate and make order there-
on, which shall be final and conclusive, and shall tax costs for the
successful party, in the same manner as are now taxed by the
county court, and issue execution therefor ; and all orders, judge-
ments, assessments of damages, and taxation of costs, by said
road commissioners on petitions before them, shall be as conclu-
sive as could, heretofore, be made by the county court."

Under the faith of this statute, the appellees became petition-
ers for the laying out of a road ; the road commissioners proceed-
ed regularly, and laid out and established the road, according to
the prayer of the petition ; and taxed costs for the petitioners
against the town of *Sunderland,* and, also, made an order for
said town to open and make said road by a given time.  These
proceedings all appear regular, and were all completed as
early as September, 1828.  The appellees were then as fully en-
titled to their execution for their costs, as if they had recovered
the same before the county court, and they were, also, as fully
absolved from all liability to pay costs to the town, as if they had
such judgement in their favor before the county court, under the
former system.  On the thirtieth of October, 1828, the act pass-
ed under which this appeal was taken.  The statute gives no ap-
peal to the petitioners if they be ever so much aggrieved ; but makes
a general provision for towns, that may be dissatisfied with the
laying of the road, and the individuals aggrieved by the assess-
ment of damages, to appeal, within twenty days, to the county
court, who shall, at their first session, appoint a committee of three

BENNINGTON,
February,
1831.

Hill et al.
vs.
Sunderland.

judicious and disinterested freeholders, who shall be sworn, &c. This statute points out the duties and powers of this committee, which, so far as pertinent to the case under consideration, are as follows : " They shall have power to reverse or affirm the decision of the road commissioners, as the public interest shall require ; and in all cases of an appeal, their decision shall be final ; and they shall tax cost for the successful party." Then, in the sixth section, this statute gives the same right to either party, to appeal in all cases, where roads had then been laid under said act of 1827, and had not been made ; provided, said appeal be applied for within ninety days after the passing of said act.

Under this statute, which clearly undertakes to give the right in a case like the present, the town of *Sunderland* took this appeal. And, if the committee, appointed by the county court, should reverse the proceedings of the road commissioners, and if this statute is operative as applied to such case, instead of the appellees collecting and retaining the costs awarded them by the road commissioners, the town of *Sunderland* must recover their costs against these appellees. The effect of the statute would then be, to provide a course of proceedings, by which a judgement, final and conclusive between the parties long before the statute had existence, might be reversed, and the opposite party recover costs. The very supposition, that a statute could have such a deleterious effect to unsettle controversies, long settled according to existing laws, exhibits the doctrine of nullification in a form by no means pleasant or useful. As well might a succeeding legislature create a statute provision for the proceedings of this last committee, long before rendered complete, to be carried before the Supreme Court, for the appointment of another committee with dernier powers of reversal. I ought not to use the word *dernier*. Upon this principle, nothing would be dernier, but the loss of faith in our government. From this there would be no appeal, that would restore the confidence of our citizens. As well might the legislature have passed a law, at the same session, granting new trials, before new panels of jurors, in all actions tried by jury, for the year next preceding. The judgements, in all those cases, were no more final between the parties, than was this judgement in favor of the appellees, and against the town of *Sunderland*, for their costs. We might say the same of all judgements, rendered by single magistrates, in any given year : so of all judgements rendered by any courts whatever ; and that, whether on trial or by default. The truth is, there must be an

PPP

BENNINGTON,
February,
1831.
Hill et al.
vs.
Sunderland

end of strife, somewhere. And where will it be, if not when a judgement is recovered, which is final by the laws then existing? What, indeed, makes a judgement final, but its being declared so by the laws then existing? Now the terms of the road commissioner act, of 1827, render their doings under it as final and conclusive, as any laws whatever render the judgements of the county court, or even of the Supreme Court. Upon the faith of this statute, the appellees became petitioners before said commissioners, which, in a very substantial sense, was commencing an action against the town of *Sunderland.* This, while no other law intervened, they prosecuted to final judgement. They might well rely upon the faith of government to protect this judgement, when obtained. They might well rely upon the stability of our judiciary, to protect such a judgement against any later statute, so framed as to effect it.

In this Court, at several different periods, the cases cited, of *Bates* vs. *Kimball,* and *Ward* vs. *Barnard,* and *Staniford* vs. *Barry,* and others, not reported, adopted the same principle; though they differed in this, that the statutes then in question were made for the particular cases, and were not general laws. Still the grand principle relied on was, that those statutes affected individual rights, already so established, that the legislature could not intermeddle with them. Statutes, which grant individual relief, are not, for that reason, void. It is their taking rights from other individuals, that renders them void. A general statute, with this effect, is void also.

Had this statute only made provision for the discontinuing of this road, on the terms of the costs taxed for the appellees being paid, and the appellants, recovering no costs, its operation would have been to affect the public, and the appellees as a portion of the public, on one part, and the town of *Sunderland,* on the other. No individual could complain that his private interests were invaded. But, in this case, if the new committee decide favorably to the appellants, the law attaches the consequence, that the appellees lose the costs they had fairly recovered, and must have execution against them for the costs of the other party.

The road commissioners always have power to·discontinue a road, in the cases within their jurisdiction; but, in doing this, they cannot reverse their former decision with regard to costs. They can relieve the town from the claim of the public, but cannot discharge the debts the town may owe individuals, without providing for their payment. Much more is it out of their power, to turn those debts about, and make them become debts due from those

individuals to the town. The statute of 1828 undertakes to give these extraordinary powers to the new committee. This is not the proper business of legislation; it exceeds the authority of the legislature. I have no idea that the legislature intended to convey such power. While they intended this new committee should have power to act between the public and the several towns, with regard to the road itself, they, probably, lost sight of the consequences to individuals, which the former part of the act attaches to their doings, in cases then past. Those who made application to the road commissioners to lay out roads, after the act of 1828, knew they were subject to this right of appeal; and it is what they must risk. But not so of those, who made their application, and got their business completed, while there was no such statute.

The observations apply with equal force, *mutatis mutandis*, to appeals from the assessment of damages. A landholder appeals for the purpose of obtaining higher damages. This claims a new decision upon the same question decided by the commissioners, at a time when no appeal was allowed, and when the statute, then in force, made the decision as final as can be made by any statute. In such a case, the town have a right to object to the operation of such a new statute.

The reasoning here adopted necessarily leads to the conclusion, that the judgement of the county court, which overruled the motion of the appellees to dismiss the appeal, and appointed a committee under the act of October 30, 1828, must be reversed and holden for nought; and

The appeal must be dismissed.

WILLIAMS, J., dissented.

*Bennett & Aiken*, for appellees.
*Skinner & Sargeant*, for appellants.

<div style="margin-left:8em">BENNINGTON,<br>*February*,<br>1831.</div>

<div style="margin-left:8em">Hill et al.<br>*vs.*<br>Sunderland</div>

———————◉————————

CHARLES M. HUNTINGTON *vs.* BENJAMIN BISHOP, trustee of ELIAKIM SPOONER.

<div style="margin-left:8em">CHITTENDEN.<br>*January*,<br>1831.</div>

When a trustee process is sued out under the act relating to absconding or concealed debtors, the writ must be served on the principal debtor by leaving a copy thereof at the house of his usual abode, or at his last and usual place of abode within this state; otherwise, the process will abate.

And such copy must be left, though the debtor has not resided in this state for a number of years, and has no place of abode within it.

In this case the writ directed the officer " to summon *Benjamin Bishop* of Richmond, trustee of *Eliakim Spooner*, late of Rich-

CHITTENDEN
January,
1831.

Huntington,
vs.
Trustee of
Spooner.

mond, an absconding or concealed debtor." The further direction required by the statute, commanding the officer to leave a copy of the writ at the last and usual place of abode of the absconding debtor, was not inserted in any part of the writ. The writ was properly served on *Bishop*, the trustee, but no copy was left at the last and usual place of abode of the principal debtor, *Spooner*, nor any service whatever made, as to him. The trustee appeared and pleaded in abatement the want of service on the principal debtor; and the plaintiff replied, " that *Spooner* had no " place of abode within this state when said writ issued, nor at " any other time afterwards; nor was he then, nor has he any " time since been, within this state; nor has he, for the last " five years next preceding the issuing of said writ, resided in this " state, nor had any place of abode within it; nor has he ever " had any family in this state." To this there was a demurrer.

After argument, *the opinion of the Court was delivered by*

WILLIAMS, J.—The trustee, in this case, pleads in abatement of the plaintiff's writ, that no service has been made on the principal debtor. The plaintiff, to avoid this plea, replies in substance, that the principal debtor, *Spooner*, at the time of issuing this writ, had no place of abode in this state. To retain this process in court, we must either decide that circumstances may exist under which an action may be sustained against the principal debtor without any service, or that the service made in this case may be considered as a service on the principal debtor within the equity of some of the existing statutes on this subject.

The fallacy of the first position will be obvious when we consider the nature of the proceeding against trustees of absconding or concealed debtors. It is a suit between the plaintiff and the principal debtor. The controversy is between them. The process against the trustee is solely for the purpose of securing the debt or demand due from the trustee to the principal debtor, and is extending the same right of attachment to property in action which by the general act is given only as to property in possession. Unless the principal debtor is before the court by some process or service provided for by statute, it is obvious that there is no action depending which can be sustained in court.

This sufficiently appears from every part of the statute. It is provided in the first section, that the process shall be served on the principal debtor, as well as on the trustee; and if actual notice has not been given to the principal debtor, the court are re-

CHITTENDEN
January,
1831.

Huntington
vs.
Trustee of
Spooner.

quired to continue the cause, and direct notice to be given in the same manner as is provided in the 55th section of the judiciary act.

By the fourth section it is provided, that if judgement is rendered in favor of the trustee, that he has no effects of the principal debtor in his hands, no farther proceedings shall be had against the principal debtor, unless he shall have been personally notified of the suit, or shall have actually appeared; and by the providing clause to the fifth section the same provision is made in regard to proceedings against the principal debtor when the trustee has effects to a less amount than his cost. Indeed, in every provision of the statute, it is considered that the principal debtor is the party, whose interest alone is to be affected by a judgement in the action. Nothing short of a positive enactment of the legislature would authorize or justify a court in sustaining a process against any one when there is no legal service upon him, unless that service is dispensed with by an actual appearance.

We will then enquire whether the service made in the case under consideration, can be considered as service on the principal debtor within the equity of any of the statutes made to regulate the service of writs. It has been contended, that unless this return is sustained, there is no method by which service could have been made in this cause, and that it will be sufficient to give notice to the principal debtor by publication, as is provided in the 55th section of the judiciary act. The first consideration cannot be urged to a court. If the statute is defective—if this is a *casus omissus*, it is for the legislature, and not for the court, to supply the defect. The second reason offered is answered by observing that publication in the newspapers, as provided for by the section of the statute before mentioned, is not a substitute for service, but is directed for the purpose of giving actual notice to a defendant when a legal service has already been made, and when a suit is actually depending.

It has also been urged that this proceeding may be compared to a service of a writ of attachment. But in every case where a writ of attachment is to be served by taking personal or real estate, a particular provision is made for leaving a copy with the defendant, or some one connected with him as agent, tenant or attorney. If there is no such tenant, agent or attorney, a copy left with a town or county clerk is in certain cases declared to be a sufficient service. This, however, is deemed to be a sufficient service, *only*, by the express words of the statute; and there is no such provision in the statute relating to absconding and concealed debtors.

CHITTENDEN
January,
1831.
——————
Huntington
*vs.*
Trustee of
Spooner.

Considering the proceedings to be in the nature of an attachment, this writ and service is the same as if the goods and chattels or real estate of *Spooner* had been taken by the officer, and no copy left either with him, his tenant, agent, or attorney. It has also been urged that the trustee is, in contemplation of law, the agent of the principal debtor ; and it is true that by the sixth section of the trustee act, certain duties are laid on him, and he is authorized to appear and defend the principal debtor, if the court shall permit him. But the trustee is not made the agent of the principal debtor for the purpose of receiving any notice required by any of the statutes to be given to the defendant in such suit. And furthermore, the plaintiff in this case has not treated him as such agent by leaving any copy with him as such.

On an examination of all the statutes which have been passed on this subject, we see no difficulty in complying with their requisitions, and in making a legal service on the absconding debtor. The service required on the principal debtor is evidently the same as is to be made on a writ of summons. The direction in the writ which is ordered to be made by the fifth section of the additional act, passed November 10, 1807, contemplates that the copy shall be left at the absconding debtor's last and usual place of abode. Now, in as much as this trustee process is only applicable to those debtors who are concealed within the state, or have absconded therefrom, such debtor must either have, at the time of issuing the writ against him and his trustee, a home or place of his usual abode in this state, or must have had such place of abode at the time of his having absconded therefrom. By comparing the twenty sixth section of the judiciary act with the fifth section of the act additional to the trustee act before mentioned, it will be evident that the writ must be served on the principal or absconding debtor by leaving a copy at the house of his usual abode, or at his last and usual place of abode within this state. When no such copy has been left, there is no service on the principal debtor within the provisions of the statute ; and no reasons can be admitted for dispensing with such service, nor can any process be sustained in court against any defendant, unless he is served with that process in some of the ways pointed out by statute.

Judgement therefore is rendered that the writ abate.

*Briggs,* for plaintiff.

*Maeck,* for defendant.

SAFFORD STEVENS *vs.* THADDEUS TUTTLE.

T, holding a note against S, received of him from time to time sundry articles, with the understanding of the parties that the articles so received should be applied on the note. T refusing to make the application when applied to for that purpose, S brought an action on book-account to recover for the articles so delivered. It was held that the action would not lie, and that S's only remedy was to have his account applied in payment of the note whenever T should attempt to enforce its collection.

This case came before the court on the report of an auditor in an action on book account. It apeared by the report that the plaintiff's account was principally for grain delivered to the defendant in January and February, 1821 ; that at the time the account accrued, it was the understanding of the parties that in the adjustment of the account, it should be applied in payment of a note which *Tuttle* held against *Stevens,* payable in cattle, October 1, 1820, or in grain in January, 1821 ; that previous to the commencement of this action an application was made to *Tuttle* for an adjustment of the account, and an application of it on said note ; and that he neglected and refused to do it.

A judgement was rendered by the county court against the plaintiff, and the cause was reserved for the opinion of this Court.

After argument, *the opinion of the Court was delivered by* WILLIAMS, J.—This case is very near the dividing line between two classes of cases on which the law is well settled. The difficulty arises from deciding on which side of the line it is to be placed.

Nothing can be clearer than that no action will lie to recover money or goods which have been delivered or received in payment of an existing debt, where the party receiving refuses or neglects to make the application. When the payment is made, the debt or obligation is so far extinguished, and it does not depend on the after will or act of the party to whom it is made, to give it the operation intended at the time it was made.

If the party receiving, either denies the receipt of the payment, or refuses to recognise it as a payment on that obligation to which it is to be applied, and seeks to recover the whole amount, the other party is not without the means of redress, but may compel the application whenever the obligation is attempted to be enforced.

On the other side, a debt may be contracted with an understanding that it should be paid in a particular way, either by endorsing on a note, or otherwise ; and if the party refuses to make the payment, an action lies to enforce the payment. Thus, there

Stevens
vs.
Tuttle.

may be mutual dealings between parties, debts contracted on both sides, and a general understanding, that on a settlement one should be set off against the other and the balance paid.  In this class of cases, it is evident that either may commence an action on their respective claims, and the other may enforce his, either by a plea in offset, or by a cross action.  The general rule is this, that for goods or money delivered in payment, or part payment, of a note or obligation, there cannot be a recovery either by a separate action or by a plea in offset : but as the delivery of them constitutes a defence against any action which may be instituted on the obligation, the payment must be taken advantage of in such suit, if any should be commenced.  This is an acknowledged doctrine of the law, and was recognised in the case of *Slasson* vs. *Davis et al.* 1 *Aikens'*, 73.  See also, *Loring* vs. *Mansfield*, 17 *Mass.* 394. No difficulties arising from the mode of dealings, as to making due proof of the particular transaction, nor any advantage or disadvantage which the respective parties might have from an action on book, can vary this principle.

We are then to enquire in this case, whether from the facts reported by the auditor, it appears that the articles delivered by the plaintiff, and to recover which this action is brought, were delivered by him to the defendant in payment of the note which the defendant held against him, and whether in an action on that note under the plea of the general issue, the present plaintiff could have given the facts as reported by the auditor in evidence, as payment of this note, or whether he must have resorted to a plea in offset.  If they could have been so given in evidence, the judgement of the county court was right, if not, the judgement was erroneous.

It appears that the note which the defendant holds against the plaintiff, was payable in grain, in January, 1821.  It also appears that the articles charged by the plaintiff, for which this action was brought, were grain delivered in January, and in the fore part of February, 1821, and a small sum for wood, delivered in the same months.  The auditor finds that it was the understanding they should be applied in payment of the note.  The county court on these facts decided correctly, that for these things, thus delivered in payment, the plaintiff could not recover, but must have them applied in payment of the note, if the defendant should ever attempt to enforce its collection.

The judgement of the county court is affirmed.

*Griswold*, for plaintiff.

*Adams*, for defendant.

JOHN ABBOTT, *vs.* E. AND T. MILLS.

When a piece of land is set apart by the proprietors or owners for a public square or common, and individuals purchase lots bordering thereon in the expectation held out by the proprietors, that it shall so remain, such proprietors cannot disappoint the expectations of the purchasers by resuming the land, thus set apart, and appropriating it to any other use.

The enjoyment of a public highway, square or common, or any other common privilege or immunity, for a considerable period of time, *may* afford conclusive evidence of a right in the public so to do.

Where the proprietors of a town pass a vote, setting apart a piece of undivided land as a public square, such vote, though not binding on the proprietors at the time, by reason of some illegality of the proceedings, yet if acquiesced in by them till they have derived a benefit from it, or if recognised by allotting their lands on said square, and laying out village lots bordering thereon, may be given in evidence, to show a dedication of the land in question to the public use.

And the silence of any of the proprietors while people are buying and building on such square, and using it as a public common, will be considered an acquiescence of of such proprietors in the dedication.

Any individual who has sustained an injury from a public nuisance, may maintain an action *on the case* for the injury, against the person erecting or continuing the nuisance.

This was an action of *trespass on the case*, wherein the plaintiff complained, in several counts, of special damage and injury to his land and buildings, by reason of a nuisance upon the public common or highway in front of his said land and buildings, consisting of a printing office erected and continued by the defendants. Plea *not guilty.*

At the trial in the county court the plaintiff introduced evidence showing, that for more than thirty years past the space of ground in the village of Burlington, called the Court House Square, had been left open, and universally known and called a public common, by the name of the court house square ; and that for about fifteen years past the plaintiff had owned and occupied a lot bounded south by main street, and west by said open space or square, whereon the plaintiff had a dwelling house and shop, as alleged in his declaration. He also proved that in 1821, the defendants erected the building complained of upon the south easterly part of said square, nearly west of the northerly part of the plaintiff's premises, and distant from them about the width of a common street in said village ; and gave evidence tending to show that by means of said building, which the defendants had ever since continued and occupied, the enjoyment and value of plaintiff's said premises had been considerably lessened and impaired. As part of the evidence to show a dedication of said square to the public as a common, the plaintiff offered in evidence a vote of the proprie-

CHITTENDEN
January,
1831.
——
Abbott
vs.
Mills et al.
tors of Burlington, dated June 26, 1798, setting apart the square in question for the use of the public. To this the defendants objected, in as much as it did not appear that the vote was authorized by any previous warning for that purpose, and because it was not competent for a mere majority of the proprietors to vote away any portion of the undivided land for such a purpose. The court admitted the evidence, not as conclusive, but to be weighed by the jury in connexion with the other evidence. The plaintiff also gave in evidence a plan of said square, and of the several streets connected therewith, as designated by the proprietors, and afterwards by the select men of Burlington.

The defendants gave in evidence the charter of Burlington; also a statute of 1794, another of 1798, another of 1803, and another of 1805, enabling the authority of towns to take charge of, and lease out, certain public rights; they also gave in evidence a lease from the select men of Burlington to themselves, executed in April, 1821, and the warning, proceedings, and votes, of a town meeting held in Burlington in March, 1821, relating to the matter in question.

The defendants also called witnesses whose testimony tended to show, that the first county buildings were erected obout the year 1797, at which time the court house was placed near the centre of said square, and the jail near the north east corner, on the ground now occupied by part of Thomas' Hotel; that in 1798, a Mr. King, for the purpose of officiating as jailer, and also of keeping a tavern, erected a tavern house contiguous to said jail, south of, and connected with the same; that about 1802, another court house was erected where the present court house stands, and about the same time the jail was separated from the tavern, aforesaid, and removed from the square; that, after this, King continued his tavern stand, and finally sold and conveyed the same as private property; that during the time of King's occupation of said tavern stand, and afterwards, till about 1816, a garden attached to said tavern, extended east and southeasterly from the same, occupying what is now the open street, between said tavern and the buildings east, and extending about as far south as the north line of the court house; that in 1819, one of the owners or occupiers of said tavern stand, erected a shed southerly from said tavern house, and standing partly upon what is now the street aforesaid, and partly upon the square or common west, which shed was continued till within a few years past; and that in most of these arrangements, and especially in the location of said court houses and

Cʜɪᴛᴛᴇɴᴅᴇɴ
January,
1831.

Abbott
vs.
Mills et al.

said original jail and tavern house, the people of Burlington village, and the authority of the town, were consulted and exercised an influence and authority. Nothing from the records of the town was shown connected with these ancient transactions. The defendants also gave in evidence an act of the legislature, passed in 1808, and a lease from the select men to King, executed in pursuance of said act, and covering the ground on which Thomas' Hotel is now situated.

It appeared that the building, erected by defendants, was placed in a line with the tavern house aforesaid and the court house, as directed in the lease to the defendants. The defendants contended, among other things, that the town were proprietors, in virtue of the charter, and the several statutes aforesaid, of several public rights, and that sufficient appeared in the case to show that they did not acquiesce in a permanent and unqualified dedication of the square to the public, as a common or highway ; and hence they insisted, that the lease to the defendants justified the erection and continuance of the building complained of.

The court charged the jury, in reference to this part of the defence, that the town were to be regarded as proprietors of one or more of the public rights named in the charter, and that unless they had acquiesced in the dedication of the square, or that part of it, at least, on which the nuisance was situated, to the public, as a common or highway, till the interest of the public, or that of individuals owning lands upon the borders of said square, required that it should continue open as such common or highway, they might lawfully resume their original right of possession as proprietors ; in which case, their lease to the defendants would entitle the latter to a verdict. But the court further instructed the jury, that their attention must be confined to such acts of the town, or their officers, as were previous to the lease to the defendants, and the town meeting which immediately preceded it ; and that to entitle the acts of the town or their officers to the effect contended for, it was necessary that they should have manifested a claim of right, or at least an intention, on the part of the town, to put an end to the enjoyment of the square, as a public common or highway, whenever it should suit their convenience, and that they should have furnished sufficient evidence of such claim or intention, for the public authorities, or individuals of common prudence and sagacity, purchasing on the borders of said square, to take notice of. The jury returned a verdict for the plaintiff.

To these several decisions of the court, and to the charge to the

CHITTENDEN jury, the defendants excepted, and the case was thereupon re-
January,
1831.    moved to this Court.

Abbott
*vs.*
Mills et al.

*Adams and Bailey, for the defendants.*—It was decided by the Court that the town of Burlington was to be regarded as proprietor of one or more of the public rights. From this it follows, that the defendants, who claim by lease from the town, have the same right to build on the square, that plaintiff has on his land, unless that right has been lost.

It was contended by the defendants, that the east side of the square had never been dedicated to the public ; and on this point we contend the court erred.

1. In admitting the paper purporting to be a vote of the proprietors, dated in June, 1798.

2. In not giving to the jury some definite time in which a dedication might be presumed from continued use.

3. In their direction to the jury, that their attention was to be confined to acts of the town previous to the lease.

4. In their direction to the jury, that the acts of the town must be accompanied by some claim of right on the part of the town at the time, to give them the effect contended for by the defendants.

5. We contend, that what shall amount to a dedication is in part a question of law, and that the court should have advised the jury on the sufficiency of the evidence to amount to such dedication, if they believed the evidence.

6. We contend, that *case* for private injury will not lie in all cases where the public might abate the nuisance, and that the court should have charged the jury on this point, and that the jury were misled by the silence of the court.

*Mr. Allen, for the plaintiff.*—The vote of the proprietors of the town of Burlington, of 1798, was properly admitted. It is not supposed that a majority of the proprietors by vote can convey away their proprietary interest. But, in connexion with other testimony, it goes to show the dedication of the land to public use. It ought to be received in connexion with the fact, that for more than thirty years the square had been left open, and was understood to be dedicated for public use. There are other facts with which it is connected, as the designation upon the plan of the village, &c.

The town has never exercised any right over the public lands placed under their care for the support of schools, as such, lying

upon the square. This shows that they, in that capacity, never opposed the dedication of it to public use. No act of theirs appears to have been done in relation to the subject of those rights with which they were connected. Their authority over the school lands can be exercised only by their leasing them, with a reservation of rent, for the support of schools. The right they have pretended to exercise is of quite another character. It was carrying into effect a vote of the town in relation to the whole square.

*The opinion of the Court was delivered by*

WILLIAMS, J.—The jury, under the direction of the court, have found that the square or common in front of the plaintiff's house has been dedicated to the public and set apart as a public common or highway ; that the defendants have erected the building thereon which is complained of; that this building is a nuisance and injury to the lands and buildings of the plaintiff, and have assessed the damages which the plaintiff has sustained thereby. Objections were taken to the decision of the court in admitting some part of the testimony, and also to their charge to the jury. The evidence on which the plaintiff and defendants relied, is detailed in the bill of exceptions. On the part of the plaintiff, it was contended that there was sufficient proof that the common had been dedicated to the public, for a public use, by the original proprietors. It was contended on the part of the defendants that the town of Burlington was to be regarded as proprietor of some one or more of the public rights ; that it had never acquiesced in the dedication, and that the defendants, having a regular lease from the town, had rightfully erected the building complained of as a nuisance, on the land belonging to the proprietors. In accordance with the views of the defendants the court decided, that the town was to be regarded as proprietor of one or more of the public rights ; and unless they had acquiesced in the dedication, the defendants would be entitled to a verdict. The correctness of this part of the decision and charge of the court, is not now in question. If the verdict had been different, the plaintiff would probably have presented this point to the court to be reviewed. The principal question involved in this case is, what shall constitute a dedication of land to the public use, so as to bar the proprietors or owners from recovering it, while it is wanted and occupied for the purpose to which it was dedicated.

The inquiry is important in every view. In the present case property to a considerable amount will be affected by the decis-

CHITTENDEN,
January,
1831.

Abbott
vs.
Mills et al.

ion, and the principle involved will affect the interest of individuals and the public in almost every town in the state. It is customary in laying out towns, particularly when it is contemplated that they will be places of business, to lay out a square or common, and to locate building lots bordering thereon. And these lots acquire an increased value in consequence of their location. If a village is built up, and individuals buy these lots, erect buildings, and commence the establishing of a village, and make it a common centre for the business of the town, the other lands in town rise in value, of which the proprietors have *all* the advantage. It would then be the height of injustice, and contrary to every principle of good faith, to permit these proprietors to derive this advantage, and then frustrate the expectations held out, by resuming the lands thus set apart, and at a value greatly enhanced in consequence of their having been thus set out.

A dedication of land to the use of the public need not be by deed. The public are not a body capable of taking the fee either by deed or otherwise. The fee must remain either in the original proprietor, or in some persons to whom he shall convey it, and the soil is his or theirs for every use and purpose not inconsistent with the use for which it is dedicated; and the whole reverts to him or them, divested of every incumbrance, when it ceases to be wanted or occupied for the use to which it is dedicated. This question was lately before the Court, and decided in the case of the *State* vs. *Wilkinson*, 2 *Vt. Rep.* 480.

Neither is it necessary that it should have been appropriated for the use of the public for so long a period of time as that a grant might or should be presumed. It is sufficient if the owner of the soil by some unequivocal act manifests his intention of dedicating the land to a public use, and, in consequence of such intention so manifested, individuals have embarked in any undertakings, or invested property which will be materially affected if such intention should be altered or changed. Whenever a public square or common is marked out and set apart as such by the owners or proprietors, and individuals are induced to purchase lots or lands bordering thereon, in the expectation held out by the proprietors or owners, that it should so remain, or even if there are no such marks placed on the ground, but a map or plan is made, and village lots marked thereon, and sold, as such, it is not competent for the proprietors or owners to disappoint the expectations of the purchasers by resuming the lands thus set apart, and appropriating them to any other use.

CHITTENDEN
January,
1831.

Abbott
vs.
Mills et al.

In the civil law it is said, " things sacred, religious and holy, belong to no individual," and that " any man may at his will render his own place religious by making it the depository of a dead body ;" and it is also said, that if a dead body be laid in a place by the consent of the owner, the place becomes religious though he afterwards dissents.—*Cooper's Justinian*, 69. The civil-law in this particular is said by *Bracton* to be the common law in regard to pious donations. In *Sullivan's* history of land titles, he speaks of burying places, training fields, and common landing places, as having been originally laid out for these purposes, and consecrated to these uses, and as public immunities, or common privileges.

In the case of the *State* vs. *Wilkinson*, above cited, the authorities in relation to highways were referred to and examined ; therefore, it will be unnecessary to re-examine them here. That case establishes the principle that the use and enjoyment of a common way for the period of fifteen years, would be sufficient to give an easement to the public, and subject the person encroaching thereon to an indictment for a nuisance, Neither that case, however, nor either of the others referred to, establish any particular period of time, short of which this presumption cannot be inferred. But it appears clearly from the cases, particularly that of *Rugby-charity* vs. *Merrywether*, 11 *East*, 375, *n.* and the remarks of *Chambers*, Judge, in *Woodger* vs. *Hadden*, 5 *Taunton*, 126, that a period short of fifteen years furnishes sufficient ground for such presumption. Indeed, we should gather from all the cases, that, as in the civil law, the burying a dead body renders the place where it is buryed religious or sacred, so the act of throwing open the property to public use, without any other formality, is sufficient to establish the fact of a dedication to the public ; and if individuals,in consequence of this act, become interested to have it continue so, as by purchasing property, &c., the owner cannot resume it. We come then to the conclusion,that the enjoyment of a public highway, square, common, or any other common privilege or immunity, for a period short of fifteen years, *may* afford conclusive evidence of a right so to do ; and that the charge of the court is not liable to the objection which has been urged; *viz.* that they omitted to charge that an enjoyment by the public for the period of fifteen years, was necessary to extinguish the right of the proprietors.

There is no difficulty in the application of this principle,and in enforcing it,in all those cases where one or more individuals are the

CHITTENDEN
January,
1831.

Abbott
vs.
Mills et al.

owners of the land, and where they do not act as a corporation, or by vote ; but there is some in applying it to the proprietors of townships, as such, who have their lands in common, and make divisions from time to time as their interests require.    A vote passed at a meeting of the proprietors, duly warned for that purpose, setting apart a common for public buildings, or for any other purpose manifestly for the interest and benefit of the proprietors, would probably be such an act of dedication as would be binding on them.    But in the case under consideration there was no such legal vote.    A division of a town among the proprietors in fact, has been recognised as a legal division, where there has been an acquiescence on the part of the proprietor, although it was neither legal nor binding when first made.    The same principle which has established those divisions may apply to the present case.    The vote of the proprietors passed June 26, 1798, though not binding on the proprietors at the time, as not made at a meeting warned for that purpose, still, if acquiesced in by them until they derive a benefit from it, by the increased value of their other lands in town, and by individuals having purchased under them in consequence of the appearance thus held out by their vote, or if recognised by allotting their lands to the common, treating it as a public common, laying their roads terminating there, and laying out village lots bordering thereon, would be such an act as ought to be binding on the proprietors of the town.    There was no error, therefore, in the decision of the court so admitting the vote of the proprietors in evidence, to be weighed with other evidence, or in their charge to the jury in this part of the case.

It has been urged in argument, that there was no evidence of acquiescence on the part of the town in this dedication.    It was clearly unnecessary to show any particular act of acquiescence on the part of the town.    If towns are to be considered as proprietors, and vested with all the rights which appertain to other proprietors, (of which there are very great doubts,) it must be incumbent upon them to show by some act of theirs, their dissent from the doings of the other proprietors.    The silence of the town, or the silence of any or all the proprietors, while people were buying and building on the square, was a sufficient acquiescence under the circumstances which are set forth in the case.    The jury was correctly charged that the town should have manifested a claim of right, or, at least, an intention to have put an end to the enjoyment of the square, and that they should have furnished some evi-

dence of such an intention, so that individuals of common sagaci-
ty or prudence might have taken notice.

The proceedings in relation to the land and buildings where the jail was formerly erected, have been cited as evidence that the town has not so acquiesced. Of the weight of the evidence introduced into the case the jury were competent judges. But it appears clear to me that those proceedings furnish no evidence at all of the dissent of the town as a proprietor to this dedication; on the contrary, that they are strong evidence that the square was recognised as dedicated to the uses designated in the vote of the proprietors. All these proceedings were unnecessary if the town as proprietors were asserting their right to the land in question. The doubts which arose as to the powers of the county court, and the necessity which was felt to apply to the legislature for authority to enable the select men to convey, (and at that time it was supposed that the powers of the legislature, both as to private and public rights, were not to be questioned,) go upon the ground that this land was appropriated to a public use by the proprietors, and that nothing short of the unlimited powers of the legislature could change the application.

Another point was made in this case, though not much insisted on, to wit, that case would not lie in all cases where the public might abate a nuisance, and that the jury should have been so charged. In all cases of nuisance the public may abate the nuisance, and if there is no injury to individuals, no action can be sustained. But if the nuisance is injurious to the individual, he may maintain an action for the damage sustained by him. It is difficult to see what advantage the defendants could have derived from this being stated to the jury. The plaintiff claimed that the acts of the defendants complained of were not only a public nuisance, but that they were detrimental to him; the jury have found so, and have estimated and assessed the damages he has sustained thereby. By the most familiar principles of law he was entitled to this remedy. Why the defendants should complain of the silence of the court in the particular mentioned, we cannot perceive; as it would only have been stating to them, that if the plaintiff had sustained no injury, he could not maintain the action, though the public might abate the nuisance.

On the whole it appears to us, that there is no error in any of the proceedings of the county court in this case; and we are fully satisfied that the verdict of the jury was right; that, from the evidence detailed in the bill of exceptions, there can be no doubt

RRR

CHITTENDEN there was a square properly dedicated to the public, and that it
January,
1831.    was not competent for the town, nor any of the proprietors, to ap-
————   propriate it to any other use than the one designated by the vote
Abbott
  vs.    of the proprietors, and acquiesced in by them.
Mills et al.
          The judgement of the county court must, therefore, be affirmed.

          *Allen,* for plaintiff.

          *Adams & Bailey & Marsh,* for defendants.

CHITTENDEN.                    STATE *vs.* GUY CATLIN.
January,
1831.
          When a piece of land is left open by the owner for public use, as a common thorough-
            fare, without any intention, manifested by him at the time, of resuming the posses-
            sion, and the land is accordingly so used by the public, without restriction, until
            other persons have become interested by purchases, made under the expectation
            that it would not be reclaimed by the owner, it becomes a highway by dedication,
            and neither the owner, nor his grantees, can again resume the possession, though
            such dedication may not have existed fifteen years.

          The declarations of the owner of the soil are admissible evidence to show a dedica-
            tion to the public use.

          When the court are not reminded of their omission to charge the jury on a particular
            point, until the jury have returned their verdict, it is not error in the court, then to
            refuse to charge on the point in question.

          This was an *indictment* for a nuisance in maintaining and con-
tinuing a certain store in Burlington.   The place, in which the of-
fence was charged to have been committed, is a large space of
ground extending from the south side of Pearl street, in Burling-
ton, to that part of the college lot, which lies west of the college
buildings, and is bounded on the west side by the tavern stand,
called the Green Mountain House, and a line of buildings south of
it, and on the east side by the brick building, opposite the dwelling
house of Judge Foote, and a line of buildings south of it, and is
supposed to be a little less than twenty rods wide, from east to
west, and more than twenty rods long from north to south.   For
the purpose of proving that the place in question had become, and
was, at the time of the offence charged, a public common and
highway, the prosecutor offered to prove by parol, that Stephen
Pearl, (who was admitted to have been the owner of the land,)
declared his intention in 1801, and afterwards, of leaving this place
open to the public as an addition to the college green ; and that
it was afterwards, within three or four years, cleared and made
smooth by the voluntary labour of students and other individuals,
and that it remained open and unobstructed until after the execu-
tion of a deed from Pearl to Giles T. Chittenden and Archibald

CHITTENDEN
January,
1831.

State
vs.
Catlin.

W. Hyde, hereafter mentioned.  The prosecutor also offered to prove, for the purpose aforesaid, that in 1801, and afterwards, the said Pearl sold and conveyed in house lots the land on the west and east sides of the tract in question, and in the deeds bounded the purchasers upon the said tract by the name of the public square or college green.  To all this evidence the respondent objected, insisting that it was not proper evidence to show a dedication to the public.  But the court overruled the objection.  The prosecutor then read in evidence the record of a deed from said Pearl to one Burnham of the land now forming part of the tavern stand, aforesaid, dated January 20, 1801, wherein the premises conveyed were described as " lying on the west side line of " the green, which is four chains wide ;" also a deed from Pearl to Frederic L. Goch, dated October 2, 1802, of a part of the same premises described in the last deed, aforesaid, and an addition, being five acres in the whole, which was therein described as " beginning at the north west corner of the college green, and " extending southerly on the side of the college green ;" also a deed from Pearl to Joseph Miller, dated in January, 1804, of the house-lot next south of the land last mentioned, which in said deed is described as " adjoining the west side of the college green ;" also a deed from said Pearl to one Flagg, dated in January, 1804, of one and a half acres next south of the last mentioned lot, and described, as " adjacent to the college square ;" also a deed from said Pearl to Samuel Fitch, dated in October, 1803, of a small lot on the east side of the tract in question, and adjoining Pearl street, in which no mention is made of any green, square, or common ; also a deed from said Pearl to Daniel Farrand, dated in August, 1804, of a lot next south of the one last mentioned, which is described as lying on the " east side of the college green," said deed containing a covenant in relation to the tract now in question.  The prosecutor also proved that the tract in question was gradually cleared off and made smooth between the years 1801, (when the college was built,) and 1805, and that this was chiefly done by voluntary labour of students and other individuals, aided in one instance by a contribution for digging out the stumps ; that it was denominated a public square or college green, and most usually, " the college green," and that it continued open, with the original college green, and wholly unobstructed, until November, 1814.  One witness testified that some considerable time previous to November, 1814, in conversation with Pearl relating to the piece of ground now in question, the latter told him in very em

CHITTENDEN
January,
1831.

State
vs.
Catlin

phatic terms, that he had given it out as a college green, and it should always remain so.   Another witness testified, that more than twenty years ago, he, the witness, owned a house lot on the west side of the tract in question, and another on the east, and being in treaty for the sale of them, and feeling interested to know whether the space in question was to remain permanently open as a common, (as that fact would affect the price of the lots,) he applied to Pearl to learn his intentions on the subject; and that he told the witness explicitly, that the space in question was thrown out to remain open as a public common or college green.   It was proved by the town records of Burlington, that in 1807 the select men laid a road six rods wide upon the west side of the tract in question, and another of the same width on the east side, which have remained open and unobstructed.

The respondent gave in evidence a deed from said Pearl to Giles T. Chittenden and Archibald W. Hyde, dated November 12, 1814, of part of the tract in question, being about six rods east and west, and about ten rods north and south, and situated between the two roads aforesaid, as laid out in 1807 ; and also proved, that soon afterwards, Pearl sold to Cornelius P. Van Ness another piece, situated between the two side roads, aforesaid, and extending from the tract last mentioned south, to the original college lot or green ; and further proved that immediately after the execution of said deed to Chittenden and Hyde, as aforesaid, the store now complained of was erected by said Chittenden, on the land described in said deed, and that said Van Ness, for several years past, had kept the land contained in his purchase from Pearl enclosed with a fence.   And it was further shown, that about ten years since the select men of Burlington laid out and opened a cross road from east to west on the line between said tract, deeded by Pearl to Chittenden and Hyde, as aforesaid, and the tract purchased by Mr. Van Ness as aforesaid, and that about the same time they added to Pearl street a small strip of ground, and to the side roads above mentioned one or two other small strips of ground, not covered by said deed from Pearl to Chittenden and Hyde, and that these roads had remained open and unobstructed. A deed was also in evidence from Giles T. Chittenden to the defendant, dated August 14, 1816, of the tract contained in the deed from Pearl to Chittenden and Hyde.   And it was proved that for several years past, the respondent by himself and his tenants had occupied and upheld the store aforesaid for his individual profit and use, which he continued to do to the time of the trial.

On the part of the respondent it was insisted, that the right of Pearl to resume the exclusive possession of the land, was not lost, unless it had been occupied with his assent as a public square or college green for the term of fifteen years previous to the execution of his deed to Chittenden and Hyde ; and that if his intention was to give the use of the land to the college corporation, and not to the public at large, the indictment could not be supported.

<div align="right">CHITTENDEN<br>January,<br>1831.<br><br>State<br>vs.<br>Catlin.</div>

The court among other things, charged the jury, that if they found from the evidence that the place in question was left open or thrown out by the owner for public use, as a common thoroughfare, without any intent on his part, manifested by acts or declarations at the time, to resume the possession, and that it was so used by all persons at pleasure,and without restriction,it might become a public square or highway by dedication, for the purposes of this prosecution, without any deed, or recorded declaration on the part of the owner, or any survey, or record, or other official act on the part of the public ; and that if he suffered it to continue until third persons, acting to his knowledge, on the expectation that such dedication was not to be revoked, would be subjected to essential injury if their expectations were disappointed, his right of resuming exclusive possession was gone, and could not be lawfully asserted by himself or his grantee, though the dedication might not have existed for the period of fifteen years. And with a view to the application of these principles, the jury were referred to the several parts of the evidence aforesaid. The jury were not instructed as to the effect upon the prosecution, if they should find that Pearl intended the dedication for the exclusive benefit of the college corporation. No other evidence of such intent appeared in the case, except what is above detailed, nor was the court reminded of their omission to charge on that point until after the verdict was pronounced. Verdict guilty. To the several decisions of the court, to the charge of the court as above given, and to the omission of the court to charge in the particular last mentioned, the respondent excepted ; whereupon the cause was removed to this Court.

After argument, *the opinion of the Court was delivered by*

WILLIAMS, J.—The principal question which has been made in this case has been considered and decided in the case of *Abbott* vs. *E. & T. Mills.** It has been decided, that land may be set apart for the public use by the owner or proprietor without deed ; that it is not necessary that the lands so set apart should

*See preceding case.

CHITTENDEN
January,
1831.

State
vs.
Catlin.

have been used for any particular period of time to establish the right of the public or of individuals to have it so continued, and that the original proprietor or owner cannot recover the lands once dedicated by him for a public common or square, when individuals have been induced to purchase lands bordering thereon, in the belief, and with the expectation, held out that it was so to remain.

The case under consideration affords a striking illustration of the propriety and justice of the principles thus established. The original owner of this college green could not recover this land without seriously prejudicing the interest of individuals, nor without the most manifest injustice on his part. The declarations of Pearl, before he sold to the respondent, or those under whom he claims, were admissible in evidence, particularly in connection with his acts and those of others of which he had knowledge. Indeed, without those declarations it might have been doubtful whether he intended a public dedication or not.

The second position which has been taken in the argument, viz., that the court should have advised the jury that there was not sufficient evidence of a dedication to the public to support the indictment, is certainly unsound. The evidence detailed in the case was abundantly sufficient for the purpose; and, if believed, (and the jury were alone to determine whether the witnesses were entitled to credit,) establishes the fact, most clearly, that this common or square had been dedicated to the public, and could not be disposed of by the owner for any other use.

It would be a sufficient answer to the third ground taken in the argument, that the court were not reminded of their omission to charge upon that part of the case until after the jury had returned their verdict. If this was an omission, the counsel for the respondent should have brought it to the notice of the court before the jury retired, so that they could have supplied the omission if the case required it. But we are satisfied from the case that there was no omission, nor any neglect to call the attention of the jury to any thing material for the respondent.

The jury must have found, under the direction of the court, that the college square was thrown out to the public for the public use as a common thoroughfare. It was not material by what name it was called, or what originally induced the owner thus to dedicate it, or whether it was primarily and principally intended for the benefit and advantage of the college. If it was given to be and remain an open space or square, by whatever name it may have been denominated, (and the evidence tended clearly to es-

tablish this fact,) any obstruction thereon, inconsistent with the public use, would be a nuisance, and would subject the person placing it there to an indictment. Therefore,

<div align="right">CHITTENDEN
January,
1831.</div>

Judgement must be rendered on the verdict.

<div align="right">State
vs.
Catlin</div>

*Adams*, for state.

*Bailey & Marsh*, for respondent.

---

## SILAS B. HAZELTINE *vs.* AARON SMITH.

<div align="right">FRANKLIN,
January,
1831.</div>

Where referees, after having made their report, and handed it to the attorney of the recovering party, discovering they had committed a mistake in computation, made an additional report, stating the error, and requesting to have the same made a part of their former report,—it was held that such additional report, having been seasonably filed in court, was a part of the first, and that both ought to be taken together as forming the true report of the referees.

When the report of referees is not sufficiently explicit for the court to render judgement for the sum which the referees intended to find, the report must be sent back to the referees that they may make it more clear and explicit, so that a judgement may be rendered thereon conformable to their intentions.

Referees are not obliged to decide according to strict principles of law, but may disregard them altogether, and adopt certain principles of equity or justice; and in such case their report will not be rejected for a mistake in law, unless impartiality or corruption can be attributed to them.

A mistake made by referees on the principles they adopt in making their decision may be good reason for setting aside their report; and

If they discover any error in computation, or any clerical mistake in drawing up the report, it is their duty to correct it while the report is under their controul.

This case came before the court on the report of referees. There were three causes between the same parties which had been referred to the same referees. In the present case they had reported that the defendant recover of the plaintiff the sum of twenty nine dollars and seventy eight cents damages. After they had drawn up the report and given it to the attorney of the defendant, they discovered they had committed a mistake in computation, and before the setting of the court to which the report was returnable, they made an additional report, as follows : "That " on further reflection on the subject, and examination of some " minutes we made of the several items of the accounts allowed " by us, we find a mistake or error of $20,25 against the plaintiff, " *Hazeltine*, in the cause in which our report was in favor of the " defendant, *Smith*, for the sum of about $11,13, which sum was " by agreement of parties to be deducted from the other report " which was in favor of *Hazeltine*. We wish therefore, that said " error may be rectified, that justice may be done between the " parties ; and if proper, would make the above a part, and wish

" the court would attach the same to our former report." This additional report was filed in court, and exceptions were taken to the whole by *Hazeltine.* The court accepted the first report, disregarding the additional one, and rendered judgement accordingly. The case was reserved for the opinion of this Court.

After argument,

WILLIAMS, J., *delivered the opinion of the Court.*—It appears that this cause, together with others between the same parties, was by the county court referred to referees, who having met and heard the parties, made their report for the defendant, *Smith,* to recover of the plaintiff twenty nine dollars seventy eight cents; and gave their report to the defendant's attorney to carry up to court for acceptance. Before the acceptance, and before the setting of the court, they discovered that a mistake had intervened in the computation of some of the demands which had been before them, which if corrected would have made a material alteration in the result to which they arrived. They, therefore, made an additional report, stating the error, and requesting to have the same attached to, or made part of, their first report. This additional report having been filed, exceptions were then taken to the whole by the plaintiff, *Hazeltine.* The county court accepted the report, and rendered judgement for the defendant to recover the sum as first reported; and on exceptions taken to this judgement, the cause is brought here.

The principles by which courts are governed in accepting or rejecting reports of referees, have been settled by this court in several cases, and are familiar to the profession. If the referees attempt to decide according to law, and mistake the law in their decision, and a different result would have been produced if the law had been correctly decided, their report founded upon such decision will be set aside. The referees, being judges of the parties' choice, are not obliged to decide upon the strict principles of law, but may disregard them altogether, and adopt certain principles of equity or justice to govern their decision; and, in such a case, unless partiality or corruption can be attributed to them, their report will not be set aside for a mistake in law. A mistake made by them on the principles which they adopt in making their decision, as mistaking a fact, or an error in computing or stating an account, may be a reason for setting aside their report: and it is on this ground, because it is not the report which they intended. A mistake in computation may, in ordinary cases, be cor-

rected by them, or by the court in rendering judgement. If the mistake is discovered before their report is accepted, or before the rule has expired, it is usual for them to amend the report and make it conformable to their intention. Having once heard the parties and made their award, the referees cannot again go into a hearing of the parties, nor receive any new or additional evidence, unless by mutual consent : but if they discover any error or mistake in computation, or any clerical error in drawing up the report, they may correct such error or mistake, and it is their duty so to do, while the report is under their control. If the mistake is not discovered until after the report is filed in court, it may be out of the power of the referees to correct it ; but this will afford sufficient reason to the court for setting such report aside and rendering no judgement thereon, unless the same is recommitted for the purpose of having it made conformable to the intention of the referees, either by consent of the parties or by order of court.

It must be the object of the court to render such a judgement as the referees intended, and if this cannot be done, either in consequence of an error made by them, or in consequence of the report having been made in such a manner, that their intention cannot be discovered or carried into effect, the report will be set aside, and the parties left to contest their claims in the usual and ordinary way in which other claims are litigated. In this case, if the first report, and what has been called the additional or supplemental report, were properly before the county court, they unquestionably erred in the judgement which they rendered, as it is apparent, that the referees in their first report made a mistake in computation, and if that mistake had been corrected, a different result would have been produced, and a balance found due from the defendant instead of the plaintiff. The defendant is, therefore, endeavouring to obtain a judgement which the referees never intentionally awarded. Whether from both reports together such judgement could have been rendered, or whether some further explanations or statements of the accounts and claims might not have been necessary in order to render judgement thereon, is uncertain. But our present inquiry is whether the judgement which the county court *did* render is erroneous or not. If the additional report had not been made, yet the same facts which appear therein substantiated in a proper and legal way, either by affidavit or otherwise, would have afforded a sufficient reason for setting

Franklin,
January,
1831.

Hazeltine
vs.
Smith.

aside the report, and the court could not with propriety have accepted the same and rendered judgement thereon.

It has been strongly insisted on in the argument, that the additional report is not to be taken into consideration, nor regarded as any part of the proceedings; and it is on this point alone that any difficulty has arisen with us, in coming to a conclusion in the case. We, however, must notice it as a part of the record. It comes here as such : it was before the county court ; was referred to as part of the report excepted to : it appears both by the direction and date to have been made before the commencement of the term of the county court, and before the first report was filed, and while it was in the power of the referees to correct any errors which had intervened in computation. It does not appear at whose suggestion, or by whose procurement, it was made ; and it may have been solely at the instance of the referees. It was not making any new award—any new decision upon evidence, nor adopting any new principles to govern the decision, but merely an amendment for the purpose of correcting a mistake. There is nothing in the additional report which, of itself, precludes it from being received as additional to, or a part of, the first report. We must, therefore, consider it as made by the referees before the first report was returned into court, or made by permission of the county court. And unless so made, the county court should have ordered it taken from the files and records.

The additional report must then be taken to be part of the first report, and from both of them together, it appears that the sum first reported, and for which judgement was given, was not the true balance between the parties ; and the judgement of the county court for that sum was therefore erroneous. The report, with the additional one, was not sufficiently explicit for the county court nor for this Court to render judgement for the sum which the referees intended to find. The report should, therefore, not have been accepted, but the referees ought to have been permitted to have made it more clear and explicit, and state the different claims adjudicated by them, with such accuracy that the court might render a judgement conformable to their intentions. If the defendant was not willing to take such judgement as the referees intended, he must submit to have the claims investigated in due course of law, and not insist on a report which the referees have declared to be erroneous and founded in mistake.

The judgement of the county court must be reversed, and the cause remanded for trial.

FRANKLIN,
January,.
1831.

Hazeltine
vs.
Smith.

HUTCHINSON, J.—I find difficulty in agreeing to the decision now made, on account of the shape in which the cause comes before us. We are deciding as upon a writ of error, and must decide upon the facts, that appear of record. There is nothing that shows that the second report, as it is called, ever became a part of the record. There appears no motion to the county court to recommit to the referees, that they might amend their report. Nothing appears that the court treated it as a part of the case. As a matter of evidence they might well have rejected it as not under oath. It has come up to this Court with the files. So might an affidavit, or deposition have come, and be no part of the record, unless referred to in the record as a part thereof. The regular way would have been for the plaintiff to have procured an affidavit of one or more of the referees, showing the mistake, and presented that to the court, with a motion to recommit for the purpose of rectifying the mistake. Then the court, without setting aside the report, or acting upon its merits, might recommit, and then the report coming in, amended under the sanction of the court, would present the whole facts to be acted upon by that court, and this as a matter of record. Probably, in this case, better justice may be done by this decision. For, if the facts stated in this second report are true, there was a mistake which turned the whole cause the wrong way. The referees found a balance for the defendant of $11 ; and as three actions were referred, this decision drew after it two bills of cost, making about $29 in the whole. If the mistake of $20 is rectified, it will turn a balance of about $9, in favor of the plaintiff, and carry with it the two bills of cost in the other suits. But I find no such record evidence of these facts, that I can give relief upon a writ of error.

Read, and Hunt & Beardsley, for plaintiff.
Smith, for defendant.

### Isaac Parker *vs.* Eleazer Kendall.

The maker of a promissory note, when sued by an endorsee, will not be allowed an offset of notes which he has purchased against the original payee of the note on which he is sued, unless he has perfected his right of action against such payee, by giving him notice that he is the holder of said notes, previous to the assignment to the plaintiff.

The demands proper to be pleaded in offset, in such cases, must be such as the defendant could have so pleaded if the action had been brought by the original payee of the note.

When the maker of a promissory note payable to A. B. or bearer, is sued by one, *as bearer*, the defendant will not be allowed to plead any demand in offset except such as he may have against the plaintiff in the action.

This was an action on a promissory note, dated April 29th, 1829, for $20,50, payable to Harvey Morgan, or bearer, in thirty days from date, and transferred to the plaintiff on the 1st day of May, 1829. On the trial in the county court it appeared in evidence, that in June following, the plaintiff gave notice to the defendant, the maker, that he had purchased the note. It also appeared that the defendant was the holder of two notes, executed by Morgan to Flint & Co. both dated March 9th, 1829, one for $10, and the other for $8,96, payable on demand, which had been regularly endorsed to the defendant in March or April, 1829; and that when the plaintiff notified the defendant of the assignment of the note by Morgan, the defendant notified the plaintiff that he, the defendant, held said notes against Morgan, and intended to have them set off against the note which had been assigned to the plaintiff by Morgan.

The court were of opinion that the defendant could not be allowed to plead the said notes in offset, because no notice had been given to Morgan, nor the plaintiff, of the purchase and transfer of said notes, before Morgan assigned the note in suit to the plaintiff. The defendant excepted to the decision, and the case was reserved for the opinion of this Court.

After argument,

Williams, J., *delivered the opinion of the Court.*—In order to enable a person sued to avail himself of a sum due to him as an offset, he must have a complete cause of action therefor at the time of the commencement of the suit against him. If the sum is due on a note or bill endorsed, he must also have given notice of such endorsement to the opposite party before the day of the service of the plaintiff's writ, (*Judiciary act,* sec. 92, *and proviso to sec.* 12, *Justice act.*

The claim which was set up by the defendant in this case was

ADDISON,
January,
1831.

Parker
vs.
Kendall.

not for a sum of money due from the plaintiff, but from one Morgan, to whom the defendant had given the note on which the suit was brought by the plaintiff. The right of the defendant to plead such offset must, therefore, be made out under the statute.

The statute, passed in October, 1798, enabling endorsees to maintain actions in their own names, in the first section, gives to the endorsee or endorsees of certain promissory notes, payable to order or bearer, the right to maintain an action thereon in his or their own name. The second section enables the defendant in all *such* actions to avail himself of any equitable defence which he might have, if the action was brought by the original payee ; and also to plead an offset of any demands, *proper to be pleaded in offset*, which the defendant may have against the original payee or payees before notice of such endorsement.

From these statutes it appears that no action can be defeated by a plea in offset founded on a note endorsed, unless the plaintiff was notified of such endorsement previous to the commencement of the action ; and that the endorsee of a promissory note cannot be affected by any claim which the maker holds against the payee, except those which were proper to be pleaded in offset, before he gave notice to the maker that such note was endorsed to him. The Court are of opinion, that the demands proper to be pleaded in offset, must be such as the defendant could have so pleaded, if the action had been brought by the original payee to the note. In applying these principles to the case before us, it will be seen, that Morgan, at the time he sold and delivered to the plaintiff the note which is here sued, had not been notified of any claim against himself in favor of the defendant, and if he had commenced a suit thereon, he could not have been defeated by the plea of the defendant, as he had not been notified that the defendant held the notes which he gave to Flint & Co. ; that the plaintiff purchased the notes of Morgan, and gave notice thereof to the defendant, before the defendant had perfected any claim against Morgan which he could have pleaded in offset against him ; and the defendant cannot be in a better situation in a suit brought by the holder of a note, than he would have been if the suit had been commenced by the payee.

The defendant insists that the notice he gave to the plaintiff of his holding the notes given by Morgan to Flint & Co., was all that was requisite according to the statute. We think differently. The claim must have been perfected and complete against Morgan. The plaintiff was not the agent of Morgan,

ADDISON,
*January,*
1831.

Parker
*vs.*
Kendall.

and therefore was not the person to whom notice was to be given.

There is another view of the case which is equally fatal to the claim of the defendant; and although I have not given it that consideration which I should, if the decision of the cause rested solely upon it, yet, as my brethren are all clear upon it, it is proper that it should be stated.

The defendant cannot avail himself of this defence unless it is by virtue of the second section of the statute before mentioned, which enables endorsees to maintain actions in their own names. That statute enables the *endorsee* of a note payable to *bearer* to maintain an action thereon in his own name; and in *such* action the defendant may plead in offset, &c.

The plaintiff does not bring this action as endorsee, or by force of the statute, but sues as bearer. In the case of *Matthews vs. Hall*, (1 *Vt. Rep.* 316,) it was decided, that on a note similar to the one here declared on, the bearer might maintain an action at common law, and that he derived no aid from the statute.

If the plaintiff can maintain this action as bearer by the principles of the common law, and is not obliged to sue as endorsee, the statute does not give to the defendant in such action the right to plead any demand in offset, except such as he may have against the plaintiff in the action; and this, in pursuance of the general statutes on the subject of offsets.

The judgement of the county court is affirmed.

*Phelps & Bell,* for plaintiff.

*Linsley & Waller and Bates & Chipman,* for defendant.

GRAND-ISLE,
*January,*
1831.

UNIVERSITY OF VERMONT *vs.* EXECUTOR OF ELISHA REYNOLDS.

In the year 1781 a charter was obtained under the authority of the state, granting to a number of persons a township of land, reserving *one seventieth part* of the tract for the use of a seminary or college. The proprietors not having made any division of the lands under the charter, nor successfully asserted their claim to them, the whole town was afterwards settled and occupied by other persons, none of whom claimed or held under the original grantees. In an action of ejectment, brought by the trustees of a university, afterwards founded, who were empowered to take possession of the land so reserved, against one who had been in uninterrupted enjoyment of a portion of the lands granted about thirty eight years previous to the commencement of the action, holding adversely to all other persons, it was held,

That the land thus reserved was held in common with all the lands in said town, and that the plaintiffs might maintain ejectment against any of the inhabitants to recover the share which had been reserved for their use;

That the provision in the statutes of limitation, exempting from their operation all lands granted, sequestered or appropriated, to public, pious and charitable uses, extended to the case in question; but,

That from the length of time the defendant had been in possession, the jury might, and ought to, presume in his favor, either an antecedent grant, or a surrender of the charter under which the plaintiffs claimed, or an extinguishment of any title which ever could have been derived under it; and

That the court ought so to have instructed the jury.

This case was an action of *ejectment,* commenced in 1821, to recover lots no. 98 and 99 in the town of Alburgh, in which the plaintiffs declared on a seizin in fee for the whole of those lots. The plaintiffs claimed title to the demanded premises by virtue of a charter obtained under the authority of the state of Vermont, dated February 23d, 1781, granting to Ira Allen, and his associates, a tract of land therein described, and incorporating it into a township, called Alburgh, and granting to the proprietors and inhabitants thereof all the privileges and immunities which were enjoyed by the inhabitants of other towns in the state. By this charter five *seventieth parts* or rights of said township were reserved for particularly specified purposes : one right for the use of a seminary or college ; one for the use of county grammar schools ; one to be and remain for the settlement of a minister or ministers of the gospel in said town ; one for the support of the social worship of God ; and one for the support of an English grammar school in said town. The right for the use of the seminary or college, and the right for the use of county grammar schools, with the improvements, rents, interests and profits arising therefrom, were to be under the controul and disposal of the General Assembly of the state forever. And the proprietors of said township were thereby authorized and empowered to locate said two rights equitably, quantity for quality, in such parts of said town as they might judge would least incommode the general settlement of said tract. There was a condition contained in the charter to this effect : that each proprietor, his heirs or assigns, were to plant and cultivate five acres of land, and build a house at least eighteen feet square, or have one family settled on each right, within three years next after the circumstances of the war, in which the country was then engaged, would admit of a settlement with safety, on penalty of forfeiting to the state each respective right not so improved and settled. This forfeiture was never claimed by the state. On the 2d day of November, 1791, the University of Vermont was founded ; and by the act of incorporation the trustees were empowered to take charge of, lease, rent, and improve, &c. all such grants of land as had already been made by the state for the use of a college.

GRAND-ISLE,    On the trial in the county court it appeared in  evidence, that
 *January,*
   1831.    prior to the year 1785 the town was plotted, and, not many years
University of Vt.after, was, by direction  of  Ira Allen,  surveyed ;  and  the lines
 *vs.*  run through  the whole town ; that the lots were  designed to be
Reynolds' ex'r.one hundred acre lots ;  and that every lot in the town was claim-
ed and owned by some person, though there were some lots which
were not improved nor cultivated.    The plaintiffs  tendered evi-
dence to prove that no person held any land in Alburgh under an
original proprietor ; to which the defendant objected.    The  ob-
jection was overruled, and the  evidence admitted,  from which it
appeared that there was no lot possessed or held under any of the
proprietors named in the charter.

It was admitted that the defendant's testator, and  those  under
whom he claimed, had been in possession of the premises demand-
ed, ever since  the spring of  the year, 1785, claiming the same
in their own right, and adversely to all the world.    The defendant
produced in evidence a  deed from Asa Gardner,  acknowledged
December, 16, 1796, granting to him lot no. 99 ;  and another
deed from Joseph Sowles, dated September 14, 1796, granting
to him lot  no. 98.

It was contended by  the defendant, 1st. That it ought to ap-
pear from  the declaration how  the plaintiffs claimed, whether as
tenants in common, or in severalty.

2d. That the defendant had a  complete title by the statute of
limitations.

3d. That the exceptions in the statute respecting public rights,
&c., did not apply until such rights were severed.

4th. That from the great length of time the town had been set-
tled,  and the defendant's testator been in possession, it was to be
presumed that the college-right had been set off by the proprie-
tors as directed by the charter.

5th. That if the college-right had not been set off, it was in-
cumbent on the plaintiffs to cause a severance before an action of
ejectment could be maintained.

6th. That if the college-right was not severed, it could not ex-
tend through the town ; the charter having directed a  particular
location.

7th. That before the plaintiffs could maintain ejectment, they
must demand of the proprietors to set out this right, and  locate
it agreeably to the provisions of the charter.

8th. That, as tenants in common, the plaintiffs could not sue to
be let into possession without a demand.

GRAND-ISLE,
January,
1831.

University of Vt
vs.
Reynolds' ex'r.

9th. That no action will lie by one proprietor of a town against another proprietor, to obtain possession, until there is a severance.

10th. That the jury ought to presume a title in the defendant's testator after thirty eight years adverse and peaceable possession.

A verdict was returned for the plaintiffs to recover *one seventieth part* of the premises demanded, with one cent damages and their cost, under a rule, that if the verdict be set aside, judgement should be rendered for the defendant to recover his costs. The defendant having filed exceptions, the case was reserved for the opinion of this Court.

*Royce and Smalley, for the defendant.*—I. The plaintiffs claim title to one undivided 70th part of the premises demanded as tenants in common with the defendant ; and, in support of this claim, rely on the charter granting the town of Alburgh to sixty-five proprietors, reserving for certain public uses five-seventieths of the same, and the act incorporating the University of Vermont, and granting to that corporation the use of one-fifth part of the lands thus reserved. By this claim the plaintiffs admit that they and the defendant's testator were co-proprietors, and, therefore, as they insist, tenants in common. But the defendant insists that the proprietors of towns do not stand in the relation of tenants in common to each other. Tenants in common must join in all personal actions where the profits of the land, or some indivisible thing, is in question.—1 *Swift's Dig.* 102, 103 ; *Hammond on Parties,* 44 ; 3 *Bac. Ab.* 706 ; *Cro. Jac.* 231.

Will it be pretended that a proprietor in possession, before a division, cannot maintain trespass against a stranger without joining all his co-proprietors ? The possession of a proprietor, as such, is necessarily adverse and exclusive, both before and after severance. From which it results that one proprietor cannot, even after demand and refusal, support ejectment against another for a commonage.—*Britton* vs. *Lawrence and Clark,* 1 *D. Chip.* 103.

Proprietors have rights and privileges which tenants in common have not ; and these rights were well known and understood at the time of granting the charter.—*Old stat.* 293, *Act of* 1779 ; *do.* 323, 124, 143 ; *Act of* 1787, sec. 5, (*Old stat.*) By these acts the majority of the proprietors could vote to a settler his lot in lieu of his draft, and grant a proprietor liberty to pitch. All

GRAND-ISLE, these powers are inconsistent with the right of tenants in common.
*January,*
1831. See *act of* 1787, *(Old stat.* 107.)

University of Vt
*vs.*
Reynolds' ex'r.

If private proprietors, before a division, may, as between themselves, be considered tenants in common, yet they and the public cannot be so treated. The public right, when no particular mode of location is pointed out by the charter, cannot be located by pitch, but must be by draft, and the agents of the public cannot interfere with these rights until they are located.

II. But granting, argumentatively, that under those charters, where the division of proprietory rights is left to be regulated by the general statutes on this subject, one proprietor may maintain an action of ejectment against a co-proprietor as a tenant in common, it is insisted that the plaintiffs in this case are not proprietors at large through the town. The charter directs that this right shall be located in such manner as the proprietors should judge would least incommode the settlement of the township. The location of this right is made a condition precedent to the rights of enjoyment or possession by the college.

It is said by the plaintiffs, that the proprietors were authorized and directed by the charter to locate the land belonging to their right, and that they have neglected so to do. Admit it. The proprietors have neglected their duty. But are the plaintiffs, because they have been deprived—through the neglect of the proprietors—of a particular right, which was given them by the charter, to acquire under this charter another and different right, which was not given? Have they the power of substituting any right which they may claim for the one they have lost? If the plaintiffs have lost any right, it is by their own neglect. They have slept for forty years, without, as they say, taking any measures to compel the proprietors to locate their land; and as a compensation for this neglect, they now ask, not that their lands may be located, not that they may have a lot of wild land, but that they may have an undivided 70th part of all the lands, with the buildings and improvements thereon, and this too without paying any thing for those improvements.

If the plaintiffs are proprietors at large through the town, and, as such, tenants in common, they may remain so to the end of time. The legislature have always exempted public lands from taxation; and are there not infinite difficulties in carrying the several statutes relative to taxes into effect while the lands are thus situated? The proprietors were directed by the charter to locate this land: if they neglected to do so, and the rights of the state

GRAND-ISLE,
January,
- 1831.

University of Vt
vs.
Reynolds' ex'r.

were thereby prejudiced, the charter might be vacated or repealed.

III. The plaintiffs are barred by the statute of limitations. By the act of October 27, 1785, (*Old stat.* 87 *and* 90, *sec.* 10,) the proviso in that act relates only to preceeding provisions, and does not affect the subsequent limitations. By the statute of March 10, 1787, (*Old stat.* 91,) there is no exception or proviso applicable to this subject. The act of 1797 does not prevent the act of 1787 from continuing to run.—*Stat.* 291, *sec.* 13. The act of 1787 attaches to the possession of the defendant, though commenced before the passing of the act, which is to be liberally construed. This act is not affected by the act of 1801, (*Stat.* 292,) which applies only to the act of 1797. Under the statute of 1787, the defendant's title was perfected in the spring of 1802. If the statute did not begin to run until after the college was incorporated in 1791, the restraining acts of 1802 did not prevent the defendant's title from becoming afterwards perfected.—*Bal. Lim.* 60.

The language of the statute is sufficiently broad to cover the rights of the state; and the state must be barred unless there is some unyielding rule of law that exempts those rights from its operation. We have adopted the common law so far as it is applicable to our local situation and government, &c. But with the common law we have not adopted the maxim of *nullum tempus occurrit regi.* This maxim arose out of the King's prerogative; and no reason can be given for its adoption, that will not apply with equal force to many other maxims relative to the King's prerogative. Such as his prerogative right in swans and royal fishes, (4 *Bac. abr.* 157;) and in wrecks, (4 *Bac. abr.* 158.)

On examining the English authorities it will be found to be laid down as a general rule, that, where an act of parliament is made for the public good, the advancement of religion and justice, and to prevent injury and wrong, the King shall be bound, though not particularly named. To take this case out of the operation of this rule, the plaintiffs must satisfy the Court that the statute of limitations was made for the promotion of public evil, and the perpetuating of injury and wrong. But admitting that the statute of limitations will not run against public lands, yet those lands must be located before they are exempted from the operation of the statute.

IV. From the great length of defendant's adverse and peaceable possession it should have been left to the jury to presume a ti-

GRAND-ISLE,
January,
1831.

University of Vt.
vs.
Reynolds' ex'r.
tle in the defendant. The old doctrine of prescription has given place to the modern doctrine of presumption, and at this day all rights of action are subject to a legal bar by limitation, or, where there is no statute of limitation, to a presumptive bar. The reason why the English writers hold the doctrine to be applicable only to incorporeal rights, is, because their statute of limitations extends to every thing else. They do extend it to lands where there is no statute of limitations.—*Mayor of Hull* vs. *Horner,* Cowp. R. 102 ; *Powel* vs. *Millbank,* 1 T. R. 399 ; *Eldridge* vs. *Knott,* Cowp. R. 214, 217 ; *Read* vs. *Brookman,* 3 T. R. 158 ; *Holcroft* vs. *Heel,* 1 B. & P. Rep. 400 ; *Johnson* vs. *Ireland,* 11 East, 280 ; *Parker* vs. *Baldwin,* 11 East, 488 ; *Bunce* vs. *Wolcott,* 2 Conn. 27 ; *Sumner* vs. *Child,* 2 Conn. 607 ; 1 Bay Rep. 26 ; 3 Johns. Cases, 109 ; *Gray* vs. *Gardner,* 3 Mass. R. 399 ; *Towner* vs. *Sadler,* 2 Hen. & Mum. R. 370 ; *Jackson* vs. *Pratt,* 10 Johns. R. 380 ; *Jackson* vs. *McCall,* 10 Johns. 337 ; *Coolridge* vs. *Learned,* 8 Pick. R. 509 ; *Shumway* vs. *Simons,* 1 Vt. Rep. 53. In these cases the courts clearly recognise the doctrine that a title in the defendant may be presumed, and this on the principle of quieting an ancient possession. Whether the charter in this case is considered as conveying to the proprietors the fee of this land in trust, reserving to the state the power of appointment, or as excepting an undivided portion out of the grant, is, for the purposes of this question, a matter of indifference to the defendant. If this charter merely reserved to the state the power of appointing the use of this right, then it is to be presumed they have executed that power, before the college was incorporated, by vesting the use in the defendant : but if it is to be treated as an exception, then the fee of this right was in the state ; and the presumption is, that the state by resolution of the legislature, or otherwise, granted the town to those under whom the defendant claims. In either point of view, there is nothing to prevent the presumption of a grant by the state, as they alone had the power of disposing of this right from 1781, when the charter was granted, to 1791, when the college was incorporated ; and this presumption is strengthened by the fact that between 1781 and 1791, and when those under whom the defendant claims were in possession, the legislature granted lands by resolution without any formal act or charter, and those grants were confirmed by an act of the legislature passed for that purpose in 1789.—*Old stat.* 253. That such a grant should have been made by a resolution, and lost, is not any way extraordinary, when it is

recollected that all the statutes passed in 1777 are not now in existence ; and many of the journals of the legislature, where alone these resolutions were recorded, are not now to be found.

GRAND-ISLE,
January,
1831.
—
University of Vt
vs.
Reynolds' ex'r.

The act incorporating the college in 1791, does not in the least rebut this presumption ; for it will be noticed, that this act does not point out these particular lands, but is a general conveyance of all lands appropriated for the use of a college ; so that if these lands, after the charter and before the act of incorporation, had been appropriated to another purpose, as they legally might have been, the college under their general grant would have no title to them.

The evidence ought to have been submitted to the jury from which they ought to have presumed a surrender of the charter,and, therefore, an extinguishment of the plaintiffs' title.   This charter was granted in 1781, at which period, or immediately after, this town was settled, and organized in 1787 ; and every year since, it has been represented in the legislature, as will appear by the journals of the house.   At the time this suit was brought, in 1821, every lot in town was occupied, but not an occupant held under a proprietor.   No proprietor had ever asserted a right to any part of this town under this charter.   Here, then, is a period of forty-one years, during which time this town has been transformed from a wilderness to cultivated fields and gardens, and not a solitary right has ever been claimed or asserted under this charter.   Can stronger evidence of a surrender of this charter be given in a court of justice ?  Can it be supposed, that if this charter had really conveyed to these proprietors this beautiful and highly valuable tract of land, that not one of the seventy proprietors, either public or private, would in forty-one years have asserted their right ? These facts ought to put at rest for ever this state claim.   There is something rotten in the business, or this claim would not have slept until all, who could tell any thing about it, had, with their transactions, passed into oblivion.

*Mr. Allen, for the plaintiffs.*—1. The defendant contended, " *that it ought to appear from the declaration, how the plaintiffs* " *claim, whether as tenants in common, or in severalty.*"   In answer, the plaintiffs insist, that they may demand the whole in their declaration, and recover according to their right.—*Chip. Rep.* 41, *Chapin* vs. *Scott* ; 1 *Burr.* 326, *Burgess* vs. *Purvis* ; *Bray.* 69, *Everts* vs. *Dunton*,

2. " *That he has a complete title by the statute of limitations.*"

GRAND-ISLE,
January,
1831.

University of Vt.
vs.
Reynolds' ex'r.

The plaintiffs answer, that the lands were reserved or granted for the use of a seminary or college; and that the University was founded in 1791. If the fee of the land remained in the government, no statute would run upon it, as the principle, "*nullum tempus occurrit regi*," would then apply. If the land was granted, the fee lay in abeyance until 1791, when it was appropriated for the use of the University, before which time no right of action had accrued. And in 1801, ten years from that time, the statute was passed exempting public lands from the operation of the statute of limitations.—*Stat. p.* 292; *State papers, p.* 503.

3. "*That, as tenant in common, the plaintiffs cannot sue to be let into possession, without demand.*" If the plaintiffs be regarded as tenants in common, they insist, that whenever there is an actual ouster, their right of action accrues. A demand to be let in, and a refusal, would be evidence of an ouster; but it does not follow, that no other evidence can be received to prove it. That the defendant has actually ousted the plaintiffs, appears from the case, "that he is in possession, claiming in his own right, adverse to all the world." The deeds, also, to the defendant from Gardner and Sowles, are evidence of an actual ouster.—5 *Mass,* 347, 252, *Higby* vs. *Rice*; *Cowp.* 217, *Fishar* vs. *Prosser*; *N. Y. Dig.* 319, *Adams on ejectment,* 55, *n.*

4. "*That the jury ought to presume a title in the defendant's testator, after thirty eight years' possession.*" There is no disagreement as to the circumstances attending the case. The charter is dated in 1781; and before the year 1785, the town was surveyed and allotted; the charter reserves a right for a college; *Reynolds* took possession of no. 98 and 99 in 1785; the statute of 1791 declares the use of these lands; the statutes of 1802 and 1810, do the same. Now, what circumstances will justify the presumption of a charter or grant, is matter of law to be judged of by the Court.—*Phil. Ev. p.* 124, 2 *Conn. R.* 628, *Sumner* vs. *Child.*

The defendant asks the Court to presume that *these lots* were granted to him; which must, of course, be before the year 1781; because, after that time, the town was allotted, and the numbers given to the lots; which is *wholly inconsistent*; for, if he prescribes for a charter from the government, subsequent to 1781, it would be inoperative and void; because, having before that time, granted, or reserved the same, they could make no second valid grant of it. A presumptive grant must be older than that which it is intended to defeat; as in 1 *Bay,* 26, *Allston* vs. *Saunders*; 11 *East,* 280, *Johnson* vs. *Ireland*; *Cowp.* 102, *Mayor of Kings-*

*ton* vs. *Horner.* If he prescribes to hold from the corporation, it must.be in conformity with their right. And, as they have no other right, than to lease their lands and receive rents, a prescription of a grant from them, *in fee,* is inconsistent with their right, and is, therefore, inoperative and void. " No grant can be presumed, when there could not have been a legal ·commencement of the right."—*2 Conn. Rep.* 614, *Sumner* vs. *Childs* ; 11 *East,* 374, *Daniel* vs. *North.* If the grant was made to the proprietors, then they held it *in trust* for the corporation ; and no grant can be presumed whereby trustees would be guilty of a breach of trust.—*2 Conn. Rep.* 615. It does not appear, that the plaintiffs ever had any knowledge of the defendant's possession ; and no title could be presumed against them, without showing that they knew the fact.—11 *East,* 374, *Daniel* vs. *North.*

*The opinion of the Court was given by*

WILLIAMS, J.—The plaintiffs instituted this action against the defendant's testator to recover the possession of lots no. 98 and 99 in Alburgh, and claim title to the same by virtue of a charter under the authority of this state, dated February 23, 1781, granting to Ira Allen and his associates, certain lands therein described,and incorporating the same into a township by the name of Alburgh, and granting to those, who did then, or might thereafter, inhabit the said tract, the same privileges and immunities which were enjoyed by those who inhabited the other towns in this state. In the charter five-seventieth parts, or rights, are reserved to the several public uses mentioned therein ; one of which is for the use of a college ; and this right together with one other, " with " the improvements, rents, interests and profits arising therefrom," it was provided, in the charter, should be " under the control, " order, direction and disposal of the general assembly of this " state forever." And the proprietors were authorized and empowered to locate the same equitably, quantity for quality, in such parts of the town as they or their committee should judge would least incommode the general settlement of said township.

· On the 2d of November, in the year 1791, the university of Vermont was founded, and by the statute giving them existence they were empowered to take charge of, lease, rent and improve, &c., all such grants as had already been made by this state for the use of a college. The case finds that the defendant's testator, *Reynolds,* and those under whom he claimed, have been in possession of the premises demanded since the spring of the year

GRAND-ISLE,
January,
1831.

University of Vt.
*vs.*
Reynolds' ex'r.

1785, claiming the same in their own right, and adverse to all the world ; that in September, 1794, he took a deed from one Joseph Sowles, granting him lot no. 98, and in December, 1796, another deed from Asa Gardner of lot no. 99.   It was in evidence on the trial that the town was plotted prior to the year 1785, and, not many years after, surveyed by direction of Ira Allen, and the lines run through the town ; that the lots were one hundred acre lots ; that every lot in town was claimed by some person, although there were some lots not improved or cultivated ; and also that no lot in town was held under an original proprietor named in the charter.   A verdict passed for the plaintiffs, for one-seventieth part of the premises described in the declaration, under a rule, agreed to by the parties.   The question is, whether the plaintiffs can recover of the defendant, the premises for which the verdict was taken, on the facts which appear in the statement of the case, or whether the court should have directed or advised to a verdict for the defendant.

It appears that the plaintiffs claim as tenants in common ; and the first inquiry which has been presented is, whether, as such, they can maintain this action against any or all of the persons inhabiting the town of Alburgh.   We all know that a tenant in common may, in ordinary cases, maintain an action of ejectment ; that the tenants are considered as having several titles, and if they are disseized, they are put to their several actions.   Each may maintain an action to recover his proportion ; and, as against a stranger, it has always been considered in this state, that he may recover the whole of the demanded premises ; and it is so considered in Connecticut, as we learn from *Swifts' Digest*, 508.   Indeed the principles of law, as applicable to tenants in common, and the actions they may bring, are familiar to every one.

It has been denied in the argument that proprietors of lands under grants from the state of New-Hampshire and this state, constituting towns, are tenants in common ; and it has been urged as an argument against their being so considered, that they can do many things by vote ; as making a division of their lands into severalty ; voting to settlers the lots on which they live, in lieu of their drafts ; and authorize a division by pitches ; that a proprietor may acquire a title by the statute of limitations ; that their possessions are considered as several, &c., which it is said are inconsistent with the idea of their being tenants in common.   They must, however, be considered as strictly tenants in common, and where they differ from ordinary tenants in common, the difference has

been created either by statute, or by a course of decisions in our courts of law.   In the grants or charters to them certain civil and political privileges are given to those who inhabit the particular tract chartered as a township, and those inhabitants are incorporated ; but these privileges are not given by the charter to the proprietors, nor have they any other interest in them, except so far as these privileges may enhance the value of the lands granted. The inhabitants of a town may be a corporation, and enjoy all the privileges which are granted either by the charter, or the several statutes, and yet be a body totally distinct from, and hold their possessions adverse to the proprietors.   Grants in this country to several persons have always been so construed as to make them tenants in common, when the same grants in England would create an estate in joint tenancy.   The very terms of the charter convey to the proprietors an estate which must, until division, be held in common, and unless they are considered as taking an estate in common, it is difficult to define the nature of the interest which they have.

These grants of townships were always considered in New-England as creating a tenancy in common.   *Sullivan*, in his history of land titles, speaking of the grants of townships to sundry grantees, without expressing any particular kind of tenure or species of estate, says, " they have always been considered as fee simple estates, and tenancies in common ; and the principles, as to the nature of the estate, have been invariably the same since the country was settled."   The opinion of *Judge Parsons*, in the case of *Higbee et al.* vs. *Rice,* 5 *Mass,* 344, is to the same effect. The right of making a division by vote or by pitching, the right as a corporation to commence or defend actions, and the right to act as a corporation, are privileges given, or regulations made, by statute, but do not alter the nature of their estate.   The right of one proprietor to maintain an action against a stranger and recover the whole of the premises demanded, his acquiring a title as against his co-proprietors by adverse possession, have not been considered as peculiar to proprietors, but as incident to them as tenants in common.   In short, these proprietors may be considered as strictly tenants in common, with all the rights and incidents to such tenancy, except where the statute or a course of decisions in this state may have altered those rights and incidents.   If the plaintiffs, then, are considered as standing on the same footing with the proprietors or grantees, the charter makes them tenants in common with the other proprietors of the tract of land therein granted.

UUU

GRAND-ISLE,
January,
1831.
University of Vt
vs.
Reynolds' ex'r.
What is the appropriate remedy for a proprietor when the others have actually taken possession and divided to themselves all the lands included in the limits of the grant, is a question which has not to my knowledge been directly brought to the consideration of the courts of this state, or received any judicial determination. But, upon the principles applicable to tenancies in common, it may well be assumed, that if the proprietors will not consent to a division in any of the methods which the law recognises for dividing the lands among them, such proprietor might, after demand, be let into possession of his share by an action of ejectment ; and if the consequences of this would be injurious to the other proprietors, it would arise from their wrongful act in excluding him from his proprietory right. The Court see no difficulty in allowing this action to be maintained by one proprietor, when he is altogether shut out from the possession by his co-proprietors, and extending to him the same remedy which the law provides for a tenant in common under similar circumstances. There is more difficulty, however, in the application of these principles and extending this remedy to those who are directed, as agents or trustees, to take charge of the rights of land which are usually denominated public rights ; not because we think there is any foundation for the argument, that the state or a corporation cannot hold lands in common, as the law is the very reverse of this. The King or a corporation, may be a tenant in common, but cannot be a joint tenant.— Co. Litt. 190, a ; 2 Saund. 319, Bennet vs. Holbeck. But the difficulty arises from the nature of their interest, which, it appears to me, cannot be enjoyed by the agents or trustees in common with the other proprietors. As to these rights of land, and particularly that one which the plaintiffs claim, it is only the use which is appropriated, and not the freehold. By an act of the legislature passed in October, 1787, (Old stat. Haswell's edit. p. 209,) it was provided, that a person should be annually appointed by the general assembly, "to take the charge and inspection of all lands appropriated by charter for the erecting a college or university in this state, and to allot and lease out the said lands for the benefit of the institution ;" and provisions, somewhat similar, were made by the same act in relation to the glebe and society lands.

By the act of 1791, founding the University, the board of trustees were empowered to take charge of, lease, rent and improve, &c. the lands granted for the use and benefit of a college. It will be but of little avail to them to be let into possession of one seventieth of every lot or tenement in a town ; and it would be impossi-

GRAND-ISLE,
January,
1831.

University of Vt
*vs*
Reynolds' ex'r.

ble to lease them to any advantage or profit to the institution; the expense and disadvantage attending it would wholly destroy the benefit intended by the grant.

One of the consequences of considering these public rights as being held in common with the other lands, ought not to be lost sight of. If the principle is correct which has been adopted in this state, before mentioned, that a tenant in common may in an action of ejectment against a stranger to the title, recover the whole of the estate held in common for the benefit of his co-tenants, and if the public lands are exempt from the operation of the statute of limitations, it will follow as a necessary consequence, that no length of time will protect a person in possession, but he will be liable at any time to be dispossessed by those who are trustees of the public rights of lands where there has been no location, not only of the *shares*, which belong to those rights, but also of the whole. The verdict in this case might as well have been for the whole, if the plaintiffs had so elected, as for the undivided share. This certainly must be the effect, unless we consider a person in possession for a sufficient length of time to bar the right of individuals, as acquiring a title by disseizin, to all the tract of land of which he is in the possession, except the undivided shares which were reserved for public uses; and thus acquire an estate in common by disseizin or by adverse possession. If an estate in common can thus be acquired, then, it is true, the disseizor would not be a stranger to the title. From the fact that provision was made at an early day for allotting the public rights; from the great difficulty, if not impossibility, of those rights being improved and occupied in such a manner as to secure the use for the benefit of those for whom they were designed, while they remain undivided, and from the consequences which will inevitably result from permitting either the whole, or an undivided share, to be recovered in an action of ejectment against the occupier of every lot of land or tenement in town, whatever may be its size, there appears to me to be great weight in the argument, that these rights cannot be occupied and enjoyed, and that no action of ejectment can be maintained to recover them until a division or allotment is made; that measures should be first taken to procure a division, or compel the proprietors to set out and locate these rights in such a manner as to secure to them an equal proportion with the other proprietors: and I think the legal or equitable powers of this Court are sufficient to compel such a division, so that the lands could be appropriated to the use designed by the charter, if the proprietors should obstinately refuse to make a division, or

GRAND-ISLE, locate and set out the public rights. A majority of the Court,
January, however, are of opinion that these lands are held in common with
1831.

University of Vt. all the lands in town *previous* to location or allotment, and that an
*vs.* action of ejectment may be maintained to recover the public lands,
Reynolds' ex'r. *when there is no actual location;* and consequently, that the plaintiffs
may maintain an action of ejectment against the defendant, if they
can establish a title to the right granted for a college or university.

The next question which arises is, whether the plaintiffs are
barred by the statute of limitations, the defendant's testator having
been in possession of the premises, claiming title thereto, and
claiming to hold the same adverse to all the world, from the spring
of the year 1785, until the commencement of this suit.  On this
question we are all agreed, that the plaintiffs are not barred by any
of the statutes of limitation which have been in existence in this
state since the defendant's testator went into possession.  The act
passed in October, 1785, called the quieting act, contains an ex-
press provision, that it shall not extend to any person or persons
settled on lands granted or sequestered for public, pious or chari-
table uses; and although this proviso is inserted in the act pri-
or to the sections containing the limitation of real actions, yet the
terms of the proviso and the nature of it embrace the whole act.
The terms are, "this act shall not extend," &c., and was unques-
tionably designed to prevent the operation of the statute of limi-
tations upon the public lands, as well as upon those lands of which
possession had been taken in pursuance of a contract with the
owner.  If this proviso is to be confined to the prior sections of
the act alone, every person who was on the land of another by
contract, and who had not complied with the terms of the contract,
and was, in consequence, liable to be ejected before the first day
of July, 1785, would have acquired a title by such possession
after three years from that time.

The act of March 10, 1787, which barred the action of eject-
ment, or any possessory or real action, after fifteen years, was, by
an act passed October 26, in the same year, suspended until the
first day of December next thereafter ; and by another act passed
the 28th day of October, 1790, the first day of December, 1787,
was declared to be the day from which the time of limitation was to
begin. (*Old statute, Haswell's edit. p.* 212, 261.)  Under this
act no action of ejectment was barred, or right of entry taken away,
by an adverse possession, until the first day of December, 1802.
The statute of limitations of 1797 was to take effect on the first
day of September, 1798 ; and under that statute no real or posses-

GRAND-ISLE,
January,
1831.

University of Vt
vs.
Reynolds' ex'r.

sory action was barred until the first day of September, 1813. And in October, 1801, and in November, 1802, before any right could be barred by these statutes, laws were passed declaring that nothing in any of them should be construed to extend to any lands granted or sequestered or appropriated to public, pious and charitable uses. The answer that has been given to these statutes of 1801 and 1802, that the statute of limitations having once begun to run, must continue to run, is by no means satisfactory. A person in possession of land without right is a trespasser, and is not considered as having any right or title commencing in consequence of this trespass. The legislature may vary the remedy given for the recovery of real or personal estate, and may prescribe a longer or shorter time, within which all actions shall be brought. No rights are acquired or lost by the statute of limitations, until the expiration of the period limited by them; and until the expiration of that period the time may be enlarged. The statutes of 1801 and 1802 prevented the operation of the statutes of 1787 and 1797, on the claim of the plaintiffs. A similar construction to the statute of 1785 was given by Judge *Patterson*, in a cause before him in the circuit court of this state; and it is understood that all these statutes of limitations have been examined by the supreme court of the United States in a case determined last winter, in which it was decided, that neither of them had any operation on public lands.

Having this view of the statute of limitations and its operation as to the public rights, it is unnecessary to examine the questions which have been presented in the argument, whether the fee of the college right, as it is called, was in abeyance until the college was founded, or to enquire, in whom the fee was, or is, vested.

It was urged in the argument, that if any of the proprietors could bring an action against the defendant's testator during the time he was in possession, that the statute would run in his favor. It is undoubtedly true, that when a joint action is given to several, the statute will run against all, notwithstanding some of them are under the disabilities mentioned in the statute, as being infants, *feme coverts*, &c., (4 *Term Rep.* 516, *Perry et al.* vs. *Jackson et al.*; 7 *Cranch*, 156, *Marsteller et al.* vs. *McLean*,) and possibly, if it was necessary, that this action should have been brought by all the proprietors by name, or by the proprietors in their corporate capacity, agreeably to the statute, this principle might operate in favor of the defendant. But, inasmuch as we are of opinion, that the plaintiffs may maintain this action for their

GRAND-ISLE,
January,
1831.

University of Vt

vs.
Reynolds' ex'r.

undivided share, and as they are expressly exempted from the operation of the statute of limitations, the principles adverted to will not preclude their recovery in this case.

The last question which was argued, and which is the one of the greatest importance, arises from the doctrine of presumption, —whether the jury would not have presumed a title in *Reynolds* after so long an adverse and peaceable possession. A possession of lands, for the period of fifteen years, where the statute of limitations will operate, is *an absolute bar* to any claim from the rightful owner, and has been considered as giving a possessory title. This was ruled by *Lord Holt*, in the case of *Stokes vs. Berry*, 2 *Salk.* 421, and 1 *Lord Raym.* 741, where a possession of twenty years was considered as giving such a title as would enable the possessor to maintain ejectment. In cases to which the statute does not apply, a long continued possession affords presumptive evidence of title. The maxim of the law is, *ex diuturnitate temporis omnia presumuntur solemniter esse acta.—Co. Litt.* 6. An act of parliament, a grant from the crown, a deed, and, in fact, any thing which will quiet a possession, may be presumed from length of time, where such act, grant, or deed would have been lawfully passed, made, or given ; and this presumption is said to be founded, 1st. on the principle, that the law will not presume any man's acts to be illegal, but will attribute such possession to a legal origin ; 2d. that the failure to interrupt such possession by those who had the right, arose from their knowledge that it was lawful in its inception ; and 3d. upon principles of public policy for quieting men in their possessions. In the case of the *Mayor of Kingston upon Hull* vs. *Horner, Cowper*, 102, it was left to the jury to presume a grant or charter from the crown of certain duties ; and *Lord Mansfield* mentions a case where a possession of one hundred years was left to the jury as evidence of right in the defendant. A great variety of cases were read at the argument, and the elementary treatises are full of them, to show that a grant, or the extinguishment or surrender of a grant, and, in short, every thing which will confirm a long continued possession may be presumed ; and this, not because it is necessary to believe that any such acts were actually done or executed, but for the purpose of quieting possession. In cases of prescription this possession is conclusive as to the right. Certain facts being found to exist, the right is confirmed as a matter of law, and the possession is considered as conclusive of the right, as if a deed or charter was actually produced.

There are certain other cases in which the presumption is not considered as altogether a legal inference, but must be made by the jury, and yet the court advise or direct the jury to make such presumption. The enjoyment of certain incorporeal heredita- ments for the period of twenty years, if adverse, establishes the right to such enjoyment founded on the presumption of a grant ; but this possession is liable to be explained. The enjoyment is, therefore, not an absolute title, but may be rebutted. But, if the enjoyment was adverse, it affords sufficient ground for such presumption. *Chancellor Kent* says, the later English authorities give to this presumption the most unshaken stability, and they say it is conclusive evidence of right. *Judge Story*, in the case of *Tyler* vs. *Wilkinson*, considers it in this light, and says that this presumption may go to the extinguishment of a right in various ways, as well as by grant. In these cases, although the courts do not decide upon these presumptions as purely questions of law, yet they direct the jury to make them to answer some purposes of justice, and to quiet possessions. These cases differ altogether from those where the jury are to make their inferences and deductions from the weight of testimony, as to the existence and loss of a deed or grant. This second class of presumptions, where the jury are advised to make them, it will be found, apply to corporeal as well as incorporeal hereditaments. Thus, a grant of land may be presumed, as well as a grant of a fishery, or common, or way, and many cases of this kind are to be found.—10 *Johns.* 377, *Jackson* vs. *M'Call; 7 Johns.* 5, *Jackson* vs. *Murray* ; 3 *Johns.* 375, *Jackson* vs. *Hudson.* In the latter case an outstanding title, founded on a deed or release, which was in evidence, was presumed to have been extinguished, as the title had never been asserted or claimed. From comparing these cases with the case of *Doe ex dem. Fenwick* vs. *Reed,* 5 *Barn. and Ald.* 232, it may be inferred, that where there has been a long continued possession which in its origin was or would have been unlawful, unless there had been a grant ; or if the origin of such possession cannot be accounted for, without considering it either as unlawful, or also lawful by virtue of a grant, the Court will not infer that the possession was unlawful, but direct the jury to presume such grant, or any thing which will confirm the possession. But if the original possession was consistent with the fact of there having been no grant, then although the possession may have been ever so long, it will be left to a jury to say whether they believe such grant has been made, and they must determine according to the weight of

GRAND-ISLE,
January,
1831.

University of Vt
vs.
Reynolds' ex'r. the evidence.   Further, it is true that where there exists no power to make a grant, none can be presumed from a possession however long it may be.   If it was necessary in this case to presume a deed from the trustees of the university to establish the defendant's claim, it would not be established, as the trustees never had any power to convey by deed.   If it were required to presume a grant from the state subsequent to the grant to Allen and his associates, none could be presumed, unless it was also presumed that the first had been surrendered.   But it is not necessary to make either of these to quiet the defendant in his possession.   The facts are that the defendant's testator went into possession of the premises adverse to all the world in the spring of the year, 1785.   From the fall of the year, 1787, to the time of commencing this action, if an agent was appointed agreeably to the direction of the act before mentioned, there have been persons, either the agents or trustees, whose duty it has been to take care of the rights granted for the use of a college, and to eject the defendant's testator, if he was in without right.   No one of the proprietors named in the charter of Alburg have ever *successfully* asserted their claim under the charter, if they have attempted it, as it appears by the case, that no lot in town is now holden under the original proprietor.   The only attempt which has been made, is the survey of the town into lots by Ira Allen ; but whether he then abandoned his claim under a conviction that it was useless to set it up against the persons inhabiting the town, because he found they had a better title, we do not learn.

Under these circumstances it appears to us that the long continued possession of these lots by *Mr. Reynolds* should be considered as affording evidence that his possession commenced under a lawful title ; and the jury should have been advised *either to* presume an antecedent grant, or a surrender of the charter, under which the plaintiffs claim, or an extinguishment of any title which ever could have been derived under it, in favor of those who are in possession.   If in this action, or in an action against any of the inhabitants of this town, none of whom hold under this charter, a grant subsequent to the grant to Allen should be produced, and from the evidence it should appear, that the town was settled under such subsequent grant, and that no claim had been asserted under the first, according to the principles laid down by *Judge Chipman*, *Paine & Morris* vs. *Smead*, 1 *Chip.* 56, such settlement under the subsequent grant and abandonment of the former would be considered as a waiver of the first and confirmation of

the second grant.   And where there has been such a  settlement and a possession for a long time, although no other grant or charter is produced under which such settlement and possession commenced, it may, and it ought to, be presumed, that the charter under which no claim had been asserted, had been abandoned or surrendered, and either an antecedent or subsequent grant made to the inhabitants who are in the actual occupancy of their lands.

From this view of the case we think it is evident that the plaintiffs are not entitled to recover in this action ; that the jury might and ought to have presumed in favor of the person who was in possession, either a grant of this particular right of land, which the legislature had the power to make until the year, 1791, when the college was founded, or an antecedent grant to the inhabitants of this town, or an abandonment and extinguishment by lawful means of the title given by the charter, or a surrender of the same, and a subsequent grant to the persons in possession, either of which would have attributed to the long and undisturbed possession of *Mr. Reynolds* a legal origin ; and that public policy requires that this possession should be quieted.

Judgement on the case must, therefore,

be rendered for the defendant.

*Allen*, for the plaintiffs.

*Smalley & Judge Royce*, for the defendant.

———————————

NATHANIEL B. HARVEY AND TIMOTHY W. TWITCHELL *vs.* HIRAM H. HURLBURT, ORANGE BRITTOL AND JOHN ROBBINS.

A mortgage deed was executed to A & B to secure them for signing a note as surety for the mortgagor.  Afterwards the mortgagor conveyed the mortgaged premises to A and another person, and the deed contained a provision that the grantees should pay off all the incumbrances.  After this A paid the note in which he and B had become surety for the mortgagor.  In an action of ejectment afterwards brought by A & B, the mortgagees, predicated on the mortgage, against the persons in possession of the mortgaged premises, it was held, that, by the conveyance to A and the other grantee, the plaintiffs were fully indemnified from the note which they had signed, and that their claim on the mortgage was discharged, and could not be set up by either of the plaintiffs.

This was an action of *ejectment* in which the plaintiffs claimed title to the demanded premises by virtue of a mortgage deed executed to them by one Samuel D. Brainerd, dated June 20, 1820, to secure them for signing a note to one Mattocks, as surety for Brainerd, for the sum of $54,63, payable on or before the first day of November, 1820.   The deed was conditioned to be void

VVV

ADDISON,
*January,*
1831.

Harvey et al.
*vs*
Hurlburt et al.

on the payment of the note by Brainerd. It appeared at the trial in the county court, that, subsequent to the date of the mortgage to the plaintiffs, one Meeker had levied an execution against Brainerd on an undivided third part of the premises, subject to the mortgage ; that Meeker had conveyed his title to H. Seymour, and that Seymour had conveyed to *Orange Brittol* and *John Brittol, jun.;* and that the defendants were in possession of the premises under said deed from Seymour.

The defendants offered in evidence a deed of the same premises from Brainerd to the plaintiff, *Harvey,* and one Scott, subject to said mortgage and other incumbrances, dated October 7, 1820, in which there was this clause : " *which incumbrances, and the demands due on them, the grantees are to pay and discharge in full.*" The defendants also offered in evidence a deed of the same premises from *Harvey* to one Stow, subject to the same incumbrances, dated January 14, 1822, and a quit-claim deed from Stow to the defendant, *Hurlburt,* accompanied with evidence to show that *Harvey* had paid the note mentioned in the mortgage deed from Brainerd to the plaintiffs subsequent to the first day of November, 1820, prior to the date of the deed from *Harvey* to Stow, and that the other plaintiff, *Twitchell,* had no interest in the mortgage. The evidence was objected to by the plaintiffs, but admitted by the court. The court directed a verdict for the de-fendants on the ground that *Harvey,* having paid the note before he conveyed to Stow, the plaintiffs had no title to the premises.

The plaintiffs also offered evidence tending to show that *John Brittol, jun.* one of the defendants, was in possession of the premises demanded, with a view to recover against him ; which evidence was rejected by the court.

The plaintiffs excepted, &c., and the cause was thereupon removed to this Court.

*Mr. Seymour, for the plaintiffs.*—The parties in this case both claiming under S. D. Brainerd, the only question is, which has the better title from him ; and as the plaintiff's title is prior in the order of time, it follows, that if that is still a valid subsisting title, they are entitled to recover. That the mortgage to plaintiffs was originally valid, is not denied ; and it is contended that the deed from Brainerd to *Harvey* and Scott, of the equity of redemption, did not operate to unite the two estates so as to merge the one in the other The union of the mortgage with the equity of redemption in the same persons would operate as a merger ; but the

mortgage title being in *Harvey* and *Twitchell*, and the equity of redemption in *Harvey* and Scott, the two estates could not amalgamate, but must remain separate and distinct. In this state of things, *Harvey* paid the note to Mattocks. This payment did not certainly vacate the mortgage, but the contrary, as it was this very contingency provided against by the deed. And even at this period of the transaction, the two interests could not unite, for the reason already given. If, therefore, the two interests still remained distinct, it was competent for *Harvey* to release or convey his interest in the equity of redemption, reserving his claim under the mortgage to be reimbursed for the amount paid upon the note to Mattocks.

ADDISON,
January,
1831.

Harvey et al.
vs.
Hurlburt et al.

*Bates and Chipman, for the defendants.*—In the first place, it may be remarked, that the case is to be decided in all respects the same as if *Twitchell* and Scott had never been named in any of the conveyances. *Twitchell* was at first a surety with Harvey ; but when *Harvey* took the absolute deed of Brainerd, and undertook to pay the demand, and did pay it, *Twitchell* ceased to have any interest whatever in the transaction. As Scott is not a party to the suit, *Harvey* cannot recover upon any supposed right of Scott. But it further appears by *Harvey's* deed to Stow, that Scott must have relinquished his right to *Harvey* ; for in that deed, *Harvey* covenants that he is well seized of the premises in his *own right*, except the Mattocks' incumbrance. The question then is, has *Harvey* a legal title to these premises ? If he has any title, it must be as the mortgagee of Brainerd in the first deed ; and as to this, the defendants contend,

1st. That at the date of *Harvey's* deed to Stow, he had become the sole owner of the incumbrance, and of the premises incumbered, and that in his person the incumbrance was necessarily merged in the absolute title. The unqualified and absolute owner of land, which has formerly been incumbered by mortgages, cannot preserve for future sales or disposition, the land and the several liens as distinct and separate estates. Where they are all owned by the same person the subordinate estates become merged and extinct.

2d. The condition of this mortgage deed was to pay the Mattocks' note. That note constituted all that could in any sense render the mortgage an incumbrance ; and when the note was paid and extinguished, the incumbrance of necessity ceased ; whatever other rights might accrue between the parties, the lien

ADDISON,
January,
1831.

Harvey et al.
vs.
Hurlburt et al.

on the land was dissolved. The cases in 6 *Johnson's Chancery Reports* show clearly that when the mortgagee purchases the equity of redemption, the equitable estate, as a general rule, merges in the legal. And when *Harvey* bought of Brainerd, he had no motive to keep them distinct. The incumbrance, as to him, sunk. —6 *Johns. Ch. Rep.* 393, Starr vs. *Ellis;* do. 417, James vs. *Johnson.* At all events the payment of the note extinguished the incumbrance.—18 *Johns.* 7.

PER CURIAM.—The last question which arises from the bill of exceptions, *viz.* whether the action was still pending against *John Brittol*, in whose favor two verdicts had been rendered before the last trial, has not been considered, as the Court are of opinion that the plaintiffs have failed to establish any title against either of the defendants.

The plaintiffs claim under a mortgage deed executed by one Samuel D. Brainerd, to indemnify them from a note which they executed to Samuel Mattocks, as surety for Brainerd, and which *Harvey*, one of the plaintiffs, had paid. It appears that Brainerd, after the mortgage in October, 1820, conveyed the premises to *Harvey*, one of the plaintiffs, and to one Lewis Scott, and in that deed, after mentioning the incumbrances, and among others, the mortgage to the plaintiffs before mentioned, there is this clause ; " which incumbrances and the demands due " on them, the said *Nathaniel B. Harvey* and Lewis Scott are " to pay and discharge in full." This, as between Brainerd and *Harvey*, was a full indemnity, and was in fact a payment to *Harvey* of the amount of the note to Mattocks, and laid him and Scott under an obligation to pay the same. It appears that while *Harvey* was the owner of the premises, either of the whole or a moiety, he did pay to Mattocks the amount of the note. This payment was a performance of an obligation which he was under, and was a payment of a debt which he and Scott were to pay, in consequence of their receiving the deed from Brainerd, and a fulfilment of the conditions of the mortgage deed. The claim on the mortgage was then extinguished, and could not be revived or set up again by either of the plaintiffs, as they were thereby fully indemnified from the note which they had signed.

It does not appear what became of the title of Scott to the undivided half of the premises ; but the probability is it was conveyed to *Harvey*, as *Harvey* afterwards, in January, 1822, conveyed the whole premises to Stow, with the usual covenants of seizin

and warranty. In *Harvey's* deed to Stow he mentions the same incumbrances which were named in the deed from Brainerd to him and Scott ; but Stow conveys to *Hurlburt*, one of the defendants, without naming any incumbrance. The plaintiffs now contend, that in consequence of this mortgage being mentioned as an incumbrance in *Harvey's* deed to Stow, that it is still an existing incumbrance on the land, and that they can hold the land until *Harvey* is repaid the amount which he paid to Mattocks. But their is no possible foundation for this claim. If such was *Harvey's* intention when he conveyed to Stow, he cannot carry it into effect. He cannot revive a mortgage which has been once discharged and satisfied. The plaintiffs have, therefore, no title by virtue of that mortgage against any person whatever.

The judgement of the county court is therefore affirmed.

### NATHANIEL GIBSON *vs.* HORATIO SEYMOUR AND LUKE HALE.

The giving of an absolute deed, without taking back a writing of defeasance, when the deed is intended only as security to the grantee, is, when the grantor is in debt, evidence of fraud, and should be so considered unless it satisfactorily appears that there was some valid reason for transacting the business in that way.

In an action of ejectment by one who claims under a deed alleged to be fraudulent for want of consideration, the defendant will be allowed to prove that the plaintiff has subsequently received from the grantor other deeds of other lands without paying any consideration therefor. Such facts show the amount the plaintiff has received from said grantor, which may be presumed, *prima facie*, to be in payment of his claims against the grantor.

The plaintiff in an action of ejectment, will not be prejudiced by having executed to a third person a mortgage deed of the premises, since the commencement of the action, though such deed is *in terms* an absolute conveyance.

This was an action of *ejectment* for seventeen acres of land in Salisbury, part of a tract of forty-one acres. The parties both claimed title from Jacob Bartholomew, the plaintiff under a deed from said Bartholomew, dated August 7, 1820, conveying the said forty-one acres and also another lot and house in Salisbury. The defendant, *Seymour*, claimed title to the premises by virtue of the levy of an execution against said Bartholomew made in June, 1823. The defendant, *Hale*, had gone into posession under *Seymour*.

At the trial in the county court, the defendants, in order to show that the deed from Bartholomew to the plaintiff was fraudulent, as respected the creditors of Bartholomew, introduced evidence to prove that, at the date of said deed, to wit, August 7, 1820, he, *Seymour*, was a creditor of Bartholomew ; that the deed was

ADDISON,
January,
1831.

Gibson
vs.
Seymour et al.

an absolute deed, and nothing was paid by the plaintiff at the time of taking the conveyance, nor any claim against Bartholomew discharged : that Bartholomew remained in possession of the premises; that it was understood between him and the plaintiff, that the plaintiff should make to Bartholomew future advances; and that the latter was much embarrassed with debts.

The plaintiff then introduced evidence tending to prove, that the deed from Bartholomew to him was executed as security for becoming bail for Bartholomew in a jail bond, predicated on an execution in favor of one Hall for nearly two hundred dollars, which the plaintiff was afterwards compelled to pay; that the property conveyed by Bartholomew to plaintiff was, at the date of said deed, incumbered by several mortgages to nearly, if not quite, the value of the property—one of which, after a decree of foreclosure thereon, the plaintiff paid on the 22d January, 1823, amounting to $354,34.

The defendants then introduced evidence tending to show, that Bartholomew paid the other mortgages on said property, and that he paid the largest mortgage soon after the date of plaintiff's deed, viz. on 30th August, 1820. The defendants also offered in evidence two other deeds of a date subsequent to the 7th August, 1820—one of them dated February, 1821, the other October, 1821—from Bartholomew to the plaintiff, of other property in Salisbury, accompanied by proof that both said deeds were given without consideration. This was objected to by the plaintiff and admitted by the court. The defendants further offered in evidence a deed from plaintiff to Asahel Parsons and Ira Allen of the premises in question, dated the 14th September, 1829, acknowledged and recorded, to show the title out of the plaintiff. This was objected to by plaintiff and admitted by the court.

The plaintiff then offered in evidence a writing executed by said Parsons and Allen of same date with their deed, by which they agreed to reconvey to plaintiff, the said premises on certain conditions, and contended that this writing made the deed to Allen and Parsons a mortgage—and that the right of possession of said premises remained in the plaintiff notwithstanding said deed. No evidence was offered to show a performance of the conditions in said writing from Parsons and Allen to Gibson. The plaintiff further insisted that the deed from Gibson to Parsons and Allen was void under the statute of 1807, by reason of the adverse possession of the premises by the defendants at the date of said deed. No evidence of the defendants being in actual possession

of the premises at the date of said deed, other than the admission of the defendants of possession, as laid in the declaration, was offered by the plaintiff. The plaintiff then offered in evidence a mortgage deed from Bartholomew, of forty-four acres of land in Salisbury, to the defendant, *H. Seymour*, dated 30th January, 1822, to secure sundry demands, and among them the judgement on which the execution issued that was levied on the premises for which this suit was brought, and a conveyance of the same by *Seymour* to one A. B. Martin; and the defendants offered, in connexion with the above testimony, a mortgage back from said Martin to *Seymour*, securing to *Seymour* the sum of eighty dollars, which was given for said land, and afterwards paid to *Seymour*; which was objected to by defendants and rejected by the court.

<div style="text-align: right"></div>

The court charged the jury, that the giving an absolute deed in lieu of a mortgage, when the same was intended as as ecurity, was not in itself fraudulent, but was evidence of fraud as against creditors of the grantor, to be weighed by the jury in connexion with the other facts. The court further charged, that if the jury should be satisfied that there was an adverse possession of the premises at the date of the deed from plaintiff to Parsons and Allen, the said deed in that case would be void, and would not affect the plaintiff's right to recover: but the court omitted to charge the jury, that the said conveyance being a mortgage, and no evidence given of the breach of the condition of said mortgage, except what appeared from the writing itself, the same could not be a bar to the action.

Verdict for the defendants. The plaintiff filed a bill of exceptions stating the foregoing facts, whereupon the cause was removed to this Court.

After argument,

WILLIAMS, J. *delivered the opinion of the Court.*—We are satisfied that the decision made by the county court in this case was correct, except on one point. The parties both claim title under Jacob Bartholomew. The plaintiff has the elder title, and the jury must either have found that title fraudulent, or that he had parted with it at the time of trial. The deed to Parsons and Allen was introduced to show that fact. The court omitted to charge the jury as to the effect of that evidence, and the verdict of the jury may have been founded thereon.

The direction to the jury, as to the effect of an absolute deed

ADDISON,
January,
1831.

Gibson
vs.
Seymour et al.
intended as a security for a debt or liability, was correct. Whenever a person intends to secure another by a lien on real estate, he should do it by a deed of mortgage. The condition should be expressed in the deed, or in a separate deed of defeasance. The giving an absolute deed, without taking back a deed or writing of defeasance, when it is understood between the parties that the deed should be defeated on the performance of a condition, is, when the grantor is in debt, evidence of a fraudulent intent between them and should so be considered, unless it satisfactorily appears that there was some valid and honest reason for transacting the business in that way.

The deeds executed by Bartholomew to plaintiff in February and October, 1821, were admissible in evidence. They tended to show the amount received by *Gibson* of Bartholomew, which might be presumed to be in satisfaction of his claim against him, unless the contrary was shown.

The mortgage deed from Bartholomew to *Seymour*, which was offered in evidence, was wholly irrelevant, as it only proved that *Mr. Seymour* had obtained a mortgage security for his demand against Bartholomew, and this was no satisfaction of his debt.

The remaining point, is the omission of the court to charge the jury as to the effect of the deed to Parsons and Allen, executed since the commencement of this action, and the defeasance. The jury may have found their verdict on this evidence, and we think it ought not to have affected the title of the plaintiff.

It has been generally considered in this state that the plaintiff must have a title at the time of trial. He recovers damages to that time. In England the judgement in the action of ejectment is conclusive evidence in an action of trespass for mesne profits, and entitles the plaintiff to recover therefor to the time the verdict was rendered. If the demise laid in the declaration has expired at the time of trial, the plaintiff cannot recover. Hence if he conveys away his title so as to be divested of any interest in the land at the time of trial, he must fail to recover. Many actions of ejectment have been defeated in this way in this state.

It is true, *Adams*, in his treatise on ejectment, advances a different idea ; but the case to which he adverts in support of his position, ( *Grundy* vs. *Clark*, 14 *East*, 488,) does not sustain him.

But in this case the title set up to defeat the plaintiff was a mortgage from him to Parsons and Allen, inasmuch as the defeasance executed by them of the same date with the deed, shows that they were mortgagees with power to sell. It is clear from

ADDISON,
January,
1831.

Gibson
vs.
Seymour et al.

principle, as well as from the authorities, that the mortgagor is entitled to the possession against every one, except the mortgagee. Before foreclosure, he is considered as the owner of the land, and as seized of the same, and may maintain an action against any stranger who disseizes him. The mortgagee has only a chattel interest in the land. For the purpose of availing himself of his interest, he may maintain ejectment to get into possession; but still the mortgagor is considered as the owner, and having all the rights of a freeholder. It is unnecessary to go into an elaborate argument to establish this position. It is sufficient to say that it is abundantly established by the following authorities.— *Wellington* vs. *Gale,* 7 *Mass.* 138 ; *Porter* vs. *Millet,* 9 *Mass.* 101 ; *Kelly et ux.* vs. *Beers,* 12 *Mass.* 387 ; *Collins* vs. *Torrey,* 7 *Johns.* 278 ; *Sedgewick* vs. *Hollenbeck, do.* 376 ; *Runyan* vs. *Mersereau, jun.* 11 *Johns.* 532. In the latter case the mortgagor was allowed to maintain trespass against those claiming under the mortgagee. The respective interest of the mortgagor and mortgagee is most fully and ably considered by Chief Justice *Hosmer,* in *Clark* vs. *Beach,* 6 *Conn. R.* 152, and renders it wholly unnecessary to say any thing further upon that subject, than merely to refer to the very able and elaborate opinion of *Justice Hosmer,* in that case.

Our conclusion from the whole is, that the deed from the plaintiff to Parsons and Allen, in connexion with the bond executed by them to the plaintiff of the same date, ought not to have prejudiced the plaintiff in this action ; and, inasmuch as the jury were not so directed, a new trial must be granted.

<div style="text-align:center">The judgement of the county court is, therefore, reversed, and a new trial granted.</div>

*Starr & Phelps,* for the plaintiff.

*O. Seymour,* for defendants.

<div style="text-align:center">WWW</div>

JOEL BOARDMAN AND CLARK FOOT *vs.* CHARLES AND JOHN W. WOOD.

A & B having become sureties for C, he executed to them certain promissory notes as an indemnity. A & B afterwards commenced suits on these notes and attached C's property thereon : whereupon W, a creditor of C, agreed with A & B, that if they would discharge their attachments, he, W, would not sue C within one year. A & B accordingly discharged the attachments. W having commenced an action against C within the year, and therein arrested him in another state,—it was held in an action brought by A & B against W for the violation of said agreement,

That C was a competent witness for the plaintiffs in said action ;

That the plaintiffs were entitled to recover such damages as they had sustained by the *breach* of the contract, taking into consideration all the circumstances of the case ;

That the testimony of commissioners who had taken the evidence of A & B, to be used in another case, was admissible to qualify or explain their depositions, or to show that they, at the time their testimony was taken, had stated certain facts which the commissioners had not inserted in the depositions, because such facts were deemed irrelevant ; and

That a juror must have *expressed*, as well as *formed*, an opinion on the merits of the case, in order to disqualify him from sitting.

This was an action of *assumpsit*, brought against *C*. and *J. W. Wood* on an alleged agreement made by them with the plaintiffs, *Joel Boardman* and *Clark Foot*, not to sue one Horace Boardman, a debtor to the defendants, within one year from the time of making the agreement. Plea the *general issue.* The facts in the case are particularly narrated in the following bill of exceptions, which was allowed at the trial in the county court :

" On empanneling the jury, one of the jurors, in answer to an inquiry put to him, stated, that he heard most of the case on a former trial, and then formed an opinion in relation to it, and might have frequently expressed it, though he could not recollect whether he had or had not. The counsel for the defendants objected to the competency of said juror on the ground that he had *formed* an opinion, and could not say but he had expressed it ; but the court overruled the objection, and decided that though the juror had formed an opinion, still, if he had not *expressed* it to others, he was not disqualified ; to which decision the counsel for the defendants excepted,

The plaintiffs offered Horace Boardman, named in said declaration, as a witness. The defendants objected to his competency on the ground that he was interested in the event of the suit ; but the court overruled the objection, and admitted the witness to testify : to which decision the defendants excepted. The plaintiffs then introduced evidence tending to show, that previous to the          day of August, 1826, they had become holden, as sureties for the said Horace Boardman, to several houses in Troy, in the state of New-York, to the amount of about $———; and that to indemnify the said *Boardman* and *Foot* for their said liability, the said Horace Boardman, on the          day of February, 1826, gave to them his promissory note for the sum of $———,

made payable *on demand*, with interest; and on the      day of
August, the said Horace gave the plaintiffs another promissory
note for the sum of $——, payable on demand, with interest.
The plaintiffs further gave evidence tending to prove, that in the
fore part of November, 1826, they commenced suits on the said
notes so given them by Horace Boardman, and attached the goods
and other property of said Boardman, estimated to be sufficient.
to secure the demands on which they were taken, and shut up the
store of the said Horace in Middlebury; and that afterwards,
about the 8th day of November aforesaid the plaintiffs released
their said attachment upon the property of said Horace at the re-
quest of the defendants, and in consideration that the defendants
had agreed not to sue or attach the said Horace. Boardman in one
year, if the plaintiffs would release their said attachment.    And
the plaintiffs proved that they relesaed their said attachment upon
the goods, &c., of the said Horace. The plaintiffs also gave evi-
dence tending to show, that in June, 1827, within one year after
making said agreement, the defendants did arrest the said Horace
Boardman in the city of New-York, and seized a large amount of
property and applied it on their debt; and that immediately af-
terwards the plaintiffs attached again the goods, &c., of the said
Horace in Middlebury; and that in the month of      following the
plaintiffs took the said property, last attached, of the said Horace
at the sum agreed upon between them, of $2122,22, and indorsed
the amount on the notes given by the said Horace to the plaintiffs;
and that all the debts of the said Horace were transferred to
plaintiffs at, or near, the time of said last mentioned attachment,
out of which they had realized the sum of $481 : and also evi-
dence tending to prove, that nothing further had been, or proba-
bly would be, realized from the said books. It appeared that
Horace Boardman, in November, 1826, at the time of the alleg-
ed contract between the plaintiffs and defendants, was indebted to
the defendants, in the sum of $1500 or $1600, which was still
due, excepting about $640, which the defendants received from
the sale of some potashes, belonging to said Horace, in New-York,
in June 1827, before mentioned. And it was also proved that
the said Horace owed in New-York, in addition to his said
debt to defendants, about $400, in November, 1826. The
plaintiffs gave evidence, consisting of statements which the defen-
dants made to them, and other evidence, tending to show, that, at
the time of making said supposed contract, the said Horace had
sufficient property in his hands, including the property so attach-
ed as aforesaid, and the debts due him, to pay all the demands
which he owed, and about $1500 more, according to an estimate
then made by said Horace and his clerk; and also gave evidence
tending to show, that said Horace continued his business as a
merchant in Middlebury during the ensuing winter, and carried to
New-York in the spring about $700 worth of pot ashes, out of
which he received of said *Woods* about $60; and that said

*[margin note:]* ADDISON,
January,
1831.

Boardman et al
*vs.*
Wood et al.

ADDISON,
January,
1831.
————————
Boardman et al
vs.
Wood et al.

Horace had assigned to the plaintiffs certain claims against sundry persons in Franklin county, arising from goods sold by one Cornish, the amount of which the witnesses did not know ; and that it was doubtful whether much, if any thing, might yet be realized from said claims in Franklin county, and from the debts and demands in Middlebury, as aforesaid ; but that in November, 1826, the said Horace, by his own estimate, had about $2000 worth of demands due to the store at the time of said alleged con‑ tract ; and that in June, 1827, or at the time he assigned and transferred his demands to the plaintiffs, as well as his goods, &c., he had, at least, $1200 worth of demands, which passed into the hands of the plaintiffs.   Evidence was given tending to show, that there was a list of the demands assigned made out at the time, but that it was lost, and that the sum received and credited was all that had been received and credited, and that the balance was bad.  The account books of the said Horace was in evidence and a statement of monies received by plaintiffs and their attorney amounting to $481,as before stated : but there was no further or other exhibit of the amount of claims, so assigned to said plaintiffs, in Middlebury, or of said claims in Franklin county.    It also appeared that there was a balance due  on said account books of said Horace of $106, from said *Foot*, and no explanation was given of said balance, apparently due as aforesaid, or of any other balances apparently due on said books of account ; but on all these points the plaintiffs offered evidence tending to show the situation of all the accounts and items mentioned, and their probable result.   It appeared that the said supposed contract was made with *Charles Wood*, one of the firm of *C. & J. W. Wood*, at Middlebury aforesaid, in the name of the firm of *C. & J. W. Wood* ; but no evidence was offered tending to show that he was authorized by his partner, *J. W. Wood*, to make such a contract on account of the partnership.

The defendants offered in evidence the depositions of *Joel Boardman* and *Clark Foot*, the plaintiffs, taken in the case between the defendants and Horace Boardman, which, with the commission and interrogatories attached thereto, are made a part of the case, tending to prove that the said *Joel* and *Clark*, had sworn that they released their attachment upon the property of said Horace in November, 1826, at the *request* of, *and by an arrangement with*, the said Horace Boardman, and not the said *Woods* ; which were admitted.    The plaintiffs then offered to show by the commissioners who took the said depositions, that the said *Clark*, when he made his deposition, stated to said commissioners, that he and *Boardman* had made a contract with the the *Woods*, and that they released their attachment by virtue of a contract with said *Woods*, and did not wish to state any thing inconsistent with such contract, and that the said commissioners told him he must testify only as to the contract with Horace Boardman.  To the admission of this evidence the defendants

objected; but the court admitted the testimony; to which the defendants excepted.

ADDISON,
January,
1831.

Boardman et at
vs.
Wood et al.

The plaintiffs showed that judgements had been recovered against them on the demands for which they had been holden for the said Horace in Troy, as aforesaid, but that they had paid nothing for the said Horace when this suit was brought. Upon this evidence the counsel for the defendants contended, that as the plaintiffs had no *debt* against the said Horace, but were merely his sureties, they could not maintain this action; that as the plaintiffs had refused to furnish clear and positive testimony of the situation and value of the said Horace's demands, at the time of the assignment to them, or of the situation of the demands in Franklin county, as aforesaid, and had neglected to explain the apparent balance due from said *Foot* and others, that they were entitled to recover only nominal damages, or that the jury in estimating the damages they had sustained, might charge them with the nominal amount of the said demands which passed into their hands, as aforesaid, and that the rule of damages could not in any event exceed the notes and claims for which the said *Joel* and *Clark* were holden for the said Horace in Troy, in 1826, and the interest thereon.

The court charged the jury, that this action was sustainable by the plaintiffs, if from the testimony they believed the plaintiffs had proved the contract set forth in the declaration, and a breach of the same; that if there was any such contract, it was not for the eventual security of the demand of the plaintiffs against Horace Boardman; for if it had been kept by the defendants, and Horace Boardman had failed, and the plaintiffs thereby had lost their debt, they would have had no claim on the defendants. But if the contract was proved to the satisfaction of the jury, and the defendants had broken the same, the plaintiffs would be entitled to recover such damages as they had sustained by the *breach*; and that in estimating these damages the jury would take into consideration the security which the plaintiffs had obtained for their demand when the contract was said to have been made, the situation and ability of Horace to pay or secure them when the contract was said to have been broken, the amount which the plaintiffs had received from Horace, on account of their claim against him, and also the prospect of their recovering or securing any thing hereafter from Horace Boardman, as he still remained liable to the plaintiffs for whatever they had paid, or might have to pay for him; and if a recovery was had in this case, it would not be for the benefit of Horace nor could he avail himself of any benefit of the same against the plaintiffs; that the damages could not exceed the amount of the judgements recovered against the plaintiffs, as sureties for the said Horace, including the *costs* in each suit; but the jury might give to that amount, deducting what the plaintiffs had received, or were likely to receive, agreeably to the directions already mentioned, if the evidence would warrant a recovery to that amount. A verdict was given for the plaintiffs for the sum of $———."

Addison,
January,
1831.
Boardman et al
vs.
Wood et al.
The case now came before this Court on a motion by the defendants for a new trial, founded on an alleged error of the county court in the several decisions, and charge to the jury, as mentioned in said bill of exceptions.

After argument, *the opinion of the Court was delivered by*

WILLIAMS, J.—The following questions arise in this case : 1st. Whether Horace Boardman was a competent witness for the plaintiffs. 2d. Whether the testimony of the commissioners who took the evidence in the case between the defendants and Horace Boardman, ought to have been received for the purpose for which it was offered. 3d. Whether the jury were properly instructed in relation to the several demands which had come into the hands of the plaintiffs, and also as to the rule of damages. 4th. Whether the rule adopted by the county court as to the proper inquiry to be made of a juror, in order to a challenge for favor, was correct. The three first questions have not been urged as strongly as the last. They have, however, been insisted on by the defendants, and must be decided by the Court.

On the first, we can discover no principle of law which would exclude Horace Boardman from being a witness, either for the plaintiffs or defendants. The contract declared on was a separate and independent contract, between the plaintiffs and defendants, and in no way for the benefit of the witness. The plaintiffs were sureties for him, and he was, and is, bound to indemnify them ; and this is the extent of his obligation to them. This obligation he must fulfil, whether the plaintiffs succeed or fail in their suit against these defendants. Whatever injury the defendants have occasioned to the plaintiffs by the breach of the contract they made with them, *they* must remunerate the plaintiffs therefor. And as the witness was no party to that contract, he can claim no benefit therefrom. There is no rule of equity, as has been supposed, which would enable the witness in a court of chancery to have appropriated to his benefit the damages which the plaintiffs may recover in this suit. If a court of chancery could do any thing upon the subject, it must be, to compel the plaintiffs to assign to the defendants their claim against Horace Boardman, on the defendants paying the amount of this verdict. But the liability of Horace Boardman is not, and cannot be, altered by any transaction between the parties to this suit on the subject of their contract.

The second objection which has been made seems to be foun-

ded on the idea that the deposition of a witness is like a contract in writing,which cannot be explained or contradicted by parol evidence.   The admissions of a party, whether contained in a written deposition or not, are never considered as conclusive evidence against him.   The rule as to all conversations, declarations, or admissions, is, that the whole must be taken together, and if a witness is precluded form stating the whole of a transaction because it is unnecessary, or irrelevant to the point in issue, there can be no objection against introducing evidence to explain this when his testimony is made use of against him.   In this case the plaintiffs,who were the witnesses in the former case,were called to testify in relation to a contract different from the one which they are here endeavouring to substantiate, and between different parties,and their depositions given upon that occasion are made use of, to prove an admission by them, that a contract was made inconsistent with the one which they are here endeavouring to enforce.   If at the time they made those depositions, they were about to state this contract between them and the defendants, or did state it, and it was not made part of their depositions, because it was considered irrelevant to the cause in which they were testifying, it was competent for the plaintiffs to shew that fact in evidence.   The testimony of the commissioners was, therefore, properly received.

The third question arises from the charge of the court on the subject of damages ; and the enquiry here must be, whether the jury were misdirected.   In stating a case it is not usual to set down all the remarks which the court made in their charge.   The directions which they gave must be so stated, that this Court can see whether the jury were misdirected ; and we are not to enquire whether by any possible construction of the case it can be conjectured that a jury may have drawn a different inference from the charge than what was intended.   The objections to the charge on this point are three.   *First* ; that the jury were not properly directed as to the several demands which went into the hands of the plaintiffs, and more particularly the books of accounts.   It appears, however, that these books were in evidence to the jury ; they were open to any investigation, or to any comments which might be made in argument, or to any evidence in relation thereto ; and, in fact, testimony was given, not only as to what had been collected, but as to what might probably be realized therefrom.   The jury was directed to take into consideration the amount which the plaintiffs had received from Horace

Addison,
January,
1831.

Boardman et al
vs.
Wood et al.

Boardman, as well as the prospect of their recovering or securing any thing from him thereafter, and to deduct from what they might find to be the claim of the plaintiffs, such sum as they had already received, or were likely to receive, thereafter. This direction was sufficient, and all the defendants could claim of the court. *Second* ; as to the costs in the suit, which had been brought against the plaintiffs as sureties for Horace Boardman. The damages which the plaintiffs sustained by the breach of the contract made between them and the defendants, might amount to the whole of their claim against Horace Boardman, if he was rendered wholly unable to indemnify the plaintiffs in consequence of the conduct of the defendants, and would have been of ability fully to indemnify them if permitted to pursue his business. The plaintiffs were entitled to a full indemnity from Horace Boardman, for all they had been compelled to pay for him to any amount, not exceeding the amount of the notes which they had taken from him, which would embrace all the costs which they had been compelled to pay in the suits commenced against them as sureties of Horace. If then the evidence warranted a recovery in favor of the plaintiffs for the amount of these demands against Horace Boardman, this must include the costs of the suits which had been instituted against them. We can see no reason why the plaintiffs should not recover against these defendants, the amount which they had been compelled to pay as sureties for Horace, whether it was for debt or cost, if from the evidence it appeared that they had been injured to that amount by the breach of the contract made between the plaintiffs and these defendants. There was no misdirection in this particular. *Third* ; to the instructions to the jury as to what subjects were proper for their consideration in assessing the damages. The jury were directed that the plaintiffs were entitled to recover such damages as they had sustained by the *breach* of the contract. In estimating these damages, a variety of considerations would necessarily present themselves. The contract on which the plaintiffs declared was not a contract for the ultimate security of their demand against Horace Boardman. The ability of Horace to pay the plaintiffs at the time the defendants, in violation of their undertaking to the plaintiffs, arrested him in New-York, and broke up his business, together with the prospect, from his youth and habits of business, of their realizing any thing thereafter, were proper considerations to influence the jury in reducing the damages. On the other hand, if the defendants, by a violation of their engagements, had availed

themselves of the means which Horace had to indemnify the
plaintiffs, and had occasioned such a sacrifice of his property as to
put it out of his power to indemnify them, and had thereby caus-
ed a loss to the plaintiffs of the whole of their claim against him
—they were entitled to recover to that amount of the defendants.
The consideration for the contract, on the part of the plaintiffs,
was their relinquishing the attachment which they had laid on the
property of Horace.   If their debt against him was of no value,
and if they had given up nothing as a consideration for the under-
taking of the defendants, they could have had no claim against
the defendants for damages for not fulfilling that undertaking.
The jury, therefore, should take that subject into consideration in
estimating the damages.   The amount of the damages which
the plaintiffs sustained, from the nature of the case, must have
been, in some measure, a subject of conjecture, depending upon
considerations which would strike the minds of different individ-
uals in a different manner.   We think the jury in this particular
were properly instructed to take these different subjects into con-
sideration, confining them in their estimate of the damages, to
those which the plaintiffs had sustained by the *breach* of, and not
by *making*, the contract ; and if there was any difficulty in their
doing justice, it resulted from the nature of the case, and not from
any misdirection.   If the defendants have been condemned in too
large an amount, it has arisen from the impossibility of arriving
at any accurate conclusion, and from the conduct of the defen-
dants at the time they violated their engagements with the plain-
tiffs, which was calculated to induce a jury to give damages to
the full amount which the plaintiffs had suffered.

The *fourth* question which arises in this case has been the most
relied on in the argument, and it is in effect whether the court
were bound to have excluded the juryman challenged.   It does
not often become necessary for the court to decide what shall be
a legal objection to a juror.   There are usually a sufficient num-
ber of jurymen present, and the court, in the exercise of their dis-
cretion, frequently direct another juryman to be called when
there are objections to those named, which do not amount to a
legal cause of challenge.   But when it becomes necessary to re-
sort to talismen by rejecting a standing juror, there ought to be
some legal cause of challenge before he is rejected.   In this case,
if the challenge had been allowed when there was no legal objec-
ton, it would have been a ground of exception on the other side.
While it is important that every juror should be free from all rea-

xxx

sonable exceptions, it is also important that trivial objections should not be listened to. The court cannot with propriety set aside a juryman and call on a talisman, unless it is upon a legal objection. If the juror who was challenged in this case ought to have been set aside because he had formed an opinion, either party could have challenged him. And, indeed, it would have been the duty of the court to have rejected him, without waiting for a challenge, unless both parties mutually consented to his remaining in the seat. Considering this a question to be determined by authorities, we have examined the cases which have been presented.

At common law, it is a good cause of challenge to a juryman that he has *declared* his opinion beforehand ; yet this has been adjudged to be no cause of challenge, when it has appeared to proceed not from ill will, but from a knowledge of the cause.–2 *Hawk. P. C. c.* 43, *s.* 28, *p.* 589. In a case in the *Year Books* it was said by *Babington, J.,* " that if a juror say twenty times that he " will pass for one party for the notice which he has of the party, " and of the truth, he is indifferent ; but if he say so for any af- " fection of the party, he is favorable, and the challenge must be " allowed."—21 *Viner,* 266. Without going into an examination of all the cases, it will be sufficient to refer to the case of the *King* vs. *Edmonds, (4 Barn. and Ald.* 471,) where the subject was considered, and many of the cases examined. In this case, in my opinion, it was clearly shown that the rule of the common law was, that in order to exclude a juryman, it must be shown, not only that he has declared his opinion beforehand, but that it proceeded from ill will towards the party challenging, or from a preconceived opinion of his guilt. And it is for this reason the question is not permitted to be asked of a juryman, in a criminal case, whether he has expressed opinions unfavorable to a respondent, as it would tend to his dishonor to express ill will towards a party accused of a crime in regard to the matter of accusation. But in a civil cause, a juryman may be asked, " if he has not given his opinion beforehand ; for he might have done it as an arbitrator."—1 *Salk.* 153. Among the causes for challenge to a juror, we find this, that if he had been a juror in the same cause, or had been an arbitrator, it is a good cause of challenge, although it has been said, that it is no cause of challenge to a juror, " if he was " indifferently chosen as an arbitrator by both the parties, though " he has treated of the matter ; although it would be if he was cho- " sen by the plaintiff or defendant, if he had been informed of, or " treated of, the matter."—*Complete Juryman,* 120. And a re-

ference is made to *1 Inst.* 157, and several cases in the *Year* Addison, January, 1831.
*Books*, as authorities for this position.   No case has been read to Boardman et al *vs.* Wood et al.
show, that it is a good cause of challenge to a juror, that he has
*formed* an opinion in the case; but all the English authorities,
which we have seen, establish the contrary doctrine; and it would
be impossible to reconcile it with the decision of the  Supreme
Court of the state of New-York, in the case of *Durell vs. Mosher*,
*(8 Johns.* 347 *;)* and we are fully satisfied that the rule is otherwise.

A reference to the American cases, where this question has
been considered either directly or incidentally, confirms us in this
opinion.   In the trial of Callender before *Judge Chase*, it was
decided that the proper inquiry to be made of a juryman was
whether he had formed and *expressed* an opinion of the guilt of
the person charged.   It is true, the conduct of the judge in this
trial was much animadverted on at the time, and was made the
subject of one of the articles of impeachment prefered against
him ; but his decision of the question has always been  sustained,
and was confirmed by *Chief Justice Marshal* in the trial of Burr.
In the last mentioned trial the chief justice says that the proper
question to be propounded to a juryman is,  "have you made up
and *delivered* the opinion that the prisoner is guilty or innocent of
the charge laid in the indictment ?" And it is worthy of notice,
that, although the counsel for the United States  adverted to the
trial of Callender, and declared that he should not contend
for the rule as laid down in that trial, but admitted that it might be
a good cause of challenge if a juryman had *formed* an opinion,
yet the *Chief Justice*, whenever he mentions the subject, is care-
ful to say "*formed* and *expressed*, or *formed* and *declared an opin-
ion, &c.*;" and in the opinion then given by him, this expres-
sion is made use of  a number of  times.   The impeach-
ment of *Judge Chase* had then but recently been decided, when
this same subject had been in controversy ; and *Chief Justice
Marshal*, both by his decision in the case, and by the cautious
and guarded manner in which he expresses himself, leaves us in no
doubt that he recognized the rule laid down by *Judge Chase*, as
the rule of law to be adopted in all similar cases.

*C. J. Swift*, in his digest, 775, says, that if a juror have form-
ed and *expressed* an opinion upon the merits of the case, it is
good ground to set aside the verdict, if unknown to the party, &c.

In this state the subject was fully considered in the case of
*Godfrey, (Brayton's Rep.* 170,) a case which excited great in-
terest, and in which every question was carefully and cautiously

Boardman et al
*vs.*
Wood et al.

investigated, and it was decided that a person who had *expressed* his opinion was not a competent juror.

In the trial of *Vermilyea,* in the city of New-York, a challenge to a juryman who had formed and delivered an opinion upon the merits of the cause, was overruled at the circuit. This decision, however, was set aside by the Supreme Court of the state of New-York.— *Ex parte Vermilyea,* 6 *Cowen,* 555 ; and *People* vs. *Vermilyea,* 7 *Cowen,* 108. In the opinion of the court in the two cases last mentioned, *Judge Woodworth* sometimes makes use of the expression, that if a juror had formed *or* expressed an opinion, it might be a good cause of challenge ; and he refers to the opinion of *C. J. Spencer,* in the case of the *People* vs. *Van Alstine,* and *Coleman* vs. *Hagerman,* and also the opinion of *Judge Story,* where the same expression is made use of. It may be observed, however, that in every case mentioned the juror had *declared* his opinion, and in the case of *Vermilyea* it was a preconceived opinion of the guilt of the persons accused ; and in the case of *Coleman* vs. *Hagerman* it clearly indicated ill will. He mentions no case, however, where a challenge has been allowed against a juror on the ground of his having formed an opinion on the merits of the case, when he had not made known by his declarations for which party that opinion was formed. It is very evident that the expressions made use of by the judge in that case must be understood as equivalent to *formed and declared.* And indeed if this was not his opinion, it would be altogether surperfluous to say any thing about an opinion *declared,* if an opinion formed was a good cause of challenge. An opinion *declared* must be an opinion *formed.*

From an examination of the authorities, we are inevitably led to the conclusion that the decision of the county court on this question was conformable to the common law as found in the English Reports, and as recognized in the courts of the United States and in this state, and must be considered as correct so far as any principle can be settled by authorities. It has been strongly urged that there is no reason for this distinction. It is sufficient for us to declare the law as we find it, though we may not know why it was so established. Possibly the reason urged at the bar may have had some influence, that men are more tenacious of an opinion which they have declared, and are less likely to listen to any reasons which may be urged against it. Further, every opinion which a juryman had formed in relation to a cause would not afford a good reason for challenging him. The opinion must be declared to enable the court to judge whether it should

ADDISON,
January,
1831.

Boardman et al
vs.
Wood et al.

disqualify him from serving as a juror. In many cases of a public nature almost every one who has heard of the transaction will have formed some opinion upon the subject, and it would be difficult, if not impossible, to procure a jury who had not formed an opinion. In the case under consideration the opinion which the juror had formed is not now known : it may have been in favor of the party challenging ; and the same reasons, which are now urged why he should have been set aside, would probably have operated to exclude every person who had been in the court house during the former trial of this case. But if there are no sufficient reasons for the law as we find it, we do not feel at liberty, against the weight of all the authorities, to change the rule which was adopted in *Godfrey's* case, and subject parties hereafter to the difficulties and hazard which may arise from conflicting decisions on this subject. Very probably, if we should alter the rule, we might learn from experience that it was founded on good reason. It is said, " that it hath been an ancient observation, that when-" ever a standing rule of law, of which the reason perhaps could " not be remembered or discerned, hath been wantonly broken " in upon, by statute or new resolutions, the wisdom of the rule " hath in the end appeared from the inconveniences that have fol-" lowed the innovation."

The judgement of the county court is affirmed.

*Bates & Phelps*, for plaintiffs.

*Linsley & Bailey*, for defendants.

---

### JOHN B. LOVELL *vs.* SIMEON LELAND.

A mortgagee, having obtained a decree of foreclosure, and appropriated the mortgaged estate to himself, divested of any equity of redemption, is considered as a purchaser of the estate, in satisfaction of his debt, if the value be equal to, or exceed, the amount ascertained to be due by the decree ; or, if the value of the estate does not amount to that sum, then in satisfaction of so much of his debt as the mortgaged estate was worth at the time the right of redemption expired.

The mortgagee, after a decree of foreclosure, can maintain an action at law on the bond, note, &c., secured by the mortgage, *only* in those cases where the security is insufficient, and to recover the difference between the value of the estate and the sum due.

*Semble*, That when such action is brought, the foreclosure is opened, and the mortgagor will be allowed, on application to the Court, to redeem the premises mortgaged by paying the full amount of the debt and cost ; and that the mortgagee, when he brings the action, should have it in his power to reconvey the mortgaged estate.

This was an action of *assumpsit* on a promissory note, executed by the defendant to the plaintiff, dated June 17, 1820, for

$400, payable in three years from the 1st day of November next after date. Plea, *general issue.*

It appeared on the trial in the county court that the note in question, together with four others, was secured by a mortgage on certain real estate in Weston in the county of Windsor. Before the note in question became due, the plaintiff assigned the mortgage and notes to Ichabod Onion, who afterwards brought a bill to foreclose the equity of redemption of the mortgaged premises, and in June, 1824, obtained a decree of foreclosure against the defendant, embracing two of the notes, only, but not the one in question, (the two others having been previously paid and taken up.) By the decree, the defendant was required to pay the sum ascertained to be due on the two notes, to wit, $866,11, by the first day of April, 1825, or be forever foreclosed of all equity of redemption in and to the said mortgaged premises. The defendant having neglected to pay said sum according to the decree, the said Onion entered into quiet possession of the premises mortgaged, and had ever since kept possession thereof. It also appeared that said premises were, on the first day of April, 1825, of greater value than the sum due on said mortgage, including interest and cost. The plaintiff objected to the admission of evidence to prove the foregoing facts ; but the objection was overruled, and the evidence admitted to go to the jury, who returned a verdict for the defendant.

The plaintiff excepted, &c., and the case was reserved for the opinion of this Court.

After argument,

WILLIAMS, J., *delivered the opinion of the Court.*—The questions which are embraced in the consideration of this case are of very great importance in this state. They have been fully investigated and very ably argued. We have endeavoured to bestow upon them all the consideration which their importance merits, sensible that a decision either way will conflict with opinions which have at different times been entertained in this state, and with decisions which have been made in different states.

It is contended by the plaintiff that, from the facts which were proved in this case, he ought not to be precluded from pursuing at law for the debt mentioned in the condition of the mortgage deed ; that the decree of foreclosure obtained by Onion, his assignee, cannot operate as a satisfaction, either in whole, or in part, of the debt due to him from the defendant ; that he may sue for,

and collect in the ordinary way, all the notes executed by the defendant which were secured by the mortgage, and that the only effect of *thus* prosecuting a suit on the notes, is to open the foreclosure. If this is correct, the absolute estate which Onion had in the mortgaged premises has been defeated, and is now an estate upon condition. If this doctrine is recognized, it renders the decree of no force or effect as to the mortgagee, and gives him every advantage, while it must be considered as conclusive upon the mortgagor. Thus, the mortgagee may appropriate to his own use, and become the absolute owner of the estate mortgaged. If it rises in value, the benefit is his; while on the other hand, if from any cause whatever it should depreciate in value, although it may once have been an ample and adequate satisfaction of the debt, he may call upon the mortgagor, compel him to pay the debt, and take back the property mortgaged at its depreciated value, notwithstanding any inconvenience or injury he may sustain arising from the lapse of time, or an alteration of his business or residence. It is certainly worthy of consideration whether any such principle has been established, and whether so flagrant an injustice is sanctioned by the law.

In Connecticut it has always been considered that a decree of foreclosure, and a possession taken in consequence thereof, was by operation of law, an extinguishment of the mortgage debt. In the case of *Derby Bank* vs. *Landon*, (3 *Conn.* 62,) this was recognized as the established law in that state, confirmed by repeated decisions. In this state it was once so considered; and when *Chief Justice Tyler* presided in this Court, I remember his directing, when a decree of foreclosure was made, that the notes should be left with the clerk, observing that the debt was satisfied by the decree. Afterwards the opinion of the profession changed, and was conformable to the views taken in this case by the plaintiff's counsel, though I do not know that the question was ever presented to the consideration of the Court, except in the case of *Strong* vs. *Strong*, (2 *Aiken*, 373.) Indeed, so general was this opinion, that when the question was first raised in this case in the county court, I thought it did not admit of a doubt that the plaintiff was entitled to a judgement for the amount of his note. I became convinced, however, on examination, that my previous opinion was not well founded, and the county court were well agreed in making the decision in this case which we are now reviewing. On an examination of the authorities we have all come to the conclusion that there was no foundation for the opinion which

ADDISON,
January,
1831.

Lovell
vs.
Leland.

ADDISON.
January,
1831.

Lovell
vs.
Leland.

has heretofore been entertained; but, on the contrary, that the authorities establish this position, that a decree of foreclosure, and a possession taken, is a satisfaction of the debt to the amount of the value of the premises mortgaged, at the period when the right of the mortgagor was extinguished, and, of course, that it is a full satisfaction of the debt, when the mortgaged premises are of greater value than the debt. And although it is laid down that an action may be commenced on the bond, &c., after the decree, yet it is only where the security is insufficient, and to recover the difference between the value of the estate and the sum due.

*Powell* in his treatise on mortgages, (page 1077,) says, that if a mortgagee, after having got a decree to foreclose, which is signed and enrolled, bring an action of debt on the bond given at the same time for the payment of the money and performance of the covenants of the mortgage deed, such, action will open the foreclosure, and let in the equity of redemption of the mortgagor; and he refers to the case of *Dashwood* vs. *Blythway*, (1 Eq. ca. abr. 371.) From this case it has been inferred that a mortgagee *might* in *every* case bring an action at law for the debt mentioned in the condition of the mortgage deed, and recover the whole amount without regard to the decree of foreclosure, and without being in any way affected by it.

There was nothing in the decision of that case, if I am correct in supposing it to be the same which is reported in *Mosely*, as I shall shortly notice, which would warrant the doctrine laid down by *Powell*, or in *Eq. ca. abr.*; and it must have been an inference of the reporter from the argument of counsel. The case of *Dashwood* vs. *Blythway*, in *Equity cases abridged*, is marked with an asterisk, as not to be found in the Reports before published. It appears to have been decided at the Rolls, Trin. term, 1729. At the same term, and upon the same subject, a case was decided at the Rolls, reported in *Mosely's Chancery Reports*, 196, by the name of *Dashwood* vs. *Bithazy*, which is unquestionably the same case that is found in *Eq. ca. abr.* From the report in *Mosely* it appears that the bill was for a foreclosure, and the solicitor general for the plaintiff prayed for a sale of the mortgaged premises instead of a foreclosure, because the security was defective; and urged as a reason for such a decree, that if they should afterwards sue the defendant on his bond, that would open the foreclosure; and he insisted that such decrees were usual. The master of the Rolls, however, did not recognize this as a common practice, but said it was usual, when the security was defective, to refer to a

Addison.
January,
1831.

Lovell
vs.
Leland.

master to set a valuation on the estate, and for the plaintiff to take it *pro tanto* ; and he referred to two cases, *viz. Hornsden* vs. *Pilby,* and *Nosworthy* vs. *Sargeant Maynard.* He however decreed a sale on the authority of the latter case. Now, it is not admitted in this case, that after a decree of foreclosure the creditor may sue on his bond and recover the whole amount. The object of the solicitor general for the plaintiff was to obtain a sale under a decree of the court, that he might then proceed at law for the balance, without the defendants being let in to redeem. The master of the Rolls was of opinion that a valuation should be set on the estate by a master, and the plaintiff take it for so much. The object which each had in view was, to apply the mortgaged premises in part satisfaction of the debt, the security being defective, and the master of the Rolls evidently considered a decree as a satisfaction to the amount for which it was taken. From this case I should infer that, although the practice was not fully settled as to the effect of a decree of foreclosure, yet the understanding was that the mortgagee might, when his security was insufficient, proceed at law for the difference between the debt and the value of the mortgaged premises, which was to be ascertained either by a sale or by a valuation affixed by a master. *Birch's case,* (*Gilbert's Reports in Equity,* 186,) appears to establish the same principle, and goes further, *viz.,* that unless there was a deficiency, the mortgagee had no further remedy on his bond. Notwithstanding these cases recognize the right of the mortgagee to proceed on his bond for the deficiency after a sale, it appears it was considered for a long time, that the mortgagee, taking the estate to himself, took it in satisfaction of his debt, and could no longer regard it as a mortgage. *Sir Samuel Romilly* expresses this opinion in arguing the case of *Perry* vs. *Barker* ; and the bill in the case of *Tooke* vs. *Hartley,* reported in 2 *Brown's C. C.* 125, and in *Dickens,* 725, was brought evidently on the supposition, that the mortgagee, by obtaining a decree of foreclosure which had become absolute, had made his election to take the pledge in satisfaction of the debt, and thereby relinquished his personal remedies. *Mr. Mansfield,* who was for the plaintiff, thought it was an ordinary case of that character ; and *Lord Thurlow,* considering it as a new case, granted the injunction upon terms, though his opinion was that the creditor might proceed at law. *Chancellor Kent* says, that the general understanding formerly was, that the mortgagee, by taking the pledge to himself, took it in satisfaction of the debt.—4 *Kent's Com.* 175. And in *Dickens'* report of

Addison,
January,
1831.

Lovell
vs.
Leland.

the case of *Tooke* vs. ———, *Lord Thurlow* was understood to have expressed himself to that effect. And although in this latter report the opinion of *Lord Thurlow* was mistaken, yet it shows that the opinions of the profession were not settled upon this subject at that time.

The case of *Tooke* vs. *Hartley*, however, appears to have determined that the mortgagee might proceed at law upon his bond, notwithstanding his having obtained a decree of foreclosure; but it will be observed, that in that case, the suit, which it was the object of the bill to enjoin, was to recover the sum only for which the mortgaged premises on sale had proved deficient. *Mr. Maddock*, who was of counsel for the defendant in the bill, contended only that he was entitled to proceed on the bond for what the pledge proved deficient to pay; and relied on the authority of *Dashwood* vs. *Blithway*, in *Eq. ca. ab.* as an authority to that effect. There is evidently a difference in the report of the case of *Tooke* vs. *Hartley*, in *Brown* and in *Dickens*, but notwithstanding the opinion which was attributed to the chancellor by the latter reporter, yet we learn from *Lord Eldon* and *Sir Samuel Romilly*, (8 *Ves. jun.* 531, and 13 *Ves. jun.* 203,) the opinion of *Lord Thurlow* was, that whether the estate was sold to a stranger, or remained in the possession of the mortgagee, there was no distinction; but an action might be brought for the difference.

The case of *Perry* vs. *Barker*, which is reported in 8 *Ves. jun.* 527, and 13 *Ves. jun.* 198, was a bill to restrain a mortgagee from proceeding at law upon his bond, after a decree of foreclosure and sale, for the balance of the debt which was not raised from the sale. In these cases the principle doubts were as to the effect of the suit upon the decree, and whether in consequence thereof, the mortgagor was at liberty to redeem. *Lord Chancellor Erskine*, while he admitted as a general rule, that if the security was scanty, the mortgagee might proceed at law to recover the difference, and that in such case he should give the mortgagor an opportunity to redeem, yet, under the circumstances of that case, he continued the injunction which had been granted by *Lord Eldon*. On this case it may be remarked, that granting the injunction shows most conclusively that the mortgagee may not in all cases proceed at law for the difference; much less can he proceed for the whole debt as has been here contended.

In the case of *Hatch* vs. *White*, 2 *Gallison*, 152, the whole of this subject was much considered by *Judge Story*. It was

ADDISON,
January,
1831.

Lovell
vs.
Leland.

there centended that the foreclosure of the mortgage was a satisfaction of the debt; and he came to the conclusion, that though it was not a satisfaction of the debt, if not of that value, yet he says, it is a satisfaction to the value of the estate at the time of the actual extinction of the equity of redemption; and he says expressly, that if an estate after foreclosure should become " materially lessened in value, the loss has never been considered the mortgagor's." The cases of *Amory* vs. *Fairbanks and others*, 3 *Mass. Rep.* 562, and *Dunckly* vs. *Van Buren*, 3 *Johns. Ch. Rep.* 330, are both to the same effect.

I have been thus particular in examining the cases on this subject which have been reported, because the general impression has been that the law was different. We are all fully convinced there are no authorities which support the position contended for, that a mortgagee may at any time after foreclosure commence an action at law and recover the whole amount secured by the mortgage, and that the only effect is to let the debtor in to redeem; but we think that the practice formerly was, when the security was defective, to decree a sale of the mortgaged premises, and apply the avails in discharge of the debt, or to refer it to a master to ascertain the value of the estate; and if less than the debt, for the mortgagee to take it *pro tanto*, leaving the mortgagee, in either case, at liberty to proceed at law for the balance; that if the foreclosure was taken for the whole sum, it was considered for some time as a satisfaction of the debt. Afterwards it was considered that after a foreclosure and sale by the mortgagee, he might, agreeably to the authority of *Tooke* vs. *Hartley*, proceed at law for the amount due on the mortgage not satisfied by the sale; or, if the premises remained with the mortgagee, he might, according to the authority of the same case, as understood by *Lord Eldon* and *Sir Samuel Romilly*, still proceed for the difference between the value of the estate at the time of the extinction of the equity of redemption, and the sum due on the mortgage; and that this difference might be ascertained by an estimate of the value, to be made as in all other cases, where property passes from one to another, without any agreement as to the value. And as the result of this examination, we decide, that a mortgagee having obtained a decree of foreclosure, and appropriated the mortgaged estate to himself, divested of any equity of redemption, must be considered as a purchaser of the estate, in satisfaction of his debt, if the value exceeds the amount ascertained to be due by the decree; or, if the value does not amount to that sum, in satisfaction of so

much of his debt as the mortgaged estate was worth in cash at the time the right of redemption given by the decree expired. The jury having found that the value of these mortgaged premises were of greater value than the principal, interest and cost due on the decree, when the time for redemption expired, the note on which this suit was brought, agreeably to the views here expressed, was satisfied in full.

The question, whether an action at law for the difference shall be considered as opening the foreclosure, has been brought to our notice in the course of the argument of this case, and although it is not directly involved in the decision, yet it was necessarily considered in investigating the question whether a decree of foreclosure was, or was not, a bar to any further proceedings at law. The cases of *Dashwood* vs. *Blythway* and *Perry* vs. *Barker*, expressly recognize, that if such action is brought the foreclosure will be opened, and in the latter case it was intimated that time might be given to the mortgagee to get the estate back if he had sold it. It is certainly highly reasonable that if the mortgagee, after having foreclosed the mortgage, is not content with the satisfaction obtained, and seeks to recover a further sum, that the mortgagor should have the privilege, by paying the full amount of the debt, to receive back the mortgaged estate, if he places a higher estimate upon its value. And when such action is brought, the mortgagee should have it in his power to reconvey on receiving the whole amount of his debt. I should think, however, that commencing an action does not, of itself, destroy the effect of the decree of foreclosure. On the commencement of the action, the mortgagor may be entitled to bring his bill for a redemption, and, by paying the whole amount due, have his land reconveyed ; but if he does not so elect, and a judgement is rendered for the difference, only, between the estimated value of the estate and the debt, there would be no equity in allowing him to redeem thereafter. But inasmuch as the decision of this question is not necessary to the decision of the case, it must be left for future adjudication.

We are not unaware that the decision in this case may be considered as overruling the decision made in the case of *Strong* vs. *Strong*, before mentioned ; and this has been pressed in the argument. On examining that case, it will be found, that although the effect of a foreclosure was a point made, and, of course, decided, yet it was not the principal point, nor one on which much stress was laid. The only authority relied on was the one from Con-

OF THE STATE OF VERMONT.

Addison,
January,
1831.

Lovell
vs.
Leland.

necticut, and this was opposed by the general impression which had prevailed in this state. The other point which was decided in that case was the important one, which occupied the attention of the court and bar almost exclusively. Although I was present at the argument and decision of that case, and it was one which attracted my attention, yet it was forgotten by me that this question was ever made or decided; and it was not noticed to me at the trial of this cause in the county court. It is evident the point was not much considered or investigated, but was lost sight of in the important question which was the principal one in that case. We should have less reluctance, therefore, in overruling that authority if it was necessary on the decision of this case.

But it may well be questioned whether the authority of that case may not stand good as not conflicting with this case. The foreclosure which was relied on in *Strong* vs. *Strong*, as a satisfaction, was obtained under our statute on the application of the defendant after judgement against him in an action of ejectment. A mortgagee institutes his action of ejectment to be let into possession, and, in this way, to receive the benefit of his security. In no other way can he receive the rents and profits; and this he may desire to do when he does not intend to foreclose his mortgage. By the 76th section of the judiciary act, a privilege is given to the defendant in an action instituted against him by the mortgagee, after a judgement is rendered against him for the possession, to have execution of this judgement stayed on his application; and after ascertaining the sum which is due on the mortgage, together with the cost, if he pays that sum by a time limited by the court, the judgement is vacated; and if he does not pay that sum by the time, it is declared by the statute that the plaintiff mortgagee shall hold the land freed and discharged of all right and equity of redemption. As this action of ejectment is not instituted by the mortgagee for the purpose of foreclosing the equity of redemption, but only for the purpose of availing himself of the benefit of his pledge by being let into possession, and as the application, and decree, and order thereon, are made at the instance, and for the benefit of the mortgagor, and the mortgagee is thereby prevented from going into possession, possibly no other effect can, or ought to be given to this proceeding, as it respects the mortgagee, than is given by the statute, *viz.* to foreclose the right of the mortgagor, leaving the mortgagee to pursue his remedies in the same manner as he would have been entitled to, if no such application had been made by the defendant. As the cred-

<div style="margin-left: left">Addison,
January,
1831.

Lovell
vs.
Leland.</div>

itor does not sue for a foreclosure, but only for possession, he stands upon different ground than he does when he brings his bill in chancery for the very purpose of extinguishing all his debtor's interest in the mortgaged estate. In the one case he compels the foreclosure, in the other it is forced upon him. This view of the case is taken by one of my brethren; whether it is tenable can be decided when a case similar to the one of *Strong* vs. *Strong*, shall be again presented to the consideration of the court.

The judgement of the county court is affirmed.

*Woodbridge & Phelps*, for plaintiff.

*S. H. Hodges & Bates*, for defendant.

———————~~~◼~~~———————

<div style="margin-left: left">Bennington,
February,
1831.</div>

## Lyman Patchen *vs.* Mark Morrison.

When a new road is etablished, any town through which it passes may immediately make it, and it then becomes the duty of the select-men to open it; and when opened, they must cause a certificate thereof to be recorded in the town clerk's office; which recording is the proper evidence of the opening of the road, and until this is done, the owner of the land may lawfully keep it enclosed with a fence, and no one has a right to remove it.

This was an action of *trespass quare clausum fregit*, wherein the plaintiff complained that the defendant, with force and arms, on the 2d day of December, 1828, broke and entered the plaintiff's close, situated in Bennington, and then and there broke down and destroyed the fence of the plaintiff, enclosing and surrounding said close. The defendant pleaded *first*, the *general issue*, and *secondly*, in justification,

" That before, and at the time of committing the trespass in the declaration mentioned, there was, and of right ought to have been, a certain common and public highway into, through, over, and along the said close in the said declaration mentioned, for people to go, return, pass and repass, on foot, and with horses and carriages, at all times of the year, at their free will and pleasure. And because the said fence in the said declaration mentioned before and at the time of committing the trespass in said declaration mentioned, had been wrongfully erected, and was there standing in and across the said public highway, and obstructing the same, so that, without breaking and pulling down, demolishing and destroying the said fence, the said *Mark* could not then pass, and repass, into, through, over and along said highway, as aforesaid, as he ought to have done, the said *Mark*, at the said time in the declaration mentioned, in order to remove said obstructions, pulled down and destroyed the fence in the declaration mentioned, and took and carried the same to a small and convenient distance,

and there left the same for the use of the said *Lyman*, doing no unnecessary damage to the said *Lyman*, on such occasion—which are the said supposed trespasses in the said declaration mentioned, and whereof the said *Lyman* hath complained against him. And this he is ready to verify," &c.

BENNINGTON,
*February,*
1831.

———

Patchin
*vs.*
Morrison.

The plaintiff in his replication traversed the existence of any snch highway leading through and over the land described in the declaration, as mentioned in the defendants plea ; on which issue was joined to the country.

The defendant to support the issue on his part offered in evi- dence, the proceedings of the road commissioners, in and for the county of Bennington, laying a road through the premises descri- bed in the plaintiff's writ ; to which testimony the plaintiff objec- ted, and the court admitted the same. The defendant further offered to show in evidence by parol testimony, that the select- men of Bennington immediately after said road was laid by said road commissioners, paid the plaintiff the damages assessed by the said commissioners, for laying the road through the premises ; that afterwards, the said select-men, with sundry other inhabi- tants of said town of Bennington worked, opened, and made said road ; that said road had remained open several weeks, and had been constantly travelled and used as a common highway, when the plaintiff, after the said road had been thus travelled and used, erected a fence across the said highway ; and the defendant, being travelling along the said road upon his ordinary business, and find- ing the said fence across the said road, gently took the same away so far as was necessary to enable himself to pass along with his horse, which he was then riding ; to which testimony the plaintiff object- ed, and the court rejected the same, it being admitted that the select-men had lodged no certificate in the town clerk's office of the opening of said road. The defendant then offered to show the same facts thus rejected, with a view to mitigate damages ; but the plaintiff agreeing to claim only actual damages, the court would not permit the evidence to go to the jury, for the purpose last mentioned, and, thereupon the jury returned a verdict for the plaintiff. The defendant excepted, &c. and the case was reserv- ed for the opinion of this court.

WILLIAMS, J., *delivered the opinion of the Court.*—The point which is presented in this case for consideration is one of conside- rable practical importance. When a road is laid through the lands of one of our citizens, it is necessary that he should be enabled to know when his dominion over the soil ceases, when he is no long-

BENNINGTON,
February,
1831.

Patchen
vs.
Morrison.

er at liberty to keep it enclosed; and on the other hand every individual in community should be able to ascertain when a road becomes a public highway, so that he has an undoubted right to travel thereon, and may call on the town to remunerate him for any damage he may sustain in consequence of the insufficiency or want of repair of such road; and the towns should know when their liability to make good such damages first arises.

Whenever a public road is opened, the right of the owners of the land to keep it enclosed ceases, and the right of individuals to the use of the road, and liability of the town commences. This opening should be by some act sufficiently open and notorious, to apprise the persons interested of their duties, rights, and liabilities; and the present case calls on us to decide what is the evidence of such opening. In order to do this it may be proper to examine briefly the several acts which have been passed on that subject, and the history of legislation on this particular branch of law.

By the general statute of 1797, all roads within the towns were to be laid out by the select-men, or, on their neglect, by a committee appointed by the county court; but there was no provision for laying out a road through more towns than one. Hence applications were repeatedly made to the legislature, when a road was wanted through several towns, and they usually by a special act appointed a committee for that purpose, and prescribed their duties in the act; but no provision was made, either by the general or special acts, for opening the roads. The consequence was, that when the towns or the select-men were adverse or unfriendly to the road laid out by the committee from the legislature, they neglected either to make or open the road, and thus rendered nugatory the proceedings of the committee. In 1806, an act was passed making it the duty of the select-men to open a road laid by a committee appointed by the county court, or by the legislature, within one year, and subjected them to a penalty of five dollars a month for neglect. This act was found to be insufficient, and in 1818, another act was passed still continuing this duty upon the select-men, and, in case of their neglect to perform the same, subjected the inhabitants of the town to a penalty of thirty dollars a month for each month the select-men should so neglect. In 1821 the towns were made liable to an indictment for not making and opening a road laid out by a committee, and, on conviction, subjected to a fine equal to the whole expense of making the road, to be laid out under the direction of a committee appointed by the court where the conviction was had. In 1826,

that part of the law which imposed the fine of thirty dollars on the inhabitants of the town was repealed.

BENNINGTON,
February,
1831.

Patchin
vs.
Morrison.

It will be seen from the history of the legislation on this subject, that after the act passed in 1806, it was the duty of the select-men to open all public roads, and that it occasioned repeated acts of the legislature to enforce the performance of this duty. It seems from another act which was passed, and it is within my recollection that such was the case, that disputes and doubts had arisen as to what was opening a road, and what was the proper evidence thereof; to prevent these disputes and doubts, an act was passed in 1820, requiring the select-men, when they opened any road which had been, or which should be, laid,to cause a certificate thereof, signed by them,or a major part of them,to be forthwith recorded in the town clerk's office, and declaring that the day on which such certificate was recorded should be taken and deemed to be the day of opening such road. This act continued in force until the session of the legislature last fall, (1830,) when upon a digest and revision of all the laws upon the subject of roads, a similar provision was made as to opening roads and recording the certificate thereof, as was made by the act of 1820. The Court consider that the recording of this certificate is the proper evidence of opening a road. It is an act simple, notorious, and well calculated to apprize all of their rights and duties. When this is done, all persons are to take notice of it as the opening of a public road : those duties, rights and liabilities, which arise from the opening of a public road,then commence ; and until this is done, the owner of the soil is not under obligation to remove his fences, nor can individuals intrude thereon as on a highway opened for public use, nor are the towns liable for the insufficiency thereof.

The powers of imagination have been called forth to describe the inconveniences which the traveller might be subject to from this view of the law ; but I apprehend these inconveniences are merely ideal, and have no existence except in the imagination. On the other hand, a different construction of the law would subject both the owner of the soil and the towns to far greater inconveniences and trouble than could possibly happen to the traveller from the view we have taken. These, however, are not considerations which can have much weight with a court whose duty it is to declare, and not make, the law.

It has been urged that the road, which is the subject of controversy in this action, was laid out by road commissioners under the act passed in 1827, and that the act of 1820 is not applicable to

ZZZ

BENNINGTON,
February,
1831.

Patchin
vs.
Morrison.

roads laid out by road commissioners.    An examination of that act, I think, will shew that it required the provision of the act of 1820 to complete the system  contemplated in relation to roads ; that it did not repeal that act, but would have been imperfect without it.    And it is some argument in favor of this, that when the laws in relation to  roads, &c., were digested and revised in 1830, the provisions of the acts of 1820 and 1827 were both preserved.

The law of 1827 gave to the road commissioners all the power which had before been exercised by the committees appointed by the supreme or county courts, and these were the same which had formerly been exercised by committees appointed by the legislature.    By the 4th section, whenever the commissioners laid out a road, they were directed " to make order of the time within which such road shall be made and opened".    Their decision,both as to laying, making and opening the road, and as to the damages, are final and conclusive.    In their order, two things are contemplated, *viz.* that the road shall be made, and that it shall be opened ; and it is in the nature of an adjudication by them, imposing a duty upon the towns or their agents to perform the acts required of them, by the time limited.    This order, however, neither makes nor opens the road, but requires this to be done by the towns, or the select-men, in the same manner that it was to be done before, if the road had been laid by a committee appointed by the supreme or county court, and established by such court. The order does no more than to determine that a road shall be made and opened in the place directed.    For the purpose of making the road, the select-men, or agents appointed by the town for that purpose, are authorized to commence work immediately. They may enter upon the land and do all the work requisite to make the road, doing no unnecessary damage, and doing nothing more than is necessary for building and constructing the bridges and the road.    The owner may still keep it enclosed with his other possessions, and make use of it for any purpose not inconsistent with the exercise of the right of the town before mentioned. When this road is made, so as to be sufficient for public travel, it is then the duty of the select-men to open the same in the manner pointed out by the act of 1820.    When this is done, a public road is opened, which the owner of the soil, the traveller and the towns, must regard as such.

It has been objected to this, that the select-men may refuse to open the road, and thus deprive the public of the benefit of the ad-

judication by the commissioners.   If this be so, and if there is such
a defect in the law, it is not for the court to supply the defect.   In
my mind it is altogether repugnant to every principle which ought
to govern courts of justice, to supply an evident omission in a pub-
lic law by judicial legislation under the pretence of construction.
But it is believed the provisions of the law are sufficient and am-
ple.   The commissioners can compel the towns to make the road :
they can levy and collect of the town a sum sufficient for that
purpose, and cause the same to be expended in making the road
under the direction of a committee appointed by them.   When
the road is made with the money collected of the town, it is not to
be expected that the select-men will neglect or refuse to open the
same.   But if they should so neglect, we think it would be such
a wanton disregard of their duty as would subject them to an in-
dictment at common law for their neglect.

The conclusion to which we arrive is this, that when the com-
missioners establish a road, the towns may immediately make it ;
that it is the duty of the select-men to open the road  when they
think proper ; but when they do open it, they must cause a cer-
tificate thereof to be recorded in the town clerk's office ; that
until the road is opened, the owner of the land may lawfully keep
it enclosed with a fence, and that no one can wantonly throw it
down.   The plaintiff, therefore, had a right to have his fence
around the land on which this road was laid, and the defendant
was not justified in throwing it down.

The judgement of the county court is therefore affirmed.

*Blackmer,* for plaintiff.

*Isham & Smith,* for the defendant.

―――――∞∞∞⊙∞∞―――――

## DAVID McCONNELL *vs.* ASA PIKE.

Where,  on a trial before auditors, one of  the parties introduced a witness who was
·objected to by the adverse party, because he suspected the witness was bail for the
party offering him,  but the. objector could  not show it, and the witness testified,
it was held, that the court ought to have rejected the report.

Auditors should report the grounds of their decision upon every question of law raised
before them, provided they are requested to do so ; and

If they refuse when so requested, that fact may be shown  by affidavit, when the re-
port will be  rejected, and the cause sent back for a full report.

This case came before the Court on objections filed to the re-
port of auditors in an action on *book account.*   The report stated,
that, on the trial before the auditors, the plaintiff offered in evi-

FRANKLIN,
January,
1832.

McConnell
vs.
Pike

dence the deposition of Lemira Abbott; which the defendant objected to on the ground that he had not had reasonable notice of the taking of said deposition. · It appeared that the citation was served on the defendant the same day on which the deposition was taken by the magistrate. The objection was overruled, and the deposition admitted. " The plaintiff then offered one Gregg as a witness. The defendant objected, stating that the witness was interested in the event of the suit. No interest being shown, he was admitted to give evidence. The defendant requested the auditors to state in their report the grounds on which they disallowed the charges on his book for keeping a horse sixteen weeks and two days, amounting to $10,84. The auditors were not satisfied, from any evidence that was introduced, that there was any contract, either expressed or implied, or that the services were rendered for the benefit of the plaintiff." A balance of $3,84 was found due to the plaintiff.

The defendant objected to the report of the auditors for the following reasons :

1. That the auditors allowed the deposition of Lemira Abbott to be read and received as evidence.

2. That the auditors permitted McDaniel Gregg, who was recognized in said suit, to testify as a witness.

3. Because the auditors, though requested, refused to state in their report the grounds on which they disallowed the charges on defendant's book for keeping a horse.

The county court overruled the objections, and accepted the report, and the case was reserved for the opinion of this Court.

After argument by *Hunt & Beardsley* for the defendant, and by *Allen* for the plaintiff,

HUTCHINSON, C. J., *pronounced the opinion of the Court.*— The defendant's counsel, in arguing these exceptions, seemed not fully to bear in mind, that the case comes up before us as by writ of error ; and we can notice nothing but errors that appear of record. The county court rendered judgement for the plaintiff, on the report of the auditors, notwithstanding the exceptions urged against that report by the defendant. The first exception relates to the admission of a deposition. The objections to it were, that the citation was served on the adverse party the same day on which the deposition was taken. Nothing appears about the distance of defendant or witness from the place of caption ;

nor does it appear, that the auditors were requested to report any such facts. Now we cannot decide, that the admission of this deposition was incorrect, unless we consider it impossible that proper notice, for the taking of a deposition, should ever be given on the same day with the taking of the deposition. We cannot so decide. There must be reasonable notice ; and that is all, that the law requires. And frequently, when all concerned live within a few rods of each other, and are not otherwise occupied, an hour's notice may be as beneficial as a longer time. Another exception is, that the auditors did not, when requested, report the grounds of their disallowing some charges of the defendant for keeping a horse three or four months. The reason assigned in their report is, that they were not satisfied from any evidence that was introduced, that there was any contract, either express or implied, or that the services were rendered for the benefit of the plaintiff. It would have been well for the defendant's counsel to have extended their request upon this point, to the reporting of the facts, as well as the grounds of the decision. In that case, it would have been well for the auditors, also, to have been more particular in their report of the facts about the keeping of the horse ; whether the defendant kept him at all ; and, if so, under what circumstances. They might say, if the fact were so, that the defendant kept such a horse, thus and thus; but not at the request of the plaintiff. In short, when thereto requested, the auditors should report what facts are proved before them with the particularity of a special verdict, that the court may see, whether their decision upon those facts be correct ; and if not, decide for the other party without the expense of sending the cause again to auditors. They should, also, inform which items of the accounts they allow, and which they disallow, in words that can be read and understood ; and not merely in uncertain characters. I will here mention, what has often been mentioned in court, but possibly not contained in the printed report of any case, that, if the report of auditors comes in without any such particular statement of facts, (we mean facts, and not the evidence of facts,) and these important to any litigated items,—on affidavits showing this, and showing a request to the auditors to make such special report, the report should be set aside, and recommitted, or the cause sent to new auditors to supply such defect in the report. This should be understood and observed, as a matter of practice ; and exceptions should not be made in court, without attention to make the proper requests before the auditors. Where no such request is

FRANKLIN, January, 1832.

McConnell vs Pike.

FRANKLIN,
January,
1832.

McConnell
vs.
Pike.

made, the auditors need not protract their report with such special details ; but merely follow the statute, by reporting all the items of the accounts of both parties, and stating which items they allow, and which they disallow ; and make the necessary *deductions* ; and report the balance due from either party.

There is a further objection, urged by the defendant, in the present case. It appears by the report, that the plaintiff's counsel offered before the auditors one McDaniel Gragg as a witness. The defendant objected to this witness on the ground of interest. The auditors then say, " no interest being shown, he was admitted to give evidence." On urging this exception before the county court, it appeared of record, that said witness was recognized in the sum of forty dollars in behalf of the plaintiff for the payment of the costs of suit, if he failed to recover. Here was an undoubted interest in the witness, and this apparent upon the record before the county court, but not intimated by any thing upon the rule, that went out to auditors. For this the county court ought to have rejected the report, unless the defendant was out of time in furnishing evidence of this interest. It is said in argument, that the witness was put under the *voir dire*, but did not seem to remember this interest. Of this we can take no notice now. But, whether it were so, or whether the defendant had no reason to suspect the interest, till he saw the record of the recognizance, would not vary the case. The plaintiff must be presumed to know who was his bail ; and his offering such a witness, while recollecting the fact, would be a deception upon the opposite party, and upon the auditors. If he proceeded through forgetfulness of a fact, he was thus bound to know, he must derive no benefit from a decision thus obtained. The county court, after noticing their own records of this recognizance, ought to have rejected the report. Their judgement is, therefore, reversed ; and the cause must be again submitted to auditors to make a report of the accounts to this Court.

The following dissenting opinion of HUTCHINSON, J., ought to have been inserted at the end of the case, *Southwick et al.* vs. *Weeks ;* (see *ante, p.* 49 ;) but having been mislaid at the time that case was printed, it was omitted.

HUTCHINSON, J., considered the return of the defendant conclusive, that he had attached the whole, and not merely half, of the property described in his return.    The creditors had a right so to understand the return of the officer, and conduct themselves accordingly, whether by treating their debt as perfectly secure, or, by seeking any further security in their power.   A case might happen, where the creditor is present, and knows that the property attached by his writ is incumbered with a prior attachment, and there is no other property shown to the officer, that he might attach ;—a mere mistake of the officer in his return in this respect ought not to render him liable beyond the lien created by the attachment.    The creditor, knowing all the circumstances, could sustain no injury.    But, when the officer acts without such knowledge of the creditor, he acts upon his own responsibility, and must be bound by his return.

All that appears in this case, upon the subject, appears by the defendant's return.    That return shows that he attached the whole of the property described in his return.    It does not appear that the creditors knew any thing about the matter, other than what they were informed by the defendant's return ; and he ought not now to be permitted to show, that he attached half only, of that property, when his return shows that he attached the whole of it.

———————————

The following note should have been inserted at the end of.the case, *Southwick, Cannon & Warren* vs. *Merrill, (ante p.* 320,) but having been mislaid, it was omitted when that case was printed.

HUTCHINSON, J., dissented.    He considered the expression, *" debt or other matter   in demand,"* in the statute regulating jurisdictions, to mean all that debt or other matter described in the declaration, which the plaintiff must prove in order to recover any thing.    If he describes a judgement of $500, or $1000, he can prove none of it without he proves the whole.   When, therefore, the judgement exceeds $100, the action must be brought before the county court, however small the sum due may appear by endorsements.    Such had always been the practical construction as far as he had known cases coming within this principle.